UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PRINCIPLE HOMECARE, LLC, MARTON
CARE INC., PROMPT HOME CARE LLC, and
CARE CONNECT CDPAP, INC.,

              Plaintiffs,

    v.

JAMES V. MCDONALD, in his official capacity
as Commissioner of the New York State
Department of Health,

              Defendant.

No. 1:24-cv-7071

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Principle Homecare, LLC, Marton Care Inc., Prompt Home Care LLC, and Care Connect CDPAP, Inc. (collectively, "Plaintiffs"), by and through their attorneys, Gibson, Dunn & Crutcher LLP, allege for their complaint against Defendant James V. McDonald, in his official capacity as Commissioner of the New York State Department of Health ("DOH"), as follows:

## <u>NATURE OF THE ACTION</u>

1.    This action challenges the constitutionality of New York State legislation that, if implemented, will destroy an entire industry and hand all of its economic value to a State-imposed and State-sanctioned private-company monopolist, disrupting services to hundreds of thousands of disabled and chronically ill individuals in the process. This is not hyperbole or conjecture; rather, the statute at issue on its face expressly requires all 600 existing companies that provide "Fiscal Intermediary" services under New York State's Consumer Directed Personal Assistance Program ("CDPAP")—a popular government program that provides New Yorkers who require home healthcare with the freedom to choose who will provide them with such

care—to cease providing services by April 1, 2025.  Thus, hundreds of companies that have

operated in New York for years or decades, including Plaintiffs and many other small and

minority-owned businesses—employing thousands of New Yorkers—will have to shut down.  In

their place, the State will transfer the entire multi-billion-dollar program to a single private

company hand-picked by the Department of Health.

       2.      The State's vehicle for doing so is an amendment to the CDPAP statute (New

York Social Services Law § 365-f).  Under CDPAP, patients requiring home care—whether due

to disability, the chronic effects of aging, or otherwise, and many of whom are non-native-

English speakers—can use Medicaid funds to hire a friend, non-spousal family member, or

trusted confidant to serve as their caregiver.  CDPAP's intent, written into the text of the statute

itself, is "to permit chronically ill and/or physically disabled individuals receiving home care

services under the medical assistance program greater flexibility and freedom of choice in

obtaining such services."

       3.      The emergence of CDPAP constituted a significant advancement in the delivery

of personal care services for patients who needed it the most.  Individuals with severe

disabilities, chronic illnesses, or who are otherwise unable to bathe, get dressed, or move around

without assistance are now able to be cared for at home and by a personal care assistant of their

choice, often a family member or longtime friend whom they know and trust.  But because the

patient employs the caregiver directly, this structure triggers various legal and regulatory

requirements—e.g., wage and benefit processing, tax withholding, personnel recordkeeping, and

compliance with DOH program requirements—that individual patients are ill-suited to handle

themselves.  Thus, as their title suggests, Fiscal Intermediaries currently operating across New

York State serve as contractual "intermediaries" who fill the void by providing these critical

administrative, financial, and compliance services and thereby enable over 280,000 care

recipients to focus on their treatment and recovery—instead of CDPAP's complex regulatory

requirements, and the associated and equally complicated administration of relevant

employment, tax, and related obligations.  The CDPAP program is a public-health success story

that has helped hundreds of thousands of individuals receive the care they need.

4.      An entire ecosystem of Fiscal Intermediaries has grown over the past three

decades, servicing hundreds of thousands of care recipients and the personal care assistants they

employ.  Over time, different Fiscal Intermediaries have developed geographic specializations,

cultural competencies in identified ethnic populations, and language-specific expertise, as well as

longstanding relationships with care providers and care recipients, that cannot simply be

transferred to or replaced by a single statewide mega-Fiscal Intermediary.  Because home

healthcare is an increasingly popular option—due to the benefits for disabled or chronically ill

individuals of being cared for at home, by a trusted personal care provider of their choice, in the

language of their choice, and supported by Medicaid—and because Fiscal Intermediaries are

making it more seamless to employ a home personal care assistant, and provide an exceptional

level of service, flexibility, and specialization, the program has grown dramatically over the

years—from approximately 1,000 care recipients in the entire State in 1999 to the current

population of over 280,000.

5.      The benefits that flow from robust market choice—and that are destroyed by the

imposition of a single statewide Fiscal Intermediary—are foundational as a matter of market

economics.  With respect to CDPAP specifically, they include freedom of choice for

participating consumers, greater responsiveness to consumer preferences and requests,

attentiveness and expertise regarding the individualized needs of New York's many diverse

communities, and specialization and differentiation in the marketplace to meet varying consumer needs.

6.      Despite the program's success and popularity, on April 20, 2024, New York Governor Kathy Hochul signed into law the New York State Budget for State Fiscal Year 2024-25.  The budget included an amendment to CDPAP (the "CDPAP Amendment") that eliminates the entire existing network of Fiscal Intermediaries in favor of a single, statewide fiscal intermediary (the "Statewide Fiscal Intermediary") to be hand-selected by the State through an opaque, DOH-run procurement process.  That process will give a single company a contract for the entire CDPAP program, yet it will not be subject to normal oversight by the State Comptroller.

7.      Prior to voting on the budget, Assembly members raised myriad concerns about the hasty shift to a Statewide Fiscal Intermediary, including the lack of sufficient studies, the potential negative implications for consumer choice, the lack of any record of problems with the current Fiscal Intermediaries that would justify it, the inability of one entity to provide an adequate degree of cultural competency, and concerns that the CDPAP Amendment would increase the State's expenditures on administrative costs.  Indeed, the State did not conduct any economic impact studies or any impact study on the delivery of services to the community that receives CDPAP services before rushing this drastic amendment through the legislative budget process.  As Assemblymen Ed Ra and Josh Jensen wrote in a joint statement, the CDPAP Amendment is a "radical proposal negotiated in secret without the involvement of the people served by this important program and passed without a plan to ensure continuity of care."

8.      The State nevertheless enacted the CDPAP Amendment, which creates a State-sponsored monopoly that will put the entire Fiscal Intermediary industry of over 600 companies

out of business.  The CDPAP Amendment, moreover, imposes an arbitrary and utterly irrational limitation on the eligibility criteria for the new Statewide Fiscal Intermediary that eliminated most of the otherwise-qualified Fiscal Intermediaries from consideration before bids were even submitted.  In order even to *compete* for the one available contract, a bidder had to have been "providing services as a fiscal intermediary on a statewide basis with at least one *other state*" as of April 1, 2024.[1]  That is, the State put its thumb on the scale and materially limited the pool of potential bidders eligible for this sweetheart deal by requiring statewide *out-of-state* experience and thereby categorically excluding from consideration the many Fiscal Intermediaries with relevant *in-state* experience—including in-state Fiscal Intermediaries with specialized experience serving discrete (and oftentimes vulnerable) subgroups within New York's diverse communities.

9.      This sweeping amendment will also lead to mass job loss and disrupt care for a large community of chronically ill and disabled New Yorkers who desperately depend on these Fiscal Intermediaries to help them manage the administrative responsibilities associated with participation in the program.  Hastily pushed through the legislative process and enacted under the guise of reducing waste, fraud, and abuse—but without any study, record, or factual basis demonstrating these purported ills, and against the backdrop of recent Office of Medicaid Inspector General audits that revealed a *99% accuracy rate* in submitted claims—this law runs roughshod over the hundreds of private entities whose contracts and businesses will be eviscerated in the process, without advancing any public benefit.

10.     The transition to a Statewide Fiscal Intermediary will reduce the quality of fiscal intermediary services by artificially limiting competition, while simultaneously creating a massive windfall for the one handpicked out-of-state operator who will get a blank check to run

---

[1] N.Y. Soc. Serv. Law § 365-f(4-a)(a)(iii)(b)(i)(B) (emphasis added).

the State's entire multi-billion-dollar Fiscal Intermediary industry as a State-sanctioned monopolist.  This will inevitably result in budgetary bloat, lack of innovation, an absence of specialization, and inefficiencies at every turn.

11.     The CDPAP Amendment not only wipes out Plaintiffs and every other existing Fiscal Intermediary (but one) to the detriment of hundreds of thousands of care recipients, but also infringes Plaintiffs' and hundreds of other Fiscal Intermediaries' rights under the United States Constitution.  The amendment constitutes a substantial impairment of existing contracts in violation of the Contracts Clause; effects a taking of private property without just compensation (indeed, without any compensation) in violation of the Takings Clause; treats similarly situated and equally qualified Fiscal Intermediaries unequally based on an irrational characteristic in violation of the Equal Protection Clause; and is arbitrary and irrational in violation of the Due Process Clause.

12.     Plaintiffs here are all small Fiscal Intermediary businesses with specialized cultural and linguistic competencies that provide lifelines to vulnerable New Yorkers across the State.  Because these Plaintiffs and their teams of hardworking employees stand to lose everything if the transition to a single Statewide Fiscal Intermediary is allowed to take effect on April 1, 2025, they bring this action for declaratory and injunctive relief, both facially and as applied to Plaintiffs, to prevent Defendant and his successors from enforcing the CDPAP Amendment.

## PARTIES

13.     Plaintiff Principle Homecare, LLC ("Principle Homecare") is a limited liability company organized under the laws of the State of New York.  Founded in 2015, Principle Homecare currently provides fiscal intermediary services to over 200 CDPAP patients throughout New York State, including, but not limited to, Manhattan, the Bronx, and Dutchess,

Orange, Putnam, Rockland, and Westchester Counties.  Principle Homecare's principal place of business is in the Bronx, New York.

14.    Plaintiff Marton Care Inc. ("Marton Care") is a domestic business corporation organized under the laws of the State of New York.  Founded in 2017, Marton Care currently provides fiscal intermediary services to approximately 120 CDPAP patients throughout New York State, including, but not limited to, all five boroughs of New York City.  Marton Care's principal place of business is in Brooklyn, New York.

15.    Plaintiff Prompt Home Care LLC ("Prompt Home Care") is a limited liability company organized under the laws of the State of New York.  Founded in 2017, Prompt Home Care currently provides fiscal intermediary services to over 700 CDPAP patients throughout New York State, including, but not limited to, all five boroughs of New York City, as well as Westchester County.  Prompt Home Care's principal place of business is in the Bronx, New York.

16.    Plaintiff Care Connect CDPAP, Inc. ("Care Connect") is a domestic business corporation organized under the laws of the State of New York.  Founded in 2016, Care Connect currently provides fiscal intermediary services to approximately 500 patients throughout New York State, including, but not limited to, all five boroughs of New York City, as well as Westchester County.  Care Connect's principal place of business is in Brooklyn, New York.

17.    Defendant James V. McDonald is the Commissioner of the New York State Department of Health and is responsible for the administration and enforcement of the CDPAP Amendment.  Defendant maintains his principal office at DOH's headquarters, which are located at Corning Tower, Empire State Plaza, Albany, New York 12237.  He is named in his official capacity.

## JURISDICTION AND VENUE

18.     This action is brought under 42 U.S.C. § 1983, which provides Plaintiffs with a

private right of action to redress the deprivation of rights, privileges, or immunities secured by

the Constitution and laws of the United States, in particular, as alleged herein:

  a.   the Contracts Clause, U.S. Const. art. I, § 10, cl. 1;

  b.   the Takings Clause of the Fifth Amendment, incorporated against the States
       by the Fourteenth Amendment;

  c.   the Equal Protection Clause of the Fourteenth Amendment; and

  d.   the Due Process Clause of the Fourteenth Amendment.

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

20.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims

occurred, and will continue to occur, in this district, and because a substantial part of the

property that is the subject of this action is situated in this district.

## FACTUAL ALLEGATIONS

### I.     The Consumer Directed Personal Assistance Program

21.     CDPAP is a Medicaid-funded government program, formally launched in 1995,

that revolutionized home care services in New York—that is, personal care services provided at

the care recipient's home by a dedicated caregiver.

22.     Medicaid is a federal program that subsidizes the states' provision of medical

services to "families with dependent children and of aged, blind, or disabled individuals, whose

income and resources are insufficient to meet the costs of necessary medical services." Under

Medicaid, the federal government provides funds to the states, which the states then use (along

with state funds) to fund patient care.

23.     New York participates in Medicaid and provides personal care services as an optional state Medicaid plan service pursuant to Section 1905(a)(24) of the Social Security Act. New York's Medicaid plan includes two options for eligible Medicaid beneficiaries who choose to receive personal care services.

24.     Under the first option, which is not at issue here, personal care services may be provided "by individuals who are qualified to provide such services, who are supervised by a registered nurse and who are not members of the recipient's family, and furnished in the recipient's home or other location."[2]  In that scenario, "[t]he home care agency is responsible for hiring, training, supervising and providing the home care worker with salary and benefits."[3]

25.     The second option is CDPAP, pursuant to which an individual directly hires a care provider (referred to in the statute as a "personal assistant") to provide home care services. Patients participating in CDPAP (referred to in the statute as "consumers") are responsible for recruiting, hiring, training, and supervising their aides.

26.     The express intent of the CDPAP statute is "to permit chronically ill and/or physically disabled individuals receiving home care services under the medical assistance program greater flexibility and freedom of choice in obtaining such services."[4]  CDPAP operates by providing patients with an individual budget, funded by Medicaid, that can be used to hire and pay their personal assistants.

27.     CDPAP personal assistants—in contrast to those employed through the licensed home care agency option—are permitted to be non-spousal members of the recipient's family.

---

[2] New York State Medicaid Plan, Attachment 3.1-A, Supplement New York 3(d)(A).
[3] New York State Medicaid Plan, Attachment 3.1-A, Supplement New York 3(d)(i).
[4] N.Y. Soc. Serv. Law § 365-f(1).

This was intentional:  It was understood that many of the vulnerable individuals who are eligible for home care services would prefer and benefit from being cared for by someone they already know, trust, and are comfortable with, and that a family member would often be the preferred option from the care recipient's perspective.  And it was understood that these ideal caregivers would generally not be in the financial position to sacrifice other job opportunities in order to provide these critical services—including helping care recipients with toileting, bathing, and other daily activities—unless the care providers receive sufficient financial remuneration for doing so.

28.     The emergence of CDPAP constituted a significant advancement in the delivery of personal care services for patients who needed it the most.

29.     In 1992, DOH began managing home healthcare with its launch of an early iteration of CDPAP, the Patient Managed Home Care Program.  Because this 1992 program was not mandatory, however, the goal of expanding consumer-directed care was not fully realized until the launch of CDPAP in 1995.

30.     CDPAP optimizes care and facilitates a safer experience for patients by eliminating the insecurity associated with letting an unfamiliar caregiver into a patient's home. Since its inception, CDPAP has proven to be a resounding success.  By 2002, over 75% of county Medicaid offices in New York State offered CDPAP services.  Since late 2012, CDPAP has been included as an option in all mainstream Managed Care and Managed Long Term Care Medicaid benefit packages.  Indeed, for a period of time, DOH was so supportive of CDPAP that it required managed care plans to offer it as an option to beneficiaries.

31.     In 1999, the program included in the neighborhood of 1,000 participants.  Today, CDPAP is an incredibly popular program with an estimated 280,000 New Yorkers enrolled in

the program and over 600 Fiscal Intermediaries operating across New York.

32.    CDPAP's success is in significant part due to the affirmative steps the State has taken to expand the program's reach.  In 2016, the State took an important step in widening CDPAP's appeal by expanding eligibility for service as a personal assistant.[5]  For example, the expanded eligibility requirements allowed parents of adult children with disabilities to serve as personal assistants, such that parents can provide care for their disabled children without sacrificing the ability to earn a paycheck.  Patients are empowered to control their care by "recruiting, hiring, and supervising" personal assistants of their choice to help them with toileting, bathing, and other daily activities.  In turn, CDPAP has provided personal assistants with the opportunity to receive a living wage and benefits like paid time off.  Indeed, DOH has directly monitored wage levels and the legislature has, over time, mandated increased wages and benefits for CDPAP personal assistants.[6]

33.    Compared to typical home care aides, personal assistants who are selected by the consumer are better positioned to establish continuity of care, encourage health and lifestyle changes, and identify health risks.  CDPAP also allows personal assistants to perform certain health services, like administering medications, that ordinarily can only be performed by a nurse or certified home health aide.[7]

34.    The consumer and the personal assistant are responsible for setting up and agreeing upon the terms of employment.

35.    The CDPAP statute, as amended, is codified in the New York Social Services

---

[5] *Clarification to the New Law in Relation to the Consumer Directed Personal Assistance Program (CDPAP)*, N.Y. St. Dep't of Health, https://www.health.ny.gov/health_care/medicaid/redesign/mrt90/docs/cdpap_clarification.pdf (last updated June 2016).

[6] *See* N.Y. Pub. Health Law § 3614-f (2023); N.Y. Dep't of Health, *Home Care Worker Minimum Wage Guidance* 2–3 (Dec. 13, 2023), https://www.health.ny.gov/health_care/medicaid/redesign/mrt61/docs/2023-12-13_hcw_min_wage_webinar.pdf.

[7] 18 N.Y.C.R.R. § 505.28(b)(3).

Law, Chapter 55, Article 5, Title 11, Section 365-f.  The DOH implementing regulations for the program are published at 18 N.Y.C.R.R. § 505.28.

## II.    Fiscal Intermediaries

36.    Although CDPAP empowered consumers to manage their home care needs, that expanded autonomy also meant that consumers would be tasked with handling the various administrative, financial, and compliance responsibilities associated with receiving home care under the program.  A diverse network of Fiscal Intermediaries emerged to manage those responsibilities on behalf of consumers.[8]

37.    Fiscal Intermediaries are "entit[ies] that provide[] fiscal intermediary services."[9]

38.    "Fiscal intermediary services," in turn, encompass a wide range of statutorily enumerated services that are "performed on behalf of the consumer," including:

    a.  "wage and benefit processing for consumer directed personal assistants";

    b.  "processing all income tax and other required wage withholdings";

    c.  "complying with workers' compensation, disability and unemployment requirements";

    d.  "maintaining personnel records for each consumer directed personal assistant, including time records and other documentation needed for wages and benefit processing and a copy of the medical documentation required pursuant to regulations established by the commissioner";

    e.   "ensuring that the health status of each consumer directed personal assistant is assessed prior to service delivery pursuant to regulations issued by the commissioner";

    f.  "maintaining records of service authorizations or

---

[8] *New York by the Numbers: Monthly Economic and Fiscal Outlook*, N.Y.C. Comptroller Brad Lander, https://comptroller.nyc.gov/wp-content/uploads/documents/Monthly-No.-84-Dec.-2023.pdf.
[9] N.Y. Soc. Serv. Law § 365-f (McKinney 2022) (pre-amendment).

reauthorizations";

g.  "monitoring the consumer's or, if applicable, the designated
representative's continuing ability to fulfill the consumer's
responsibilities under the program and promptly notifying the
authorizing entity of any circumstance that may affect the
consumer's or, if applicable, the designated representative's
ability to fulfill such responsibilities";

h.  "complying with regulations established by the commissioner
specifying the responsibilities of fiscal intermediaries
providing services under [CDPAP]";

i.  "entering into a department approved memorandum of
understanding with the consumer that describes the parties'
responsibilities under this program"; and

j.  "other related responsibilities which may include, as
determined by the commissioner, assisting consumers to
perform the consumers' responsibilities under this section and
department regulations in a manner that does not infringe upon
the consumer's responsibilities and self-direction."[10]

39.      Fiscal Intermediaries fill a critical gap that would otherwise exist in the CDPAP

program.  Outside the CDPAP context, home care aides are employed by the home care agencies

that manage the patients' care, meaning that the agencies handle all of the employment-related

responsibilities.  But under CDPAP, patients employ their caregivers directly—with the Fiscal

Intermediaries stepping in to manage the associated responsibilities that the patients are not in a

position to handle themselves, such as "setting wage levels and fringe benefits, including health

insurance coverage and other benefits, e.g. unemployment and workers compensation."[11]

40.      Fiscal Intermediaries are responsible for creating significant job growth in New

---

[10] N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii).
[11] New York State Medicaid Plan, Attachment 3.1-A, Supplement New York 3(d)(i).

York.[12]  Currently, approximately 300,000 people work as personal assistants in the State through CDPAP, with much of the growth occurring as a result of the COVID-19 pandemic when it became difficult and in some cases impossible to find home care services through more traditional providers.

41.     Just as consumers have the right to choose a personal assistant, consumers also have the right to choose a Fiscal Intermediary.

42.     Individuals in New York receiving personal care services through CDPAP can choose from over 600 Fiscal Intermediaries.  The breadth of service providers has allowed CDPAP to meet the diverse needs of New Yorkers, including those from specific geographic, racial, and ethnic communities.

43.     Many Fiscal Intermediaries, for example, have structured their operations and outreach to serve particular geographic, linguistic, racial, and ethnic communities, many of which have historically experienced difficulty navigating the healthcare system.  Plaintiff Prompt Home Care, for instance, primarily serves the Dominican community in the Bronx, while Plaintiff Principle Homecare provides fiscal intermediary services to the State's Chinese-, Haitian-Creole-, Korean-, and Spanish-speaking communities, among others.

44.     Fiscal Intermediaries play a critical role in CDPAP's success, as they perform services "on behalf of the consumer to facilitate the consumer's role as the employer."[13]

45.     And, as Assemblywoman Mary Beth Walsh noted during legislative discussion of the CDPAP Amendment, Fiscal Intermediaries do "a lot more than payroll."[14]

---

[12] David Belkin, *Past as Prologue: Revised Histories and Extraordinary Trends in the New York City Economy*, N.Y.C. Indep. Budget Off. (May 2019), https://ibo.nyc.ny.us/iboreports/past-as-prologue-revised-histories-and-extraordinary-trends-in-the-new-york-city-economy-may-2019.pdf.
[13] N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii).
[14] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 100 (N.Y. Apr. 19, 2024) (Assemb. Mary Beth Walsh).

46.     For example, Fiscal Intermediaries provide consumers with guidance on how to find and retain personal assistants, in addition to assisting with personal assistant onboarding. They play an active role in assessing the eligibility of current and prospective personal assistants to provide care under CDPAP, including arranging for and bearing the cost of initial and annual health assessments.  They also support consumers by assisting with insurance-related issues and transportation needs.  Fiscal Intermediaries also help patients by serving as subject-matter experts on the laws and regulations governing CDPAP's numerous compliance requirements.

47.     But providing these services to consumers comes at significant expense to the Fiscal Intermediaries, who are required to develop and maintain key business infrastructure—including, but not limited to, staff, supplies, information technology systems, and office space—to ensure that their financial, administrative, and regulatory responsibilities are properly discharged in accordance with the statute's requirements.  Fiscal Intermediaries, like Plaintiffs here, have made substantial investments in their businesses on the reasonable expectation that they would be able to recoup and profit to a reasonable degree as a result.

48.     Fiscal Intermediaries are reimbursed in one of two ways, depending on whether the consumer is enrolled in Medicaid Managed Care ("MMC") or Fee-For-Service ("FFS") Medicaid.

49.     Under MMC Medicaid, Fiscal Intermediaries are paid by Medicaid managed care organizations ("MMCOs")—private companies that contract with states to provide healthcare services to Medicaid beneficiaries.  MMCOs are compensated through contracts that they enter into with the State.[15]  Fiscal Intermediary reimbursement rates under MMCO Medicaid have historically been based on a single hourly rate that encompasses *both* administrative and direct

---

[15] N.Y. Soc. Serv. Law § 364-j(18).

care costs negotiated between MMCOs and Fiscal Intermediaries.  Shortly after the CDPAP

Amendment was enacted, however, DOH adopted a new methodology as of August 1, 2024, that

replaced these all-inclusive reimbursement rates with a bifurcated structure: a negotiated rate for

*direct care costs*, and a separate fixed, three-tiered rate for *administrative* costs calculated on a

per customer per month basis, based on hours of service received by the consumer.[16]  This is

largely the same as the administrative rate structure used in FFS Medicaid, described below.[17]

      50.    Under FFS Medicaid, Fiscal Intermediaries enter into contracts with counties,

referred to in the statute as "local social service districts," for the provision of fiscal intermediary

services.  Local social service districts are authorized to assess, develop, and authorize the plan

of care for individuals entering the CDPAP program.[18]  Although "[m]ost Medicaid recipients

are required and some recipients may elect to receive health services from a Medicaid managed

care organization,"[19] certain individuals are "exempt from enrollment."[20]  Fiscal Intermediaries

may provide services to those individuals by contracting directly with a local social service

district, helping to ensure that eligible individuals can receive care.

      51.    Under FFS Medicaid, DOH reimburses Fiscal Intermediaries for the direct cost of

care calculated according to a rate methodology set forth in 18 N.Y.C.R.R. § 505.14(h).  DOH

also pays Fiscal Intermediaries for their administrative costs under a three-tier fee schedule set

forth in 18 N.Y.C.R.R. § 505.28(k)(3).

      52.    As such, Fiscal Intermediaries enter into voluntary contracts with both MMCOs

---

[16] New York State Medicaid Update - May 2024 Volume 40 - Number 5,
https://health.ny.gov/health_care/medicaid/program/update/2024/no05_2024-05.htm.
[17] In FFS Medicaid, however, the administrative component is based on a consumer's *authorized* hours rather than
the hours of service *received* by the consumer.  *See* 18 N.Y.C.R.R. § 505.28(k)(3).
[18] *See* 18 N.Y.C.R.R. § 505.28.
[19] 18 N.Y.C.R.R. § 360-10.1(a); N.Y Soc. Serv. Law § 364-j(3)(a).
[20] 18 N.Y.C.R.R. § 360-10.5(c); N.Y Soc. Serv. Law § 364-j(3)(e).  Similarly, if permitted by the commissioner, a
local social service district can seek an exemption from implementing managed care programs where "the district
has insufficient capacity to participate in the program."  N.Y Soc. Serv. Law § 364-j(2)(b).

(public and private) and local social service districts to provide certain services on behalf of the consumer, to facilitate the consumer's role as the employer of a personal assistant. These contracts are generally based on the same standard form template and, as relevant here, contain the same material terms.

53.    These Fiscal Intermediary-MMCO contracts generally have one-year terms that automatically renew absent termination. Although they typically allow the parties to terminate without cause upon a certain notice period (shortened in the event of a breach), as a practical matter, these contracts remain in effect for extended periods given the automatic renewal provisions and longstanding business relationships between Fiscal Intermediaries and their MMCO counterparties.

54.    These contracts between Fiscal Intermediaries and MMCOs also terminate automatically in the event of misconduct by either party—that is, if either party is "excluded, suspended, or barred from participating in any government health care program." Similarly, under the statute, DOH is permitted to "terminate a fiscal intermediary's contract . . . or suspend or limit the fiscal intermediary's rights and privileges under the contract" if an Fiscal Intermediary "failed to comply with the provisions of [the statute] or regulations."[21] The statute also allows for "terminat[ion]" and "suspen[sion]" of the Fiscal Intermediary's rights upon a determination that the "public health or safety would be imminently endangered by the continued operation of actions of the fiscal intermediary."[22]

55.    There are also important requirements that protect the integrity of the program. For example, the current regulatory regime encourages Fiscal Intermediaries to weed out misconduct like the submission of inaccurate timesheets by subjecting Fiscal Intermediaries to

---

[21] N.Y. Soc. Serv. Law § 365-f (McKinney 2022) (pre-amendment).
[22] *Id.* (pre-amendment).

overpayment liability for submitting false claims to the Medicaid program.

56.    The Fiscal Intermediaries' contracts also protect against fraud.  For example, the contracts between Fiscal Intermediaries and MMCOs require Fiscal Intermediaries to certify that all data directly or indirectly reported or submitted to MMCOs are accurate, complete, and truthful; forgo claiming payment in any form, directly or indirectly, from a federal health care program for items or services covered under the contracts; and comply with laws designed to prevent or ameliorate fraud, waste, and abuse, including applicable provisions of federal criminal law, the False Claims Act, and the Social Security Act's anti-kickback provision.  In 2022, New York's Medicaid Inspector General finalized two audits of CDPAP by reviewing a claims universe of over $37 million.[23]  It reported a "99 percent claiming accuracy."[24]

57.    The contracts also require Fiscal Intermediaries to check staff, employees, and personal assistants against a government-curated "Excluded Provider List" on a monthly basis.

## III.    The CDPAP Amendment

58.    Despite CDPAP's success and popularity in providing important services to care recipients, and the critical role it serves for vulnerable populations, the State has now enacted legislation that in one fell swoop will eliminate the entire industry of over 600 Fiscal Intermediaries—many of whom have spent years and invested significant amounts of money building their businesses, customer bases, expertise, and relationships with consumers—and instead hand the entire multi-billion-dollar New York State CDPAP industry, via a single contract, to a single, DOH-selected Statewide Fiscal Intermediary.  This dramatic and sudden destruction of an entire industry, and its replacement by a State-selected, State-sanctioned, and

---

[23] *Annual Report*, Off. of the Medicaid Inspector Gen. (2022),
https://omig.ny.gov/media/84601/download?attachment.
[24] *Id.*

State-sponsored monopoly, has no rational justification. It will, moreover, have drastic negative effects for CDPAP consumers and caregivers alike, without providing any benefit to the State or those populations. And, by virtue of the requirements of the single Statewide Fiscal Intermediary law, most otherwise-eligible New York Fiscal Intermediaries were categorically excluded from consideration for the statewide contract.

59.    On April 20, 2024, the Governor approved the New York State Budget for State Fiscal Year 2024-25, which included the CDPAP Amendment.

60.    Put simply, the CDPAP Amendment altogether obliterates the Fiscal Intermediary industry—and Plaintiffs' contracts and businesses—and replaces it with a State-sponsored monopoly.

61.    Specifically, the CDPAP Amendment added a new provision, § 365-f(4-a-1)(a), pursuant to which, as of April 1, 2025, "no entity shall provide, directly or through contract, fiscal intermediary services" as part of CDPAP "[e]xcept for the [Statewide FI] and its subcontractors."

62.    The CDPAP Amendment requires that an eligible bidder for the Statewide Fiscal Intermediary contract must, "[a]s of April 1, 2024, [be] providing services as a fiscal intermediary on a statewide basis with at least one other state."[25]

63.    After being selected, the Statewide Fiscal Intermediary must subcontract to facilitate the delivery of fiscal intermediary services with at least one entity per rate setting region with a proven record of delivering services to individuals with disabilities and the senior population.[26] The subcontractor must have been providing fiscal intermediary services since January 1, 2012, and must provide any delegated fiscal intermediary services with cultural and

---

[25] N.Y. Soc. Serv. Law § 365-f(4-a)(b)(i)(B).
[26] N.Y. Soc. Serv. Law § 365 f(4-a)(a)(ii-b).

linguistic competency specific to the population of consumers and those of the available workforce.[27]  The CDPAP Amendment also requires that the Statewide Fiscal Intermediary subcontract to facilitate the delivery of fiscal intermediary services "to an entity that is a service center for independent living" that has been providing fiscal intermediary services since January 1, 2024 or earlier.[28]  Service Centers for Independent Living ("ILCs") are "community based non-residential program designed to promote independent living for persons with disabilities."[29]  Early versions of the CDPAP Amendment proposed prohibiting ILCs from providing fiscal intermediary services.[30]  However, after intense lobbying from various interest groups, the final iteration of the CDPAP Amendment carved out an exception for ILCs—but not Fiscal Intermediaries.

64.    The CDPAP Amendment is devastating for existing Fiscal Intermediaries such as Plaintiffs, as it completely nullifies their contracts with MMCOs and local social service districts and categorically excludes them from the industry.

65.    For Fiscal Intermediaries (like Plaintiffs) that have no non-CDPAP operations, this change eliminates their businesses altogether.

66.    The Governor has embarked on a full-throated campaign against Fiscal Intermediaries and the CDPAP program, lobbing a series of unsubstantiated claims of fraud, waste, and abuse in the process that appear designed to create and prop up an (unsubstantiated and counterfactual) justification for destroying the existing Fiscal Intermediary industry and replacing it with a State-created monopolist.  As one recent news report observed, the Governor

---

[27] *Id.*
[28] *Id.*
[29] N.Y. Educ. Law § 1121.
[30] *NYAIL Urges the State to Preserve the Role of Independent Living Centers*, N.Y. Ass'n on Indep. Living (Feb. 26, 2024), https://ilny.us/images/Documents/Advocacy/NYAIL_statement_on_CDPAP_2.26.24.pdf.

"has been incredibly critical of CDPAP, calling it a 'racket' and 'one of the most abused programs in the entire history of the state of New York,'" even though "2022 audits by the state's Medicaid Inspector General reviewed $37 million in claims—and found that 99 percent were accurate" and virtually all documented overpayments were later recollected.[31]

67.     Noting that the Governor's attacks on CDPAP were unfounded, community organizations criticized the Governor, noting that those allegations constituted "inaccurate, gross misrepresentation[s]" of CDPAP and that the Governor's pejorative-laced use of the term "racket" was "insulting the people with disabilities who rely on the program, home care workers, and the Fiscal Intermediaries who administer the program."[32]

68.     Without drawing any specific connection between the Fiscal Intermediaries and unsubstantiated allegations of "waste and abuse," and without substantiation, the Governor claimed that the CDPAP Amendment would "save us $500 million every single year, and allow us to start putting controls and guardrails in place for what has historically been a very under regulated program."[33]

69.     But the purported protections against waste and abuse never materialized.  If anything, the CDPAP Amendment *weakens* fraud protections by excluding the selection of the Statewide Fiscal Intermediary from State Comptroller review and oversight—a function the Comptroller typically performs when, as here, the value of a State agency contract exceeds $50,000.[34]  The Comptroller "promotes fair competition," "detects fraud and waste before tax

---

[31] Julia Métraux, *Disability Advocates Fear New York Will Gut a Key Home Care Program*, Mother Jones (Aug. 13, 2024), https://www.motherjones.com/politics/2024/08/disability-advocates-new-york-cdpap-hochul-home-care-fi/.
[32] Press Release, *CDPA is a Way of Life, Not a Racket!*, N.Y. Ass'n on Indep. Living (July 29, 2024), https://ilny.us/press-releases/577-cdpap-july-press-release.
[33] *Video, Audio, Photos & Rush Transcript: Governor Hochul Announces Agreement on FY 2025 State Budget*, N.Y. St. Governor (Apr. 15, 2024), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-announces-agreement-fy-2025-state-budget.
[34] *See Comptroller's Oversight of State Contracts*, Off. of the N.Y. St. Comptroller, https://www.osc.ny.gov/state-agencies/contracts/oversight (last accessed Sept. 3, 2024).

dollars are spent," and "adds transparency to the process" of reviewing contracts awarded by the State.[35]

70.     Nor was the elimination of virtually all existing Fiscal Intermediaries a necessary means of achieving any purported antifraud goals; plenty of protections against fraud already exist.  Both the New York State Office of Medicaid Inspector General and Medicaid Fraud Control Unit can and do investigate purported Medicaid fraud and pursue appropriate remedies. Ironically, as noted above, the Office of Medicaid Inspector General's 2022 audits revealed a *99% accuracy rate* in submitted claims.[36]

71.     The benefits that flow from robust market competition—and that are destroyed by the transition to a single Statewide Fiscal Intermediary—are foundational as a matter of market economics.  With respect to CDPAP specifically, they include freedom of choice for participating consumers; greater responsiveness to customer needs, requests, and inquiries; responsiveness to the specialized needs of New York's many diverse communities; specialization and differentiation in the marketplace to meet varying consumer preferences and demands; and increased consumer awareness about the availability of the CDPAP program through Fiscal Intermediary-specific advertising.  Moreover, as one opponent of the amendment noted during the floor vote, the shift to a Statewide Fiscal Intermediary might actually cause "costs [to] increase" due to the increased burden of debts and other obligations falling on a single company.[37]

---

[35] *Id.*
[36]  Office of the Medicaid Inspector General, Annual Report (2022), https://omig.ny.gov/media/84601/download?attachment.
[37] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 87–88 (N.Y. Apr. 19, 2024) (Assemb. Josh Jensen) (noting that "if you're going to have hiring [of] all of the personal assistants for the CD[PAP] program through the one [Fiscal Intermediary] and they're gonna be responsible for paying it all, that . . . could incur huge, ginormous debts and obligations, you know, up to $2.2 billion just for the health insurance alone for the number of personal assistants that are currently employed through the CDPAP program.  So is there a concern that

72.     Prior to voting on the budget, assemblymembers raised myriad concerns about the hasty implementation of the shift to a Statewide Fiscal Intermediary, including the lack of sufficient studies,[38] the potential negative implications for consumer choice,[39] the lack of a record of Fiscal Intermediary fraud and abuse,[40] the inability of one organization to provide an adequate degree of cultural competency,[41] and concerns that the CDPAP Amendment would increase the State's expenditures on administrative costs.[42]

73.     The State did not conduct *any* economic impact studies or any "impact study on the delivery of services to the disabled and elderly community that receives CDPAP services" before rushing this drastic amendment through the legislative budget process.[43]

74.     Assemblymen Ed Ra and Josh Jensen wrote in a joint statement that, "[r]ather than involve stakeholders in making common-sense reforms that would make the program more efficient and effective, save dollars, and eliminate the bad actors taking advantage of the CDPAP program, the state will seemingly move forward with a radical proposal negotiated in secret without the involvement of the people served by this important program and passed without a plan to ensure continuity of care."[44]

75.     When asked whether the State Attorney General or the Office of Medicaid Inspector General had ever "gone after any of the bad actors for perpetrating fraud or abuse," the

---

while we're trying to save money and reduce the scope, that we may reduce the scope but actually see the costs increase?").

[38] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 90–91, 105–06 (N.Y. Apr. 19, 2024) (Assembs. Mary Beth Walsh & Josh Jensen).

[39] *Id.* at 71–72 (Assemb. Ed Ra).

[40] *Id.* at 86 (Assemb. Josh Jensen).

[41] *Id.* at 135 (Assemb. González-Rojas).

[42] *Id.* at 87–88 (Assemb. Josh Jensen).

[43] *Id.* at 90–91 (Assemb. Josh Jensen).

[44] *Ra & Jensen: Consumer Directed Personal Assistance Program Changes Raises Great Concern*, Assemblyman Edward P. Ra Assembly Dist. 19 (Apr. 16, 2024), https://assembly.state.ny.us/mem/Edward-P-Ra/story/110089.

Chair simply responded that a single Fiscal Intermediary would be "easier" to oversee.[45]

76.     In addition to noting the lack of meaningful data on the purported benefits of the transition to a Statewide Fiscal Intermediary, lawmakers highlighted that the transition to a single payroll provider in other states caused harm to both vulnerable program participants and their caregivers.  As Assemblywoman Mary Beth Walsh noted, "when this transition was done in Pennsylvania it was disastrous."[46]

77.     The Assemblywoman was right.  In Pennsylvania, the transition from 37 private agencies to a single payroll provider led to a disruption in services, as the statewide provider struggled to combine the records of the participants and caregivers enrolled in Pennsylvania's participant-directed services program, which provides home- and community-based assistance.[47] At the time of Pennsylvania's transition in 2013, the program had approximately 20,000 participants—far fewer than the estimated 280,000 in New York State.[48]  Even with this relatively low number of participants, many caregivers were forced to abandon their duties in search of a paycheck after going unpaid for over a month—leaving vulnerable Pennsylvanians in "a void of essential services as their caregivers went unpaid."[49]

78.     The CDPAP Amendment also raised concerns about how a statewide transition would harm vulnerable communities that depend on the existence of local Fiscal Intermediaries.

---

[45] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 86, (N.Y. Apr. 19, 2024) (Assemb. Josh Jensen).
[46] *Id.* at 103 (Assmeb. Mary Beth Walsh).
[47] Eugene A. DePasquale, Performance Audit: Department of Public Welfare's Oversight of Financial Management Services Providers, Commonwealth of Pa. Dep't of Auditor Gen. 4, 25 (Nov. 2013), https://www.paauditor.gov/wp-content/uploads/audits-archive/Media/Default/Reports/speDPWPPL111413.pdf; Brian Roche, *Follow Up: Thousands of Workers Not Being Paid*, WGAL8 (last updated Jan. 17, 2013), https://www.wgal.com/article/follow-up-thousands-of-workers-not-being-paid/6223991; David Pierce, *Pa. Caregivers Go Unpaid After Payroll Agency Snafus*, Pocono Record (last updated Jan. 17, 2013), https://www.poconorecord.com/story/lifestyle/health-fitness/2013/01/17/pa-caregivers-go-unpaid-after/49153901007/.
[48] Roche, *Follow Up*; Pierce, *Pa. Caregivers*.
[49] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 103 (N.Y. Apr. 19, 2024) (Assmeb. Mary Beth Walsh); Roche, *Follow Up*; Pierce, *Pa. Caregivers*.

As Assemblywoman González-Rojas noted, in her Queens district, "[w]e speak nearly 200 languages" and "we have agencies that are reflective of the religious, cultural and linguistic needs of our communities."[50]

79.    The CDPAP Amendment was signed into law anyway.

80.    The outgrowth of this arbitrary government overreach was the CDPAP Amendment, which will eliminate nearly all 600 Fiscal Intermediaries in favor of a Statewide Fiscal Intermediary that will be "selected through [a DOH] procurement process."

81.    Although the State has never suggested that Plaintiffs are in any way responsible for the State's unfounded and unproven allegations of widespread waste and fraud, the CDPAP Amendment forces them to bear the economic burden of the State's unconstitutional overreach.

82.    And, in addition to rendering existing Fiscal Intermediary contracts valueless, the CDPAP Amendment also bars most existing Fiscal Intermediaries from even being considered for the new statewide contract.  This is because any existing Fiscal Intermediary operating solely in New York is *statutorily ineligible* to become the new Statewide Fiscal Intermediary, regardless of how much experience that Fiscal Intermediary has administering CDPAP (the only relevant program)—even if it is operating on a statewide basis in New York State, and even if that Fiscal Intermediary is otherwise qualified to continue servicing consumers in need of home care.  Thus, numerous New York businesses are effectively discriminated against by the CDPAP Amendment.

83.    These Fiscal Intermediaries now stand to lose their businesses not because of any malfeasance or mismanagement on their part, but because they operate only in New York—the very state in which the Statewide Fiscal Intermediary will need to operate going forward.

---

[50] Chambers Transcript on Assembly Bill No. A08807C, 2024 Assemb., Reg. Sess. 90–91, 135 (N.Y. Apr. 19, 2024) (Assemb. González-Rojas).

84.     Existing Fiscal Intermediaries such as Plaintiffs could not reasonably have anticipated this drastic change, as nothing in the history of New York's regulation of Medicaid or CDPAP suggested that the State would gut an entire New York industry in favor of a State-granted monopoly that preferences out-of-state business.

85.     There is no conceivable basis for treating similarly situated businesses differently based on that arbitrary characteristic.  Just the opposite:  A critical component of the Statewide Fiscal Intermediary's role is serving particular cultural and linguistic communities *in New York*. Experience with out-of-state communities and health systems does not provide any advantage in furthering that purpose.

86.     Nor is out-of-state experience any more probative than in-state experience in ensuring that a potential bidder is prepared to operate on the scale required to perform statewide fiscal intermediary services in New York.  For example, Massachusetts and Pennsylvania have approximately 40,000 and 20,000 care recipients—nowhere close to the *280,000* CDPAP participants in New York.  Certain in-state Fiscal Intermediaries, meanwhile, currently serve approximately the same number of care recipients as served by the entire program in other states. In other words, any entity selected as the Statewide Fiscal Intermediary will have to scale up significantly from its current operations.

87.     Further, although the CDPAP Amendment requires that the Statewide Fiscal Intermediary demonstrate "cultural and language competencies specific to the population of consumers and those of the available workforce," Fiscal Intermediaries that serve these specific communities are usually small, targeted businesses that would necessarily be eliminated from consideration because of the out-of-state requirement.

88.     Moreover, "fiscal intermediary" is a defined term for purposes of CDPAP (a New

York-specific statute), and the amendment is silent as to what that term means as applied to the provision of services in *other* states.  Experience providing different services under different programs in another state is not a rational requirement for eligibility to administer the CDPAP program in New York—certainly not more relevant than a company having done just that for many years.

89.      Even if a Fiscal Intermediary is selected as a subcontractor, that Fiscal Intermediary's existing contracts with MMCOs and local service districts will be destroyed, as the subcontractor Fiscal Intermediaries will be required to enter into *new contracts* with the Statewide Fiscal Intermediary, not with the MMCOs or local service districts.[51]  That subcontractor Fiscal Intermediary will be at the mercy of the Statewide Fiscal Intermediary, performing only those services "that the statewide fiscal intermediary includes in a subcontract."[52]  Though the subcontracts would have to include "services designed to meet the needs of consumers of the program" like "education and training" of consumers and "assisting consumers with navigation of the program,"[53] the statute does not protect the subcontractors' rights to perform the most essential Fiscal Intermediary tasks under their existing contracts.  As the Executive director of BRIDGES, a Rockland-based center for independent living, noted "[t]he subcontracting model means that we are no longer responsible for compliance. . . . We're no longer responsible for payroll.  We're no longer responsible for billing.  All we're left with is providing intake services, answering first-hand questions, and helping people apply for the program.  It's destructive; we're becoming the middleman."[54]  And, in any event, a company

---

[51] N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii-b).
[52] *Id.*
[53] *Id.*
[54] Andy Milone, *New York State Ushering in Law That Will Severely Impact How Agencies Like BRIDGES Operate & Receive Funding*, Rockland Cnty. Bus. J. (May 5, 2024), https://rcbizjournal.com/2024/05/05/new-york-state-ushering-in-law-that-will-severely-impact-how-agencies-like-bridges-operate-receive-funding/.

must have been providing fiscal intermediary services since at least 2012 in order to be eligible to serve as a subcontractor, rendering Fiscal Intermediaries such as Plaintiffs categorically ineligible for that role.

## IV.    DOH Implementation of the CDPAP Amendment

90.    On June 17, 2024, DOH issued Request for Proposals #20524 (the "RFP") to select the Statewide Fiscal Intermediary.  DOH set an anticipated contract start date for the Statewide Fiscal Intermediary of October 1, 2024.[55]  Although DOH did not publicize a date by which it would publicly announce the identity of the entity that is to be selected as the single Statewide Fiscal Intermediary, it is anticipated that DOH will do so in advance of the contract start date.

91.    DOH permitted interested parties seeking to clarify terms or sections within the RFP to submit questions by July 2, 2024.  Parties submitted a total of 1,362 questions—a volume that speaks to the widespread confusion and uncertainty that has been foisted upon the Fiscal Intermediary community by the single Statewide Fiscal Intermediary amendment.[56]  DOH originally announced that it would provide answers to the questions by July 19, 2024, and that the deadline for submission of proposals was August 2, 2024.  After pushing its own answer deadline back multiple times, DOH released answers to the questions on August 7, 2024, together with a set of substantive amendments to the RFP.  At the same time, it moved the deadline for submission of proposals to August 21, 2024.

92.    In the questions submitted to DOH, numerous parties asked DOH to clarify what it means to provide "services as a fiscal intermediary on a statewide basis in at least one other

---

[55] *New York State Fiscal Intermediary Services*, N.Y. St. Dep't of Health, https://www.health.ny.gov/funding/rfp/20524/ (last updated Aug. 2024).
[56] *Request for Proposals (RFP) #20524 New York State Fiscal Intermediary Service: Questions and Answers*, N.Y. Dep't of Health (Aug. 7, 2024), https://www.health.ny.gov/funding/rfp/20524/qanda.pdf [hereinafter *Questions and Answers*].

state," prompting DOH to amend the RFP in relevant part.[57]  DOH now interprets the phrase

"statewide basis" to mean the Fiscal Intermediary "is currently engaged in a contract with the

single State agency established or designated to administer or supervise the administration of the

State's Medicaid program in a state other than New York, to be a provider of fiscal intermediary

services throughout the entire geographic area of the subject state."[58]  This definition artificially

constrains the pool of eligible bidders beyond the already-narrow terms set by the statute itself.

93.    DOH also indicated, in its August 7 "Questions and Answers," that it would

construe "providing services as a fiscal intermediary" in another state to mean "performing

services *similar to* those required under Social Services Law 365-f."[59]  This nebulous

interpretation confirms that, in selecting the Statewide Fiscal Intermediary, DOH has virtually

unfettered authority to determine which bundle of services are sufficiently "similar to" the

services outlined Social Services Law 365-f.

94.    The lack of any objective criteria is confirmed by DOH's response to a series of

questions asking how bids would be scored or evaluated and who would be involved in the

process:  "This information will not be shared with the bidding community."[60]

95.    In fact, DOH refused to respond to over 200 of the submitted questions—many

relating to scoring or evaluation of bids—claiming that the questions were either "not relevant"

or that the answers would "not be shared with the bidding community."[61]  Thus, Fiscal

Intermediaries have little guidance on what (if any) objective criteria DOH will use in weighing

and evaluating competing bids, and DOH has virtually unfettered discretion to select a "winning"

---

[57] *See, e.g.*, *id.* at 28.
[58] *RFP #20524 New York State Fiscal Intermediary Service: Amendment #3*, N.Y. Dep't of Health 2 (Aug 7, 2024), https://www.health.ny.gov/funding/rfp/20524/amendment_3.pdf.
[59] *Questions and Answers* at 26.
[60] *See, e.g.*, *Questions and Answers* at 31–32.
[61] *See id.*

bidder from among those who submit proposals—for whatever irrational or politically motivated reason it sees fit to do so.

V.    **The CDPAP Amendment Violates Fiscal Intermediaries' Constitutional Rights and Will Cause Significant Harm, Including Disruptions in Patient Care and the Destruction of Hundreds of Businesses**

96.    As set forth below, the CDPAP Amendment violates Plaintiffs' and hundreds of other Fiscal Intermediaries' rights under the U.S. Constitution's Contracts, Takings, Equal Protection, and Due Process Clauses.  It will have a host of catastrophic effects, including driving 600 companies out of business, resulting job dislocation and losses, and disruption of care for over 280,000 consumers who depend on CDPAP services for bathing, showering, dressing, getting in and out of bed, walking, using the toilet, and eating.  Just as in other states that attempted similar policy feats under far more favorable circumstances, the directionless transition here will leave thousands of vulnerable New Yorkers in a void of essential services. The brunt of the burden will fall on vulnerable communities that depend on the existence of a functioning fiscal intermediary market that offers competitive services to consumers.

97.    These disastrous consequences should come as no surprise given that the CDPAP Amendment will eliminate every generally accepted advantage of market competition.  When prices that businesses can charge for their services are already prescribed by government regulation—as is the case with CDPAP—firms in the marketplace are forced to find other ways to compete for consumers' business.  That competition becomes concentrated not in offering the lowest *prices* to consumers, but by offering the highest *quality of services*.  But that competition in quality disappears quickly in the absence of thriving competition.  The same will happen here. By eliminating hundreds of competing Fiscal Intermediaries in favor of a single State-sanctioned Fiscal Intermediary monopoly, New York will have eliminated every market-driven incentive to continue offering the highest-quality services to consumers whose health cannot afford any

sudden gaps, regressions, or degradations.  This is directly contrary to CDPAP's intent, which was "to permit chronically ill and/or physically disabled individuals receiving home care services under the medical assistance program greater flexibility and freedom of choice in obtaining such services."[62]

98.    Fiscal Intermediaries, including Plaintiffs, have spent millions of dollars building and investing in their businesses based on the reasonable expectation that they would be able to continue to perform fiscal intermediary services for many years to come.  The State's conduct here is especially egregious considering that Fiscal Intermediaries, including Plaintiffs, have to make significant investments in their businesses just to comply with CDPAP's threshold statutory and regulatory requirements.  They have also made significant investments in technology and services designed to improve consumers' access to and experiences with CDPAP.  Now, despite all of these investments and Fiscal Intermediaries' good-faith stewardship of the program, the State has pulled the rug out from under them by seeking to raze the entire industry, rendering all of those investments for naught.

99.    In light of these anticipated harms, backlash against the CDPAP Amendment has been swift.  Activists and elected officials from across the political spectrum have voiced their concerns that the amendment will cause significant harm to consumers in particular.  These concerns are well-founded, as other states that have implemented similar transitions have encountered significant home care disruptions.  For example, both Massachusetts and Pennsylvania had far fewer care recipients than New York (approximately 40,000 and 20,000, respectively, compared to 280,000 in New York) but still experienced delays in transferring and verifying health assessments, tuberculosis tests, vaccination records, and electronic visit

---

[62] N.Y. Soc. Serv. Law § 365-f(1).

verification records, which led to workers going unpaid for up to two months.[63]  Indeed, these

issues arose in Massachusetts even though that state was transitioning from just *three* entities to

one, whereas New York now plans to transition from *over 600* Fiscal Intermediaries to one.

100.    Moreover, although both Massachusetts and Pennsylvania allocated twelve

months to transition services to a new statewide provider after the entity had been chosen, both

states nevertheless had to extend that transition period to eighteen months.  Here, it is still

unclear when the Statewide Fiscal Intermediary will be chosen, as DOH has simply said that it

"will notify the selected bidder of its award within a timeframe which will allow for the

anticipated October 1, 2024 contract start date."[64]  But the one thing that is clear is that the

CDPAP Amendment requires that the State evaluate all proposals and select the Statewide Fiscal

Intermediary in a matter of weeks—between the August 21, 2024 bid-submission deadline and

the October 1, 2024 commencement date for the Statewide Fiscal Intermediary contract.  And it

requires that, in the mere six months between October 1, 2024 and the April 1, 2025 drop-dead

date for the existing Fiscal Intermediaries, the Statewide Fiscal Intermediary must "transition all

consumers and their personal assistants from their current fiscal intermediaries to the Statewide

Fiscal Intermediary," including:

- "Executing agreements with subcontractors and managed care plans;

- Contacting every managed care plan and Local Department of Social Services to determine the consumers that need to be transitioned and the fiscal intermediaries they currently work with;

- Contacting each consumer to educate them about the transition;

---

[63] Leif Greiss, *Change in the Way Pennsylvania Pays Home Care Workers Causes Delayed Paychecks for Some, Creating Stress for Families*, Morning Call (Aug. 7, 2022), https://www.mcall.com/2022/08/07/change-in-the-way-pennsylvania-pays-home-care-workers-causes-delayed-paychecks-for-some-creating-stress-for-families/; Katie Johnston, *Missing Personal Care Attendant Payments Strain an Already Taxed Workforce*, Boston Globe (Feb. 7, 2022), https://www.bostonglobe.com/2022/02/07/business/missing-personal-care-attendant-payments-strain-an-already-taxed-workforce/.
[64] *Questions and Answers* at 2.

- Assisting consumers with educating their personal assistants about the transition;

- Hosting in-person or virtual informational sessions to provide information about the transition in a culturally competent manner;

- Onboarding personal assistants including enrolling in direct deposit and transferring documentation from the current fiscal intermediary;

- Specialized assistance for vulnerable subpopulations, e.g., people with disabilities, children, and limited English proficiency;

- Developing and disseminating of any other public information relevant to the consumers, personal assistants, managed care plans and Local Departments of Social Services."[65]

101.    Although the transition to a Statewide Fiscal Intermediary must, by statute, take effect on April 1, 2025, the size of CDPAP and the State's failure to develop any transition plan will inevitably lead to disruptions of a significantly larger scope than experienced in other states.

102.    The CDPAP Amendment also raises concerns that it was enacted to hand a massive contract to a single preferred entity that will be hand-picked by the State.

103.    The criteria that a current Fiscal Intermediary must meet even to be considered for the role of Statewide Fiscal Intermediary are stringent, nonsensical, and clearly designed to exclude all but a handful of Fiscal Intermediaries from participating in a procurement process that will not even be overseen by the State Comptroller.

**VI.    Plaintiffs Are Suffering under the CDPAP Amendment's Unconstitutional Regime**

104.    All Plaintiffs are being harmed in the manners described above by virtue of the CDPAP Amendment, which violates their rights under the U.S. Constitution's Contracts Clause, Takings Clause, Equal Protection Clause, and Due Process Clause.

---

[65] *RFP #20524 New York State Fiscal Intermediary Service: Amendment #3*, N.Y. Dep't of Health 2 (Aug 7, 2024), https://www.health.ny.gov/funding/rfp/20524/amendment_3.pdf.

### A.    Plaintiff Principle Homecare, LLC

105.    As discussed above, Principle Homecare is a Fiscal Intermediary that currently serves over 200 CDPAP consumers throughout New York State.

106.    Principle Homecare is a minority-owned business founded in 2015 and driven by the belief that business owners should look like the patients and home care aides they serve.

107.    Principle Homecare serves consumers in Manhattan, the Bronx, Brooklyn, and Queens, as well as Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, and Westchester Counties.  It provides services to Chinese-, Haitian-Creole-, Korean-, and Spanish-speaking consumers (among others) throughout the State.

108.    Principle Homecare's work goes far beyond the minimum requirements of the CDPAP statute.  In addition to providing standard fiscal intermediary services, Principle Homecare sponsors community events and food banks, and it assists consumers with Medicaid enrollment and setting up trusts.

109.    To provide a more streamlined experience for consumers while also doing its part to reduce paper consumption and protect the environment, Principle Homecare has invested tens of thousands of dollars in software and technology.

110.    Principle Homecare works aggressively to monitor and prevent any potential fraud—conducting home visits to connect a voice with a face, conducting daily rollcalls to make sure the consumer and the personal assistant are in the same place, utilizing electronic and telephonic systems to clock personal assistants in and out, and reporting any instances of noncompliance.  Principle Homecare "pushes principle"—it is more than just a name.

111.    Principle Homecare has longstanding existing contracts with MMCOs that would have remained in effect beyond April 1, 2025—the date on which the Statewide Fiscal Intermediary is set to take over.  For example, Principle Homecare has a contract with Elderplan

Inc. that has been in effect since 2017, has auto-renewed annually ever since, and was expected to remain in effect going forward.  But the CDPAP Amendment will prohibit Principle Homecare from providing fiscal intermediary services after that date, thereby destroying Principle Homecare's rights under this or any of its other contracts.

112.    Principle Homecare has spent significant sums building and investing in its business based on the reasonable expectation that it would be able to continue to perform fiscal intermediary services for many years to come.

113.    The CDPAP Amendment has completely shattered Principle Homecare's reasonable investment-backed expectations by making it impossible for the company to continue to provide fiscal intermediary services after April 1, 2025.  On that date, Principle Homecare will become statutorily prohibited from operating under its contracts with MMCOs to provide fiscal intermediary services to the consumers and personal assistants with whom it has worked for years.

114.    Principle Homecare does not have out-of-state operations and therefore was not eligible to bid for the Statewide Fiscal Intermediary contract.

**B.    Plaintiff Marton Care Inc.**

115.    As discussed above, Marton Care is Fiscal Intermediary that currently serves approximately 120 CDPAP consumers throughout New York State.

116.    Marton Care was founded in 2017 by a former CDPAP personal assistant who, after spending years caring for his own grandfather, decided to form his own fiscal intermediary company so that other elderly and disabled New Yorkers could receive the care they deserve.

117.    Marton Care now has contracts with MMCOs to provide services in every county in New York State and currently serves consumers in 17 of those counties, including all five boroughs of New York City, as well as Albany, Broome, Cattaraugus, Erie, Lewis, Monroe,

Nassau, Niagara, Oneida, Schoharie, Suffolk, and Washington Counties.  The company serves Arabic-, Spanish-, and Yiddish-speaking consumers.

118.    In addition to performing the statutorily prescribed fiscal intermediary services, Marton Care employees develop personal relationships with the consumers and personal assistants with whom they work.  Marton Care counsels consumers, coordinates peer mentoring for personal assistants, guides consumers through setting up transportation services, and generally helps consumers navigate the healthcare industry.

119.    In 2019, to better serve its upstate customers, Marton Care invested tens of thousands of dollars to open a new office in Amherst, New York.

120.    Marton Care diligently monitors the locations from which personal assistants clock in and out and, in the few instances where it has suspected potential wrongdoing, immediately reported it in accordance with the mandated procedures.

121.    Marton Care has longstanding existing contracts with MMCOs that would have remained in effect beyond April 1, 2025—the date on which the Statewide Fiscal Intermediary is set to take over.  For example, Marton Care has a contract with Centers Plan for Healthy Living, LLC that has been in effect since 2017, has auto-renewed annually ever since, and was expected to remain in effect going forward.  But the CDPAP Amendment will prohibit Marton Care from providing fiscal intermediary services after that date, thereby destroying Marton Care's rights under this or any of its other contracts.

122.    Marton Care has spent significant sums building and investing in its business based on the reasonable expectation that it would be able to continue to perform fiscal intermediary services for many years to come.

123.    The CDPAP Amendment has completely shattered Marton Care's reasonable

investment-backed expectations by making it impossible for the company to continue to provide fiscal intermediary services after April 1, 2025.  On that date, Marton Care will become statutorily prohibited from operating under its contracts with MMCOs to provide fiscal intermediary services to the consumers and personal assistants with whom it has worked for years.

124.    Marton Care does not have out-of-state operations and therefore was not eligible to bid for the single fiscal intermediary contract.

### C.    Plaintiff Prompt Home Care LLC

125.    As discussed above, Prompt Home Care is a Fiscal Intermediary that currently serves over 700 CDPAP consumers throughout New York State.

126.    Prompt Home Care was formed in 2017 (and commenced operations in 2018) with the goal of expanding awareness of CDPAP and thereby affording more patients access to safe, personalized home care provided by a known and trusted caretaker of their choosing.

127.    Nearly all of Prompt Home Care's consumers are members of racial and ethnic minority groups:  85% are of Hispanic descent, and 13% are African American.  Indeed, although Prompt Home Care serves consumers across New York City, as well as in Westchester and Nassau Counties, it caters primarily to the Dominican community in the Bronx. Accordingly, nearly all of Prompt Home Care's employees—including the team members handling enrollment, HR, and payroll—speak Spanish, and virtually all of them are themselves Dominican.

128.    Prompt Home Care's work goes far beyond the minimum requirements of the CDPAP statute.  In addition to providing standard fiscal intermediary services, Prompt Home Care helps consumers navigate insurance-related issues and helps facilitate telehealth visits for patients who need them.  Prompt Home Care develops hands-on relationships with its consumers

and regularly fields calls from them with all kinds of questions.

129.    In 2022, to build a street presence and better serve its consumers, Prompt Home Care invested hundreds of thousands of dollars to open a second, storefront location in the Bronx.

130.    Prompt Home Care works diligently to guard against any potential fraud, with a dedicated, full-time employee who is responsible for verifying clock-ins, scrutinizing timesheets, and cross-checking them against the schedule, with any discrepancies brought to the company's compliance officer for immediate redress.

131.    Prompt Home Care has longstanding existing contracts with MMCOs that would have remained in effect beyond April 1, 2025—the date on which the Statewide Fiscal Intermediary is set to take over.  For example, Prompt Home Care has a contract with Centers Plan for Healthy Living, LLC that has been in effect since approximately late 2017, has auto-renewed annually ever since, and was expected to remain in effect going forward.  But the CDPAP Amendment will prohibit Prompt Home Care from providing fiscal intermediary services after that date, thereby destroying Prompt Home Care's rights under this or any of its other contracts.

132.    Prompt Home Care has spent significant sums building and investing in its business based on the reasonable expectation that it would be able to continue to perform fiscal intermediary services for many years to come.

133.    The CDPAP Amendment has completely shattered Prompt Home Care's reasonable investment-backed expectations by making it impossible for the company to continue to provide fiscal intermediary services after April 1, 2025.  On that date, Prompt Home Care will become statutorily prohibited from operating under its contracts with MMCOs to provide fiscal

intermediary services to the consumers and personal assistants with whom it has worked for years.

134.    In addition to disrupting services to the hundreds of consumers who have developed relationships with Prompt Home Care staff and have grown comfortable with the cultural and linguistic competencies it offers, this result would be devastating for the company's staff, most of whom lack college degrees but have developed specialized expertise in the fiscal intermediary industry.  Because Prompt Home Care will have to close its doors come April 1, 2025, these hard-working individuals—most of whom have been with the company from the very beginning, and some of whom recently purchased their first homes—will lose their jobs and be forced to start from scratch.

135.    Prompt Home Care does not have out-of-state operations and therefore was not eligible to bid for the Statewide Fiscal Intermediary contract.

**D.    Plaintiff Care Connect CDPAP, Inc.**

136.    As discussed above, Care Connect is a Fiscal Intermediary that currently serves approximately 500 CDPAP consumers throughout New York State.

137.    Care Connect, which was formed in 2016 and commenced operations in 2018, was founded by two Ukrainian immigrants who opened the business on the belief that patients have the right to receive care from those they love and trust and who provide them with happiness and peace.  The founders view their success in building Care Connect as the fulfillment of the American dream.

138.    Care Connect serves consumers in all five boroughs of New York City, as well as Albany, Erie, Nassau, Niagara, Suffolk, and Westchester Counties.  Its language competencies include Albanian, Chinese, Hindi, Punjabi, Russian, Spanish, and Ukrainian.

139.    In addition to performing the statutorily prescribed fiscal intermediary services,

Care Connect facilitates Medicaid certifications by connecting consumers with a third-party company that can assist with that process. Care Connect also helps consumers find doctors and connects them with experts to assist with translation- and immigration-related needs.

140.    Care Connect has invested approximately $100,000 to customize its client-facing software to help make the process as seamless as possible.

141.    Care Connect works to police potential fraud, monitoring clock ins and outs via phone or with a GPS-enabled app that only allows personal assistants to clock in within 100 feet of the patient's address. One of the owners personally oversees the process of verifying timesheets.

142.    Care Connect has longstanding existing contracts with MMCOs that would have remained in effect beyond April 1, 2025—the date on which the Statewide Fiscal Intermediary is set to take over. For example, Care Connect has a contract with Centers Plan for Healthy Living, LLC that has been in effect since 2018, has auto-renewed annually ever since, and was expected to remain in effect going forward. But the CDPAP Amendment will prohibit Care Connect from providing fiscal intermediary services after that date, thereby destroying Care Connect's rights under this or any of its other contracts.

143.    Care Connect has spent significant sums building and investing in its business based on the reasonable expectation that it would be able to continue to perform fiscal intermediary services for many years to come.

144.    The CDPAP Amendment has completely shattered Care Connect's reasonable investment-backed expectations by making it impossible for the company to continue to provide fiscal intermediary services after April 1, 2025. On that date, Care Connect will become statutorily prohibited from operating under its contracts with MMCOs to provide fiscal

intermediary services to the consumers and personal assistants with whom it has worked for years.

145.    Care Connect does not have out-of-state operations and therefore was not eligible to bid for the single fiscal intermediary contract.

## FIRST CAUSE OF ACTION
### Contracts Clause – Article I, § 10; 42 U.S.C. § 1983

146.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

147.    The Contracts Clause of Article I, Section 10 of the United States Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."   The Contracts Clause "limits . . . the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power."   *Allied Structure Steel Co. v. Spannaus*, 438 U.S. 234, 242 (1978).   This is because "[c]ontracts enable individuals to order their personal and business affairs according to their particular needs and interests.   Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them."   *Id.* at 245.

148.    Acting under color of state law, Defendant has caused, and will continue to cause, Fiscal Intermediaries (including Plaintiffs) to be deprived of their rights guaranteed by the Contracts Clause, both facially and as applied to Plaintiffs.

149.    Specifically, the CDPAP Amendment substantially impairs existing contractual relationships by forcing existing Fiscal Intermediaries to stop performing under their existing contracts with MMCOs and local social service districts as of April 1, 2025.  Before the State enacted the CDPAP Amendment, Plaintiffs entered into such voluntary contractual relationships pursuant to which they reasonably expected to receive compensation in exchange for their

ongoing provision of fiscal intermediary services to CDPAP consumers.

150.    The CDPAP Amendment undermines the bargains embodied in these contracts, interferes with the contracting parties' reasonable expectations, and prevents Fiscal Intermediaries, including Plaintiffs, from safeguarding their rights.

151.    By preventing existing Fiscal Intermediaries from continuing to provide fiscal intermediary services, the CDPAP Amendment will cause immediate, severe, and permanent changes to Plaintiffs' contractual rights, and, as such, will disrupt Plaintiffs' reasonable expectations and reasonably expected long-term revenue streams under those contracts, on which Plaintiffs reasonably relied in structuring and investing in their businesses.

152.    This drastic, irrational, and self-serving "amendment" was unforeseeable at the time that Fiscal Intermediaries, such as Plaintiffs, entered into their contracts.  Nothing in CDPAP's history could have alerted Fiscal Intermediaries to the possibility that the State would step in and void every single one of Plaintiffs' contracts.

153.    As discussed above, the CDPAP Amendment is untethered to any conceivable public purpose, let alone a significant or legitimate purpose of the sort required to withstand constitutional scrutiny under the Contracts Clause.

154.    Instead of favoring the public at large by strengthening and improving CDPAP, the CDPAP Amendment eliminates choice for services by turning the Fiscal Intermediary industry into a government-supported monopoly run by a single Statewide Fiscal Intermediary that will be hand-picked by the State.  This irrational crackdown on competition may benefit the new Statewide Fiscal Intermediary—a private entity—but will harm the public by reducing the level and quality of home care for New York residents who need it most.

155.    Moreover, even if a legitimate public purpose existed, the CDPAP Amendment's

provisions vitiating private contracts (and an entire private industry) represent a wholly unreasonable and unnecessary means of achieving any such purpose.

156.    The CDPAP Amendment musters the immense powers of the State to prevent Plaintiffs from safeguarding or ever reinstating their contractual rights.  Indeed, it makes it illegal for them to do so.  The CDPAP Amendment also includes no mechanism whereby Plaintiffs can hope to recover the revenue that they will lose as a result.

157.    A bona fide and actual controversy exists in that Plaintiffs allege that the enactment of the CDPAP Amendment violates the Contracts Clause of the United States Constitution, both facially and as applied to Plaintiffs.

158.    Plaintiffs desire a judicial determination of the validity of the CDPAP Amendment to save themselves from the irreparable harm caused by the enactment of the Amendment, which deprives Plaintiffs of the benefit of their existing contracts.  The enactment of the CDPAP Amendment results in substantial hardship to Plaintiffs.

159.    A judicial determination of the invalidity of the CDPAP Amendment is necessary and appropriate to avoid the deprivation of constitutional rights that results from applying the CDPAP Amendment to Plaintiffs and other Fiscal Intermediaries.

160.    In light of this violation of the Contracts Clause of the United States Constitution, the Court should enjoin enforcement of the CDPAP Amendment, both facially and as applied to Plaintiffs.

161.    In the absence of declaratory and injunctive relief, Fiscal Intermediaries (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to them by the United States Constitution.

## SECOND CAUSE OF ACTION
### Taking Without Just Compensation – Fifth Amendment; 42 U.S.C. § 1983)

162.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

163.    The Takings Clause of the Fifth Amendment to the United States Constitution, incorporated against the States by the Fourteenth Amendment, provides:  "[N]or shall private property be taken for public use, without just compensation."

164.    Contracts constitute property within the meaning of the Fifth Amendment and are susceptible to a taking within the meaning of the Takings Clause.  Thus, the State may not deprive Plaintiffs of the benefits of their contractual property rights without prior and just compensation.

165.    Acting under color of state law, Defendant has caused, and will continue to cause, Fiscal Intermediaries (including Plaintiffs) to be deprived of their property rights, and has taken their private property for a claimed public use without just compensation, in violation of the Takings Clause, both facially and as applied to Plaintiffs.

166.    Before the State enacted the CDPAP Amendment, Plaintiffs entered into voluntary contractual relationships with MMCOs whereby Plaintiffs received compensation in exchange for their ongoing provision of fiscal intermediary services to CDPAP consumers. These contracts typically remain in effect for extended periods of time.

167.    The CDPAP Amendment constitutes an unconstitutional regulatory taking, for at least two independent reasons.

168.    *First*, the CDPAP Amendment deprives Fiscal Intermediaries of *all* economically viable or profitable use of their private property, without just compensation.

169.    By mandating that, as of April 1, 2025, "no entity" other than the State-selected

Statewide Fiscal Intermediary "shall provide, directly or through contract, fiscal intermediary services," this new legislation strips Fiscal Intermediaries of all economically beneficial use of their existing contracts. The CDPAP Amendment renders those contracts valueless, as Fiscal Intermediaries are completely and permanently barred from participation in the Fiscal Intermediary industry and from performing (or receiving compensation) under their existing contracts. This abrupt change does not merely reduce Fiscal Intermediaries' revenues; rather, it extinguishes their rights in their contracts altogether.

170.    Because the CDPAP Amendment constitutes a total taking that deprives existing Fiscal Intermediaries, such as Plaintiffs, of all economically beneficial use of their property, the statute effects a *per se* regulatory taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992).

171.    *Second*, at a minimum, the CDPAP Amendment "goes too far and effects a regulatory taking" based on an array of case-specific factors, including, but not limited to, the statute's "economic effect on the [property owners], the extent to which the [law] interferes with reasonable investment-backed expectations, and the character of the government action," that together establish that justice and fairness require that the economic injuries caused by the CDPAP Amendment be compensated by the government, rather than remain disproportionately borne by the Fiscal Intermediaries without just compensation. *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).

172.    The regulatory takings analysis eschews any set formula, requires careful examination and weighing of all relevant circumstances in context, and depends largely on the particular impacts of the statute at issue.

173.    Through the CDPAP Amendment, Defendant has imposed unduly harsh

economic impacts on Fiscal Intermediaries' private property by effectively outlawing them from continuing their business operations under their existing contracts.  These impacts include completely and permanently devaluing Plaintiffs' contracts and businesses; rendering their significant investments in their businesses unprofitable; making it commercially impossible to continue to operate as Fiscal Intermediaries; and interfering with Plaintiffs' legitimate property interests in the ways set forth above.

174.    The CDPAP Amendment also interferes with Plaintiffs' reasonable investment-backed expectations in their contracts and businesses.  This interference is so severe that Defendant's actions are the functional equivalent of a government appropriation, again without just compensation.

175.    The character of this governmental action—which eviscerates Fiscal Intermediaries' right to continue their business operations and transfers that right to a State-supported monopolist, with no public benefit arising from the change—confirms that this "regulation" is in fact an unconstitutional regulatory taking of private property.

176.    The CDPAP Amendment does not provide Fiscal Intermediaries such as Plaintiffs with any, let alone just, compensation for these takings.

177.    A bona fide and actual controversy exists in that Plaintiffs allege that the enactment of the CDPAP Amendment violates the Takings Clause of the Fifth Amendment to the United States Constitution, both facially and as applied to Plaintiffs.

178.    Plaintiffs desire a judicial determination of the validity of the CDPAP Amendment to save themselves from the irreparable harm caused by the enactment of the Amendment, which deprives Plaintiffs of the benefit of their existing contracts.  The enactment of the CDPAP Amendment results in substantial hardship to Plaintiffs.

179.    A judicial determination of the invalidity of the CDPAP Amendment is necessary and appropriate to avoid the deprivation of constitutional rights that results from applying the CDPAP Amendment to Plaintiffs and other Fiscal Intermediaries.

180.    In light of this violation of the Takings Clause of the United States Constitution, the Court should enjoin enforcement of the CDPAP Amendment, both facially and as applied to Plaintiffs.

181.    In the absence of declaratory and injunctive relief, Fiscal Intermediaries (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to them by the United States Constitution.

**THIRD CAUSE OF ACTION**
**Equal Protection – Fourteenth Amendment; 42 U.S.C. § 1983**

182.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

183.    The equal protection clause of the Fourteenth Amendment to the United States Constitution provides:  "[N]or [shall any State] deny to any person within its jurisdiction the equal protection of the laws."

184.    Acting under color of state law, Defendant has caused, and will continue to cause, Fiscal Intermediaries (including Plaintiffs) to be deprived of their right to equal protection guaranteed by the Fourteenth Amendment, both facially and as applied to Plaintiffs.

185.    The CDPAP Amendment singles out Fiscal Intermediaries (such as Plaintiffs) who provide services exclusively within the State of New York, rendering those Fiscal Intermediaries categorically ineligible to serve as the Statewide Fiscal Intermediary.  Meanwhile, and for no conceivable reason, entities with out-of-state operations are given disparately favorable treatment—even if those entities have no prior connection to New York and lack any

experience serving the New York home care population.

186.    Plaintiffs and other in-state-only Fiscal Intermediaries are similarly situated to entities with statewide out-of-state operations in all relevant respects.

187.    The State's preferential treatment of Fiscal Intermediaries with out-of-state operations bears no rational relationship to a legitimate government interest.  If anything, Fiscal Intermediaries that already have knowledge of, connections to, and longstanding histories of serving local New York communities are *better* situated to serve them.

188.    A bona fide and actual controversy exists in that Plaintiffs allege that the enactment of the CDPAP Amendment violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, both facially and as applied to Plaintiffs.

189.    Plaintiffs desire a judicial determination of the validity of the CDPAP Amendment to save themselves from the irreparable harm caused by the enactment of the Amendment, which deprives Plaintiffs of the benefit of their existing contracts with MMCOs and arbitrarily disqualifies them from serving as the Statewide Fiscal Intermediary.  The enactment of the CDPAP Amendment results in substantial hardship to Plaintiffs.

190.    A judicial determination of the invalidity of the CDPAP Amendment is necessary and appropriate to avoid the deprivation of constitutional rights that results from applying the CDPAP Amendment to Plaintiffs and other Fiscal Intermediaries.

191.    In light of this violation of the Equal Protection Clause of the United States Constitution, the Court should enjoin enforcement of the CDPAP Amendment, both facially and as applied to Plaintiffs.

192.    In the absence of declaratory and injunctive relief, Fiscal Intermediaries (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of

rights guaranteed to them by the United States Constitution.

**FOURTH CAUSE OF ACTION**
**Substantive Due Process – Fourteenth Amendment; 42 U.S.C. § 1983**

193.    Plaintiffs repeat and reallege each and every allegation of this Complaint as if fully set forth herein.

194.    The due process clause of the Fourteenth Amendment to the United States Constitution provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

195.    Acting under color of state law, Defendant has caused, and will continue to cause, Fiscal Intermediaries (including Plaintiffs) to be deprived of their property without due process in violation of their substantive due process rights under the Fourteenth Amendment, both facially and as applied to Plaintiffs.

196.    Fiscal Intermediaries have constitutionally protected interests in operating their businesses free from unreasonable governmental interference, and in their existing contracts with MMCOs.  Fiscal Intermediaries are also protected from excessive and unreasonable government conduct intentionally directed toward them.

197.    The CDPAP Amendment infringes upon these rights in an arbitrary manner, without any conceivable rational basis.  It bars Fiscal Intermediaries from continuing to provide services and receive compensation under the terms of their existing contracts, instead providing preferential economic treatment to a single State-selected monopolist.

198.    This legislative abolition of an entire private industry—and the resultant elimination of competition for services—lacks a reasonable and nondiscriminatory legislative purpose and has no relation to any conceivable rational basis, including those related to public health, safety, or general welfare.  If anything, the CDPAP Amendment will have a deleterious

impact on consumers, who will have to endure disruptions in care caused by the transition to a Statewide Fiscal Intermediary.

199.    A bona fide and actual controversy exists in that Plaintiffs allege that the enactment of the CDPAP Amendment violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both facially and as applied to Plaintiffs.

200.    Plaintiffs desire a judicial determination of the validity of the CDPAP Amendment to save themselves from the harm caused by the enactment of the Amendment, which deprives Plaintiffs of the benefit of their existing contracts and their ability to provide fiscal intermediary services under CDPAP.  The enactment of the CDPAP Amendment results in substantial hardship to Plaintiffs.

201.    A judicial determination of the invalidity of the CDPAP Amendment is necessary and appropriate to avoid the deprivation of federal constitutional rights that results from applying the CDPAP Amendment to Plaintiffs and other Fiscal Intermediaries.

202.    In light of this violation of the Due Process Clause of the United States Constitution, the Court should enjoin enforcement of the CDPAP Amendment, both facially and as applied to Plaintiffs.

203.    In the absence of declaratory and injunctive relief, Fiscal Intermediaries (including Plaintiffs) will continue to be irreparably harmed and subjected to the deprivation of rights guaranteed to them by the United States Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in Plaintiffs' favor and grant the following relief:

1. A declaration that the CDPAP Amendment is facially unconstitutional because it violates:

a.  The Contracts Clause of Article I, § 10 of the U.S. Constitution;

b.  The Takings Clause of the Fifth Amendment to the U.S. Constitution, as incorporated against the States by the Fourteenth Amendment;

c.  The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; and

d.  The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution;

2.  A permanent injunction enjoining Defendant from enforcing the CDPAP Amendment as violative of each of the above-listed constitutional provisions;

3.  A declaration that the CDPAP Amendment is unconstitutional as applied to each Plaintiff because it violates each of the constitutional provisions listed in Prayer (1) above;

4.  A permanent injunction enjoining Defendant from enforcing the CDPAP Amendment as against each Plaintiff as violative of each of the above-listed constitutional provisions;

5.  An award of fees, costs, expenses, and disbursements, including attorneys' fees and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

6.  Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: New York, New York
        September 18, 2024

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Akiva Shapiro*
     Akiva Shapiro
     Mylan Denerstein
     William J. Moccia

     200 Park Avenue, 47th Floor
     New York, NY 10166-0193
     Telephone: (212) 351-4000
     AShapiro@gibsondunn.com
     MDenerstein@gibsondunn.com
     WMoccia@gibsondunn.com

     *Attorneys for Plaintiffs*