# EXHIBIT 5

Administrative Agreement
for the Provision of Fiscal Intermediary Services for the
Consumer Directed Personal Assistance Services

**THIS AGREEMENT** ("Agreement") is made and entered into as of **6/1/2018** by and between Centers Plan for Healthy Living, LLC ("MCO") and **Care Connect CDPAP Inc.** ("FI"). MCO and FI are referred to hereinafter individually as "Party" and collectively as the "Parties".

**WHEREAS**, MCO offers Medicaid managed care health benefit plans and seeks to engage FI to provide fiscal intermediary services in relation to consumer directed personal assistance program benefits for Members of such plans;

**WHEREAS**, FI is a fiscal intermediary designated to provide wage and benefit processing for consumer directed personal assistants on behalf of an employing consumer and other responsibilities specified in this Agreement in accordance with 18 N.Y.C.R.R. § 505.28(i); and

**WHEREAS**, MCO and FI desire to enter into this Agreement.

**NOW THEREFORE**, the Parties agree as follows:

1.    **Definitions.**

"**consumer**" means a medical assistance recipient who a social services district or MCO has determined eligible to participate in the consumer directed personal assistance program.

"**consumer directed personal assistance**" means the provision of some or total assistance with personal care services, home health aide services and skilled nursing tasks by a consumer directed personal assistant under the instruction, supervision and direction of a consumer or the consumer's designated representative.

"**consumer directed personal assistant**" ("CDPA") means an adult who provides consumer directed personal assistance to a consumer under the consumer's instruction, supervision and direction or under the instruction, supervision and direction of the consumer's designated representative. A consumer's spouse, parent or designated representative may not be the consumer directed personal assistant for that consumer; however, a consumer directed personal assistant may include any other adult relative of the consumer who does not reside with the consumer or any other adult relative who resides with the consumer because the amount of care the consumer requires makes such relative's presence necessary.

"**continuous consumer directed personal assistance**" means the provision of uninterrupted care, by more than one consumer directed personal assistant, for more than 16 hours per day for a consumer who, because of the consumer's medical condition and disabilities, requires total assistance with toileting, walking, transferring or feeding at times that cannot be predicted.

"**designated representative**" means an adult to whom a self-directing consumer has delegated authority to instruct, supervise and direct the consumer directed personal assistant and to perform

the consumer's responsibilities specified in subdivision (g) of Section 505.28 of Title 18 of the New York Codes, Rules and Regulations ("NYCRR") and who is willing and able to perform these responsibilities. With respect to a non-self-directing consumer, a "designated representative" means the consumer's parent, legal guardian or a responsible adult surrogate who is willing and able to perform such responsibilities on the consumer's behalf. The designated representative may not be the consumer directed personal assistant or a fiscal intermediary employee, representative or affiliated person.

"**fiscal intermediary**" ("FI") means an entity that has a contract with MCO to provide wage and benefit processing for consumer directed personal assistants and other fiscal intermediary responsibilities specified in subdivision (i) of Section 505.28 of Title 18 of the NYCRR.

"**home health aide services**" means services within the scope of practice of a home health aide pursuant to Article 36 of the Public Health Law including simple health care tasks, personal hygiene services, housekeeping tasks essential to the consumer's health and other related supportive services. Such services may include, but are not necessarily limited to, the following: preparation of meals in accordance with modified diets or complex modified diets; administration of medications; provision of special skin care; use of medical equipment, supplies and devices; change of dressing to stable surface wounds; performance of simple measurements and tests to routinely monitor the consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function.

"**Medicaid Contract**" means the applicable agreement between the MCO and NYSDOH, or its successor, pursuant to which MCO agrees to provide and arrange for the provision of health care services to persons eligible for Medicaid under Title XIX of the Social Security Act.

"**NYSDOH**" means the New York State Department of Health.

"**personal care services**" means the nutritional and environmental support functions, personal care functions, or both such functions, that are specified in Section 505.14(a)(6) of Part 505 of Title 18 of the NYCRR except that, for individuals whose needs are limited to nutritional and environmental support functions, personal care services shall not exceed eight hours per week.

"**self-directing consumer**" means a consumer who is capable of making choices regarding the consumer's activities of daily living and the type, quality and management of his or her consumer directed personal assistance; understands the impact of these choices; and assumes responsibility for the results of these choices.

"**skilled nursing tasks**" means those skilled nursing tasks that are within the scope of practice of a registered professional nurse or a licensed practical nurse and that a consumer directed personal assistant may perform pursuant to Section 6908 of the Education Law.

"**some assistance**" means that a specific personal care service, home health aide service or skilled nursing task is performed or completed by the consumer with help from another individual.

October 1, 2012

"**stable medical condition**" means a condition that is not expected to exhibit sudden deterioration or improvement and does not require frequent medical or nursing evaluation or judgment to determine changes in the consumer's plan of care.

"**total assistance**" means that a specific personal care service, home health aide service or skilled nursing task is performed or completed for the consumer.

2.       **Fiscal Intermediary Responsibilities**. The fiscal intermediary shall have the following responsibilities:

     a.    Process each CDPA's wages and benefits including establishing the amount of each assistant's wages and benefits; process all income tax and other required wage withholdings; and comply with workers' compensation, disability and unemployment insurance requirements.

     b.    Ensure that the health status of each consumer directed personal assistant is assessed pursuant to 10 NYCRR § 766.11(c) and (d) or any successor regulation.

     c.    Maintain records for each CDPA which shall include, at a minimum, time records, the CDPA health assessments required pursuant to 10 NYCRR § 766.11(c) and (d) or any successor regulation, and the information needed for payroll processing and benefit administration.

     d.    Maintain records for each consumer, including copies of the authorizations, reauthorizations, and the contracts between the consumer and the FI.

     e.    Obtain a signed agreement with consumer outlining consumer's responsibilities as contained in 18 NYCRR § 505.28. Use best efforts to notify the MCO if the FI becomes aware that the consumer has been admitted to a higher level of care such as an inpatient hospital or skilled nursing facility. Monitor enrollment in MCO on the 1st and 15th of each month; provided, however, that such monitoring on the part of the FT shall not relieve the MCO of the MCO's responsibility to notify the FT in the event of a consumer's disenrollment in the MCO or in the event of a determination that the consumer is no longer authorized to participate in the CDPAP program.

     f.    Monitor the ability of the consumer, or the ability of the consumer's designated representative, if applicable, to fulfill the consumer's responsibilities under the consumer directed personal assistance program and notify the MCO promptly in the event that the FI becomes aware of any circumstances that may affect the ability of the consumer, or that of the consumer's designated representative, if applicable, to fulfill such responsibilities.

     g.    Comply with applicable NYSDOH regulations regarding the responsibilities of providers enrolled in the medical assistance program.

     h.    Enter into an Agreement with the consumer that stipulates that **the consumer** and, as applicable, the consumer's designated representative shall be solely responsible to:

i.      Manage the plan of care authorized by the MCO, including recruiting and hiring a sufficient number of CDPAP to provide authorized services as set forth in the plan of care authorized by the MCO; training, supervising and scheduling each CDPA; terminating the CDPA's employment with the consumer; and assuring that each CDPA completely and safely performs the personal care services, home health aide services and skilled nursing tasks included on the consumer's MCO approved plan of care;

ii.     Notify the MCO within 5 business days of any changes in the consumer's medical condition or social circumstances including but not limited to, any hospitalization of the consumer or change in the consumer's address or telephone number;

iii.    Timely notify the FI of any changes in the employment status of each CDPA;

iv.     Attest to the accuracy of each time record for each CDPA;

v.      Transmit the CDPA's time records to the FI according to the FI's policies and procedures;

vi.     Timely distribute each CDPA's paycheck, if needed;

vii.    Arrange and schedule substitute coverage when a CDPA is temporarily unavailable for any reason;

viii    Acknowledge and agree that: (1) any person who receives, directly or indirectly, an overpayment from the Medicaid program is obligated to report and return the overpayment, within sixty days of the identification of the overpayment. Failure to do so may expose the person to liability under the False Claims Act, including whistleblower actions, treble damage and penalties; and (2) that the Office of the Medicaid Inspector General or MCO may suspend payments to the FI and CDPA, if applicable, pending an investigation of a credible allegation of fraud against the FI or CDPA, as applicable, unless the state determines there is good cause not to suspend such payments; and

ix      Comply with applicable labor laws and provide equal employment opportunities to CDPAP in accordance with applicable laws.

x.      Notify the FI and/or MCO of any disclosure of information that the MCO has taken reasonable measures to maintain as confidential and which derives independent economic value from not being generally known or readily ascertainable by the public (Proprietary information). Proprietary information includes the compensation arrangements between the MCO and the FI and the amount the FI pays the CDPA and any other information relating to the MCO's business that is not public information.

3.    **MCO Responsibilities**. The MCO shall undertake the following:

    a.  Provide information to any enrollee determined to be in need of home care that CDPAP is available and the conditions under which a consumer is eligible.

    b.  Conduct initial and semi-annual nursing and social assessments of consumers.

    c.  Determine that the consumer is eligible for long term care services provided by a certified home health agency, the AIDS home care program or personal care services, and is in need of home care services or private duty nursing.

    d.  Determine that the consumer is eligible to participate in the CDPAP program. A consumer is eligible if the consumer: (1) has a stable medical condition; (2) is self-directing or if, non-self-directing, has a designated representative; (3) needs some or total assistance with one or more personal care services, home health aide services or skilled nursing tasks; (4) is able and willing or has a designated representative able and willing to fulfill the responsibilities of a consumer, including but not limited to, making informed choices as to the type and quality of services, including but not limited to nursing care, personal care, transportation and respite services; (5) participates, as needed, or has a designated representative participate in the required assessment and bi-annual reassessment process, or if the MCO determines an unexpected change in the consumer's social circumstances, mental status or medical condition has occurred during the authorization or reauthorization period that would affect the type, amount or frequency of consumer directed personal assistance provided during such period and does not have (a) voluntary assistance available from informal caregivers, including, but not limited to, the consumer's family, friends or other responsible adult, provided that thsis shall include an evaluation of the potential contribution of informal supports, such as family members or friends, to the individual's care, which must consider the number and kind of informal supports available to the individual; the ability and motivation of informal supports to assist in care; the extent of informal supports' potential involvement; the availability of informal supports for future assistance; and the acceptability to the individual of the informal supports' involvement in his or her care; or formal services provided by an entity or agency or (b) adaptive or specialized equipment or supplies including, but not limited to, bedside commodes, urinals, walkers and wheelchairs, when such equipment or supplies are provided to the consumer and can safely and cost-effectively meet the need for services.

    e.  Determine the consumer's eligibility for the program through its initial and periodic assessments. The MCO will authorize the level and amount of services and will authorize payment for the CDPAP services and communicate such authorization to the consumer, or if applicable, the designated representative, and the FI. The MCO shall not refuse to authorize consumer directed personal assistance when a consumer is otherwise eligible unless it reasonably expects that such assistance cannot maintain the consumer's health and safety in the home or other setting in which consumer directed personal assistance may be provided and that a designated representative

either cannot be identified or would not result in a change in the consumer's ability to maintain his or her health and safety in the home.

f.     Notify the FI in the event that the MCO makes changes to the authorization for the amount duration or scope of CDPAP services; or determines that the consumer is no longer eligible to participate in the CDPAP program; or that the consumer is no longer able to fulfill the consumer's responsibilities under the program.

g.     Comply with the assessment, authorization, reassessment and reauthorization procedures required by regulation and/or NYSDOH guidance.

h.     Receive and promptly review the FI notification to the MCO of any circumstances that may affect the consumer's or, if applicable, the consumer's designated representative's ability to fulfill the consumer's responsibilities under the program and make changes in the consumer's authorization and reauthorization as needed.

i.     Monitor the FT's performance under this Agreement to ensure that the FT is fulfilling its responsibilities under this Agreement.

j.     Monitor consumer's on-going eligibility for the program and discontinue authorization for CDPAP services when MCO determines that the consumer or their designated representative is no longer able to fulfill their responsibilities or no longer desires to continue in the program and a designated representative or alternative designated representative cannot be identified. In such case, the MCO must authorize other services as required.

k.     Enter into an understanding with the consumer, the terms of which shall be defined by the NYSDOH.

**4.     Maintenance of Records**. The FI shall maintain consumer records for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after the age of majority or six (6) years after the date of service, whichever is later, or for such longer period as required by law, regulation or the Medicaid Contract. This provision shall survive the termination of this Agreement regardless of the reason.

**5.     MCO Protocols.** The FI agrees to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, Medicaid Contract, or DOH guidelines or policies and (b) has provided or given access to the FI at least thirty (30) days in advance of implementation regarding, but not limited to, authorization requirements, referral processes, quality improvement and management activities, and utilization management.

**6.     Representations and Warranties**. The FI is a duly organized validly existing organization in good standing, as designated by NYSDOH or the LDSS. FI agrees it is and will continue to be for the term of the Agreement eligible to participate in the NYS Medicaid Program, and to comply with all state and federal laws and regulations, including Medicaid program requirements and the Medicaid Contract.

October 1, 2012

**7.    Monitoring and Auditing.** MCO shall monitor the performance of the FI's obligations under this Agreement, by reasonable and appropriate financial, programmatic and oversight tools and measures. Copies of all such tools and measures used shall be provided to the FI in advance, to facilitate and foster proactive on-going continuous improvement efforts. The MCO and any government officials with oversight authority over the MCO, including but not limited to the Department of Health and Human Services, shall have the right, during normal business hours and upon advance written notice, to monitor and evaluate, through inspection or other means, FI's performance under this Agreement, including but not limited to access to consumer records and CDPA personnel records in the possession of the FI. The FI shall permit MCO and any government officials with oversight authority over the MCO to conduct site visits, upon prior notice, to verify the performance under this Agreement and that such performance continues to comply with the terms and standards of the MCO and any NYSDOH standards. This provision shall survive the termination of this Agreement regardless of the reason.

**8.    Quality, Data and Reporting Requirements.** FIs shall comply with MCO data and reporting requirements. The MCO shall provide the FI with full, complete, and current copies of its protocols for all such activities in advance.

**9.    Payment.** MCO shall pay FI as set forth on Attachment **APPENDIX A** within thirty (30) days from when MCO receives a claim. The Parties acknowledge and agree that unless otherwise provided by law, Section 3224(a) and (b) of the NYS Insurance Law does not apply to this Agreement as of the date of execution of this Agreement. No payment shall be made to the FI or, if made shall be recouped, even if authorized by the MCO, unless the FI's claim is supported by documentation, including but not limited to CDPA time records, of the time spent in provision of services for each consumer.

**10.    Term.** The term of the Agreement shall begin as of the Effective Date and shall continue for one (1) year, after which this Agreement shall re-new for additional one (1) year terms; unless otherwise terminated as provided by this Agreement or either Party gives sixty (60) days advance written notice prior to the renewal date.

**11.    Termination**. Either Party shall have a right to terminate this Agreement without cause upon 60 days written notice. Either Party shall have the right to terminate this Agreement upon 30 days written notice, or such earlier time period if warranted, if the other Party materially breaches this Agreement and such breach is not cured within the 30 days' notice period. This Agreement shall terminate automatically and immediately in the event that either Party is excluded, suspended or barred from participating in any government health care program.

**12.    Obligations Post Termination.** Upon termination, FI shall: (1) assist in effecting an orderly transfer of services and obligations to another FI to which MCO has assigned consumers to prevent any disruption in services to such consumers; (2) provide MCO and NYSDOH with access to all books, records and other documents relating to the performance of services under this Agreement that are required or requested, at no charge; and (3) subject to applicable laws and regulations, stop using and return and/or destroy all proprietary information. This provision shall survive the termination of the Agreement regardless of the reason.

October 1, 2012

13.     **Indemnification.** Neither FI nor MCO shall be responsible for fulfilling the responsibilities of the consumer or, if applicable, the consumer's designated representative as set forth in the agreements between the FI and consumer or in the agreement between the MCO and the consumer. This shall not diminish the FI's or MCO's respective obligations to exercise reasonable care in properly carrying out its respective responsibilities under the consumer directed personal assistance program. Both FI and MCO understand and acknowledge that pursuant to state law, the Office of the Medicaid Inspector General (OMIG) and/or the Office of the Inspector General (OIG) may review and audit all contracts, claims, bills and other expenditures of medical assistance program funds to determine compliance. Each Party agrees to indemnify and hold the other Party harmless from any and all liability arising out of any suit, investigation, administrative action, fine, penalty or sanction by or on behalf of the OMIG and/or the OIG against the other Party, to the extent that such liability arises directly out of the wrongful acts or omissions of the indemnifying party.

14.     **Adjustments: Recoupment/Adjustments for incorrect/over payment to FI**. Other than recovery for duplicate payments, MCO will provide FI with not less than 30 days prior written notice before engaging in incorrect/over payment recovery efforts seeking recovery of the incorrect/over payment to the FI. Such notice shall state the specific information relating to such incorrect/over payment, payment amount and proposed adjustment with a reasonable explanation of the proposed adjustment. Within 30 days after receipt of such notice, FI may dispute the allegation(s) of incorrect/over payment and the proposed adjustment in writing. MCO shall submit a written response to FI's dispute within 10 days, addressing each of the disputed particulars in detail. The Parties shall apply their best efforts to resolve the dispute by good-faith negotiation. MCO will not initiate incorrect/over payment recovery efforts more than six (6) years after the original payment unless authorized or required by the state.

15.     **Non-discrimination**. FI shall not discriminate against any consumers based on color, race, creed, age, gender, sexual orientation, disability, place of origin or source of payment or type of illness or condition. FI shall comply with the Federal Americans with Disabilities Act (ADA).

16.     **Confidentiality**. Each Party understands the other Party to be a covered entity, as that term is defined by the Health Insurance Portability and Accountability Act ("HIPAA") and thus, not a business associate requiring a business associate agreement. FI agrees to adhere to and comply with the applicable provisions of HIPAA; the Health Information Technology for Economic and Clinical Health Act (HITECH); and the HIV confidentiality requirements of Article 27-F of the Public Health Law; Mental Hygiene Law Section 33.13, if applicable; and the confidentiality requirements set forth in the Medicaid Contract.

17.     **Lobby Certification.** FI agrees, pursuant to 31 U.S.C. § 1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of FI for the purpose of influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. FI agrees to complete and submit the "Certification Regarding Lobbying," form, if this Agreement exceeds $100,000. If any funds

other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement, and payments to the FI under this Agreement exceed $100,000, FI shall complete and submit, if required, Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

**18.    Implementation Prior to DOH Approval**.          This Agreement is subject to the approval of the NYSDOH and if implemented prior to such approval, the Parties agree to incorporate into this Agreement any and all modifications required by NYSDOH for approval or, alternatively, to terminate this Agreement if so directed by NYSDOH, effective sixty (60) days subsequent to such notice.

**19.    Assignment.** This Agreement may not be assigned by either Party without the prior written consent of the other Party, such consent not to be unreasonably withheld.

**20.    Model Contract.** This Agreement incorporates the pertinent obligations under the Medicaid Contract, including but not limited to the Medicaid Managed Care and/or the Family Health Plus contract, and/or the Managed Long-Term Care Plan contract, between the MCO and DOH as if set forth fully herein.

**21.    Sanctioned Individuals.** FI is required to check staff and employees and CDPAP against the Excluded Provider List, which includes updates from the List of Excluded Individuals and Entities (LEIE) and the Restricted, Terminated or Excluded Individuals or Entities List, on a monthly basis.

**22.    Subcontractors.** FI agrees it shall notify MCO if it subcontracts any of its obligations hereunder or the performance of any of FT's obligations and responsibilities. Any subcontractor shall be subject to the provision of this Agreement to the same extent as the FI.

**23.    Fraud, Waste and Abuse Compliance and Reporting**. Claims, data and other information submitted to MCO pursuant to this Agreement and used, directly or indirectly, for purposes of obtaining payments from the government under a Federal health care program, and payments that FI receives under this Agreement are, in whole or in part, from Federal funds. Accordingly, FI shall: (1) upon request of MCO, certify, based on its best knowledge, information and belief, that all data and other information directly or indirectly reported or submitted to MCO pursuant to this Agreement is accurate, complete and truthful; (2) not claim payment in any form, directly or indirectly, from a Federal health care program for items or services covered under this Agreement; (3) comply with laws designed to prevent or ameliorate fraud, waste, and abuse, including applicable provisions of Federal criminal law, the False Claims Act (31 USC §§ 3729 et. seq.), and the anti-kickback statute (section 1128B(b) of the Social Security Act); and (4) require it and its employees and its subcontractors and their employees comply with MCO compliance program requirements, including MCO's compliance training requirements, and to report to MCO any suspected fraud, waste, or abuse or criminal

October 1, 2012                                                                                         9

acts. Further, FI acknowledges and agrees pursuant to Section 6402 of PPACA, MCO may suspend payment to the FI pending an investigation of a credible allegation of fraud, unless the state determines there is a good cause not to suspend such payments.

**24.    Insurance**.        FI shall secure and maintain for itself and its employees, commercial general liability as may be necessary to insure FI, its agents and employees, for claims arising out of events occurring during the term of this Agreement or any post termination activities under this Agreement. Coverage shall be in amounts and terms customary for the industry and in general conformity with similar type and size entities within New York State, and, if required by State laws, worker's compensation insurance in amounts required by such State laws. FI shall, upon request of MCO, provide MCO with certificates of insurance or other evidence of coverage reflecting satisfaction of the foregoing requirements of this paragraph. FI shall provide at least 30 days notice to MCO in advance of any material modification, cancellation or termination of its insurance.

**25.    Modifications and Amendments.** Except as otherwise set forth in this Agreement, any amendments to this Agreement shall be in writing and signed by both Parties. Amendments required due to changes in state law or regulation or as required by NYSDOH and implemented by MCO shall be unilaterally and automatically made upon thirty (30) days notice to FI.

**26.    Notification**. All notices required or permitted under this Agreement must be in writing and sent by (a) hand delivery, (b) U.S. certified mail, postage prepaid, return receipt requested, or (c) overnight delivery service providing proof of receipt. Any such notice shall be deemed given: (i) when delivered, if delivered in person; (ii) four (4) calendar days after being delivered by U.S. mail, or (iii) one (1) business day, if being sent by overnight carrier. Notices shall be sent to the address listed on the Signature Page, otherwise each Party may designate by notice any future or different addresses to which notices will be sent. Notices will be deemed delivered upon receipt or refusal to accept delivery. Routine day to day operational communications between the Parties are not notices in accordance with this section.

**27.    Proprietary Information.** In connection with this Agreement, a Party or its affiliates may disclose to the other Party, directly or indirectly, certain information that the disclosing Party has taken reasonable measures to maintain as confidential and which derives independent economic value from not being generally known or readily ascertainable by the public ("Proprietary Information"). Proprietary Information includes Member lists, the compensation provisions of this Agreement, and other information relating to the Party's business that is not generally available to the public. Each Party shall, and shall require its subcontractors hold in confidence and not disclose any Proprietary Information and not use Proprietary Information except (1) as expressly permitted under this Agreement, or (2) as required by law or legal or regulatory process. Each Party shall, and shall require its subcontractors disclose Proprietary Information only in order to perform their obligations under this Agreement, and only to persons who have agreed to maintain the confidentiality of the Proprietary Information. The requirements of this Agreement regarding Proprietary Information shall survive expiration or termination of this Agreement.

**28.    Dispute Resolution**. MCO and FI agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

a.      Any dispute, other than a dispute regarding malpractice, fraud or abuse, or a failure of the Parties to agree on a reimbursement amount between the Parties regarding the performance or interpretation of this Agreement shall be resolved, to the extent possible, by informal meeting or discussions between appropriate representatives of the Parties.

b.      In the event the Parties are unable to resolve a dispute informally, the Parties agree to submit the matter to binding arbitration before a single arbitrator acceptable to both Parties, under the commercial rules of the American Health Lawyers Association ("AHLA") then in effect. The Parties agree to divide equally the AHLA's administrative fee as well as the arbitrator's fee, if any, unless otherwise apportioned by the arbitrator. The arbitrator shall not award punitive damages to either Party. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce such award.

c.      Arbitration shall take place in the county in which the MCO does business unless otherwise agreed to by the Parties.

d.      The Parties acknowledge that the Commissioner of NYSDOH is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and NYSDOH shall be given notice of all issues going to arbitration or mediation, and copies of all decisions.

**29.    Relationship of the Parties.** No provision of this Agreement is intended to create, and none shall be deemed or construed to create, any relationship between MCO and FI other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of the Agreement. Neither Party nor any of their respective employees shall be construed under this Agreement to be the partner, joint venture, agent, employer or representative of the other for any purpose, including, but not limited to, unemployment or Worker's Compensation. In its capacity as an independent contractor, FI shall have sole responsibility for the payment of federal and state taxes.

**30.    Waiver**. No assent or waiver, express or implied, of any breach of any one or more of the covenants, conditions or provisions hereof shall be deemed or taken to be a waiver of any other covenant, condition or provision hereof or a waiver of any subsequent breach of the same covenant, condition or provision hereof.

**31.    Severability**. When possible, each provision of this Agreement shall be interpreted in such manner as to be effective, valid and enforceable under applicable law. The provisions of this Agreement are severable, and, if any provision of this Agreement is held to be invalid, illegal or otherwise unenforceable, in whole or in part, in any jurisdiction, said provision or part thereof shall, as to that jurisdiction be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

**32.    Governing Law.** This Agreement shall be governed by and construed and enforced in

accordance with the laws of the State of New York applicable to contracts, except where Federal law applies, without regard to principles of conflict of laws. Each Party hereby agrees to settle disputes by means other than trial by jury in any suit, action or proceeding arising hereunder. Notwithstanding anything in this Agreement, either Party may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement.

**33.    Third Parties**. Except as otherwise provided in this Agreement, this Agreement is not a third party beneficiary contract and no provision of this Agreement is intended to create or may be construed to create any third party beneficiary rights in any third party, including any consumer or CDPA.

**34.    Non-Solicitation.** For the term of this Agreement and for one year thereafter, FI shall not directly or indirectly solicit any consumer to join a competing health plan or induce any consumer to cease doing business with MCO. The foregoing shall not be deemed to prohibit FI from informing consumers as to the names of all the managed care organizations with which FI has contractual relationships in compliance with NYSDOH marketing guidelines.

**36.    Compliance with all Laws**. The Parties shall comply with all applicable federal and state laws and regulations and shall assist each other in such compliance. During the term of this Agreement, FI shall comply with all applicable federal and state laws and regulations relating to the provision of consumer directed personal assistance.

**37.    Entire Agreement.** This Agreement and the attachments, each of which are made a part of and incorporated into this Agreement, comprises the complete agreement between the Parties and supersedes all previous agreements and understandings, oral or in writing, related to the subject matter of this Agreement.

**38.    Names, Symbols and Service Marks.** The Parties shall not use each other's name, symbol, logo or service mark for any purpose without the other Party's prior written approval. However, MCO shall be allowed to include FI, its name, address, telephone number, and other professional demographics in MCO's listings, directories and publications, in any marketing or advertising materials, and MCO's Internet sites, to help promote MCO to potential consumers. FI agrees that such listings are considered accurate if based upon the most recent information submitted to MCO by or on behalf of FI.

**39.    Counterparts.** This Agreement may be executed and delivered in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

**40.    Ownership and Controlling Interest Requirements.** FI shall comply with requirements for disclosure of ownership and control, business transactions, and information for persons convicted of crimes against Federal health care programs as described in 42 CFR part 455 subpart B (Program Integrity: Medicaid).

**41.    Ineligible Persons.** FI warrants and represents, and shall cause each CDPA to warrant and represent that, as of the Effective Date and throughout the term of the Agreement and the duration of post expiration or termination transition activities described in this Agreement, that none of its principal owners or any individual or entity it employs or has contracted with to carry

out its part of this Agreement, is an Ineligible Person. "Ineligible Person" means an individual or entity who (1) is currently excluded, debarred, suspended or otherwise ineligible to participate in (a) Federal health care programs, as may be identified in the List of Excluded Individuals/Entities maintained by the OIG, or (b) Federal procurement or nonprocurement programs, as may be identified in the Excluded Parties List System maintained by the General Services Administration, (2) has been convicted of a criminal offense subject to OIG's mandatory exclusion authority for Federal health care programs as described in section 1128(a) of the Social Security Act, but has not yet been excluded, debarred or otherwise declared ineligible to participate in such programs, or (3) is currently excluded, debarred, suspended or otherwise ineligible to participate in State medical assistance programs, including Medicaid or CHIP, or State procurement or nonprocurement programs as determined by a State governmental authority.

IN WITNESS WHEREOF, the undersigned with the intent and authority to legally bind the respective Party, have caused this Agreement to be duly executed and effective as of the Effective Date.

**MCO**

By: _____

Print Name: _Omry Cohen

Title: _VP of Operations_
05/02/2018
10:27 AM EDT
Date: _____

**FISCAL INTERMEDIARY**

By: _____

Print Name: _Diana Yakhnis_____

Title: VP
05/01/2018
02:00 PM EDT
Date: _____

*ALB 1556624v10*

**Notice Address:**

_75 Vanderbilt Avenue_____

_Staten Island, NY 10306____

_____

_____

__9305 Avenue L, 2nd Floor

_Brooklyn, NY 11235__

_____

_____

October 1, 2012

Click or tap here to enter text.                    **Appendix A**

Compensation for Covered Services

These rates are inclusive of all federal and state wage requirements as of the effective date of the Agreement including New York State Home Care Worker Wage Parity Act requirements, Federal Fair Labor Standards Act requirements, and minimum wage requirements set forth in New York Labor Law § 652.

1. **Personal Care (PCW), CDPAP\***

| Geographic Location | Base Rate |
|---|---|
|  |  |

2. **Personal Care (PCW), mutual\***

| Geographic Location | Calculated Rate |
|---|---|
|  |  |

3. **Personal Care (PCW), CDPAP live in\***

| Geographic Location | Calculated Rate |
|---|---|
|  |  |

4. **Personal Care (PCW), CDPAP live in mutual\***

| Geographic Location | Calculated Rate |
|---|---|
|  |  |

\*Please refer to the CPHL LHCSA Billing Guide for the appropriate HCPCS code.  Please note that the CPHL Billing Guide is subject to change as it is updated in accordance with New York State Department of Health Universal Billing Codes for Home and Community LTC.

**Appendix  B**



# New York State Department of Health

# Standard Clauses
# for
# Managed Care
# Provider/IPA/ACO Contracts

APPENDIX
Revised 04/01/2017

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "the Agreement " or "this Agreement ") the Article 44 plans and providers that contract with such plans, and who are a party agree to be bound by the following clauses which are hereby made a part of the Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, such clauses must be included in IPA/ACO contracts with Providers, and Providers must agree to such clauses.

## A.    Definitions for Purposes of this Appendix

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer a comprehensive health services plan, or a health and long term care services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of contracting for the delivery or provision of health services by individuals, entities and facilities licensed and/or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment. Under these arrangements, such health care Providers and suppliers will provide their service in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of Health Care Services which are licensed, registered and/or certified as required by applicable federal and state law.

## B.    General Terms and Conditions

1.         This agreement is subject to the approval of the New York State Department of Health (DOH) and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by DOH for approval or, alternatively, to terminate this Agreement if so directed by DOH, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403 (6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2.         Any material amendment to this Agreement is subject to the prior approval of DOH, and any such amendment shall be submitted for approval in accordance with the appropriate procedures and timelines described in Sections III and VII of the New York State Department of Health Provider Contract Guidelines for MCOs and IPA/ACOs. To the extent the MCO provides and arranges for the provision of comprehensive Health Care Services to enrollees served by the Medical Assistance Program, the MCO shall notify and/or submit a copy of such material amendment to DOH, as may be required by the Medicaid Managed Care contract between the MCO and DOH.

APPENDIX – Revised 04/01/2017

CPHL/Ancillary Provider Agreement 2016

3.        Assignment of an agreement between an MCO and (1) an IPA/ACO, (2) an institutional network Provider, or (3) a medical group Provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA/ACO and (1) an institutional Provider or (2) a medical group Provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health.

4.        The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA/ACO's Providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, contract, or DOH or DFS guidelines or policies and (b) has provided to the Provider at least thirty days in advance of implementation, including but not limited to:

> quality improvement/management;
> utilization management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data;
> member grievances; and
> Provider credentialing.

5.        The Provider or, if the Agreement is between the MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees, and shall require its Providers to agree, to not discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition.

6.        If the Provider is a primary care practitioner, the Provider agrees to provide twenty-four (24) hour coverage and back-up coverage when the Provider is unavailable. The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7.        The MCO or IPA/ACO that is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA/ACO's own acts or omissions, by indemnification or otherwise, to a Provider.

8.        Notwithstanding any other provision of this Agreement, the parties shall comply with the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996) Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007, Chapter 237 of the Laws of 2009, Chapter 297 of the Laws of 2012, Chapter 199 of the Laws of 2014, Part H, Chapter 60, of the Laws of 2014 and Chapter 6 of the Laws of 2015 with all amendments thereto.

9.        To the extent the MCO enrolls individuals covered by the Medical Assistance Program, this Agreement incorporates the pertinent MCO obligations under the

APPENDIX – Revised 04/01/2017

Medicaid Managed Care contract between the MCO and DOH as set forth fully herein, including:

a.          The MCO will monitor the performance of the Provider or IPA/ACO under the Agreement and will terminate the Agreement and/or impose other sanctions if the Provider's or IPA/ACO's performance does not satisfy the standards set forth in the Medicaid Managed Care contract.

b.          The Provider or IPA/ACO agrees that the work it performs under the Agreement will conform to the terms of the Medicaid managed care contract between the MCO and DOH and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the
                    Provider's or IPA/ACO's performance.

c.          The Provider or IPA/ACO agrees to be bound by the confidentiality requirements set forth in the Medicaid Managed Care contract between the MCO and DOH.

d.          The MCO and the Provider or IPA/ACO agree that a woman's enrollment in the MCO's Medicaid Managed Care product is sufficient to provide services to her newborn, unless the newborn is excluded from the enrollment in Medicaid Managed Care or the MCO does not offer a Medicaid Managed Care product in the mother's county of fiscal responsibility.

e.          The MCO shall not impose obligations and duties on the Provider or IPA/ACO that are inconsistent with the Medicaid Managed Care contract or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services.

f.          The Provider or IPA/ACO agrees to provide medical records to the MCO for purposes of determining newborn eligibility for Supplemental Security Income where the mother is a member of the MCO and for quality purposes at no cost to the MCO.

g.          The Provider or IPA/ACO agrees, pursuant to 31 U.S.C. §1352 and CFR Part 93, that no federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA/ACO for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of any Member of Congress in connection with the award of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement. The Provider or IPA/ACO agrees to complete and submit the "Certification Regarding
                    Lobbying," Appendix _____ attached hereto and incorporated herein, if this Agreement exceeds $100,000. If any funds other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering

APPENDIX – Revised 04/01/2017

of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA/ACO shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

h. The Provider or IPA/ACO agrees to disclose to the MCO, on an ongoing basis, any managing employee who has been convicted of a misdemeanor or felony in relation to the employee's involvement in any program under Medicare, Medicaid or a Title XX services program (block grant programs).

i. The Provider or IPA/ACO agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE), the Social Security Administration Death Master List, and the National Plan Provider Enumeration System (NPPES).

j. The Provider or IPA/ACO agrees to disclose to the MCO complete ownership, control, and relationship information.

k. The Provider or IPA/ACO agrees to obtain for the MCO ownership information from any subcontractor with whom the Provider has had a business transaction totaling more than $25,000 during the 12-month period ending on the date of the request made by DOH, Office of the Medicaid Inspector General (OMIG) or the United States Department of Health and Human Services (DHHS). The information requested shall be provided to the MCO within 35 days of such request.

l. The Provider or IPA/ACO agrees to have an officer, director or partner of the Provider execute and deliver to DOH a certification, using a form provided by DOH through OMIG's website, within five (5) days of executing this agreement, stating that:

> The Provider or IPA/ACO is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the Provider. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

> All claims submitted for payment by the Provider/IPA/ACO are for care, services or medical supplies that have been provided.

> Payment requests are submitted in accordance with applicable law.

m. The Provider or IPA/ACO agrees to require that an officer, director or partner of all subcontractors if they are not natural persons, or the subcontractor itself if it is a natural person, execute a certification, using a form provided by DOH through OMIG's website, before the subcontractor requests payment under the subcontract, acknowledging that:

APPENDIX – Revised 04/01/2017

The subcontractor is subject to the statutes, rules, regulations, and applicable Medicaid Updates of the Medicaid program and of DOH related to the furnishing of care, services or supplies provided directly by, or under the supervision of, or ordered, referred or prescribed by the subcontractor. This includes 18 NYCRR 515.2 except to the extent that any reference in the regulation establishing rates, fees, and claiming instructions will refer to the rates, fees and claiming instructions set by the MCO.

All claims submitted for payment by the subcontractor are for care, services or medical supplies that have been provided.

Payment requests are submitted in accordance with applicable law.

10. The parties to this Agreement agree to comply with all applicable requirements of the federal Americans with Disabilities Act.

11. The Provider agrees, or if the Agreement is between the MCO and an IPA/ACO or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees and shall require the IPA's Providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act, the HIV confidentiality requirements of Article 27-F of the Public Health Law, and Mental Hygiene Law § 33.13.

12. Compliance Program. The Provider agrees that if it claims, orders, or is paid $500,000 or more per year from the Medical Assistance Program, including, in the aggregate, claims submitted to or paid directly by the Medical Assistance Program and/or claims submitted to or paid by any MCO under the Medicaid Managed Care Program, that it shall adopt and implement a compliance program which meets the requirements of New York State Social Services Law § 363-d(2) and 18 NYCRR § 521.3.

13. Compliance Program Certification. The Provider agrees that if it is subject to the requirements of Section B (12) of this Appendix, it shall certify to DOH, using a form provided by OMIG on its website, within 30 days of entering into a Provider Agreement with the MCO, if they have not so certified within the past year that a compliance program meeting the requirements of 18 NYCRR §521.3 and Social Services Law § 363-d(2) is in place. The Provider shall recertify during the month of December each year thereafter using a form provided by OMIG on OMIG's website.

## C. Payment and Risk Arrangements

1. Enrollee Non-liability. Provider agrees that in no event, including, but not limited to, nonpayment by the MCO or IPA/ACO, insolvency of the MCO or IPA/ACO, or breach of this Agreement, shall Provider bill; charge; collect a deposit from; seek compensation, remuneration or reimbursement from; or have any recourse against a subscriber, an enrollee or person (other than the MCO or IPA/ACO) acting on his/her/their behalf, for services provided pursuant to the subscriber contract or Medicaid Managed Care contract and this Agreement, for the period

covered by the paid enrollee premium. In addition, in the case of Medicaid Managed Care, Provider agrees that, during the time an enrollee is enrolled in the MCO, Provider will not bill DOH or the City of New York for covered services within the Medicaid Managed Care benefit package as set forth in the Agreement between the MCO and DOH. This provision shall not prohibit the Provider, unless the MCO is a Managed Long Term Care plan designated as a Program of All-Inclusive Care for the Elderly (PACE), from collecting copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the evidence of coverage, or fees for uncovered services delivered on a fee-for-service basis to a covered person, provided that Provider shall have advised the enrollee in writing that the service is uncovered and of the enrollee's liability therefore prior to providing the service. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service. This provision shall survive termination of this Agreement for any reason and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

2.   Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the Provider. However, with respect to enrollees eligible for medical assistance or participating in Child Health Plus, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

3.   If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA/ACO must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law §4406-c(5-c). Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional. This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology, or payment policy indexing scheme.

4.   The parties agree to comply with and incorporate the requirements of Physician Incentive Plan (PIP) Regulations contained in 42 CFR §438.6(h), 42 CFR §422.208, and 42 CFR §422.210 into any contracts between the contracting entity (Provider, IPA/ACO, hospital, etc.) and other persons/entities for the provision of services under this Agreement. No specific payment will be made directly or indirectly under the plan to a physician or physician group as an

APPENDIX – Revised 04/01/2017

inducement to reduce or limit medically necessary services furnished to an enrollee.

5. The parties agree that, where required by Public Health Law §4903, a claim for certain continued, extended, or additional health care services cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided within the required timeframes and under the circumstances described in Public Health Law §4903.

6. The parties agree to follow Section 3224-a of the Insurance Law providing timeframes for the submission and payment of Provider claims to the MCO.

7. The parties agree to follow Section 3224-b(a) of the Insurance Law requiring an MCO to accept and initiate the processing of all claims submitted by physicians that conform to the American Medical Association's Current Procedural

Technology (CPT) codes, reporting guidelines and conventions, or to the Centers for Medicare and Medicaid Services' Healthcare Common Procedure Coding System (HCPCS).

8. The parties agree to follow Section 3224-b(b) of the Insurance Law prohibiting an MCO from initiating overpayment recovery efforts more than 24 months after the original payment was received by a health care Provider, except where: (1) the plan makes overpayment recovery efforts that are based on a reasonable belief of fraud or other intentional misconduct or abusive billing; (2) for the Medicaid Managed Care and Family Health Plus programs, the overpayment recovery period for such programs is six years from date payment was received by the health care Provider with written notice 30 days prior to engaging in overpayment recovery efforts. Such notice must state the patient's name, service date, payment amount, proposed adjustment, and a reasonably specific explanation of the proposed adjustment.

9. The parties agree to follow Section 3224-c of the Insurance Law providing that claims cannot be denied solely on the basis that the MCO has not received from the member information concerning other insurance coverage.

10.        The parties agree that this contract does not waive, limit, disclaim, or in any way diminish the rights that any Provider may have pursuant to Section 3238 of the Insurance Law to the receipt of claims payment for services where preauthorization was required and received from the appropriate person or entity prior to the rendering of the service.

11.        The parties agree that for a contract involving Tier 2 or 3 arrangements as described in Section VII.B of the Guidelines, the contract must:

a.  Provide for the MCO's ongoing monitoring of Provider financial capacity and/or periodic Provider financial reporting to the MCO to support the transfer of risk to the Provider; and

b.  Include a provision to address circumstance where the Provider's financial condition indicates an inability to continue accepting such risk; and

APPENDIX – Revised 04/01/2017

      c.  Address MCO monitoring of the financial security deposit, describing the method and frequency of monitoring and recourse for correcting underfunding of the deposit to be maintained by the MCO; and

      d.  Include a provision that the Provider will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH.

12.      The parties agree that for any contract involving an MCO and IPA/ACO, the contract must include provisions whereby:

a.      The parties expressly agree to amend or terminate the contract at the direction of DOH (applies to Tier 1, Tier 2, and Tier 3);

b.      The IPA/ACO will submit annual financial statements to the MCO, as well as any additional documents required by the MCO as necessary to assess the IPA/ACO's progress towards achieving value based payment goals as specified in the Roadmap, and the MCO will notify DOH of any substantial change in the financial condition of the IPA/ACO (applies to Tier 2 and Tier 3); and

c.      The IPA/ACO will submit any additional documents or information related to its financial condition to the MCO, if requested by DOH (applies to Tier 2 and Tier 3); and

d.      The parties agree that all Provider contracts will contain provision prohibiting Providers, in the event of a default by the IPA/ACO, from demanding payment from the MCO for any covered services rendered to the MCO's enrollees for which payment was made by the MCO to the
      IPA/ACO pursuant to the risk agreement (applies to Tier 2 and Tier 3).

## D.   Records and Access

1.      Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA/ACO if applicable) for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements (QARR)), payment processing, and qualification for government programs, including but not limited to newborn eligibility for Supplemental Security Income (SSI) and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse. The Provider will also make enrollee's medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law. The Provider shall provide copies of such records to DOH at no cost. The Provider (or IPA/ACO if applicable) expressly acknowledges that the Provider shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law. These provisions shall survive termination of the contract for any reason.

2.      When such records pertain to Medicaid reimbursable services, the Provider agrees to disclose the nature and extent of services provided and to furnish

APPENDIX – Revised 04/01/2017

records to DOH and/or the United States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their authorized representatives upon request. This provision shall survive the termination of this Agreement regardless of the reason.

3.          The parties agree that medical records shall be retained for a period of six years after the date of service, and in the case of a minor, for three years after majority or six years after the date of service, whichever is later, or for such longer period as specified elsewhere within this Agreement. This provision shall survive the termination of this Agreement regardless of the reason.

4.          The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time of service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA/ACO or to third parties. If the Agreement is between an MCO and an IPA/ACO, or between an IPA/ACO and an IPA/ACO, the IPA/ACO agrees to require the Providers with which it contracts to agree as provided above. If the Agreement is between an IPA/ACO and a Provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

## E.          Termination and Transition

1.          Termination or non-renewal of an agreement between an MCO and an IPA/ACO, institutional network Provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA/ACO and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination by the MCO may be effected on less than 45 days' notice provided the MCO demonstrates to the satisfaction of DOH, prior to termination, that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2.          If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law. The MCO shall provide the health care professional 60 days' notice of its decision to not renew this Agreement.

3.          If this Agreement is between an MCO and an IPA/ACO, and the Agreement does not provide for automatic assignment of the IPA/ACO's Provider contracts to the MCO upon termination of the MCO/IPA/ACO contract, in the event either party

APPENDIX – Revised 04/01/2017

gives notice of termination of the Agreement, the parties agree, and the IPA/ACO's Providers agree, that the IPA/ACO Providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever occurs first. This provision shall survive termination of this Agreement regardless of the reason for the termination.

4.        Continuation of Treatment. The Provider agrees that in the event of MCO or IPA/ACO insolvency or termination of this contract for any reason, the Provider shall continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the subscriber contract or Medicaid Managed Care contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period. **For purposes of this clause, the term "Provider" shall include the IPA/ACO and the IPA/ACO's contracted**

**Providers if this Agreement is between the MCO and an IPA/ACO.** This provision shall survive termination of this Agreement.

5.        Notwithstanding any other provision herein, to the extent that the Provider is providing Health Care Services to enrollees under the Medicaid Program, the MCO or IPA/ACO retains the option to immediately terminate the Agreement when the Provider has been terminated or suspended from the Medicaid Program.

6.        In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA/ACO agrees to require all participating Providers of its network to assist in the orderly transfer of enrollees to another Provider.

## F.    Arbitration

To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation and copies of all decisions.

## G.    IPA/ACO-Specific Provisions

Any reference to IPA/ACO Quality Assurance (QA) activities within this Agreement is limited to the IPA/ACO's analysis of utilization patterns and quality of care on its own behalf and as a service to its contractual Providers.

APPENDIX – Revised 04/01/2017

Error! Unknown document property name.

## *APPENDIX C*

## CERTIFICATION REGARDING LOBBYING

The undersigned certifies, to the best of his or her knowledge, that:

1.  No Federal appropriated funds have been paid or will be paid to any person by or on behalf of the Provider for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of a Member of Congress in connection with the award of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress in connection with the award of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into any cooperative agreement, or the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan, or cooperative agreement, and the Agreement exceeds $100,000, the Provider shall complete and submit Standard Form-LLL "Disclosure Form to Reporting Lobby," in accordance with its instructions.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into submission of this certification is a prerequisite for making or entering into this transaction pursuant to U.S.C. Section 1352. The failure to file the required certification shall subject the violator to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

TITLE: VP_____

DATE: _____
05/01/2018
02:00 PM EDT

ORGANIZATION: _Care Connect CDPAP Inc. _____

NAME: _Diana Yakhnis_____

SIGNATURE: _____
*Diana Yakhnis*

## *APPENDIX D*

Approved by OMB
0348-0046
Appendix **[b]**

### Disclosure of Lobbying Activities

Complete this form to disclose lobbying activities pursuant to 31 U.S.C. 1352

(See reverse for public burden disclosure)

# INSTRUCTIONS FOR COMPLETION OF SF-LLL, DISCLOSURE OF LOBBYING ACTIVITIES

This disclosure form shall be completed by the reporting entity, whether subawardee or prime Federal recipient, at the initiation or receipt of a covered Federal action, or a material change to a previous filing, pursuant to title 31 U.S.C. section 1352. The filing of a form is required for each payment or agreement to make payment to any lobbying entity for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with a covered Federal action. Complete all items apply for both the initial filing and material change report. Refer to the implementing guidance published by the Office of Management and Budget for additional information.

1.  Identify the type of covered Federal action for which lobbying activity is and/or has been secured to influence the outcome of a covered Federal action.

2.  Identify the status of the covered Federal action.

3.  Identify the appropriate classification of this report. If this is a followup report caused by a material change to the information previously reported, enter the year and quarter in which the change occurred. Enter the date of the last previously submitted report by this reporting entity for this covered Federal action.

4.  Enter the full name, address, city, State and zip code of the reporting entity. Include Congressional District if known. Check the appropriate classification of the reporting entity that designates if it is, or expects to be, a prime or subaward recipient. Identify the tier of the subawardee, e.g. the first subawardee of the prime is the 1st tier. Subawards include but are not limited to subcontracts, subgrants and contract awards under grants.

5.  If the organization filing the report in item 4 checks "Subawardee," then enter the full name, address, city, State and zip code of the prime Federal recipient. Include Congressional District, if known.

6.  Enter the name of federal agency making the award or loan commitment. Include at least one organizational level below agency name, if known. For example, Department of Transportation, United States Coast Guard.

7.  Enter the Federal program name or description for the covered Federal action (item 1). If known, enter the full Catalog of Federal Domestic Assistance (CFDA) number for grants, cooperative agreements, loans, and loan commitments.

8.  Enter the most appropriate Federal identifying number available for the Federal action identified in item 1 (e.g. Request for Proposal (RFP) number, Invitations for Bid (IFB) number; grant announcement number; the contract, grant, or loan award number; the application/proposal control number assigned by the Federal agency). Included prefixes, e.g. "RFP-DE-90-001".

9.  For a covered Federal action where there has been an award or loan commitment by the Federal agency, enter the Federal amount of the award/loan commitment for the prime entity identified in item 4 or 5.

10. (a) Enter the full name, address, city, State and zip code of the lobbying registrant under the Lobbying Disclosure Act of 1995 engaged by the reporting entity identified in item 4 to influence the covered Federal action.
    (b) Enter the full names of the individual(s) performing services, and include full address if different from 10(a). Enter Last Name, First Name and Middle Initial (MI).

The certifying official shall sign and date the form, print his/her name, title and telephone number.

According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB control Number. The valid OMB control number for this information collection is OMB No. 0348-0046. Public reporting burden for this collection of information is estimated to average 10 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0046), Washington, DC 20503

EXHIBIT E

## STANDARD CLAUSES

## FOR MANAGED CARE PROVIDER/IPA CONTRACTS

## FOR THE FULLY-INTEGRATED DUALS ADVANTAGE PROGRAM

### January 1, 2015

Notwithstanding any other provision of this agreement, contract, or amendment (hereinafter "Agreement"), which shall specify the delegated activities and reporting requirements, the parties agree to be bound by the following clauses, exclusively for the New York State Fully Integrated Duals Advantage Program ("FIDA"), covering long-terms care services for individuals eligible for both Medicare and New York Medicaid benefits, which are hereby made a part of this Agreement. Further, if this Agreement is between a Managed Care Organization and an IPA, or between an IPA and an IPA, such clauses must be included in IPA contracts with providers, and providers must agree to such clauses.

A.  DEFINITIONS FOR PURPOSES OF THIS APPENDIX

"Managed Care Organization" or "MCO" shall mean the person, natural or corporate, or any groups of such persons, certified under Public Health Law Article 44, who enter into an arrangement, agreement or plan or any combination of arrangements or plans which provide or offer, or which do provide or offer, a comprehensive health services plan.

"Independent Practice Association" or "IPA" shall mean an entity formed for the limited purpose of arranging by contract for the delivery or provision of health services by individuals, entities and facilities licensed or certified to practice medicine and other health professions, and, as appropriate, ancillary medical services and equipment, by which arrangements such health care providers and suppliers will provide their services in accordance with and for such compensation as may be established by a contract between such entity and one or more MCOs. "IPA" may also include, for purposes of this Agreement, a pharmacy or laboratory with the legal authority to contract with other pharmacies or laboratories to arrange for or provide services to enrollees of a New York State MCO.

"Provider" shall mean physicians, dentists, nurses, pharmacists and other health care professionals, pharmacies, hospitals and other entities engaged in the delivery of health care services which are licensed, registered and/or certified as required by applicable federal and state law.

"New York FIDA Contract" shall mean the agreement between the MCO, the United States Department of Health and Human Services Centers for Medicare and Medicaid Services ("CMS"), and the New York State Department of Health for the arrangement of FIDA covered services.

A.    GENERAL TERMS AND CONDITIONS

1.  This Agreement is subject to the approval of the New York State Department of Health and if implemented prior to such approval, the parties agree to incorporate into this Agreement any and all modifications required by the Department of Health for approval or, alternatively, to terminate this Agreement if so directed by the Department

of Health, effective sixty (60) days subsequent to notice, subject to Public Health Law §4403(6)(e). This Agreement is the sole agreement between the parties regarding the arrangement established herein.

2. Any material amendment to this Agreement is subject to the prior approval of the Department of Health, and any such amendment shall be submitted for approval at least thirty (30) days, or ninety (90) days if the amendment adds or materially changes a risk sharing arrangement that is subject to Department of Health review, in advance of anticipated execution. The MCO shall notify and/or submit a copy of such material amendment to DOH or New York City, as may be required by New York FIDA Contract.

3. Assignment of an agreement between an MCO and (i) an IPA, (ii) institutional network provider, or (iii) medical group provider that serves five percent or more of the enrolled population in a county, or the assignment of an agreement between an IPA and (i) an institutional provider or (ii) medical group provider that serves five percent or more of the enrolled population in a county, requires the prior approval of the Commissioner of Health. Otherwise and if applicable, delegated activities and reporting responsibilities delegated to Provider, if any, must be set forth in this Agreement. **[42 C.F.R. § 422.504(i)(4)(i)]**.

4. The Provider agrees, or if this Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree, to comply fully and abide by the rules, policies and procedures that the MCO (i) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, or DOH or DFS guidelines or policies and (ii) has provided to the Provider in writing at least thirty (30) days in advance of implementation (unless such change is mandated by CMS or DOH without thirty (30) days prior notice), including but not limited to:

- quality improvement/management;
- covered items and services;
- utilization review / management, including but not limited to precertification procedures, referral process or protocols, and reporting of clinical encounter data;
- enrollee grievances;
- provider credentialing;
- care management and the interdisciplinary team (IDT);
- advance directives; and
- delivery of preventative health service.

The Provider also agrees, or if this Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require the IPA's providers to agree to comply fully and abide by the rules, policies, procedures and requirements related to the IDT, including but not limited to: (i) participating in approved training on the IDT process, person-centered service planning process, cultural competence, disability, accessibility and accommodations, independent living and recovery, and wellness principles, along with other required training, as specified by DOH, CMS or the New York FIDA Contract, (ii) acknowledging that the IDT has the authority to make coverage determinations and the services planning process as set forth in the IDT policy, and (iii) participation in and ongoing involvement with each enrollee's IDT.

5. The Provider or, if this Agreement is between the MCO and an IPA, or between an IPA and an IPA, the IPA agrees, and shall require its providers to agree not to discriminate against an enrollee based on color, race, creed, age, gender, sexual orientation, disability, place of origin, source of payment or type of illness or condition. In addition, all services covered under this Agreement must be provided in a culturally and linguistically competent

manner to all enrollees, including those with limited English proficiency or reading skills, and diverse cultural and ethnic backgrounds.  **[42 C.F.R. § 422.112(a)(8)]**.

6.  If the Provider is a primary care practitioner, the Provider agrees to provide for twenty-four (24) hour coverage and back up coverage when the Provider is unavailable.  The Provider may use a twenty-four (24) hour back-up call service provided appropriate personnel receive and respond to calls in a manner consistent with the scope of their practice.

7.  The MCO or IPA which is a party to this Agreement agrees that nothing within this Agreement is intended to, or shall be deemed to, transfer liability for the MCO's or IPA's own acts or omissions, by indemnification or otherwise, to a provider.  IPA or Provider is not required to indemnify the MCO for any expenses and liabilities, including, without limitation, judgments, settlements, attorneys' fees, court costs and any associated charges, incurred in connection with any claim or action brought against the MCO based on the MCO's management decisions, utilization review provisions or other policies, guidelines or actions.

8.  The Parties shall comply with all applicable federal and state laws, regulations, and CMS instructions. Notwithstanding any other provision of this Agreement, the parties shall comply with 42 C.F.R. 422.504, 423.505, 438.6(i) and the provisions of the Managed Care Reform Act of 1996 (Chapter 705 of the Laws of 1996), Chapter 551 of the Laws of 2006, Chapter 451 of the Laws of 2007 and Chapter 237 of the Laws of 2009 with all amendments thereto.

9.  Any services or other activities performed by the Parties must be consistent and comply with MCO's contractual obligations with CMS and DOH pursuant to the New York FIDA Contract.  **[42 C.F.R. § 422.504(i)(3)(iii)]** Accordingly, this Agreement incorporates the pertinent MCO obligations under the New York FIDA Contract as if set forth fully herein, including but not limited to:

    a.  the MCO will monitor the performance of the Provider or IPA under this Agreement on an ongoing basis (including the performance of any delegated activities and reporting requirements), and will terminate this Agreement and/or impose other sanctions, if the Provider's or IPA's performance does not satisfy the standards of the MCO, DOH, CMS or as otherwise set forth in the New York FIDA Contract;

    b.  the Provider or IPA agrees that the work it performs under this Agreement will conform to the terms of the New York FIDA Contract, and that it will take corrective action if the MCO identifies deficiencies or areas of needed improvement in the Provider's or IPA's performance;

    c.  The Provider or IPA agrees to safeguard enrollee privacy and confidentiality of enrollee health record as required by the New York FIDA Contract between MCO, CMS and DOH;

    d.  The MCO shall not impose obligations and duties on the Provider or IPA that are inconsistent with the New York FIDA Contract, or that impair any rights accorded to DOH, the local Department of Social Services, or the United States Department of Health and Human Services;

    e.  The Provider or IPA agrees, pursuant to 31 U.S.C. § 1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of the Provider/IPA for the purpose of influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.  The Provider or IPA agrees to complete and submit the "Certification Regarding Lobbying," Appendix _C-1___ attached hereto and incorporated herein, if this Agreement exceeds $100,000.

    f.  If any funds other than Federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of a member of Congress, in connection with the award of any Federal Contract, the making of any Federal grant, the making of any Federal loan, the entering of any cooperative agreement, or the extension, continuation, renewal, amendment, or  modification of any Federal contract,

31

grant, loan, or cooperative agreement, and the Agreement exceeds $100,000 the Provider or IPA shall complete and submit Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions;

g. The Provider agrees to disclose to MCO on an ongoing basis, any managing employee that has been convicted of a misdemeanor or felony related to the person's involvement in any program under Medicare, Medicaid or a Title XX services program (Block grant programs);

h. The Provider agrees to monitor its employees and staff against the List of Excluded Individuals and Entities (LEIE) and excluded individuals posted by the OMIG on its Website;

i. The Provider agrees to disclose to MCO complete ownership, control, and relationship information;

j. Provider agrees to obtain for MCO ownership information from any subcontractor with whom the provider has had a business transaction totaling more than $25,000, during the 12 month period ending on the date of the request made by SDOH, OMIG or DHHS.  The information requested shall be provided to MCO within 35 days of such request; and

k. Provider or IPA agrees that any services rendered under this Agreement with the MCO must be accessible to all enrollees and that Provider, or if this Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require its providers to agree to provide reasonable accommodations to all enrollees who require them;

10. The parties to this Agreement agree to comply with all applicable requirements of the Federal Americans with Disabilities Act.

11. The Provider agrees, or if this Agreement is between the MCO and an IPA or between an IPA and an IPA, the IPA agrees and shall require it's providers to agree, to comply with all applicable requirements of the Health Insurance Portability and Accountability Act; the HIV confidentiality requirements of Article 27-F of the Public Health Law and Mental Hygiene Law § 33.13.  In addition, the Parties agree to comply with the following : (i) abiding by all Federal and State laws regarding confidentiality and disclosure of medical records, or other health and enrollment information, (ii) ensuring that medical information is released in accordance with applicable Federal or State law, or pursuant to court orders or subpoenas, (iii) maintaining medical records and other enrollee records and information in an accurate and timely manner, and (iv) ensuring timely access by enrollees to the records and information that pertain to them.  **[42 C.F.R. §§ 422.118 and 422.504(a)(13)]**.

12. The parties acknowledge the requirements under the Emergency Medical Treatment and Labor Act ("EMTALA") to ensure public access to emergency services regardless of an individual's ability to pay.  Thus, the parties shall not take any action(s) to create any conflicts with a hospital's obligations under EMTALA.

B.    PAYMENT / RISK ARRANGEMENTS

1. Payment.  MCO is obligated to pay IPA or Provider under the terms of this Agreement.  As defined in 42 C.F.R. § 447.46, the MCO shall pay all clean electronic claims within thirty (30) days of receipt and paper claims within forty-five (45) days per NYS Insurance Law Section 3224-a.  The MCO shall pay clean claims from network pharmacies (other than mail-order and long-term care pharmacies) within fourteen (14) days of receipt for electronic claims and within thirty (30) days of receipt all other claims.  The MCO shall pay interest on clean claims that are not paid within the applicable fourteen (14) days, thirty (30) days or forty-five (45) days in accordance with NYS Insurance Law Section 3224-a.

2. Enrollee Non-liability.  Provider agrees that in no event, including, but not limited to,

nonpayment by the MCO or IPA, insolvency of the MCO or IPA, or breach of this Agreement, shall Provider bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against an enrollee or person (other than the MCO or IPA) acting on his/her/their behalf, for services provided pursuant to the

New York FIDA Contract and this Agreement, for the period covered by the paid enrollee premium.  In addition, Provider agrees that during the time the enrollee is enrolled in the MCO that he/she/it shall not bill CMS, DOH, the City of New York for Covered Services within the benefit package as set forth in the New York FIDA Contract. Provider agrees that during the time the enrollee is enrolled in the MCO that he/she/it shall not collect copayments, coinsurance amounts, or permitted deductibles, as specifically provided in the New York FIDA Contract or fees for uncovered services delivered on a fee-for-service basis to a covered person unless Provider has advised the enrollee in writing that the service is uncovered and the enrollee's liability prior to providing the services. Enrollees shall not be held liable for Medicare Parts A and B cost sharing.  Medicare Parts A and B services must be provided at zero cost-sharing as part of the integrated package of benefits under FIDA. Where the Provider has not been given a list of services covered by the MCO, and/or Provider is uncertain as to whether a service is covered, the Provider shall make reasonable efforts to contact the MCO and obtain a coverage determination prior to advising an enrollee as to coverage and liability for payment and prior to providing the service.  Under no circumstances may enrollees be held liable for payment of any fees that are the legal obligation of MCO.  **[42 C.F.R. §§ 422.504(g)(1)(i) and 422.504(i)(3)(i)]**.  This provision shall survive termination of this Agreement for any reason, and shall supersede any oral or written agreement now existing or hereafter entered into between Provider and enrollee or person acting on his or her behalf.

3.      Coordination of Benefits (COB). To the extent otherwise permitted in this Agreement, the Provider may participate in collection of COB on behalf of the MCO, with COB collectibles accruing to the MCO or to the provider.  However, with respect to enrollees eligible for medical assistance under FIDA, the Provider shall maintain and make available to the MCO records reflecting COB proceeds collected by the Provider or paid directly to enrollees by third party payers, and amounts thereof, and the MCO shall maintain or have immediate access to records concerning collection of COB proceeds.

4.      If the Provider is a health care professional licensed, registered or certified under Title 8 of the Education Law, the MCO or the IPA must provide notice to the Provider at least ninety (90) days prior to the effective date of any adverse reimbursement arrangement as required by Public Health Law § 4406-c(5-c).  Adverse reimbursement change shall mean a proposed change that could reasonably be expected to have a material adverse impact on the aggregate level of payment to a health care professional.  This provision does not apply if the reimbursement change is required by law, regulation or applicable regulatory authority; is required as a result of changes in fee schedules, reimbursement methodology or payment policies established by the American Medical Association current procedural terminology (CPT) codes, reporting guidelines and conventions; or such change is expressly provided for under the terms of this Agreement by the inclusion or reference to a specific fee or fee schedule, reimbursement methodology or payment policy indexing scheme.

5.      IPA or Provider agrees to comply with all applicable requirements governing physician incentive plans (PIP), including but not limited to such requirements contained in 42 CFR Parts 417, 422, 434, 438, and 1003 and to incorporate such required provisions into any contracts between the contracting entity and any first tier, downstream or related entities for medical providers for the provision of services under this Agreement.  No specific payment will be made directly or indirectly to a physician or physician group as an inducement to deny, reduce, delay or limit medically necessary services furnished to an enrollee. IPA and Provider shall not profit from the provision of services that are not medically necessary or medically appropriate.  As such, any financial risk assumed by IPA or Provider for the cost of medical care, services or equipment provided or authorized by another provider or health care provider shall include provisions for (i) stop-loss protection; (ii) minimum patient population size for Provider or the provider group; and (iii) identification of the health care services for which Provider is at risk.

6.      Provider agrees that he/she/it shall not be entitled to payment from MCO for a "Provider Preventable Condition" as defined in the New York FIDA Contract.  In addition, as a condition of payment, Provider shall identify provider-preventable conditions associated with claims and comply with the reporting requirements of 42 CFR §447.26(d) and as may be specified by MCO.

7.    The parties agree that a claim for home health care services following an inpatient hospital stay cannot be denied on the basis of medical necessity or a lack of prior authorization while a utilization review determination is pending if all necessary information was provided before an enrollee's inpatient hospital discharge, consistent with Public Health Law § 4903.

C.    RECORDS ACCESS

1.  Pursuant to appropriate consent/authorization by the enrollee, the Provider will make the enrollee's medical records and other personally identifiable information (including encounter data for government-sponsored programs) available to the MCO (and IPA if applicable), for purposes including preauthorization, concurrent review, quality assurance, (including Quality Assurance Reporting Requirements ("QARR")), care management, treatment, payment or heath care operations, payment processing, qualification for government programs, and for MCO/Manager analysis and recovery of overpayments due to fraud and abuse.  The Provider will also make enrollee medical records available to the State for management audits, financial audits, program monitoring and evaluation, licensure or certification of facilities or individuals, and as otherwise required by state law.  The Provider shall provide copies of such records to DOH at no cost.  The Provider (or IPA if applicable) expressly acknowledges that he/she/it shall also provide to the MCO and the State (at no expense to the State), on request, all financial data and reports, and information concerning the appropriateness and quality of services provided, as required by law.  These provisions shall survive termination of the contract for any reason.

2.  The Provider agrees to disclose the nature and extent of FIDA covered services provided and to furnish records to DOH and/or the United States Department of Health and Human Services, the County Department of Social Services, the Comptroller of the State of New York, the Office of the Medicaid Inspector General, the New York State Attorney General, and the Comptroller General of the United States and their designees or authorized representatives upon request.  HHS, the Comptroller General, DOH, the New York State Office of the Inspector General, Office of the State Comptroller, and the Office of the New York State Attorney General or their designees, and state and federal agencies with monitoring authority related to Medicare and Medicaid shall have the right to audit, evaluate and inspect any pertinent information including books, contracts, computers or other electric systems, records, including medical records, and documentation and any information for or of the Provider, IPA and IPA Providers.  HHS's, the Comptroller General's, DOH's, the New York State Office of the Medicaid Inspector General, Office of State Comptroller, and office of the Attorney General or their designees rights to inspect, evaluate, and audit any pertinent information for any particular contract period shall be for a period of 10 years from the final date of the contract period or from the date of completion of any audit, whichever is later.  **[42 C.F.R. § 422.504(i)(2)(i) and (ii)]**.  Accordingly, the parties agree that medical records shall be retained for a period of at least ten (10) years after the date of the provider contract. This provision shall survive the termination of this Agreement regardless of the reason for the termination.

3.  The MCO and the Provider agree that the MCO will obtain consent directly from enrollees at the time of enrollment or at the earliest opportunity, or that the Provider will obtain consent from enrollees at the time service is rendered or at the earliest opportunity, for disclosure of medical records to the MCO, to an IPA or to third parties for treatment, payment, or health care operations.  If this Agreement is between an MCO and an IPA, or between an IPA and an IPA, the IPA agrees to require the providers with which it contracts to agree as provided above.  If this Agreement is between an IPA and a Provider, the Provider agrees to obtain consent from the enrollee if the enrollee has not previously signed consent for disclosure of medical records.

D.     TERMINATION AND TRANSITION

1. Termination or non-renewal of an agreement between an MCO and an IPA, institutional network provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination or non-renewal of an agreement between an IPA and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health.  Neither the MCO nor the IPA or Provider shall terminate the Agreement, or, at least participation in the MCO's FIDA benefit plan or FIDA program without cause.  The effective date of termination by a Provider or IPA shall not be upon less than ninety (90) days notice to the MCO.  Unless otherwise provided by statute or regulation, the effective date of termination by the MCO shall not be less than forty-five (45) days after receipt of notice to the IPA or Provider, provided, however, that termination by the MCO may be effected on less than 45 days' notice provided the MCO demonstrates to DOH's satisfaction prior to termination that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.

2. If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for a review as required by state law.  The MCO shall provide the health care professional 60 days notice of its decision to not renew this Agreement.  Otherwise, MCO shall provide a written statement to IPA or Provider (other than a health care professional) stating the reason or reasons for termination with cause.

3. If this Agreement is between an MCO and an IPA, and the Agreement does not provide for automatic assignment of the IPA's Provider contracts to the MCO upon termination of the MCO/IPA contract, in the event either party gives notice of termination of the Agreement, the parties agree, and the IPA's providers agree, that the IPA providers shall continue to provide care to the MCO's enrollees pursuant to the terms of this Agreement for 180 days following the effective date of termination, or until such time as the MCO makes other arrangements, whichever first occurs.  This provision shall survive termination of this Agreement regardless of the reason for the termination.

4. Continuation of Treatment.  The Provider agrees that in the event of MCO or IPA insolvency or termination of this contract for any reason, the Provider shall (i) continue to provide treatment to enrollees for the duration of the period for which payment has been made and (ii) continue, until medically appropriate discharge or transfer, or completion of a course of treatment, whichever occurs first, to provide services pursuant to the New York FIDA Contract, to an enrollee confined in an inpatient facility, provided the confinement or course of treatment was commenced during the paid premium period.  **For purposes of this clause, the term "provider" shall include the IPA and the IPA's contracted providers if this Agreement is between the MCO and an IPA**.  This provision shall survive termination of this Agreement.

5. Notwithstanding any other provision herein, the Provider, the MCO or IPA retains the option to immediately terminate this Agreement if the Provider has been terminated or suspended from the Medicaid or Medicare Programs.

1.  In the event of termination of this Agreement, the Provider agrees, and, where applicable, the IPA agrees to require all participating providers of its network to assist in the orderly transfer of enrollees to another provider, including sharing the enrollee's medical record and other relevant enrollee information as directed by the MCO or enrollee.

E.     ARBITRATION

1.     To the extent that arbitration or alternative dispute resolution is authorized elsewhere in this Agreement, the parties to this Agreement acknowledge that the Commissioner of Health is not bound by arbitration or mediation decisions.  Arbitration or mediation shall occur within New York State, and the Commissioner of Health will be given notice of all issues going to arbitration or mediation, and copies of all decisions.

G.    IPA-SPECIFIC PROVISIONS

1.  Any reference to IPA quality assurance (QA) activities within this Agreement is limited to the IPA's analysis of utilization patterns and quality of care on its own behalf and as a service to its contract providers.

H.  MISCELLANEOUS

1.  If IPA or Provider has been delegated to perform credentialing of medical providers, then any credentialing of medical professionals shall comply with Section 2.7.1.2 of the New York FIDA Contract. The credentials of medical professionals affiliated with the IPA or Provider contracted with MCO shall either be reviewed by MCO or the credentialing process shall be reviewed and approved by MCO and MCO will audit the credentialing process on an ongoing basis. **[42 C.F.R. § 422.504(i)(4)(iv)]**.

2.  Notwithstanding any other provision herein, MCO retains the right to approve, suspend, or terminate any arrangement with an IPA, Provider, first tier, downstream or related entity.  **[42 C.F.R. § 422.504(i)(5)]**.

3.  MCO agrees that it shall not refuse to contract with or pay an otherwise eligible Provider for the provision of FIDA covered items and services solely because such Provider has communicated in good faith with one or more of his or her prospective, current or former patients regarding the method by which such Provider is compensated by the MCO for items and services provided to the patient.

4.  IPA or Provider acknowledges and agrees that if Provider is providing laboratory testing services IPA or Provider shall comply with the Clinical Laboratory Improvement Amendments ("CLIA") and shall have either a CLIA certificate or a waiver of a CLIA certificate or registration, unless otherwise provided by law.