UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PRINCIPLE HOMECARE, LLC, MARTON CARE INC., PROMPT HOME CARE LLC, and CARE CONNECT CDPAP, INC.,

Plaintiffs,

v.

JAMES V. MCDONALD, in his official capacity as Commissioner of the New York State Department of Health,

Defendant.

No. 1:24-cv-7071 (MGM)

**<u>ORAL ARGUMENT REQUESTED</u>**

---

## MEMORANDUM OF LAW IN OPPOSITION TO <u>DEFENDANT'S MOTION TO DISMISS</u>

GIBSON, DUNN & CRUTCHER LLP
200 PARK AVENUE
NEW YORK, NY 10166-0193
TELEPHONE: 212.351.4000

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 5

I.    CDPAP Develops As An Important Program With A Thriving Free Market In New York .................................................................................................................... 5

II.   Plaintiffs Have Spent Years Building Businesses As Fiscal Intermediaries ................. 6

III.  The CDPAP Amendment Eviscerates Plaintiffs' Contracts And The Fiscal Intermediary Industry ......................................................................................... 8

STANDARD OF REVIEW ................................................................................... 10

ARGUMENT ...................................................................................................... 10

I.    Plaintiffs Have Adequately Alleged A Contracts Clause Violation ............................ 10

    A.   The CDPAP Amendment Substantially Impairs Plaintiffs' Contracts ................. 11

    B.   The CDPAP Amendment Does Not Appropriately Or Reasonably Advance A Significant And Legitimate Public Purpose ......................................................... 15

        1.   The CDPAP Amendment Does Not Serve A Significant And Legitimate Public Purpose .............................................................................................. 15

        2.   The CDPAP Amendment Is Not A Reasonable And Necessary Means Of Achieving Its Purported Purpose .................................................................. 17

II.   Plaintiffs Have Adequately Alleged An Unconstitutional Taking ................................ 19

    A.   Plaintiffs Have A Protected Property Interest In Their Contracts ........................ 20

    B.   Plaintiffs Have Adequately Alleged A Regulatory Taking .................................. 22

        1.   The CDPAP Amendment Effects A Categorical Taking Of Plaintiffs' Private Property .................................................................................................... 22

        2.   The CDPAP Amendment Effects A *Penn Central* Taking ......................... 24

III.  Plaintiffs Have Adequately Alleged An Equal Protection Violation ........................... 26

IV.  Plaintiffs Have Adequately Alleged A Violation Of The Due Process Clause ........... 29

CONCLUSION .................................................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
  761 F.3d 252 (2d Cir. 2014)........................................................................................22

*A.F.C. Enters. v. N.Y.C. Sch. Const. Auth.*,
  1999 WL 1417210 (E.D.N.Y. June 29, 1999) .........................................................21

*All. of Auto. Mfrs., Inc. v. Currey*,
  984 F. Supp. 2d 32 (D. Conn. 2013) ........................................................................13

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234, 245 (1978) ..........................................................................................15

*Anderson v. Spear*,
  356 F.3d 651 (6th Cir. 2004) ....................................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................................10

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................................10

*Bimber's Delwood, Inc. v. James*,
  496 F. Supp. 3d 760 (W.D.N.Y. 2020) ....................................................................23

*Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York*,
  2021 WL 4198332 (S.D.N.Y. Sept. 14, 2021)..........................................................13

*Bryant v. N.Y. Educ. Dep't*,
  692 F.3d 202 (2d Cir. 2012).......................................................................................29

*Corning Council v. McDonald*,
  No. 908147-24, NYSCEF No. 59 (Sup. Ct. Albany Cnty. Sept. 30, 2024)..............28

*Dairyland Greyhound Park, Inc. v. Doyle*,
  719 N.W.2d 408, 433 (Wis. 2006)............................................................................14

*DoorDash, Inc. v. City of New York*,
  692 F. Supp. 3d 268 (S.D.N.Y. 2023).............................................................. *passim*

*Elmsford Apartment Assocs., LLC v. Cuomo*,
  469 F. Supp. 3d 148 (S.D.N.Y. 2020).......................................................................26

*Engquist v. Or. Dep't of Agric.*,
  553 U.S. 591 (2008)...................................................................................................28

*Freedom Care LLC v. N.Y. Dep't of Health*,
  No. 161036/2024 (Sup. Ct. N.Y. Cnty. Nov. 25, 2024) ..........................................10

ii

*Ganci v. N.Y.C. Transit Auth.*,
  420 F. Supp. 2d 190 (S.D.N.Y.) ............................................................................21

*Gersman v. Grp. Health Ass'n, Inc.*,
  725 F. Supp. 573, 575 (D.D.C. 1989) ....................................................................14

*Gizzo v. Ben-Habib*,
  44 F. Supp. 3d 374 (S.D.N.Y. 2014) ......................................................................21

*Greater Chautauqua Fed. Credit Union v. Marks*,
  2023 WL 2744499 (S.D.N.Y. Mar. 31, 2023) ........................................19, 21, 24, 25

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
  480 U.S. 470 (1987) ................................................................................................18

*Lingle v. Chevron U.S.A. Inc.*,
  544 U.S. 528 (2005) ................................................................................................22

*Lucas v. S.C. Coastal Council*,
  505 U.S. 1003 (1992) ..............................................................................................22

*Lynch v. United States*,
  292 U.S. 571 (1934) ................................................................................................20

*Martz v. Inc. Vill. of Valley Stream*,
  22 F.3d 26 (2d Cir. 1994) ........................................................................................21

*McCarthy v. Cuomo*,
  2020 WL 3286530 (E.D.N.Y. June 18, 2020) ........................................................23

*Melendez v. City of New York*,
  16 F.4th 992 (2d Cir. 2021) ............................................................................. *passim*

*Meyer v. Nebraska*,
  262 U.S. 390 (1923) ................................................................................................29

*Michael Grecco Prods., Inc. v. RADesign, Inc.*,
  112 F.4th 144, 148 (2d Cir. 2024) ..........................................................................10

*Nielsen v. Rabin*,
  746 F.3d 58 (2d Cir. 2014) ......................................................................................10

*Nixon v. United States*,
  978 F.2d 1269 (D.C. Cir. 1992) ..............................................................................22

*Palazzolo v. Rhode Island*,
  533 U.S. 606 (2001) ................................................................................................24

*Penn Central Transp. Co. v. City of New York*,
  438 U.S. 104 (1978) ..........................................................................................23, 24

*Philip Morris, Inc. v. Reilly*,
  312 F.3d 24 (1st Cir. 2002) .....................................................................................23

*Rose Acre Farms, Inc. v. United States*,
   373 F.3d 1177 (Fed. Cir. 2004)...................................................................22

*Ruane v. Cnty. of Suffolk*,
   2015 WL 2337329 (E.D.N.Y. May 13, 2015) .........................................29

*Ruckelshaus v. Monsanto Co.*,
   467 U.S. 986 (1984)....................................................................................20

*S & D Maint. Co. v. Goldin*,
   844 F.2d 962 (2d Cir. 1988)........................................................................21

*Schmid v. Sonoma Clean Power*,
   2014 WL 12689941 (N.D. Cal. Nov. 14, 2014), *aff'd*, 673 F. App'x 785 (9th
   Cir. 2017) ...................................................................................................30

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
   535 U.S. 302 (2002)....................................................................................24

*U.S. Tr. Co. of New York v. New Jersey*,
   431 U.S. 1 (1977).........................................................................................20

*United States v. Strock*,
   982 F.3d 51 (2d Cir. 2020)..........................................................................16

*Vaher v. Town of Orangetown*,
   916 F. Supp. 2d 404 (S.D.N.Y. 2013).........................................................30

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012)........................................................................27

*Winston v. City of Syracuse*,
   887 F.3d 553 (2d Cir. 2018).................................................................27, 29

## Statutes

10 U.S.C. § 4654(c)(2)...........................................................................................11

N.Y. Soc. Serv. Law § 365-f......................................................................4, 8, 25, 27

## Other Authorities

Adam Smith, *The Wealth Of Nations*, Book II, Chapter II (1776) .............................30

Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms:
   Striking A Better Balance*, 72 Antitrust L.J. 3 (2004).......................................30, 31

Louis Brandeis, *The Curse of Bigness* (1934) ........................................................3, 30

N.Y. Governor's Off., Governor Hochul Announces Next Steps in Plans to
   Strengthen Home Care Services for New Yorkers (Sept. 30, 2024),
   https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-
   plans-strengthen-home-care-services-new-yorkers ...............................................9

## Constitutional Provisions

U.S. Const. art. I, § 10, cl. 1 ................................................................................................10

U.S. Const. amend. V ............................................................................................................19

U.S. Const. amend. XIV, § 1 ................................................................................................29

Plaintiffs Principle Homecare, LLC, Marton Care Inc., Prompt Home Care LLC, and Care Connect CDPAP, Inc. (collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant James V. McDonald's motion to dismiss.

## PRELIMINARY STATEMENT

This case challenges a misbegotten and unconstitutional government "reform" that dismantles a thriving ecosystem of competing businesses in a multi-billion-dollar industry in New York State—making it illegal for them to continue to do business pursuant to longstanding private contracts after April 1, 2025—and hands their entire economic value to a private, state-appointed monopolist. The affected businesses have long provided "Fiscal Intermediary" services under New York State's Consumer Directed Personal Assistance Program ("CDPAP")—a program that allows individuals requiring home care to hire a friend, non-spousal family member, or trusted confidant to serve as their caregiver. Fiscal Intermediaries serve a critical function in facilitating the program, helping roughly 280,000 home care recipients manage the financial, administrative, and regulatory responsibilities associated with the program. Currently, there are approximately 600 Fiscal Intermediaries operating across New York, pursuant to private contracts. Plaintiffs are just a few of these Fiscal Intermediaries—small companies that have worked hard to provide tailored services to local communities, accounting for their unique linguistic and other needs. But, with the stroke of a pen, the State has irrationally decided to destroy this entire industry, putting hundreds of Fiscal Intermediaries out of business in favor of a single private monopolist—while providing no compensation for this taking of their property.

This maneuver was set in motion on April 20, 2024, when Governor Kathy Hochul approved the New York State Budget, which (among other things) amended CDPAP to require that all consumers transition to a single statewide Fiscal Intermediary no later than April 1, 2025

(the "CDPAP Amendment").  The State did not conduct any economic impact or other studies of the effects this drastic change would have on the Fiscal Intermediary industry or the communities that receive CDPAP services before rushing it through the legislative budget process.  The CDPAP Amendment established an opaque procurement process run by the Department of Health for the selection of the statewide Fiscal Intermediary—to whom the State will hand the reins of this entire multi-billion-dollar industry.  For inexplicable reasons, the CDPAP Amendment exempts this procurement process from State Comptroller review and oversight—a function that would normally apply in such instances to detect fraud and waste before taxpayer dollars are spent.

Because this CDPAP Amendment, as plausibly alleged, violates the U.S. Constitution in multiple respects, both facially and as applied, the State's motion to dismiss should be denied and the Amendment should—at the appropriate time—be blocked and invalidated in its entirety.

*First*, the CDPAP Amendment violates the Contracts Clause because it extinguishes—and therefore substantially impairs—all contracts Fiscal Intermediaries have with private Medicaid service providers, provides no compensation for doing so, and is neither reasonable nor necessary to advance a significant and legitimate public interest.  Nothing in the regulatory history of CDPAP could have put the in-state Fiscal Intermediaries on notice that they might invest years of work and millions of dollars in building their businesses and private contractual relationships only for the government to completely and permanently nullify those contracts without regard to the Fiscal Intermediaries' capabilities, performance, or integrity—let alone that the government would do so by eviscerating the entire Fiscal Intermediary industry.  And far from being reasonable and necessary to achieve a significant public purpose of increasing efficiency and eliminating waste, fraud, and abuse in Medicaid, as the State asserts in its motion to dismiss, the CDPAP Amendment—based on a scant legislative record and nonexistent factual basis—eliminates

competition in a way that will ultimately increase costs, reduce efficiency, and impair the quality of care under CDPAP. As Justice Brandeis long ago explained, "[t]he only argument that has been seriously advanced in favor of private monopoly is that competition involves waste, while the monopoly prevents waste and leads to efficiency. This argument is essentially unsound. The wastes of competition are negligible. The economies of monopoly are superficial and delusive."[1] The Constitution forbids the wanton destruction of contracts via a State-imposed monopoly justified by nothing more than vague references to "efficiency," "waste," and the like.

*Second*, the CDPAP Amendment effects a regulatory taking without just compensation, in violation of the Takings Clause, by rendering the contracts Fiscal Intermediaries have with private Medicaid service providers completely valueless. This complete deprivation of property rights amounts to both a categorical taking (under *Lucas*) and a non-categorical taking (under *Penn Central*). In reasonable reliance on their contracts, Fiscal Intermediaries have invested tremendous amounts of effort, time, and money in developing the business infrastructure necessary to provide critical services to the many caretakers (called "personal assistants") and care-recipients (called "consumers") who depend on them. But this was of no apparent concern to the State, which decided to extinguish these contracts and place all economic power in the hands of a State-selected monopolist—the only guaranteed beneficiary of this new legislation. The Fiscal Intermediaries could not predict this severe and unprecedented intrusion on their property rights, which is precisely the type of regulation that the Takings Clause was intended to guard against.

*Third*, the CDPAP Amendment violates the Equal Protection Clause because it imposes an arbitrary and irrational limitation on the eligibility criteria for the new Statewide Fiscal Intermediary that eliminated most of the otherwise-qualified Fiscal Intermediaries from

---

[1] Louis Brandeis, *The Curse of Bigness* 105 (1934).

consideration before bids were even submitted. To even *compete* for the one available contract, a bidder had to have been "providing services as a fiscal intermediary on a statewide basis with at least one *other state*" as of April 1, 2024. N.Y. Soc. Serv. Law § 365-f(4-a)(a)(iii)(b)(i)(B) (emphasis added). In other words, the State decided to exclude Plaintiffs and hundreds of other local businesses from consideration by requiring statewide out-of-state experience. In its motion to dismiss, the State contends this requirement ensures that the monopolist have "capacity" to service all 280,000 CDPAP participants. But this explanation merely *confirms* the amendment's irrationality, as experience in another state—such as Pennsylvania, which has only 20,000 participants in its home health care program—says nothing about whether a potential bidder is equipped to manage New York's much larger program. Nor does operating solely within New York—i.e., having broad and in some cases statewide experience successfully providing services under the actual program at issue—indicate a lack of capacity to assume statewide responsibilities in New York. This favoritism of out-of-state interlopers is not just bad policy, but irrational.

*Fourth*, the CDPAP Amendment violates the Due Process Clause by depriving existing Fiscal Intermediaries of their contracts without any rational basis. It is well-established that these kinds of private contracts constitute protected property interests. In its motion, the State contends that it had good reasons (noted above) for extinguishing these contracts. Putting aside that there was no basis to conclude that the claimed problems with the program actually exist, it has long been understood that monopolies kill efficiency and lead to degraded services, and the State provides no justification for its apparent belief that this monopoly will prove unique in this regard. The CDPAP Amendment also mandates a series of subcontractors, thus adding an *additional* layer of bureaucracy and all but ensuring a worsening of the purported (but conjectural) problems that the Amendment supposedly seeks to cure. The State's motion to dismiss should be denied.

**BACKGROUND**

I.     **CDPAP Develops As An Important Program With A Thriving Free Market In New York**

CDPAP is a statewide program that empowers elderly, chronically ill, and disabled New Yorkers to take control of their home healthcare decisions by hiring a friend, non-spousal family member, or trusted confidant to serve as their caregiver.  Compl. ¶ 2.  As part of this program, the care-recipients (or "consumers") directly employ their caregivers (or "personal assistants") and pay their wages using funds from Medicaid.  *Id.* ¶¶ 26, 39.  Launched in 1995, CDPAP has been an incredibly popular program that today includes an estimated 280,000 consumers and 300,000 personal assistants.  *Id.* ¶¶ 21, 31, 40.

But for most consumers, it is not so easy to serve as an employer—a role that comes with myriad legal and regulatory requirements such as wage and benefit processing, tax withholding, personnel recordkeeping, and compliance with Department of Health ("DOH") program requirements.  Compl. ¶ 3.  The CDPAP statute anticipated these needs and provided for the existence of "Fiscal Intermediaries," a network of businesses which would assist consumers with these employer-related responsibilities while complying with enumerated minimum statutory duties.  *Id.* ¶¶ 3, 36, 38.  There are approximately 600 Fiscal Intermediaries currently providing these critical services to consumers across New York State—a number representative of the widespread popularity of the program and the diversity of the care-recipient pool (geographically, linguistically, ethnically, etc.).  *Id.* ¶¶ 42–43.  These Fiscal Intermediaries are private businesses that have competed for years on service and cost, investing significantly along the way on things like staff, supplies, information technology systems, and office space, as necessary to discharge their duties in accordance with the CDPAP requirements.  *Id.* ¶ 47.

The primary way in which Fiscal Intermediaries are paid for their services is through contracts with Medicaid managed care organizations ("MMCOs"), which are private companies that contract with states to provide healthcare services to Medicaid beneficiaries.  Compl. ¶ 49.[2] These contracts are generally uniform for all Fiscal Intermediaries, based on the same standard template and containing the same material terms.  *Id.* ¶ 52.  The contracts can be terminated by either party without cause, or will terminate in the event of misconduct by either party—that is, if either party is "excluded, suspended, or barred from participating in any government health care program."  *Id.* ¶¶ 53–54.  Absent termination, the contracts automatically renew at the end of their one-year terms.  *Id.* ¶ 53.  As a practical matter, this automatic renewal provision keeps these private contracts in effect for extended periods.  *Id.*

## II.    Plaintiffs Have Spent Years Building Businesses As Fiscal Intermediaries

Plaintiffs are New York-based Fiscal Intermediaries that serve consumers across the State but do not provide any similar services outside New York.  Compl. ¶¶ 114, 124, 135, 145. Plaintiffs each have existing contracts with MMCOs, which have automatically renewed each year since initial execution.  *Id.* ¶¶ 111, 121, 131, 142.  As discussed below, Plaintiffs each have a unique history of operation and each serve an important function in the CDPAP ecosystem.  Each will be put out of business by the CDPAP Amendment.  *Id.* ¶¶ 8, 60, 96.

*Principle Homecare, LLC*.  Founded in 2015, Principle Homecare is a minority-owned Fiscal Intermediary that currently serves Chinese-, Haitian-Creole-, Korean-, and Spanish-speaking consumers (among others) throughout the State.  Compl. ¶¶ 105–07.  Principle Homecare sponsors community events and food banks and assists consumers with Medicaid enrollment and

---

[2] In limited circumstances, Fiscal Intermediaries may enter into a contract with a county—also referred to as a local social services district—for the provision of fiscal intermediary services.  Compl. ¶ 50.

setting up trusts.  *Id.* ¶ 108.  It also works aggressively to monitor and prevent any potential fraud—conducting home visits to connect a voice with a face, conducting daily rollcalls to make sure the consumer and the personal assistant are in the same place, utilizing electronic and telephonic systems to clock personal assistants in and out, and reporting any instances of noncompliance.  *Id.* ¶ 110.  Principle Homecare has invested tens of thousands of dollars in software and technology to provide a more streamlined experience for consumers.  *Id.* ¶ 109.

*Marton Care Inc*.  Founded in 2017, Marton Care is a Fiscal Intermediary that currently serves Arabic-, Spanish-, and Yiddish-speaking consumers throughout New York State.  Compl. ¶¶ 115–17.  Marton Care counsels consumers, coordinates peer mentoring for personal assistants, guides consumers through setting up transportation services, and generally helps consumers navigate the healthcare industry.  *Id.* ¶ 118.  In 2019, Marton Care invested tens of thousands of dollars to open a new office in Amherst, New York to better serve its upstate customers.  *Id.* ¶ 119.

*Prompt Home Care LLC*.  Founded in 2017, Prompt Home Care is a Fiscal Intermediary that currently services consumers belonging to racial and ethnic minority groups throughout New York State, with a special focus on the Dominican community in the Bronx.  Compl. ¶¶ 125–27.  Nearly all of Prompt Home Care's employees—including the team members handling enrollment, HR, and payroll—speak Spanish, and virtually all of them are themselves Dominican.  *Id.* ¶ 127.  Prompt Home Care helps consumers navigate insurance-related issues and helps facilitate telehealth visits for those who need them.  *Id.* ¶ 128.  In 2022, Prompt Home Care invested hundreds of thousands of dollars to open a second, storefront location in the Bronx.  *Id.* ¶ 129.

*Care Connect CDPAP, Inc.*  Care Connect is a Fiscal Intermediary founded in 2016 by two Ukrainian immigrants who opened the business on the belief that individuals in need have the right to receive care from those they love and trust and who provide them with happiness and peace.

Compl. ¶¶ 136–37.  Care Connect's language competencies include Albanian, Chinese, Hindi, Punjabi, Russian, Spanish, and Ukrainian.  *Id.* ¶ 138.  In addition to performing the statutorily prescribed fiscal intermediary services, Care Connect facilitates Medicaid certifications by connecting consumers with a third-party company that can assist with that process.  *Id.* ¶ 139.  Care Connect also helps consumers find doctors and connects them with experts to assist with translation- and immigration-related needs.  *Id.*  Care Connect has invested approximately $100,000 to customize its client-facing software to help make the process as seamless as possible.  *Id.* ¶ 140.

### III.    The CDPAP Amendment Eviscerates Plaintiffs' Contracts And The Fiscal Intermediary Industry

On April 20, 2024, New York Governor Kathy Hochul approved the New York State Budget for State Fiscal Year 2024-25, which included an amendment to CDPAP that eliminated the roughly 600 Fiscal Intermediaries currently operating in favor of a single, statewide Fiscal Intermediary (the "Statewide Fiscal Intermediary").  Compl. ¶¶ 58–60.  The CDPAP Amendment gave DOH virtually unfettered authority to select the Statewide Fiscal Intermediary from a pool of bidders, though the only entities eligible to bid were those "providing services as a fiscal intermediary on a statewide basis with at least one other state" as of April 1, 2024.  N.Y. Soc. Serv. Law § 365-f(4-a)(b)(i)(B).  In other words, the CDPAP Amendment handed a multi-billion-dollar industry to a single State-selected monopolist and excluded from contention all Fiscal Intermediaries without pre-existing operations in *other states*, irrespective of their competencies and performance history in New York—the only state in which CDPAP operates.

Under the CDPAP Amendment, the Statewide Fiscal Intermediary must subcontract with other entities to facilitate the delivery of fiscal intermediary services.  Compl. ¶ 63.  But even if an existing Fiscal Intermediary is selected as a subcontractor (most will not be), that Fiscal

Intermediary will have to enter *new* contracts with the Statewide Fiscal Intermediary, and its current contracts with the MMCOs will be destroyed. *Id.* ¶ 89. The small percentage of Fiscal Intermediaries selected for a role as a subcontractor—and thus added to a new layer of bureaucracy—will perform whatever tasks for whatever price set out in their new contracts. *Id.*

This draconian "amendment" lacked any rational basis, and it certainly was not necessary to achieve a legitimate government interest. The CDPAP Amendment was hastily pushed through as part of the legislative budget process and enacted under the guise of reducing waste, fraud, and abuse. *Id.* ¶ 9. But this reasoning was asserted without any study, record, or factual basis, and against the backdrop of recent Office of Medicaid Inspector General audits that revealed a *99% accuracy rate* in submitted claims under CDPAP. *Id.* ¶¶ 9, 56, 66, 70. The CDPAP Amendment was also pushed through even though the procurement process for the selection of the Statewide Fiscal Intermediary would be exempt from the State Comptroller's review and oversight—an inexplicable feature in light of the State's purported interest in combating "fraud." *Id.* ¶¶ 6, 69, 103. And while claims have been made that the CDPAP Amendment would result in cost savings, *id.* ¶ 66, the State did not conduct any economic impact studies in support of this assertion, *id.* ¶ 73. The State also seems to have given little thought to the disruptions in service that will result, turning the New York care-recipients who will be harmed by this transition into cost-cutting collateral damage. *Id.* ¶¶ 9, 99, 101.[3]

---

[3] On September 30, 2024, DOH announced that Public Partnerships LLC ("PPL") "won" its bid to fulfill the role of the Statewide Fiscal Intermediary. *See* N.Y. Governor's Off., Governor Hochul Announces Next Steps in Plans to Strengthen Home Care Services for New Yorkers (Sept. 30, 2024), https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-plans-strengthen-home-care-services-new-yorkers. PPL is an out-of-state company with no relevant prior experience in New York and with a history of significant operational problems in its other states. Indeed, PPL is the company responsible for Pennsylvania's disastrous transition—alleged in the Complaint—from just 37 private entities to one. *See* Compl. ¶ 77. The botched transition in Pennsylvania caused a serious disruption in services and forced unpaid caregivers to abandon their duties in search of a different paycheck—leaving vulnerable Pennsylvanians in a void of essential services. *Id.* At the time of the transition, Pennsylvania's program had approximately 20,000 participants—far fewer than the estimated 280,000 in New York State. *Id.* In New York state court, a Fiscal Intermediary (represented by the undersigned) alleges that DOH preselected PPL as the statewide

Despite these issues, the CDPAP Amendment stands to be fully implemented by April 1, 2025. *Id.* ¶ 79. On that day, Plaintiffs and all other existing Fiscal Intermediaries will have their private contracts extinguished, will no longer be permitted to operate as fiscal intermediaries, and will be displaced by the Statewide Fiscal Intermediary.

## STANDARD OF REVIEW

When ruling on a motion to dismiss for failure to state a claim, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A facially plausible claim "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## ARGUMENT

### I.    Plaintiffs Have Adequately Alleged A Contracts Clause Violation

The CDPAP Amendment constitutes a facial and as-applied violation of the Contracts Clause. The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. To determine whether a law violates the Contracts Clause, courts consider: "(1) whether the contractual impairment is substantial," and if so, "(2) whether the law serves a legitimate public purpose such as remedying a general social or economic problem, and (3) whether the means chosen to accomplish this purpose are reasonable

---

contract awardee and then engaged in a sham public contract bidding process. *See* Complaint, *Freedom Care LLC v. N.Y. State Dep't of Health*, No. 161036/2024 (Sup. Ct. N.Y. Cnty. Nov. 25, 2024). This Court may take judicial notice of the selection of PPL and the allegations of the *Freedom Care* litigation. *See Michael Grecco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 (2d Cir. 2024).

and necessary." *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 289 (S.D.N.Y. 2023) (internal quotation marks omitted). As alleged here, these factors all support Plaintiffs' Contracts Clause claim.

### A.   The CDPAP Amendment Substantially Impairs Plaintiffs' Contracts

In determining whether a state law substantially impairs a contract, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Melendez v. City of New York*, 16 F.4th 992, 1033 (2d Cir. 2021) (internal quotation marks omitted). The CDPAP Amendment fails on all three fronts.

*Extent of the Intrusion*. The CDPAP Amendment nullifies every existing contract that Fiscal Intermediaries have entered into with MMCOs. Those contracts have automatic renewal terms and thus (as a practical matter) would remain in effect indefinitely but-for the CDPAP Amendment. Compl. ¶ 53. When a state law "effectively repudiates" a contract, "rendering [it] permanently and completely unenforceable," that law "is *certainly* a substantial impairment of contract." *Melendez*, 16 F.4th at 1034 (emphasis added). That ends the inquiry.

The State tries to muddy the waters by suggesting that the contracts affirmatively authorize termination in occasions such as this one. Not so. The State invokes language in the contracts stating that they "shall terminate automatically and immediately in the event that either Party is excluded, suspended or barred from participating in any government health care program." Preis Decl. Exs. 2–5 ¶ 11. But that provision has no application here, as it is plainly intended to guard against misconduct by either party—not to authorize a wholesale overhaul of the industry. Compl. ¶ 54; *cf.* 10 U.S.C. § 4654(c)(2) ("The term 'suspend' means to disqualify, pursuant to established administrative procedures, from Government contracting and subcontracting for a temporary period of time because a concern or individual is suspected of engaging in criminal, fraudulent, or

seriously improper conduct.").  Even if that were not so, the provision would *still* not apply here because, as the State notes, Fiscal Intermediaries can continue certain "CDPAP operations" if "chosen as a subcontractor."  State Br. at 11.  As a result, while Plaintiffs have not been so chosen—and while their existing contracts and roles in the program have now been nullified— neither have they been categorically "barred" from participating in CDPAP altogether.

The State also cites provisions that require the parties to comply with state law, contending that this requirement means "Plaintiffs bargained for and agreed to comply with any changes to state law and the Medicaid program, including the requirements set forth in the CDPAP Amendment."  State Br. at 12.  But the natural reading of those provisions is that Plaintiffs must abide by applicable regulations *in the course of performing their contracts*.  *See, e.g.*, Preis Decl. Ex. 2 ¶ 35 ("During the term of this Agreement, FI shall comply with all applicable federal and state laws and regulations relating to the provision of consumer directed personal assistance."). Thus, the very provisions on which the State relies assume a continuation—not a termination—of the contracts.

The State also contends that the contractual bargain has not been undermined because the "contracts terminate on 60 days' notice without cause, and therefore MCOs can terminate their contracts with Plaintiffs under the explicit terms of those contracts before entering contracts with the Statewide FI."  State Br. at 12 (emphasis omitted).  But another court in this district recently rejected this very argument, noting that the text of the Contracts Clause "does not carve out any category of contracts from its scope."  *DoorDash*, 692 F. Supp. 3d at 290.  This makes sense.  Just because an MMCO (a private party) has the theoretical contractual right to terminate the contract without cause, that does not give the government the right to step in and nullify the contract.

12

_Reasonable Expectations_.  The CDPAP Amendment amounts to a "permanent" and "irrevocabl[e]" repudiation of the MMCO contracts and thus "seriously upsets . . . reasonable expectations." _Melendez_, 16 F.4th at 1034 (internal quotation marks omitted).  As discussed, the contracts between the Fiscal Intermediaries and MMCOs have one-year terms that automatically renew absent termination.  Compl. ¶ 53.  The Fiscal Intermediaries thus had "lawfully contracted-for expectations" that their business relationships with MMCOs would persist until the parties decided otherwise, or until a specified termination condition was triggered.  _Melendez_, 16 F.4th at 1042.

The State contends that Fiscal Intermediaries had no reasonable expectation in the preservation of their contracts—and cannot even claim surprise at the complete destruction of their industry—since they operate in a "heavily regulated healthcare field."  State Br. at 13.  That is not the law.  The relevant inquiry is whether, "at the time the [plaintiff's] contractual obligations were originally undertaken," the plaintiff was "regulated _in the particular_ to which he now objects." _Melendez_, 16 F.4th at 1035 (emphasis added) (citations omitted).  Thus, as the State's own cases make clear, prior regulation gives rise only to a reasonable expectation of "further legislation upon the _same topic_." _Bldg. & Realty Inst. of Westchester & Putnam Cntys., Inc. v. New York_, 2021 WL 4198332, at *34 (S.D.N.Y. Sept. 14, 2021) (emphasis added); _see also All. of Auto. Mfrs., Inc. v. Currey_, 984 F. Supp. 2d 32, 55 (D. Conn. 2013) (explaining that "a history of regulation is an insufficient basis on which to reject a Contract Clause challenge," and that there must be a "clear continuity . . . between the [challenged regulations] and their precursor").  In this case, all the prior regulations the government cites kept the competitive Fiscal Intermediary market intact, making only minor changes to the process for becoming and operating as a Fiscal Intermediary.  _See infra_ note 6.  These regulations—most of which weren't even in effect when Plaintiffs originally entered

13

into their contracts—could not possibly give rise to the expectation that the entire industry would be eviscerated.

The State then argues that Fiscal Intermediaries cannot claim to be surprised by the CDPAP Amendment because the operative contracts at the time the Amendment goes into effect on April 1, 2025, will have one-year terms and would have auto-renewed *after* the passage of the CDPAP Amendment on April 1, 2024.  State Br. at 16.  Though it offers no authority in support of this argument, the State seems to suggest that the automatic renewal of an existing contract constitutes a *new* contract such that the expectations of the parties should be assessed at the time of renewal and not at the time the contract was initially formed.  That argument is meritless.  "[R]enewal of a contract that contains language which explicitly provides for automatic renewal, and does not, therefore, require an affirmative act by either party in order to renew, constitutes a continuation of the pre-existing contractual relationship and not a 'fresh decision' to continue."  *Dairyland Greyhound Park, Inc. v. Doyle*, 719 N.W.2d 408, 433 (Wis. 2006); *Gersman v. Grp. Health Ass'n, Inc.*, 725 F. Supp. 573, 575 (D.D.C. 1989) ("It is illogical to argue that when the automatic renewal provision took effect within the original contemplation of the Parties new and distinct contracts were created."), *aff'd*, 931 F.2d 1565 (D.C. Cir. 1991), *vacated on other grounds*, 502 U.S. 1068 (1992).  Thus, the CDPAP Amendment interferes with *pre-existing* contracts, and Plaintiffs' reasonable expectations should be measured at time those contracts went into effect—i.e., *before* April 1, 2024.

*Reinstating Rights*.  The CDPAP Amendment is "permanent":  It eliminates Plaintiffs' existing contracts with MMCOs and provides them "no opportunity to reinstate [their] rights" under those contracts.  *DoorDash*, 692 F. Supp. 3d at 290; Compl. ¶¶ 6, 8, 58, 64–65, 80, 151.  The State contends that there is no issue here because "FIs can still potentially operate as

subcontractors with the Statewide FI." State Br. at 17.  But that is irrelevant.  "The fact that the [Amendment] does not invalidate" some *other* "bargain cannot gainsay its destruction of" the bargain at issue.  *Melendez*, 16 F.4th at 1034.  That is doubly true where, as here, the other bargain that the State invokes—a hypothetical subcontract with the Statewide Fiscal Intermediary—is "speculative at best," and in any event would not offer Plaintiffs the same value, payments, autonomy, and responsibilities as their current contracts.  *Id.* at 1033; Compl. ¶ 89.

### B.    The CDPAP Amendment Does Not Appropriately Or Reasonably Advance A Significant And Legitimate Public Purpose

Because the CDPAP Amendment substantially impairs Plaintiffs' contracts, the State must show that the law is "warranted by a significant and legitimate public purpose pursued through reasonable and appropriate means."  *Melendez*, 16 F.4th at 1017.  This standard is "more demanding than . . . rational basis review," *id.*, and the greater "the degree of contract impairment," the higher "the hurdle the state legislation must clear."  *Id.* at 1029, 1035 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978)).  Thus, a "'[s]evere impairment . . . will push the inquiry to a careful examination of the nature and purpose' of the challenged state legislation."  *Id.* at 1035 (alteration in original) (quoting *Allied Structural Steel*, 438 U.S. at 245).  The CDPAP Amendment, which effects the most severe impairment possible, cannot clear that bar.

#### 1.    The CDPAP Amendment Does Not Serve A Significant And Legitimate Public Purpose

As a threshold matter, a significant and legitimate public purpose exists only when a law is meant to "deal with a broad, generalized economic or social problem."  *Allied Structural Steel*, 438 U.S. at 242–50.  But there is no problem with CDPAP.  The State claims the CDPAP Amendment will reduce waste, fraud, and abuse, State Br. at 28, but there is no evidence that any of those things existed in the program.  Indeed, the Office of Medicaid Inspector General's 2022 audits revealed a *99% accuracy rate* in submitted claims.  Compl. ¶¶ 9, 70.

Perhaps for that reason, the State pivots, *post hoc*, to the more modest claim that the CDPAP Amendment will "save on administrative costs and improve efficiency."  State Br. at 18. But the State did not conduct any economic impact study before pushing the CDPAP Amendment through the legislative budget process.  Compl. ¶¶ 7, 73.  Instead, the State's only support for its claim is a NYS Enacted Financial Budget Plan, Preis Decl. Ex. 6, that postdates the CDPAP Amendment and, in any event, is not properly before the Court on a motion to dismiss.  *See United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (to the extent district court could have taken judicial notice of government report in ruling on motion to dismiss, it was not permitted to do so "*for the truth of the matters asserted* therein" (internal quotation marks omitted)).

Even if the Court were to consider the Enacted Financial Plan, which summarily suggests that the existing system is inefficient, the State does not explain how fierce competition caused any supposed inefficiencies in CDPAP, let alone how a State-appointed monopoly would cure them.  The State claims, for instance, that "the cost of CDPAP has increased by 1,200 percent since 2016."  State Br. at 18.  But the State concedes that "medical cost increases; enrollment remaining elevated above pre-COVID-19 pandemic levels; expansion of benefits; increases to reimbursement rates; and growing aging and high utilization populations" have contributed to those increases— all of which are external factors that have nothing to do with the number of Fiscal Intermediaries, and each of which will be identical cost drivers under the Statewide Fiscal Intermediary.  Preis Decl. Ex. 6 at 23.  As to some purported but unidentified portion of cost increases that the State now claims are the result of the current system, the State does not provide any explanation for how competition among Fiscal Intermediaries could possibly cause cost increases—let alone by how much—nor how the imposition of a private monopoly would stem them.

Similarly, the State simply asserts, without any support, that "[m]oney that would otherwise be spent on administrative costs will instead be spent on Medicaid patient care, and the more efficiently functioning program will greatly benefit the needs of CDPAP consumers." State Br. at 20. Such bare *ipse dixet* would be insufficient to establish that the CDPAP Amendment serves a significant public purpose even in a procedural posture more favorable to the State, let alone on a motion to dismiss.

### 2.    The CDPAP Amendment Is Not A Reasonable And Necessary Means Of Achieving Its Purported Purpose

Even if the CDPAP Amendment were aimed at advancing a significant and legitimate public purpose, the State has not shown that it is a "reasonable and necessary" means of doing so. *DoorDash*, 692 F. Supp. 3d at 289 (internal quotation marks omitted). In *Melendez*, the Second Circuit weighed five factors in determining whether the challenged law was reasonably and appropriately drawn: (1) whether the law is only a "temporary" or "limited" impairment of contract, (2) whether the law is appropriately drawn, including whether it has "some record basis to link purpose and means," (3) who bears the "allocation of [the law's] economic burden," (4) whether the law's "relief is . . . conditioned on need," and (5) whether the law provides for injured parties "to be compensated for damages or losses sustained as a result of their [contracts'] impairment." 16 F.4th at 1038–46. To the extent these factors are applicable here, every single one of them weighs in Plaintiffs' favor, or at a minimum presents factual issues that cannot be resolved on the pleadings alone.

*First*, the CDPAP Amendment is not a "temporary" or "limited" impairment of the contracts at issue, but "permanently and entirely extinguishes them." *Melendez*, 16 F.4th at 1039. "This not only demonstrates a significant impairment of contract, but also weighs heavily against a legal determination at the pleadings stage that means so destructive of contract rights are

reasonable to address the [government's] professed public interest." *Id.* The State's only argument on this score is that the contracts were not impaired at all, which is incorrect for the reasons discussed above. *See supra* Section I.A.

*Second*, the CDPAP Amendment is not appropriately drawn. There is *no* record basis linking the CDPAP Amendment to the State's professed purpose of combatting waste, fraud, and abuse in CDPAP. *See supra* Section I.B.1. The State also claims that the CDPAP Amendment will promote "administrative cost-saving and efficiency," including by "cut[ting] annual costs by about $200 million." State Br. at 20. But, as discussed, the State's sole basis for this claim is a NYS Enacted Financial Plan that cannot be considered on a motion to dismiss, *supra* Section I.B.1, and the Plan does not even explain how it arrived at that number. Plaintiffs, by contrast, have alleged in detail that the CDPAP Amendment will in fact undermine the State's professed goals— and, at this stage of the proceedings, all reasonable inferences must be drawn in Plaintiffs' favor. By eliminating open competition among Fiscal Intermediaries, adding additional layers of bureaucracy, and arbitrarily limiting the role of Statewide Fiscal Intermediary to a single monopolist without prior experience with New York's CDPAP program, and without close connections to the communities it will be serving, the CDPAP Amendment will, in the long-term, increase costs and reduce efficiency, while also reducing the quality of care consumers receive. Compl. ¶¶ 71, 82–83, 85–86, 154; *see also infra* Section IV.

*Third*, the CDPAP Amendment places all the economic burden on the Fiscal Intermediaries who have done nothing but compete hard for decades in this industry and attempt to help consumers deal with the administrative burdens imposed by CDPAP. The State reasons that it is fair to hurt these small businesses because they have purportedly caused the problem (high administrative costs) that the CDPAP Amendment seeks to remedy. But in contrast to a "mine

operator" who is forced to "assume the financial responsibility for the repair of damaged structures," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 487, 506 (1987), here there is no factual or record link at all between any conduct by the Fiscal Intermediaries and the supposed high administrative costs about which the State complains. If the State wants to cast blame, it needs at least *some* evidentiary support to defeat a Contracts Clause claim.

*Fourth*, the CDPAP Amendment does not afford any "relief . . . conditioned on need," because it does not provide a benefit that could be allocated based on potential recipients' financial means. *Melendez*, 16 F.4th at 1043. Thus, this factor is not applicable here.

*Fifth*, as the State concedes, "Plaintiffs will not be compensated for damages or losses sustained as a result of the CDPAP Amendment." State Br. at 21. The fact that some Fiscal Intermediaries "may not be locked out of involvement with CDPAP, as they could potentially subcontract with the selected Statewide FI," State Br. at 21, does not change the analysis. The fact that *other* contracts *might* be available (at the discretion of the Statewide Fiscal Intermediary) does not alter the fact that the CDPAP Amendment destroys Plaintiffs' existing contracts without compensation.

All of the applicable *Melendez* factors thus weigh in Plaintiffs' favor. As a result, it is clear that the CDPAP Amendment is not a reasonable or necessary means of advancing a significant public purpose, and it therefore violates the Contracts Clause.

## II.    Plaintiffs Have Adequately Alleged An Unconstitutional Taking

The CDPAP Amendment violates the Takings Clause of the Constitution, both facially and as applied to Plaintiffs. The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V. While "[t]he classic example of a taking by the government is when land has been occupied or otherwise seized[,] . . . not all cases are so simple, and the question of what constitutes a 'taking' has long been a much debated

and vexing issue." *Greater Chautauqua Fed. Credit Union v. Marks*, 2023 WL 2744499, at *10 (S.D.N.Y. Mar. 31, 2023). Here, precedent and common sense both lead to the conclusion that Plaintiffs' property interests in their contracts are protected by the Takings Clause and that the State has effected a regulatory taking by eviscerating those interests and transferring their full economic value to a State-selected private monopolist.

A.    **Plaintiffs Have A Protected Property Interest In Their Contracts**

As a threshold matter, Plaintiffs have a protected property interest in their private contracts with the MMCOs. This principle is well settled. It dates back nearly a century, when the Supreme Court stated in no uncertain terms that "[v]alid contracts are property." *Lynch v. United States*, 292 U.S. 571, 579 (1934). The Court made clear that the rule is rigid and applies "whether the obligor be a private individual, a municipality, a state, or the United States." *Id.* A person's contracts and the rights they confer are thus protected by the Fifth and Fourteenth Amendments and cannot be taken through government action "without making just compensation." *Id.*

This rule has held firm over time. Decades after *Lynch*, the Supreme Court restated that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.16 (1977). The Supreme Court subsequently cited *Lynch* with approval and relied on its holding that "valid contracts are property within [the] meaning of the Taking Clause." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (citing *Lynch*, 292 U.S. at 579). In the years since, lower courts have been equally strict in following this clear line of Supreme Court precedent— which continues to inform cases on the Takings Clause. *See, e.g.*, *DoorDash*, 692 F. Supp. 3d at 277, 287 (denying motion to dismiss takings claim where "Plaintiffs assert that the City has deprived them of their contractual property rights without prior and just compensation").

The State does not confront this binding precedent, instead citing a smattering of inapposite cases in an attempt to create ambiguity where none exists.  Many of the cases the State cites (*see* State Br. at 21–23) discuss whether there exists a property right in Medicaid reimbursement, and *not* whether property rights exist through *private contracts*—which, as the State itself acknowledges, is the issue here.  *See* Compl. ¶¶ 155, 164; *see also* State Br. at 19 (stating that the CDPAP Amendment "is only alleged to impair *private contracts*" (emphasis added)).  The few cases the State cites that do involve contracts are inapposite because they involve "implied" contracts, *see Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 199 (S.D.N.Y. 2005), or "public" contracts, *see, e.g.*, *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 381 (S.D.N.Y. 2014) (citation omitted).[4]  Indeed, all cases the State cites in support of its claim that at-will or terminable contracts do not constitute property interests fall into this latter bucket—supporting the unremarkable (and inapplicable) proposition that the government can terminate at-will contracts to which it is a party.  *See* State Br. at 23–24 (collecting cases).

Here, Plaintiffs have entered into private contracts with MMCOs for the sole purpose of providing fiscal intermediary services in exchange for compensation.  Compl. ¶¶ 52, 149.  These contracts are neither implied nor public.  And although it is true that they are at-will and terminable, that has no bearing on the fact that private contracts are protected property under the Takings Clause.  *See DoorDash*, 692 F. Supp. 3d at 297 ("Defendant's argument that one cannot have a reasonable investment-backed expectation in an at-will contract is meritless.").

---

[4] The public contract cases have stated the following: "An interest in enforcement of an ordinary commercial contract *with a state* is qualitatively different from the interests the Supreme Court has thus far viewed as 'property' entitled to procedural due process protection."  *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988) (emphasis added); *see also A.F.C. Enters. v. N.Y.C. Sch. Const. Auth.*, 1999 WL 1417210, at *10 (E.D.N.Y. June 29, 1999) (same).  Although *Martz v. Inc. Vill. of Valley Stream*, 22 F.3d 26, 30 (2d Cir. 1994), also concerns public contracts, it truncated the typical language such that it omitted (without any substantive effect) the critical phrase "with a state," which modifies the word "contract"—as emphasized in the above quotation from *S & D*.  The State cites this truncated quotation—to misleading effect—in its brief.  *See* State Br. at 23.

### B.    Plaintiffs Have Adequately Alleged A Regulatory Taking

There are two types of takings claims:  physical and regulatory.  This case concerns a regulatory taking, which occurs when the "governmental regulation of private property 'goes too far' and is 'tantamount to a direct appropriation or ouster.'"  *Greater Chautauqua*, 2023 WL 2744499, at *11 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005)).  A taking of this sort can be categorical or non-categorical.  *Id.*  Here, the CDPAP Amendment founders under either rubric.

### 1.    The CDPAP Amendment Effects A Categorical Taking Of Plaintiffs' Private Property

A categorical taking occurs when the government, without compensation, "completely deprive[s] an owner of '*all* economically beneficial us[e]' of [its] property."  *Lingle*, 544 U.S. at 538 (second alteration in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)).  That is exactly what has happened here.  The State did not just tinker with Plaintiffs' contracts, such as by limiting the prices charged or the services provided.  Rather, the CDPAP Amendment extinguishes the contracts entirely and transfers them wholesale to a State-selected monopolist.  It is the most severe deprivation possible—total and complete.

The State tries to sidestep this issue by arguing that categorical takings apply only to real property.  That argument is mistaken.  Although the Second Circuit has not spoken directly to this issue, *see 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 264–65 (2d Cir. 2014) (describing the issue as "unclear"), precedent provides good reason to conclude that categorical takings can apply to all sorts of property interests—not just land.  *See, e.g.*, *Anderson v. Spear*, 356 F.3d 651, 669 (6th Cir. 2004) (applying categorical takings analysis to unexpended campaign contributions); *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196–97 (Fed. Cir. 2004) (chickens); *Nixon v. United States*, 978 F.2d 1269, 1285 (D.C. Cir. 1992) (presidential papers).

That is because the categorical analysis is not a distinct creature from the non-categorial analysis (which indisputably applies to all property interests); it is just the most extreme version of it. The First Circuit made this point clear when it explained that "the *Penn Central* [or non-categorical] regulatory takings framework is not practically different from utilizing per se rules," which, in effect, are "simply shortcuts" to a fuller *Penn Central* analysis. *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 35 (1st Cir. 2002); *see also id.* at 51 (Selya, J., concurring) ("Limiting per se takings analysis to cases involving real property is a crude boundary with no compelling basis in the law."). Following the Supreme Court's decision in *Lucas*, the D.C. Circuit similarly rejected the contention advanced by the State here that the categorical takings doctrine is limited to real property, finding it "without basis in the law" because "[o]ne may be just as permanently and completely dispossessed of personal property as of real property." *Nixon*, 978 F.2d at 1285.

The State then argues that any categorical claim must fail for the separate reason that "Plaintiffs cannot show that [the State's] actions deprived them and every single other FI of all economically beneficial or productive use of their businesses." State Br. at 26 (internal quotation marks omitted). This argument rests on a faulty premise—that a governmental regulation must destroy a business for it to count as a categorical taking. That is not the law. If the government passes a regulation that renders valueless a plot of land—as just one example—that regulation is still a categorical taking even if the plot is owned by a sprawling business, which can continue its other operations. Unsurprisingly, the State has not cited any case to the contrary.[5] It thus does not

---

[5] The two cases cited by the State do not discuss any requirement that there be a full deprivation of one's *business*, only that there be a full deprivation of one's *property*—in those cases, the particular restaurant at issue. *See McCarthy v. Cuomo*, 2020 WL 3286530, at *5 (E.D.N.Y. June 18, 2020) ("The COVID-19 Executive Orders plainly do not deny McCarthy all economically beneficial use of his property."); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 784 (W.D.N.Y. 2020) ("Plaintiffs are therefore unlikely to succeed on any categorical claim, since they are not precluded from *all* economically beneficial uses of their property."). Although property and business can in certain instances be coterminous, when the two diverge it is the former that provides the relevant denominator in determining the extent of any deprivation.

matter that there is a possibility that Plaintiffs or other Fiscal Intermediaries might get selected as subcontractors, or that they could pursue "other business ventures." State Br. at 26. All of their existing contracts—the property at issue—will still be rendered valueless. That is what matters. And since the Fiscal Intermediaries all entered into the same standard-form contracts, Compl. ¶ 52, which the State does not dispute, this deprivation of property applies equally across the board, rendering the CDPAP Amendment facially unconstitutional.

### 2.    The CDPAP Amendment Effects A *Penn Central* Taking

Even if the CDPAP Amendment did not effect a categorical taking, it would still be unconstitutional under the more general test set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). The *Penn Central* analysis involves a "complex of factors including [1] the regulation's economic effect on the [property owner], [2] the extent to which the regulation interferes with reasonable investment-backed expectations, and [3] the character of the government action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Central*, 438 U.S. at 124). There is no "mathematically precise" formula for weighing these factors, which serve more as "guideposts." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 326 n.23 (2002) (internal quotation marks omitted). Thus, the "regulatory takings analysis . . . 'is characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'" *Greater Chautauqua*, 2023 WL 2744499, at *14 (quoting *Tahoe-Sierra*, 535 U.S. at 322, and denying motion to dismiss).

The economic impact factor clearly weighs in favor of a taking for the reasons discussed above. *See supra* Section II.B.1. And the other two factors likewise favor Plaintiffs here.

In terms of investment-backed expectations, Plaintiffs made substantial investments in their businesses on the reasonable expectation that their longstanding contractual relationships would endure. *See* Compl. ¶¶ 47, 98. This included investments in business infrastructure, such

as staff, technology, and office space.  *Id.* ¶¶ 47, 109, 119, 129.  When the government interfered with the contracts that would compensate Fiscal Intermediaries for their investments, it interfered with the investments made in reliance on those contracts.  That is common sense, reflected in the case law.  *See DoorDash*, 692 F. Supp. 3d at 297 (explaining that plaintiffs had "reasonable investment-backed expectations in their contracts" based on allegations that they had "made enormous investments into their businesses with the expectation that their investments would be recouped through the contractual arrangements that have been modified by the [government]").

The State's sole retort on this issue is that Plaintiffs could not have "reasonable expectations to continued participation as FIs" because they became Fiscal Intermediaries "fully aware that it is a heavily regulated program."  State Br. at 27; *see also id.* at 12–16.  This proves too much.  The government may have regulated Fiscal Intermediaries over the years, but such regulations were relatively minor—e.g., making small adjustments to the application/procurement process or reporting requirements.  *See* State Br. at 15–16, nn.7–9.[6]  These changes added some limitations on who could qualify to serve as a Fiscal Intermediary, but only by requiring that prospective Fiscal Intermediaries demonstrate basic capabilities related to providing FI services— such as language competency and the ability to provide timely assistance—and that they submit offers for contracts based on those capabilities.  *See supra* note 6.  The CDPAP Amendment is an entirely different "type" of regulation.  *DoorDash*, 692 F. Supp. 3d at 297.  It eviscerates the entire Fiscal Intermediary industry in a manner that is "without precedent and . . . not easily predictable."

---

[6] These prior amendments modified things such as the application process, N.Y. Soc. Serv. Law § 365-f(4-a)(c)(i-viii) (effective Jan. 1, 2018), and Fiscal Intermediaries' reporting requirements, N.Y. Soc. Serv. Law § 365-f(4-a)(h) (effective Apr. 12, 2018), and also set up a procurement process "based on criteria reasonably related to the contractors' ability to provide fiscal intermediary services," such as "demonstrated cultural and language competencies specific to the population of consumers," N.Y. Soc. Serv. Law § 365-f(4-a)(a)(i), (b)(i)(B) (version effective Jan. 1, 2020).  The two most recent amendments actually *increased* the number of Fiscal Intermediaries that could operate in New York.  *See* N.Y. Soc. Serv. Law § 365-f(4-a)(b-2)–(b)(3) (effective Apr. 19, 2021); N.Y. Soc. Serv. Law § 365-f(4-a)(b-1) (effective Apr. 9, 2022).

*Greater Chautauqua*, 2023 WL 2744499, at *13.[7]  Put simply, it has completely upended Plaintiffs' reasonable investment-backed expectations.  Any argument to the contrary is, at most, a fact question incapable of resolution on a motion to dismiss.

As to the character of the government action, courts consider whether the regulation "benefits" one group of private parties "at the expense of" another without compensation. *DoorDash*, 692 F. Supp. 3d at 298.  The CDPAP Amendment is the most extreme form of such regulation—it quite literally creates a State-appointed monopolist at the expense of roughly 600 small businesses that have worked and substantially invested in the same industry for years.  *See* Compl. ¶¶ 58, 98.  The State claims that the CDPAP Amendment "could" allow some FIs to serve as subcontractors, State Br. at 26, but such an option is speculative and generally without foundation, *see supra* Section I.A, and in any event it is indisputable that the Amendment will benefit (at most) a small group of private parties at the expense of hundreds of existing Fiscal Intermediaries.

There is only one clear winner here:  the State-appointed monopolist.  That company will now have full control over a multi-billion-dollar industry that was, until now, dispersed across hundreds of competitors.  Compl. ¶ 58.  By privileging one State-selected entity "at the expense" of many others, the CDPAP Amendment bears all the hallmark characteristics of an unlawful taking.

## III.    Plaintiffs Have Adequately Alleged An Equal Protection Violation

The CDPAP Amendment also plainly violates the Equal Protection Clause, both facially and as applied.  "The Equal Protection Clause of the Fourteenth Amendment embodies a general

---

[7] The drastic nature of the CDPAP Amendment is a far cry from the case law the State cites, and the regulations relied upon therein, which involved a mere "temporary adjustment" of longstanding rules that disrupted "profitability." *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 167–68 (S.D.N.Y. 2020).

rule that States must treat like cases alike, but may treat unlike cases accordingly." *Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (internal quotation marks omitted). "Whether a state law or policy satisfies this general principle, and what sort of review a court must apply, depends on the nature of the class of individuals the state or local government treats differently or the rights at issue." *Id.* Where a "law neither burdens a fundamental right nor targets a suspect class," the legislative classification will be struck down if it does not bear "a rational relation to some legitimate end." *Id.* (internal quotation marks omitted). While this standard is not strict, it is "not meant to be toothless." *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012). "Instead, rational basis review imposes a requirement of some rationality in the nature of the class singled out." *Winston*, 887 F.3d at 560 (internal quotation marks omitted).

Here, the CDPAP Amendment violates the Equal Protection Clause because it discriminates against wholly in-state Fiscal Intermediaries without any rational justification. In particular, the CDPAP Amendment provides that the monopolist it appoints need not have any in-state experience, but instead must have experience providing fiscal intermediary services on a statewide basis elsewhere. *See* N.Y. Soc. Serv. Law § 365-f(4-a)(ii-b). The State contends that this requirement "is rationally designed to ensure the selected FI has the capacity to operate such a statewide program in New York." State Br. at 29. But there is nothing rational about this rule.

The root of the irrationality stems from the scope of New York's program. It is a behemoth, with an estimated 280,000 participants—more than *ten times* larger than similar programs in other states. Compl. ¶¶ 77, 86, 99. Take Pennsylvania, for example, which operates a program with an estimated 20,000 participants. *Id.* That a company operated on a statewide basis in Pennsylvania in no way means that it is has the capacity to do so for the supersized New York program. And, of course, there is no reason to think that such a company would be better suited to meet the

capacity demands in New York relative to an in-state-only Fiscal Intermediary that deals with a comparable—if not greater—number of participants.  If capacity were the concern, there were a number of ways of dealing with that issue without discriminating against hard-working and long-running New York companies.

Unable to support its decision with logic, the State turns to inapposite caselaw.  In particular, it cites a recent state court decision that denied a motion to preliminarily enjoin the CDPAP Amendment on equal protection grounds.  *See Corning Council v. McDonald*, No. 908147-24, NYSCEF No. 59 (Sup. Ct. Albany Cnty. Sept. 30, 2024); *see also* Preis Decl. Ex. 1.  That decision relied on the (different) rationale that, by requiring out-of-state experience, "the selected provider will not have to create a new model, thus minimizing service disruption." *Corning Council*, No. 908147-24 at 8.[8]  But that rationale is similarly flawed because, as discussed, experience in other states that have much smaller programs has no bearing on whether a Fiscal Intermediary could operate on a much larger scale in New York.  A model designed for a program of 20,000 in one state cannot function as-is for a program of 280,000 diverse participants.  There is not a shred of evidence that the models are ready-made or that an old (bespoke) model will have any effect at all in minimizing service disruption.

The State also contends that Plaintiffs "do not plausibly allege that they are similarly situated to an FI that does [provide statewide Fiscal Intermediary services]."  State Br. at 29.  But this argument erroneously assumes that Plaintiffs advance a "class-of-one" claim.  Not so.  A "[c]lass of one" claim arises where the claimant "has not alleged class-based discrimination, but instead claims that [it] has been irrationally singled out." *Enquist v. Oregon Dep't of Agric.*, 553

---

[8] The state court also discussed the supposed cost-saving and oversight benefits of having a Statewide Fiscal Intermediary, which of course are purported "benefits" unrelated to the specific requirement that the monopolist also operate statewide *in another state*. *Id.* at 7–8.  Those purported benefits are thus irrelevant to the equal protection analysis and, in any event, are illusory and unsupported. *See supra* Section I.B.

U.S. 591, 601 (2008).  There is no class of one claim here, where four plaintiffs, belonging to a class of in-state Fiscal Intermediaries, have brought facial and as-applied constitutional challenges to the statute as a whole.  The State has mischaracterized this case and, as a result, has argued the wrong legal standard.

## IV.    Plaintiffs Have Adequately Alleged A Violation Of The Due Process Clause

The CDPAP Amendment amounts to a facial and as-applied due process violation.  The Due Process Clause of the Fourteenth Amendment states that no State shall "deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  This prohibition "embodies a substantive component that protects against certain government actions regardless of the fairness of the procedures used to implement them."  *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (internal quotation marks omitted).  "To establish a substantive due process violation, a plaintiff must show both (1) that [it] has an interest protected by the Fourteenth Amendment, and (2) that the statute, ordinance, or regulation in question is not rationally related to a legitimate government interest."  *Winston*, 887 F.3d at 566.

Here, the CDPAP Amendment violates Plaintiffs' substantive due process rights by irrationally depriving them of their contracts with the MMCOs.  That Plaintiffs' interest in their contracts is a protected property interest is well-settled.  *See supra* Section II.A.  The State contends that not all property interests are *constitutionally* protected, *see* State Br. at 31–32, but does not cite a single case that applies this principle to private contracts.  This is unsurprising, because interference with private contracts has long been deemed a basis for a substantive due process claim.  *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (recognizing that the sphere of liberty protected by the Due Process Clause includes "the right of the individual to contract"); *Ruane v. Cnty. of Suffolk*, 2015 WL 2337329, at *9 (E.D.N.Y. May 13, 2015) ("[L]iberty interests, such as the right of the individual to contract . . . are also protected by substantive due process.");

*Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 432 (S.D.N.Y. 2013) (relying on *Meyer*'s "broad concept of liberty" protected by the Fourteenth Amendment); *see also Schmid v. Sonoma Clean Power*, 2014 WL 12689941, at *5 (N.D. Cal. Nov. 14, 2014) ("The liberty guaranteed by the Fourteenth Amendment has been recognized to include the right of the individual to contract."), *aff'd*, 673 F. App'x 785 (9th Cir. 2017).

This deprivation of a constitutionally protected property interest amounts to a due process violation because it is not rationally related to a legitimate government interest.  The State contends that "the decision to switch from 600 FIs to a statewide FI in order to save on administrative costs and permit more effective oversight by DOH is rationally related to the legitimate public interest of preventing waste, fraud, or abuse in Medicaid."  State Br. at 33.

At the threshold, it is doubtful that marginal (at best) savings on administrative costs constitute a legitimate government interest that could justify destroying an entire industry and replacing it with a State-sanctioned monopoly.  Even if it could in theory, the means and the end have no rational relationship here, as monopolies by definition kill efficiency and are less responsive to the needs of the customer.  Compl. ¶¶ 5, 10, 71, 97, 154.  That statement has long been understood to be true and has driven government efforts to root out monopolies in all sorts of contexts.  *See, e.g.*, Louis Brandeis, *The Curse of Bigness* 105, 114–15 (1934); Adam Smith, *The Wealth of Nations*, Book II, Chapter II at 312 (Edwin Cannan ed., Methuen & Co. 1904) (1776) ("In general, if any branch of trade, or any division of labour, be advantageous to the public, the freer and more general the competition, it will always be the more so."); *see also* Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking A Better Balance*, 72 Antitrust L.J. 3, 32–33 (2004) (Monopolies "raise price[s]", "generate allocative inefficiencies and benefit from . . . a transfer of wealth from consumers."  Therefore, "a policy that tolerates

monopoly runs the risk of less innovation and less . . . efficiency.").  The State provides no rationale for its assumption that the monopoly it imposes—a single out-of-state company providing services to over 280,000 consumers and hundreds of thousands of personal assistants—will be different from every other.  Compl. ¶¶ 71–75.  What is more, the CDPAP Amendment mandates that the monopolist employ a series of subcontractors, Compl. ¶ 63, thus adding an *additional* layer of bureaucracy to the program—a surprising move, given that middlemen are not known for generating efficiencies.  The State has thus created a system that is—by definition—counterproductive to its aims.

As for waste, fraud and abuse, as recent Office of Medicaid Inspector General audits confirmed, existing Fiscal Intermediaries boast a 99% accuracy rate in submitted claims under CDPAP—i.e., there is no pattern of fraud or abuse.  Compl. ¶ 56.  Even assuming such problems did exist, moreover, there is no conceivable basis to conclude that the CDPAP Amendment will cure them.  Removing Comptroller review and oversight, *id.* ¶¶ 6, 69, 103, while imposing a monopolist general contractor to stand between the Inspector General and the Fiscal Intermediary subcontractors will only eliminate the benefits of direct oversight in the existing CDPAP system, making it *more* difficult to track and combat any fraud or abuse.  It will, in fact, invite these very evils.  Depriving Fiscal Intermediaries of their property under such circumstances is entirely unjustified and cannot withstand any degree of scrutiny.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied.

31

Dated: December 12, 2024
      New York, New York

Respectfully submitted,


GIBSON, DUNN & CRUTCHER LLP


By:   */s/ Akiva Shapiro*
    Akiva Shapiro
    Mylan L. Denerstein
    William J. Moccia
    Jason Bressler

    200 Park Avenue, 47th Floor
    New York, NY  10166-0193
    Telephone:  (212) 351-4000
    ashapiro@gibsondunn.com
    mdenerstein@gibsondunn.com
    wmoccia@gibsondunn.com
    jbressler@gibsondunn.com

    *Attorneys for Plaintiffs*