# Exhibit 6

# Administrative Agreement
# for the Provision
# of Fiscal Intermediary Services for the
# Consumer Directed Personal Assistance Program

THIS AGREEMENT ("Agreement") is made and entered into as of January 1, 2017 ("Effective Date") by and between **Elderplan, Inc.** ("MCO") and **Principle Homecare, LLC.** ("FI"). MCO and FI are referred to hereinafter individually as "Party" and collectively as the "Parties".

WHEREAS, MCO offers Medicaid managed care health benefit plans and seeks to engage FI to provide fiscal intermediary services in relation to consumer directed personal assistance program benefits for Members of such plans;

WHEREAS, FI is a fiscal intermediary designated to provide wage and benefit processing for consumer directed personal assistants on behalf of an employing consumer and other responsibilities specified in this Agreement in accordance with 18 N.Y.C.R.R. § 505.28(i); and

WHEREAS, MCO and FI desire to enter into this Agreement.

NOW THEREFORE, the Parties agree as follows:

1. **Definitions.**

"**consumer**" means a medical assistance recipient who a social services district or MCO has determined eligible to participate in the consumer directed personal assistance program.

"**consumer directed personal assistance**" means the provision of some or total assistance with personal care services, home health aide services and skilled nursing tasks by a consumer directed personal assistant under the instruction, supervision and direction of a consumer or the consumer's designated representative.

"**consumer directed personal assistant**" ("CDPA") means an adult who provides consumer directed personal assistance to a consumer under the consumer's instruction, supervision and direction or under the instruction, supervision and direction of the consumer's designated representative. A consumer's spouse, parent or designated representative may not be the
consumer directed personal assistant for that consumer; however, a consumer directed personal assistant may include any other adult relative of the consumer who does not reside with the consumer or any other adult relative who resides with the consumer because the amount of care the consumer requires makes such relative's presence necessary.

"**continuous consumer directed personal assistance**" means the provision of uninterrupted care, by more than one consumer directed personal assistant, for more than 16 hours per day for a consumer who, because of the consumer's medical condition and disabilities, requires total assistance with toileting, walking, transferring or feeding at times that cannot be predicted.

**"designated representative"** means an adult to whom a self-directing consumer has delegated authority to instruct, supervise and direct the consumer directed personal assistant and to perform the consumer's responsibilities specified in subdivision (g) of Section 505.28 of Title 18 of the New York Codes, Rules and Regulations ("NYCRR") and who is willing and able to perform these responsibilities. With respect to a non-self-directing consumer, a "designated representative" means the consumer's parent, legal guardian or a responsible adult surrogate who is willing and able to perform such responsibilities on the consumer's behalf. The designated representative may not be the consumer directed personal assistant or a fiscal intermediary employee, representative or affiliated person.

**"fiscal intermediary"** ("FI") means an entity that has a contract with MCO to provide wage and benefit processing for consumer directed personal assistants and other fiscal intermediary responsibilities specified in subdivision (i) of Section 505.28 of Title 18 of the NYCRR.

**"home health aide services"** means services within the scope of practice of a home health aide pursuant to Article 36 of the Public Health Law including simple health care tasks, personal hygiene services, housekeeping tasks essential to the consumer's health and other related supportive services. Such services may include, but are not necessarily limited to, the following: preparation of meals in accordance with modified diets or complex modified diets; administration of medications; provision of special skin care; use of medical equipment, supplies and devices; change of dressing to stable surface wounds; performance of simple measurements and tests to routinely monitor the consumer's medical condition; performance of a maintenance exercise program; and care of an ostomy after the ostomy has achieved its normal function.

**"Medicaid Contract"** means the applicable agreement between the MCO and NYSDOH, or its successor, pursuant to which MCO agrees to provide and arrange for the provision of health care services to persons eligible for Medicaid under Title XIX of the Social Security Act.

**"NYSDOH"** means the New York State Department of Health.

**"personal care services"** means the nutritional and environmental support functions, personal care functions, or both such functions, that are specified in Section 505.14(a)(6) of Part 505 of Title 18 of the NYCRR except that, for individuals whose needs are limited to nutritional and environmental support functions, personal care services shall not exceed eight hours per week.

**"self-directing consumer"** means a consumer who is capable of making choices regarding the consumer's activities of daily living and the type, quality and management of his or her consumer directed personal assistance; understands the impact of these choices; and assumes responsibility for the results of these choices.

**"skilled nursing tasks"** means those skilled nursing tasks that are within the scope of practice of a registered professional nurse or a licensed practical nurse and that a consumer directed personal assistant may perform pursuant to Section 6908 of the Education Law.
**"some assistance"** means that a specific personal care service, home health aide service or skilled nursing task is performed or completed by the consumer with help from another individual.

**"stable medical condition"** means a condition that is not expected to exhibit sudden deterioration or

improvement and does not require frequent medical or nursing evaluation or judgment to determine changes in the consumer's plan of care.

"**total assistance**" means that a specific personal care service, home health aide service or skilled nursing task is performed or completed for the consumer.

2. **Fiscal Intermediary Responsibilities.** The fiscal intermediary shall have the following responsibilities:

   a. Process each CDPA's wages and benefits including establishing the amount of each assistant's wages and benefits; process all income tax and other required wage withholdings; and comply with workers' compensation, disability and unemployment insurance requirements.

   b. Ensure that the health status of each consumer directed personal assistant is assessed pursuant to 10 NYCRR § 766.11(c) and (d) or any successor regulation.

   c. Maintain records for each CDPA which shall include, at a minimum, time records, the CDPA health assessments required pursuant to 10 NYCRR § 766.11(c) and (d) or any successor regulation, and the information needed for payroll processing and benefit administration.

   d. Maintain records for each consumer, including copies of the authorizations, reauthorizations, and the contracts between the consumer and the FI.

   e. Obtain a signed agreement with consumer outlining consumer's responsibilities as contained in 18 NYCRR § 505.28. Use best efforts to notify the MCO if the FI becomes aware that the consumer has been admitted to a higher level of care such as an inpatient hospital or skilled nursing facility. Monitor enrollment in MCO on the 1st and 15th of each month; provided, however, that such monitoring on the part of the FI shall not relieve the MCO of the MCO's responsibility to notify the FI in the event of a consumer's disenrollment in the MCO or in the event of a determination that the consumer is no longer authorized to participate in the CDPAP program.

   f. Monitor the ability of the consumer, or the ability of the consumer's designated representative, if applicable, to fulfill the consumer's responsibilities under the consumer directed personal assistance program and notify the MCO promptly in the event that the FI becomes aware of any circumstances that may affect the ability of the consumer, or that of the consumer's designated representative, if applicable, to fulfill such responsibilities.

   g. Comply with applicable NYSDOH regulations regarding the responsibilities of providers enrolled in the medical assistance program.

   h. Enter into an Agreement with the consumer that stipulates that the consumer and, as applicable, the consumer's designated representative shall be solely responsible to:

       i. Manage the plan of care authorized by the MCO, including recruiting and hiring a sufficient number of CDPAs to provide authorized services as set forth in the plan of care authorized by the MCO; training, supervising and scheduling each

       CDPA; terminating the CDPA's employment with the consumer; and assuring that each CDPA completely and safely performs the personal care services, home health aide services and skilled nursing tasks included on the consumer's MCO approved plan of care;

    ii. Notify the MCO within 5 business days of any changes in the consumer's medical condition or social circumstances including but not limited to, any hospitalization of the consumer or change in the consumer's address or telephone number;

    iii. Timely notify the FI of any changes in the employment status of each CDPA;

    iv. Attest to the accuracy of each time record for each CDPA;

    v. Transmit the CDPA's time records to the FI according to the FI's policies and procedures;

    vi. Timely distribute each CDPA's paycheck, if needed;

    vii. Arrange and schedule substitute coverage when a CDPA is temporarily unavailable for any reason;

    viii. Acknowledge and agree that: (1) any person who receives, directly or indirectly, an overpayment from the Medicaid program is obligated to report and return the overpayment, within sixty days of the identification of the overpayment. Failure to do so may expose the person to liability under the False Claims Act, including whistleblower actions, treble damage and penalties; and (2) that the Office of the Medicaid Inspector General or MCO may suspend payments to the FI and CDPA, if applicable, pending an investigation of a credible allegation of fraud against the FI or CDPA, as applicable, unless the state determines there is good cause not to suspend such payments; and

    ix. Comply with applicable labor laws and provide equal employment opportunities to CDPAs in accordance with applicable laws.

    x. Notify the FI and/or MCO of any disclosure of information that the MCO has taken reasonable measures to maintain as confidential and which derives independent economic value from not being generally known or readily ascertainable by the public (Proprietary information). Proprietary information includes the compensation arrangements between the MCO and the FI and the amount the FI pays the CDPA and any other information relating to the MCO's business that is not public information.

3. **MCO Responsibilities.** The MCO shall undertake the following:

    a. Provide information to any enrollee determined to be in need of home care that CDPAS is

available and the conditions under which a consumer is eligible.

b. Conduct initial and semi-annual nursing and social assessments of consumers.

c. Determine that the consumer is eligible for long term care services provided by a certified home health agency, the AIDS home care program or personal care services, and is in need of home care services or private duty nursing.

d. Determine that the consumer is eligible to participate in the CDPAP program. A consumer is eligible if the consumer: (1) has a stable medical condition; (2) is self-directing or if, non-self-directing, has a designated representative; (3) needs some or total assistance with one or more personal care services, home health aide services or skilled nursing tasks; (4) is able and willing or has a designated representative able and willing to fulfill the responsibilities of a consumer, including but not limited to, making informed choices as to the type and quality of services, including but not limited to nursing care, personal care, transportation and respite services; (5) participates, as needed, or has a designated representative participate in the required assessment and bi-annual reassessment process, or if the MCO determines an unexpected change in the consumer's social circumstances, mental status or medical condition has occurred during the authorization or reauthorization period that would affect the type, amount or frequency of consumer directed personal assistance provided during such period and does not have (a) voluntary assistance available from informal caregivers, including, but not limited to, the consumer's family, friends or other responsible adult, provided that this shall include an evaluation of the potential contribution of informal supports, such as family members or friends, to the individual's care, which must consider the number and kind of informal supports available to the individual; the ability and motivation of informal supports to assist in care; the extent of informal supports' potential involvement; the availability of informal supports for future assistance; and the acceptability to the individual of the informal supports' involvement in his or her care; or formal services provided by an entity or agency or (b) adaptive or specialized equipment or supplies including, but not limited to, bedside commodes, urinals, walkers and wheelchairs, when such equipment or supplies are provided to the consumer and can safely and cost effectively meet the need for services.

e. Determine the consumer's eligibility for the program through its initial and periodic assessments. The MCO will authorize the level and amount of services and will authorize payment for the CDPAP services and communicate such authorization to the consumer, or if applicable, the designated representative, and the FI. The MCO shall not refuse to authorize consumer directed personal assistance when a consumer is otherwise eligible unless it reasonably expects that such assistance cannot maintain the consumer's health and safety in the home or other setting in which consumer directed personal assistance may be provided and that a designated representative either cannot be identified or would not result in a change in the consumer's ability to maintain his or her health and safety in the home.

f. Notify the FI in the event that the MCO makes changes to the authorization for the amount duration or scope of CDPAS services; or determines that the consumer is no longer eligible to participate in the CDPAP program; or that the consumer is no longer able to fulfill the

consumer's responsibilities under the program.

g. Comply with the assessment, authorization, reassessment and reauthorization procedures required by regulation and/or NYSDOH guidance.

h. Receive and promptly review the FI notification to the MCO of any circumstances that may affect the consumer's or, if applicable, the consumer's designated representative's ability to fulfill the consumer's responsibilities under the program and make changes in the consumer's authorization and reauthorization as needed.

i. Monitor the FI's performance under this Agreement to ensure that the FI is fulfilling its responsibilities under this Agreement.

j. Monitor consumer's on-going eligibility for the program and discontinue authorization for CDPAP services when MCO determines that the consumer or their designated representative is no longer able to fulfill their responsibilities or no longer desires to continue in the program and a designated representative or alternative designated representative cannot be identified. In such case, the MCO must authorize other services as required.

k. Enter into an understanding with the consumer, the terms of which shall be defined by the NYSDOH.

4. **Maintenance of Records.** The FI shall maintain consumer records for a period of six (6) years after the date of service, and in the case of a minor, for three (3) years after the age of majority or six (6) years after the date of service, whichever is later, or for such longer period as required by law, regulation or the Medicaid Contract. This provision shall survive the termination of this Agreement regardless of the reason.

5. **MCO Protocols.** The FI agrees to comply fully and abide by the rules, policies and procedures that the MCO (a) has established or will establish to meet general or specific obligations placed on the MCO by statute, regulation, Medicaid Contract, or DOH guidelines or policies and (b) has provided or given access to the FI at least thirty (30) days in advance of implementation regarding, but not limited to, authorization requirements, referral processes, quality improvement and management activities, and utilization management.

6. **Representations and Warranties.** The FI is a duly organized validly existing organization in good standing, as designated by NYSDOH or the LDSS. FI agrees it is and will continue to be for the term of the Agreement eligible to participate in the NYS Medicaid Program, and to comply with all state and federal laws and regulations, including Medicaid program requirements and the Medicaid Contract.

7. **Monitoring and Auditing.** MCO shall monitor the performance of the FI's obligations under this Agreement, by reasonable and appropriate financial, programmatic and oversight tools and measures. Copies of all such tools and measures used shall be provided to the FI in advance, to facilitate and foster proactive on-going continuous improvement efforts. The MCO and any government officials with oversight authority over the MCO, including but not limited to the Department of Health and Human Services, shall have the right, during normal business hours and

upon advance written notice, to monitor and evaluate, through inspection or other means, FI's performance under this Agreement, including but not limited to access to consumer records and CDPA personnel records in the possession of the FI. The FI shall permit MCO and any government officials with oversight authority over the MCO to conduct site visits, upon prior notice, to verify the performance under this Agreement and that such performance continues to comply with the terms and standards of the MCO and any NYSDOH standards. This provision shall survive the termination of this Agreement regardless of the reason.

8. **Quality, Data and Reporting Requirements.** FIs shall comply with MCO data and reporting requirements. The MCO shall provide the FI with full, complete, and current copies of its protocols for all such activities in advance.

9. **Payment.** MCO shall pay FI as set forth on Attachment _A___ within thirty (30) days from when MCO receives a claim. The Parties acknowledge and agree that unless otherwise provided by law, Section 3224(a) and (b) of the NYS Insurance Law does not apply to this Agreement as of the date of execution of this Agreement. No payment shall be made to the FI or, if made shall be recouped, even if authorized by the MCO, unless the FI's claim is supported by documentation, including but not limited to CDPA time records, of the time spent in provision of services for each consumer.

10. **Term.** The term of the Agreement shall begin as of the Effective Date and shall continue for one (1) year, after which this Agreement shall re-new for additional one (1) year terms; unless otherwise terminated as provided by this Agreement or either Party gives sixty (60) days advance written notice prior to the renewal date.

11. **Termination.** Either Party shall have a right to terminate this Agreement without cause upon 60 days written notice. Either Party shall have the right to terminate this Agreement upon 30 days written notice, or such earlier time period if warranted, if the other Party materially breaches this Agreement and such breach is not cured within the 30 days' notice period. This Agreement shall terminate automatically and immediately in the event that either Party is excluded, suspended or barred from participating in any government health care program.

12. **Obligations Post Termination.** Upon termination, FI shall: (1) assist in effecting an orderly transfer of services and obligations to another FI to which MCO has assigned consumers to prevent any disruption in services to such consumers; (2) provide MCO and NYSDOH with access to all books, records and other documents relating to the performance of services under this Agreement that are required or requested, at no charge; and (3) subject to applicable laws and regulations, stop using and return and/or destroy all proprietary information. This provision shall survive the termination of the Agreement regardless of the reason.

13. **Indemnification.** Neither FI nor MCO shall be responsible for fulfilling the responsibilities of the consumer or, if applicable, the consumer's designated representative as set forth in the agreements between the FI and consumer or in the agreement between the MCO and the consumer. This shall not diminish the FI's or MCO's respective obligations to exercise reasonable care in properly carrying out its respective responsibilities under the consumer directed personal assistance program. Both FI and MCO understand and acknowledge that pursuant to state law, the Office of the Medicaid Inspector General (OMIG) and/or the Office of the Inspector General (OIG) may review and audit

all contracts, claims, bills and other expenditures of medical assistance program funds to determine compliance. Each Party agrees to indemnify and hold the other Party harmless from any and all liability arising out of any suit, investigation, administrative action, fine, penalty or sanction by or on behalf of the OMIG and/or the OIG against the other Party, to the extent that such liability arises directly out of the wrongful acts or omissions of the indemnifying party.

14. **Adjustments: Recoupment/Adjustments for incorrect/over payment to FI.** Other than recovery for duplicate payments, MCO will provide FI with not less than 30 days prior written notice before engaging in incorrect/over payment recovery efforts seeking recovery of the incorrect/over payment to the FI. Such notice shall state the specific information relating to such incorrect/over payment, payment amount and proposed adjustment with a reasonable explanation of the proposed adjustment. Within 30 days after receipt of such notice, FI may dispute the allegation(s) of incorrect/over payment and the proposed adjustment in writing. MCO shall submit a written response to FI's dispute within 10 days, addressing each of the disputed particulars in detail. The Parties shall apply their best efforts to resolve the dispute by good-faith negotiation. MCO will not initiate incorrect/over payment recovery efforts more than six (6) years after the original payment unless authorized or required by the state.

15. **Non-discrimination.** FI shall not discriminate against any consumers based on color, race, creed, age, gender, sexual orientation, disability, place of origin or source of payment or type of illness or condition. FI shall comply with the Federal Americans with Disabilities Act (ADA).

16. **Confidentiality.** Each Party understands the other Party to be a covered entity, as that term is defined by the Health Insurance Portability and Accountability Act ("HIPAA") and thus, not a business associate requiring a business associate agreement. FI agrees to adhere to and comply with the applicable provisions of HIPAA; the Health Information Technology for Economic and Clinical Health Act (HITECH); and the HIV confidentiality requirements of Article 27-F of the Public Health Law; Mental Hygiene Law Section 33.13, if applicable; and the confidentiality requirements set forth in the Medicaid Contract.

17. **Lobby Certification.** FI agrees, pursuant to 31 U.S.C. § 1352 and CFR Part 93, that no Federally appropriated funds have been paid or will be paid to any person by or on behalf of FI for the purpose of influencing or attempting to influence an officer or employee of any agency, a member of Congress, an officer or employee of Congress, or an employee of a member of Congress in connection with the award of any Federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement. FI agrees to complete and submit the "Certification Regarding Lobbying," form, if this Agreement exceeds $100,000. If any funds other than federally appropriated funds have been paid or will be paid to any person for the purpose of influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress, in connection with the award of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, or the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement, and payments to the FI under this Agreement exceed $100,000, FI shall complete and submit, if required, Standard Form-LLL "Disclosure Form to Report Lobbying," in accordance with its instructions.

18. **Implementation Prior to DOH Approval.** This Agreement is subject to the approval of the NYSDOH and if implemented prior to such approval, the Parties agree to incorporate into this Agreement any and all modifications required by NYSDOH for approval or, alternatively, to terminate this Agreement if so directed by NYSDOH, effective sixty (60) days subsequent to such notice.

19. **Assignment.** This Agreement may not be assigned by either Party without the prior written consent of the other Party, such consent not to be unreasonably withheld.

20. **Model Contract.** This Agreement incorporates the pertinent obligations under the Medicaid Contract, including but not limited to the Medicaid Managed Care and/or the Family Health Plus contract, and/or the Managed Long Term Care Plan contract, between the MCO and DOH as if set forth fully herein.

21. **Sanctioned Individuals.** FI is required to check staff and employees and CDPAs against the Excluded Provider List, which includes updates from the List of Excluded Individuals and Entities (LEIE) and the Restricted, Terminated or Excluded Individuals or Entities List, on a monthly basis.

22. **Subcontractors.** FI agrees it shall notify MCO if it subcontracts any of its obligations hereunder or the performance of any of FI's obligations and responsibilities. Any subcontractor shall be subject to the provision of this Agreement to the same extent as the FI.

23. **Fraud, Waste and Abuse Compliance and Reporting.** Claims, data and other information submitted to MCO pursuant to this Agreement and used, directly or indirectly, for purposes of obtaining payments from the government under a Federal health care program, and payments that FI receives under this Agreement are, in whole or in part, from Federal funds. Accordingly, FI shall: (1) upon request of MCO, certify, based on its best knowledge, information and belief, that all data and other information directly or indirectly reported or submitted to MCO pursuant to this Agreement is accurate, complete and truthful; (2) not claim payment in any form, directly or indirectly, from a Federal health care program for items or services covered under this Agreement; (3) comply with laws designed to prevent or ameliorate fraud, waste, and abuse, including applicable provisions of Federal criminal law, the False Claims Act (31 USC §§ 3729 et. seq.), and the anti-kickback statute (section 1128B(b) of the Social Security Act); and (4) require it and its employees and its subcontractors and their employees comply with MCO compliance program requirements, including MCO's compliance training requirements, and to report to MCO any suspected fraud, waste, or abuse or criminal acts. Further, FI acknowledges and agrees pursuant to Section 6402 of PPACA, MCO may suspend payment to the FI pending an investigation of a credible allegation of fraud, unless the state determines there is a good cause not to suspend such payments.

24. **Insurance.** FI shall secure and maintain for itself and its employees, commercial general liability as may be necessary to insure FI, its agents and employees, for claims arising out of events occurring during the term of this Agreement or any post termination activities under this Agreement. Coverage shall be in amounts and terms customary for the industry and in general conformity with similar type and size entities within New York State, and, if required by State laws, worker's compensation insurance in amounts required by such State laws. FI shall, upon request of MCO,

provide MCO with certificates of insurance or other evidence of coverage reflecting satisfaction of the foregoing requirements of this paragraph. FI shall provide at least 30 days notice to MCO in advance of any material modification, cancellation or termination of its insurance.

25. **Modifications and Amendments.** Except as otherwise set forth in this Agreement, any amendments to this Agreement shall be in writing and signed by both Parties. Amendments required due to changes in state law or regulation or as required by NYSDOH and implemented by MCO shall be unilaterally and automatically made upon thirty (30) days notice to FI.

26. **Notification.** All notices required or permitted under this Agreement must be in writing and sent by (a) hand delivery, (b) U.S. certified mail, postage prepaid, return receipt requested, or (c) overnight delivery service providing proof of receipt. Any such notice shall be deemed given: (i) when delivered, if delivered in person; (ii) four (4) calendar days after being delivered by U.S. mail, or (iii) one (1) business day, if being sent by overnight carrier. Notices shall be sent to the address listed on the Signature Page, otherwise each Party may designate by notice any future or different addresses to which notices will be sent. Notices will be deemed delivered upon receipt or refusal to accept delivery. Routine day to day operational communications between the Parties are not notices in accordance with this section.

27. **Proprietary Information.** In connection with this Agreement, a Party or its affiliates may disclose to the other Party, directly or indirectly, certain information that the disclosing Party has taken reasonable measures to maintain as confidential and which derives independent economic value from not being generally known or readily ascertainable by the public ("Proprietary Information"). Proprietary Information includes Member lists, the compensation provisions of this Agreement, and other information relating to the Party's business that is not generally available to the public. Each Party shall, and shall require its subcontractors hold in confidence and not disclose any Proprietary Information and not use Proprietary Information except (1) as expressly permitted under this Agreement, or (2) as required by law or legal or regulatory process. Each Party shall, and shall require its subcontractors disclose Proprietary Information only in order to perform their obligations under this Agreement, and only to persons who have agreed to maintain the confidentiality of the Proprietary Information. The requirements of this Agreement regarding Proprietary Information shall survive expiration or termination of this Agreement.

28. **Dispute Resolution.** MCO and FI agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

    a. Any dispute, other than a dispute regarding malpractice, fraud or abuse, or a failure of the Parties to agree on a reimbursement amount between the Parties regarding the performance or interpretation of this Agreement shall be resolved, to the extent possible, by informal meeting or discussions between appropriate representatives of the Parties.

    b. In the event the Parties are unable to resolve a dispute informally, the Parties agree to submit the matter to binding arbitration before a single arbitrator acceptable to both Parties, under the commercial rules of the American Health Lawyers Association ("AHLA") then in effect. The Parties agree to divide equally the AHLA's administrative fee as well as the arbitrator's fee, if any, unless otherwise apportioned by the arbitrator. The arbitrator shall not award

punitive damages to either Party. The arbitrator's award may be enforced in any court having jurisdiction thereof by the filing of a petition to enforce such award.

   c. Arbitration shall take place in the county in which the MCO does business unless otherwise agreed to by the Parties.

   d. The Parties acknowledge that the Commissioner of NYSDOH is not bound by arbitration or mediation decisions. Arbitration or mediation shall occur within New York State, and NYSDOH shall be given notice of all issues going to arbitration or mediation, and copies of all decisions.

29. **Relationship of the Parties.** No provision of this Agreement is intended to create, and none shall be deemed or construed to create, any relationship between MCO and FI other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of the Agreement. Neither Party nor any of their respective employees shall be construed under this Agreement to be the partner, joint venture, agent, employer or representative of the other for any purpose, including, but not limited to, unemployment or Worker's Compensation. In its capacity as an independent contractor, FI shall have sole responsibility for the payment of federal and state taxes.

30. **Waiver.** No assent or waiver, express or implied, of any breach of any one or more of the covenants, conditions or provisions hereof shall be deemed or taken to be a waiver of any other covenant, condition or provision hereof or a waiver of any subsequent breach of the same covenant, condition or provision hereof.

31. **Severability.** When possible, each provision of this Agreement shall be interpreted in such manner as to be effective, valid and enforceable under applicable law. The provisions of this Agreement are severable, and, if any provision of this Agreement is held to be invalid, illegal or otherwise unenforceable, in whole or in part, in any jurisdiction, said provision or part thereof shall, as to that jurisdiction be ineffective to the extent of such invalidity, illegality or unenforceability, without affecting in any way the remaining provisions hereof or rendering that or any other provision of this Agreement invalid, illegal or unenforceable in any other jurisdiction.

32. **Governing Law.** This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts, except where Federal law applies, without regard to principles of conflict of laws. Each Party hereby agrees to settle disputes by means other than trial by jury in any suit, action or proceeding arising hereunder. Notwithstanding anything in this Agreement, either Party may bring court proceedings to seek an injunction or other equitable relief to enforce any right, duty or obligation under this Agreement.

33. **Third Parties.** Except as otherwise provided in this Agreement, this Agreement is not a third party beneficiary contract and no provision of this Agreement is intended to create or may be construed to create any third party beneficiary rights in any third party, including any consumer or CDPA.

34. **Non-Solicitation.** For the term of this Agreement and for one year thereafter, FI shall not directly or indirectly solicit any consumer to join a competing health plan or induce any consumer to cease doing business with MCO. The foregoing shall not be deemed to prohibit FI from informing

consumers as to the names of all the managed care organizations with which FI has contractual relationships in compliance with NYSDOH marketing guidelines.

35. **Compliance with all Laws.** The Parties shall comply with all applicable federal and state laws and regulations and shall assist each other in such compliance. During the term of this Agreement, FI shall comply with all applicable federal and state laws and regulations relating to the provision of consumer directed personal assistance.

36. **Entire Agreement.** This Agreement and the attachments, each of which are made a part of and incorporated into this Agreement, comprises the complete agreement between the Parties and supersedes all previous agreements and understandings, oral or in writing, related to the subject matter of this Agreement.

37. **Names, Symbols and Service Marks.** The Parties shall not use each other's name, symbol, logo or service mark for any purpose without the other Party's prior written approval. However, MCO shall be allowed to include FI, its name, address, telephone number, and other professional demographics in MCO's listings, directories and publications, in any marketing or advertising materials, and MCO's Internet sites, to help promote MCO to potential consumers. FI agrees that such listings are considered accurate if based upon the most recent information submitted to MCO by or on behalf of FI.

38. **Counterparts.** This Agreement may be executed and delivered in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

39. **Ownership and Controlling Interest Requirements.** FI shall comply with requirements for disclosure of ownership and control, business transactions, and information for persons convicted of crimes against Federal health care programs as described in 42 CFR part 455 subpart B (Program Integrity: Medicaid).

40. **Ineligible Persons.** FI warrants and represents, and shall cause each CDPA to warrant and represent that, as of the Effective Date and throughout the term of the Agreement and the duration of post expiration or termination transition activities described in this Agreement, that none of its principal owners or any individual or entity it employs or has contracted with to carry out its part of this Agreement, is an Ineligible Person. "Ineligible Person" means an individual or entity who (1) is currently excluded, debarred, suspended or otherwise ineligible to participate in (a) Federal health care programs, as may be identified in the List of Excluded Individuals/Entities maintained by the OIG, or (b) Federal procurement or nonprocurement programs, as may be identified in the Excluded Parties List System maintained by the General Services Administration, (2) has been convicted of a criminal offense subject to OIG's mandatory exclusion authority for Federal health care programs as described in section 1128(a) of the Social Security Act, but has not yet been excluded, debarred or otherwise declared ineligible to participate in such programs, or (3) is currently excluded, debarred, suspended or otherwise ineligible to participate in State medical assistance programs, including Medicaid or CHIP, or State procurement or nonprocurement programs as determined by a State governmental authority.

IN WITNESS WHEREOF, the undersigned with the intent and authority to legally bind the

respective Party, have caused this Agreement to be duly executed and effective as of the Effective Date.

ELDERPLAN, INC.

By: _____

Print Name: _MARISSA BURO_

Title: _VP Provider Network Operations & Ops_

Date: _12/6/16_

PRINCIPLE HOMECARE, LLC.

By: _____

Print Name: __SASHA GUILLAUME__

Title: __CEO__

Date: __12/06/2016__

Tax Identification Number: __47-5503946__

Notice Address:

Elderplan, Inc.
6323 7th Avenue
Brooklyn, NY 11220

Notice Address:

Principle Homecare, LLC.
807 Lydig Avenue 2nd Floor
Bronx, NY 10462

## Attachment A

## COVERED SERVICES

Fiscal Intermediary shall provider Consumer Directed Personal Assistance Services to members.

## COMPENSATION

MCO shall reimburse Principle Homecare (FI) for CDPAS services as follows:

| Codes | Description | Rate |
|---|---|---|
| T1020, U1 | CDPAS, 1 client | $ ███ |
| S5126, U1 | CDPAS, 1 client live-in | $ ███ |
| S5126, U2 | CDPAS, 2 client live-in (mutual) | $ ███ |