Exhibit 11

**FRIDAY, APRIL 19, 2024**                                    **12:03 P.M.**

ACTING SPEAKER AUBRY:  The House will come to order.

In the absence of clergy, let us pause for a moment of silence.

(Whereupon, a moment of silence was observed.)

Visitors are invited to join the members in the Pledge of Allegiance.

(Whereupon, Acting Speaker Aubry led visitors and members in the Pledge of Allegiance.)

A quorum being present, the Clerk will read the Journal of Thursday, April the 18th.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I move to dispense with the further reading of the Journal of Thursday, April the

1

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

18th and that the same stand approved.

ACTING SPEAKER AUBRY:  Without objection, so ordered.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir. Colleagues and guests that are in the Chambers, I'd like to share a quote with you today.  This one is from Elizabeth Lynne Cheney.  She is an American attorney and a politician.  She represented Wyoming's at-large congressional district in the U.S. House of Representatives from 2017 to 2023.  Her words for us today:  *We may have disagreed on pretty much everything else, but Nancy Pelosi and I saw eye to eye on one thing that mattered more than any other:  The defense of our Constitution and the preservation of our Republic*.  Again, these words from Elizabeth Cheney.

Mr. Speaker, members have on their desks a main Calendar.  We are going to call for the following committees to meet, Rules and Ways and Means.  These committees are going to create and produce an A-Calendar, which we will take up today.  After housekeeping and/or introductions the House will stand at ease until the conclusion of the Rules Committee.  If there is a need, and there probably will be a need for further floor activity, I will announce that as we proceed.  However, we can expect a very long day, but we hope there's a very long but productive day.  I want to thank my colleagues for their continued patience and cooperation as we continue to do our work to adopt a New York State budget.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

So Mr. Speaker, that's a general outline of where we're going today.  If you have introductions or housekeeping now would be a great time, sir.  Thank you.

ACTING SPEAKER AUBRY:  We do have introductions, but Mrs. Peoples-Stokes maybe we should call the committees.

MRS. PEOPLES-STOKES:  Mr. Speaker, if you could call the Ways and Means Committee immediately to the Speaker's Conference Room.

ACTING SPEAKER AUBRY:  Ways and Means, Speaker's Conference Room.

For the purposes of a introduction, Mr. Simpson.

MR. SIMPSON:  Thank you, Mr. Speaker.  I'm delighted today to have the Lake George Elementary fifth graders here today.  This is a great school in my district and actually one that I attended as an elementary student back in 1976.  So it brings me great pleasure to introduce the students and the teachers of this school and I would also ask for your -- offer them the cordialities of the People's House.

ACTING SPEAKER AUBRY:  Certainly.  On behalf of Mr. Simpson, the Speaker and all the members, we welcome these fifth graders here to the New York State Assembly, extend to you the privileges of the floor, commend you on your patience and being so quiet and cooperative this morning.  We hope your trip to Albany will be beneficial.  Hope you enjoy this and I hope as it approaches, you

3

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

have a great summer, because there's nothing like the summer and being out of school.  Thank you so very much.  Happy to have you.

(Applause)

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, would you please put the House at ease.

ACTING SPEAKER AUBRY:  The House will stand at ease.

(Whereupon, at 12:07 p.m. the House stood at ease)

*          *          *          *          *

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Members have on their desk an A-Calendar.  Mr. Speaker, I'd now like to advance that A-Calendar.

ACTING SPEAKER AUBRY:  On Mrs. Peoples-Stokes' motion the A-Calendar is advanced.

MRS. PEOPLES-STOKES:  Thank you, sir.

ACTING SPEAKER AUBRY:  On the A-Calendar, page 3, Rules Report No. 34, the Clerk will read.

THE CLERK:  Assembly No. A08804-D, Rules Report No. 34, Budget Bill.  An act making appropriations for the support of government, Capital Projects Budget.

ACTING SPEAKER AUBRY:  Governor's message is at the desk.  The Clerk will read.

THE CLERK:  I hereby certify to an immediate vote,

4

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Weinstein.

MS. WEINSTEIN:  Thank you, Mr. Speaker.  Today the State Assembly is -- has before us the Capital Projects bill.  This is the second appropriation bill of this legislative season.  The Capital Projects bill that members have, appropriates 21.7 billion for State Fiscal year 2024-'25, while authorizing disbursements of up to 17.6 billion on an All-Funds basis for capital projects for fiscal year '24-'25.  The Capital Projects bill makes critical investments in transportation, health, education, economic development, public protection, social welfare, housing and other areas.  Transportation and economic development, capital obligations account for 10.4 billion or 48 percent of the total spending in State fiscal year '24-'25.  Capital spending over the next five years is expected to average 18.7 billion.  And with that Mr. Speaker, happy to take any questions.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will Chair Weinstein yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. RA:  Thank you.  So, as you mentioned, this is our second appropriation bill after Debt Service, which we obviously did several weeks ago at this point, but we do not at this point have a

5

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

full financial plan yet?

        MS. WEINSTEIN:  That -- that is correct.

        MR. RA:  Okay.  And we don't have a full picture of what the total spending will be in this budget?

        MS. WEINSTEIN:  Correct.

        MR. RA:  Okay.  You mentioned the appropriation amounts and the fiscal impact of this bill.  How much in new debt issuances is part of this bill?

        MS. WEINSTEIN:  Eight billion.

        MR. RA:  Thank you.  And in general, before I get to some specific provisions, can you identify the appropriations or programs in this bill that are discretionary funds either supported by the Governor or the majorities that don't have set recipients through some type of formula?

        (Pause)

        MS. WEINSTEIN:  You want to know what that total dollar amount is?

        MR. RA:  Yes.

        (Pause)

        MS. WEINSTEIN:  I believe it's 4 -- 4 -- 435 million.

        MR. RA:  Thank you.  So with regards to some of the specific pieces of this.  Starting with Environmental Conservation.  So we have a restoration of the $250,000,000 in Clean Water Infrastructure Act funding, correct?

        MS. WEINSTEIN:  Yes.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. RA:  So that brings us back to $500 million, which is the same as last year.

MS. WEINSTEIN:  Correct.

MR. RA:  Do we know how much of this funding we have actually spent out over the past few years, and how much is being reappropriated?

(Pause)

MS. WEINSTEIN:  Well, I do believe that the reapprops are -- are substantial.  There is a long process to get these projects to the point of being able to have the money flow.

MR. RA:  Okay.  This also includes funding for a multi-year effort for -- to plant 25 million trees.  Fifteen million dollars in new funding I believe, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  So is this -- how is this program going to work?  Is it up to the municipalities to just decide locations to plant trees?

MS. WEINSTEIN:  It -- it will be grants.  This was a proposal the Governor put forward.

MR. RA:  Thank you.  And then the budget also includes $50 million to support the Green New York Council which was established by Executive Order 22.  So do we know how many electric vehicles the State will be able to purchase with this appropriation?

MS. WEINSTEIN:  I -- I don't believe that it's -- I'm

7

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

told that it's not for actual vehicles but it's for the facilities, State --
State facilities.

MR. RA:  State facilities, okay, thank you.  With
regard to parks, this NY SWIMS proposal or... well, I guess we
wouldn't call it a proposal at this point as it's in the final budget.

MS. WEINSTEIN:  Correct.

MR. RA:  But how are locations going to be selected
for those -- for those pools?

MS. WEINSTEIN:  I believe that actually what will
happen is municipalities will apply for this funding.

MR. RA:  Okay.  And is there any prioritization with
regard to rural or suburban areas for that funding?

MS. WEINSTEIN:  The restriction is $60 million for
underserved communities but not - it's not urban or rural.  It's just the
underserved communities.

MR. RA:  Underserved communities, okay, thank
you.  On Economic Development, we have -- you know, I talked a lot
about this yesterday, right?  We have a lot of Economic Development
programs.  One of the one that I think has actually worked well has
been our Centers of Excellence program.  You know, they've -- our
are 14 Centers of Excellence have created 341 new jobs, on an
investment of 11.8 million in State support, which is one job for every
$35,000 in taxpayer funds.  But, we have also in this, the Regional
Economic Development Councils.  Now we're providing funding
again for that program?

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  And do we know what the State's return on investment has been for that program?

MS. WEINSTEIN:  We don't have that information at -- at this time.  Obviously it's a lot of different programs spread out throughout the State over several years.

MR. RA:  Okay.  And I mean I know funding --

MS. WEINSTEIN:  We do get an annual report but I don't have the specifics.

MR. RA:  Okay.  We've awarded more than $8 billion through that program since 2011, which has supported almost 10,000 projects.  So I -- I think we would like to see the type of return on investment that we're getting from something like the Center of Excellence in -- in this program.  In terms of the discretionary funding that we talked about earlier --

MS. WEINSTEIN:  Mm-hmm.

MR. RA: -- 98 percent of New York business have fewer than 100 employees.  Is there a specific percentage or dollar amount of the Governor's discretionary $400 million New York Works Economic Development Fund that is directed towards small businesses?

MS. WEINSTEIN:  No, I -- I don't believe so.

MR. RA:  Okay.  In --

MS. WEINSTEIN:  I mean let me just say that -- that it is an eligible category.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. RA:  Okay.  It's an eligible category but not --
not necessarily prioritized for -- for small businesses.  In terms of
other Economic Development, you know, we talked I think yesterday
regarding some of the mega deals that are out there.  Are we doing
anything with regard to those, you know, things like Micron, those
types of efforts that we make with -- with bringing in new businesses
and bringing in factories in the State in this bill?

(Pause)

MS. WEINSTEIN:  You're talking about past
programs or -- or going forward?

MR. RA:  Well, in terms of how we award those
dollars going forward.

(Pause)

MS. WEINSTEIN:  So they -- it is through a -- an
RFP process that has to then be approved.

MR. RA:  Okay, thank you.  Moving on to Education.
So I -- I -- I think many of us are aware and I -- this is I think a pretty,
you know, universal thing of support on both sides of the aisle in
terms of our libraries.  According to the State library, there's $1.75
billion in unmet needs to re -- repair and update our State -- our
libraries Statewide.  I know I hear from mine regularly, they need
roofs, they need HVAC systems.  What are we doing with regard to
library construction in -- in this budget?

MS. WEINSTEIN:  So in term -- in terms of capital
we add an additional $10 million for a total of $44 million which is 10

NYS ASSEMBLY                                    APRIL 19, 2024

million above last year.

MR. RA:  Okay.  And with regard to directly at the State level, the State museum and library, there's -- there's been a few local news stories about the state of repair and -- and needs with regard to the State museum.  Are we giving them any support to make those repairs?

MS. WEINSTEIN:  Yes.  There -- the budget includes $10 million additional capital and we also amended a $59.7 billion reapprop to the cultural education storage facility to allow SED to spend funds on the State museum.

MR. RA:  Okay.  Do we know if they'll be able to repair the earthquake measurement device with that?

MS. WEINSTEIN:  I -- I think that's a little too micro for my knowledge.

MR. RA:  Thank -- thank you.  With regard to schools, non-public school safety grants.  What are we doing in the budget with regard to those?

MS. WEINSTEIN:  So we have $25 million above last year for non-public school health and safety projects so it's a total of 70 million.

MR. RA:  Okay.  And have we included any new language in terms of streamlining that process?  I've -- I've heard, you know, a lot of frustration just in terms of the time it takes to award those funds.

MS. WEINSTEIN:  Not specifically in this budget

11

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

but since these are -- have been ongoing annual grants that have been available, we think that they've gotten it into a better state of being able to move from the application process to actually getting the money out the door.

          MR. RA:  Okay.  With regard to our 4201 schools. We're providing $30 million to new capital funding?

          MS. WEINSTEIN:  Correct.

          MR. RA:  How is that funding awarded amongst the 4201 schools?

          MS. WEINSTEIN:  They will -- like in other -- in other situations, they will be applying to SED for a portion of that capital and SED will make the determinations.

          MR. RA:  SED will choose which projects get funded?

          MS. WEINSTEIN:  Yes.

          MR. RA:  Okay.  And then the -- on Higher Education.  I believe we have $40 million for another round of Higher Education matching grants program?

          MS. WEINSTEIN:  Yes.

          MR. RA:  Are we making any changes with regard to that in terms of how we awarded and the contribution ratio?

          MS. WEINSTEIN:  No, we are not.

          MR. RA:  Okay.  So it would remain then a 50/50 split?

          MS. WEINSTEIN:  Yes.  There -- there will be a

NYS ASSEMBLY                                    APRIL 19, 2024

remaining split situation.

        MR. RA:  Okay.  And I know this is maybe a topic
we did get into yesterday but also related to this -- the AI consortium.
How was it chosen that SUNY Buffalo, as opposed to any of the other
SUNY institutions, was the one that is -- is being awarded, which is I
would say a significant sum of money for this AI consortium.

        MS. WEINSTEIN:  My understanding is they do
have a good research program and they had the space to be able to
have the consortium hardware located.

        MR. RA:  And do we have any particular metrics or
expectations as to what we think the return on investment will be from
that?

        MS. WEINSTEIN:  I -- I think it's premature to -- to
predict that as this point.  I would just know that -- that Buffalo also
has very good access to renewable energy, SUNY Buffalo, so that's
another thing in that -- that campus' favor.

        MR. RA:  Thank you.  With regard to the -- the pro
housing certification.  Now, as we were going through the hearing
process - you know, we heard a lot about this -- now we have different
programs now that I guess are being not even prioritized, but are -- are
the local government needs to have that certification in order to access
the funds, but it looks to me like the budget language uses a *may*
rather than --

        MS. WEINSTEIN:  Correct.

        MR. RA: -- *shall* language.  So is -- is it the intention,

13

though, that, you know, any of these programs that are now being conditioned on that, will -- the municipality will have to have that designation in order to access them?

MS. WEINSTEIN:  Well, we are giving the agency the latitude since it is *may* and not *shall*.

MR. RA:  Okay.  But I -- I -- I -- I see that with regard to the language.  I -- I believe the Commissioner during the budget hearing process did indicate that the intention was that that be a -- a requirement rather than just something that they may do.  So do we know what the intention is, I guess, on the regulatory side with regard to this?

MS. WEINSTEIN:  I mean that -- you know, our understanding is that is their intention going forward, but it's not in the statute requirement.

MR. RA:  Okay.  And can you just detail what programs are going to require this or potentially require this pro housing certification?

MS. WEINSTEIN:  So, various programs including Downtown Revitalization Initiative Program - that's been happening for a number of years - NY Forward Program, the Regional Council Capital Funds [sic], we talked about that.  Capital Grants from Market New York, Long Island Investment Fund, Mid-Hudson Momentum Fund, New York Main Street Program and Public Transportation Modernization En -- Enhancement Program.

MR. RA:  Okay, thank you.  And do we know at this

NYS ASSEMBLY                                    APRIL 19, 2024

point how many local governments have been certified and how many
have applied for that certification?

       MS. WEINSTEIN:  So there -- there is an interactive
website.  So on the RADC's website, there are 100 -- as of Monday,
there were 175 submitted letters of intent and 46 have been certified.

       MR. RA:  Thank you.  With regard to some programs
that we have funded in previous budgets but I don't believe there's any
new funding for, the Veterans Non-Profit Capital Program.  There's no
new funding, correct, with regard to that program?

       MS. WEINSTEIN:  No new funding, correct.

       MR. RA:  Okay.  And my understanding is that today
is the final day to apply for round two of that program.  Do we know
how long it will take to make awards with regard to funding of veteran
service organizations?

       MS. WEINSTEIN:  Unfortunately I can't -- I -- I don't
have that information.

       MR. RA:  Okay.  Volunteer Firefighter Infrastructure
Grant.  There was no additional funding for those in this budget?

       MS. WEINSTEIN:  There is no new funding.  Our
understanding is it's been difficult to, because of the various
organizations, to be able to get that funding out the door.

       MR. RA:  Okay.  Do we know how much remains
available from prior funding of that program?

       MS. WEINSTEIN:  I would say approximately 5
million.

NYS ASSEMBLY                                    APRIL 19, 2024

MR. RA:  Five million, okay, thank you.  On the Transportation side.  You know, the Governor had proposed a cut of $60 million to CHIPS.  We are restoring that, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  So that brings us back to the level we were at in last year's enacted budget?

MS. WEINSTEIN:  Correct.

MR. RA:  Okay.  And then, are we looking at anything in terms of infrastructure for charging stations, garage facilities, fire suppression systems with regard to electric vehicle mandates on the State?

MS. WEINSTEIN:  Nothing additional, but there is a Bond Act money that is available for those uses.

MR. RA:  Thank you.  I think that's all I have right now.

Mr. Speaker, on the bill.

MS. WEINSTEIN:  Thank you.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RA:  Thank you.  So, I -- I do want to since this is really our first appropriation bill other than Debt Service, reiterate the fact that we're here starting to vote on appropriation bills.  We did three budget bills yesterday, we're doing this one and if you include Debt Service, that's half of the bills that make up our budget, and still no financial plan.  We still can't answer the very simple question of how much money does this budget spend.  We will have adopted

16

NYS ASSEMBLY                              APRIL 19, 2024

likely more than half of the bills that make up this budget after we do
Health next and not be able to answer that simple question, which to
me is absurd.  We know it's going to be somewhere north of 235
billion, the Governor said 237 the other day, but we're voting on more
than half the budget without knowing that for a fact, without looking
at a simple document that shows us what money is coming in and
what money is going out?  That's absurd.  And I -- and I really have to
say, you know, in the 14 years that -- that I've been here and
unfortunately this has probably been the case more often than not, but
it just seems to get worse and worse and worse.  And in particular, I
have to say if it wasn't for poor leadership, there'd be no leadership
coming from the Second Floor.  The Governor is out there
glad-handing today talking about the -- the cannabis, illegal cannabis
that was in the budget bill yesterday and that's great.  We -- we all
thought that was necessary, but she should be up here doing her job
and making sure we have a financial plan as we're adopting this
budget, not spiking the ball in the five-yard line.  So I -- I -- I really
think that she is failing to lead this State right now, and I -- and I -- I
think this directly reflects on her and it's not -- it's not on the staff, it's
not on the Division of Budget, it's the leadership that is coming from
that one individual which is lacking right now.  We're here in really
mid-to-late April.  Last year we didn't have a budget done until May
1st. We're hoping that within the next 24 hours we're going to wrap
this up, but still we have four bills that aren't even in print on April
19th, and we don't know how much money we're spending in this

17

NYS ASSEMBLY                                    APRIL 19, 2024

budget.  That is a failure.  It's not something any of us should be happy about and -- and I just -- I really just don't know what else to say at this point.  This Capital bill does a lot of good things.  As I always say when you're spending that kind of money, you're going to make a lot of people happy.  I'm happy to see support for our 4201 schools, I'm happy to see library construction, I'm happy to see at least a restoration with regard to the CHIPS program to help -- to help our local governments, you know, with paving, but, you know, we have again a lot of discretionary funding that -- that -- that is in here that is not lined out going back to the point of transparency, so -- so that's a concern for me.  I hope that as we get into the next bill, which -- which will be Health and we're going to have plenty to say about that, there's obviously some very troubling proposals within -- within that budget bill, but man, we need to have a financial plan so we can look and say this is how much money this State is spending in this budget.  Not have half the budget already passed without knowing that simple fact.  Thank you, Mr. Speaker.

                ACTING SPEAKER AUBRY:  Mr. Slater.

                MR. SLATER:  Thank you, Mr. Speaker.  Will the Chair yield for some questions?

                ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

                MS. WEINSTEIN:  Yes.

                ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

NYS ASSEMBLY                              APRIL 19, 2024

MR. SLATER:  Good afternoon, Madam Chair.  I have some questions on the Transportation portion of this budget --

MS. WEINSTEIN:  Sure.

MR. SLATER: -- if we can dive right into that.  Can you walk me through the funding that's being proposed as it relates to repaving and investing in State and local roads?

MS. WEINSTEIN:  Sure.  So the -- this is for State roads that run through municipalities that we will be -- it is -- it's $1.3 billion total which is 100 million above the Governor.

MR. SLATER:  In total investment for both State and local?

MS. WEINSTEIN:  This is just the local portion.

MR. SLATER:  Just local portion, thank you.  The Senate and Assembly one-House budgets included $400 million in DOT Core Capital Improvement Projects we're funding for -- to the tune of $400 million for those types of projects for the DOT Core Capital Plan.  Can you identify for me where that allocation is in this budget?

MS. WEINSTEIN:  You're correct that it was in our one-House.  It did not make it into the final budget that we are voting on today.

MR. SLATER:  And could you maybe explain to me if you can shed some light as to why it was not included?

MS. WEINSTEIN:  The Executive was not convinced to go along with our proposal.

19

NYS ASSEMBLY                                    APRIL 19, 2024

MR. SLATER:  Well, maybe if the Executive is, as my colleague said, spiking the football at the five-yard line, she can drive through the Hudson Valley on some of the State roads and then may change her mind.

If we could turn our attention to CHIPS.

MS. WEINSTEIN:  Yes.

MR. SLATER:  I'm happy to see that we stopped the Governor's proposed cuts to CHIPS.

MS. WEINSTEIN:  Correct.

MR. SLATER:  Do we know what the increase in paving costs have been over the last five years?

MS. WEINSTEIN:  I -- that I do not know.

MR. SLATER:  According to one of my local highway superintendents, he is reporting to me that in the last five years he's seen an increase of asphalt from $78 a ton to $130 a ton. And I'm just wondering if we know or if you can share with us in those -- in that five year span, what has the State done when it comes to CHIPS?  Have we seen an increase in funding?  Is it a flat funding? Is it in -- is it keeping pace with the increased costs of maintaining local roads?

MS. WEINSTEIN:  Well, we looked for the -- the details.  We have had -- we have had -- we've had an increase, like -- we do have an increase from five years ago in the DOT's Capital Plan. I couldn't tell you if it's that same percentage that you talk about in terms of asphalt.

20

NYS ASSEMBLY                                    APRIL 19, 2024

MR. SLATER:  For the DOT Capital Plan.  What about CHIPS?  Has the CHIPS funding that goes to local roads, has that also increased or has that remained flat?

MS. WEINSTEIN:  Yes.  It has increased over these past --

MR. SLATER:  Would you be able to tell me how much, approximately?

MS. WEINSTEIN:  I'm -- I'm sorry.  I'd be happy to. I can't tell you now because I don't -- we don't have that data here.

MR. SLATER:  Understood.

MS. WEINSTEIN:  I'd be happy to share with you after this debate.

MR. SLATER:  But this budget maintains the same funding as the previous years; is that correct?

MS. WEINSTEIN:  Yes.  We --  we've agreed to restore to last year's level.

MR. SLATER:  Thank you.  And I just want to go back, if we can, just to the DOT funding.  So we know that Governor Hochul single-handedly rejected $400 million for State roads.  Is there any money being allocated for our regional DOT so that they can improve the state of our State roads and bridges?

MS. WEINSTEIN:  Well, just going back to the -- the DOT Capital Plan.  This five-year plan is approximately 40 percent higher than the prior five-year plan.  So, you know, without the actual dollar figures, I can tell you that it's substantially higher.

21

NYS ASSEMBLY                                    APRIL 19, 2024

MR. SLATER:  Well, I know that -- I know that we had testimony during the budget hearings by some of our experts and they were requesting $500 million.  And so we went from 500 to 400 to zero to deal with the -- the state of our bridges and roads that are run by New York State, but -- so can you dive maybe deeper into that five-year Capital Plan so we have an idea as to how much money our regional DOT hubs are going to have available to them?

MS. WEINSTEIN:  The -- the plan isn't broken down by region, but we do think that it fully funds the -- the needs going forward.

MR. SLATER:  So since it's not broken down by region I'm assuming, and please if you could shed some light, none of that is allocated based on the highway and bridge conditions report?

(Pause)

MS. WEINSTEIN:  I mean it is a needs-based program so the... (pause), right.  It's a -- it's a needs-based program.  I couldn't tell you directly whether it is -- how much is based on any bridge maintenance surveys.

MR. SLATER:  So if it's a needs-based program, is there any way of telling us what those needs are based on?  Is it based on the conditions report which tells us that, for instance, Region 8, my region in the Hudson Valley has the worst road conditions in the State of New York?  And so, if that's the case, they should be getting the most amount of money out of that Capital Project Plan?

MS. WEINSTEIN:  I don't have the details on the --

22

NYS ASSEMBLY                                    APRIL 19, 2024

on the breakdown, but approximately 53 percent of the five-year

Capital Plan is spent on State road and bridge maintenance,

construction and engineering, right-of-way costs but, you know, again,

I -- I can't tell you about the Hudson Valley.

MR. SLATER:  Understood, I appreciate that.  If we

can just pivot quickly to the Resilient Ready program that's being

proposed.  How much are we proposing for this program?

MS. WEINSTEIN:  Forty million dollars.

MR. SLATER:  And which agency is going to

administer those funds?

MS. WEINSTEIN:  Housing, HCR.

MR. SLATER:  And can you describe for us what or

who is intended to benefit from this program?  Who qualifies for these

dollars?

(Pause)

MS. WEINSTEIN:  I don't think we have the details

yet on it.  It's still being developed, but the goal is to help homeowners

better prepare for natural disasters.

MR. SLATER:  Very good, thank you very much.  I

appreciate you answering my questions.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. SLATER:  You know, I am very disheartened,

disappointed in this particular budget, especially as it relates to

funding of our roads.  If you come to the Hudson Valley and you talk

23

NYS ASSEMBLY                                    APRIL 19, 2024

to our residents, you talk to my constituents and you say the word *roads* they start to twitch, and they twitch because they know that the conditions of our roads is subpar.  In fact, the latest conditions report tells us that Region 8, the Hudson Valley, has the worst conditions of State roads in the entire State of New York.  And there is a concerted effort by this House and the Senate to allocate additional dollars to deal with DOT's Core Capital Plan.  And I think it's just outrageous, simply outrageous that Governor Hochul has unilaterally washed that money away.  This is a quality of life issue.  Our taxpayers are breaking their backs to survive here and they deserve safe, high-quality roads in order to get from place to place.  As for CHIPS, great.  We stopped the Governor again on more cuts to these vital services that people frankly deserve, but we're not keeping pace with the cost of construction and so we continue to ask our highway superintendents to do more with less and then we kick it around like a political football, it's wrong.  The investments in our infrastructure is wrong.  There was one testimony during the budget hearings this year from one of the experts and they said, and I quote, "They have never seen a greater decline in conditions than we have today."  And what's the Governor's answer?  The Governor's answer is to stop the right investments in our State roads, in our State transportation system.  It's wrong, the Governor is wrong and I think we have to do more as a Body to push back against her direction.  I do want to agree with my colleague Assemblyman Ra, there are certain things in here that I do appreciate.  Of course, our investments in our libraries is very

24

NYS ASSEMBLY                                    APRIL 19, 2024

important, as well as our clean water and environment protection fund dollars, restoring those I think is very beneficial to the residents of New York, but if we can't drive on our roads, where are we and how are we going to benefit from them.  And on the last point I want to make, Mr. Speaker, regarding the Resilient and Ready Program, you know, details matter.  We're being asked to allocate $40 million to a program which we don't have any parameters on.  We just know it's supposed to help people.  Yeah, great, but who, how?  Forty million dollars is a lot of money, $40 million to our roads in the Hudson Valley is a lot of money.  And so I think we have to get our priorities in order, I think we have to be more realistic in the state of the infrastructure here in New York State, and I think that the Governor, once again, is completely wrong for eliminating the $400 million investment that this House and the Senate tried to make.  Thank you very much, Mr. Speaker.

            ACTING SPEAKER AUBRY:  Thank you.

            Mr. Braunstein.

            MR. BRAUNSTEIN:  Thank you, Mr. Speaker.  On the bill.

            ACTING SPEAKER AUBRY:  On the bill, sir.

            MR. BRAUNSTEIN:  So Mr. Speaker, I represent the Creedmoor Psychiatric Center which is a State property in Eastern Queens.  Many of you might be familiar with the site given that recently the City of New York jointly with the State of New York have been using the property to house about 1,200 migrants in a tent

in the middle of a residential neighborhood in Eastern Queens.  Last January, around last January, New York State Empire State Development Corporation expressed an interest in redeveloping the Creedmoor campus for housing.  They went forward with what they called community visioning sessions and sought input from civic groups and community leaders about what type of housing they would like to see on this property.  The community responded, they had different ideas, different types of housing.  The one request the community did have was that Empire State Development attempt to keep the density of the project somewhat contextual to the surrounding community.  So we had those visioning sessions, the community expressed their thoughts, and then in December of 2023, without any notice, I found out from Twitter, that Empire State Development was putting out a proposal for 2,800 units of housing.  To give you an example:  The surrounding community is single-family homes, two-story garden apartments, the community leaders recognized that perhaps they would probably go a little bit more than that, they suggested four-story buildings.  ESDC went with eight-story buildings.  Glen Oaks Village, what I believe is the largest garden cooperative in the City of New York is adjacent to the Creedmoor campus.  That development is 2,900 units on 110 acres, so that's the surrounding community, 2,900 units on 110 acres.  The proposal from ESDC was 2,800 units on 55 acres, double the density of the surrounding community.  I found this out on Twitter.  Understandably there was overwhelming community opposition to this proposal.  So

**NYS ASSEMBLY**                                **APRIL 19, 2024**

that was December.

In January, the Governor's Executive proposal includes the RUSH program, which is in this bill before us, that allocates $250 million for infrastructure to encourage development on underutilized State property. In January, when I heard the Governor had this proposal, I reached out to the Governor's office and I asked, Do you intend to use this money for this Creedmoor project? And they told me that they did. So then naturally like -- like any legislator would in that situation, I -- I requested that the -- the Governor's office do something to lessen the density of this project, meet with the community, try to meet us somewhere. The community overwhelming opposes this project. You're putting the funding for it in the State budget, asking the Legislature to vote for it, we're requesting -- we're not saying you have to comply with locals only, but work with the community to find something that everybody's comfortable with. The Governor's office refused to negotiate on that. Throughout the budget process, I'm told that our Speaker attempted to get the Governor's office to work with us to find something that's more amenable to the surrounding community and we got nowhere. The Governor's office was unwilling to change the proposed project.

So here we are with the RUSH program, intact in the budget. The Governor's office has refused to negotiate with the community. I will tell you; it's not just myself. I have colleagues in the surrounding community whose -- whose districts aren't far away who oppose this project, the State senator opposes this project, the

27

local councilwoman opposes this project, the local community board opposes this project.  So -- and -- so I -- I cannot in good conscience vote to fund this project.  And I will just say, this -- this community deserves better.  They're already dealing with the quality of life concerns of a 1,200 person, single men migrant tent shelter in the middle of this residential community, and they're simply requesting that the ESDC come back to the table and work on a proposed development that is something that the rest of the community will agree with.  And given the fact that this funding is in the budget for that project, I will be voting in the negative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Palmesano.

MR. PALMESANO:  Yes, Mr. Speaker.  Will the sponsor yield for some questions?

ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. PALMESANO:  Thank you, Madam Chair.  Ultimately I'm going to get to the CHIPS program, but I want to ask you a few questions about the discretionary funding programs that are in the budget.

MS. WEINSTEIN:  Sure.

MR. PALMESANO:  It's my understanding that the CREST Program in this budget increased funding for the CREST

**NYS ASSEMBLY**                    **APRIL 19, 2024**

Program by $385 million; is that correct?

MS. WEINSTEIN:  It's maintaining funding at that level, yes.

MR. PALMESANO:  It's not an increase of $385 million above what the Governor proposed?

MS. WEINSTEIN:  It's above the Governor.  It's what -- it mirrors what we did last year, yes.

MR. PALMESANO:  So it's an additional $385 million.

MS. WEINSTEIN:  Yes.

MR. PALMESANO:  Okay.  And then on the -- and for that program, is that -- it's my understanding there's about $768 million left in that program, and we have appropriated $1.16 billion for that discretionary program over the past three years, approximately?

MS. WEINSTEIN:  Yes, and it goes for, you know, very important projects in -- in members' districts --

MR. PALMESANO:  Sure.

MS. WEINSTEIN: -- such as, you know, in your own Seneca County, the historic county courthouse renovations were made available because of this funding.

MR. PALMESANO:  I'm -- I'm not disputing -- all this funding goes for important projects, I just wanted to get to put it in perspective when we get to some of these other votes.  And the local Community Access Program, another discretionary funding

29

**NYS ASSEMBLY**                                   **APRIL 19, 2024**

program, another $100 million increase, correct, for this year?

   MS. WEINSTEIN:  Yes.

   MR. PALMESANO:  And in the SAM Program currently there's $1.9 billion left in that discretionary program, correct?

   MS. WEINSTEIN:  That -- that does seem a bit high. It may be reflecting projects that just haven't --

   MR. PALMESANO:  I understand.

   MS. WEINSTEIN: -- that -- that are appropriate that have been submitted, have been approved but just haven't moved forward to a point of being able to collect --

   MR. PALMESANO:  I understand.

   MS. WEINSTEIN: -- their dollars of reimbursement.

   MR. PALMESANO:  Okay.  And we talked about the -- my colleague talked about the -- the Volunteer Fire Infrastructure and Response Equipment Grant Program.

   MS. WEINSTEIN:  Yes.

   MR. PALMESANO:  That was started last year as part of the budget, right?

   MS. WEINSTEIN:  Yes.

   MR. PALMESANO:  And then this year we're eliminating that program?

   MS. WEINSTEIN:  We're not eliminating, but the funding hasn't gone out.  So that funding is being reappropriated to be hopefully spent this year.

MR. PALMESANO:  Okay.  So let's talk about the CHIPS program a little bit if we could.

MS. WEINSTEIN:  Sure.

MR. PALMESANO:  First before we get to that, the DOT five-year Capital Plan, that's $32 billion, correct?

MS. WEINSTEIN:  Yes.

MR. PALMESANO:  And the MTA five-year -- five-year Capital Plan is 55 billion, correct?

MS. WEINSTEIN:  Yes.

MR. PALMESANO:  And then --

MS. WEINSTEIN:  You know, I mean I know you're aware, Mr. Palmesano, they're financed very differently.

MR. PALMESANO:  Yes, absolutely.  So CHIPS, the Governor proposed a $6 million cut.  The Legislature now we're increasing or restoring that $6 million cut.

MS. WEINSTEIN:  Correct.

MR. PALMESANO:  Right?  Is there any reason why we didn't just restore it?  And the reason why I want to put that into perspective, we just talked about how - I'm not saying they're not important - funding programs through CREST that's at the member discretion, a $385 million increase for CREST, $100 million increase for the Health Cap [sic] Program but we're leaving CHIPS flat.

MS. WEINSTEIN:  Well, you know, as I said, the -- the CREST program is reflecting the same dollar amount as last year and the CHIPS program is reflecting the same dollar amount we had

**NYS ASSEMBLY**                                **APRIL 19, 2024**

last year.  So, you know, in that regard it's similar.  I mean obviously the amounts are different but it's a similar concept going in this bill.

MR. PALMESANO:  Okay.  And -- and also in this budget you restored the $40 million to the touring roads; is that correct?

MS. WEINSTEIN:  Correct.  Matching last year's funding.

MR. PALMESANO:  Now the CHIPS program impacts every single municipality in the State of New York, every municipality in New York City, Long Island, Upstate New York benefits from that, correct?

MS. WEINSTEIN:  Yes.

MR. PALMESANO:  And the State touring roads there's I believe 88 or 89 municipalities that have benefitted from that program; is that correct?  I know it's to fix State roads --

MS. WEINSTEIN:  I -- I don't have the exact number --

MR. PALMESANO:  Okay.

MS. WEINSTEIN: -- but I'll --

MR. PALMESANO:  That's fair.

MS. WEINSTEIN: -- you know, I assume it's pretty close to what you said.

MR. PALMESANO:  I guess I want -- I guess I want to get -- the question I was trying to get at to you was, how come, you know, you're well aware that the Federal Highway Administration

NYS ASSEMBLY                                    APRIL 19, 2024

came out with a report saying that the highway construction cost index

has increased 58-and-a-half percent over the past two-and-a-half years

so any money that we're providing is being eaten up by inflation.  Why

are we not increasing funding for the CHIPS program or our local

highway construction programs to pave our potholes even and leaving

it flat when we know this is a challenge to our local municipalities?

And I'm sure the MTA is not being held flat.  Their funding is going

up.

            MS. WEINSTEIN:  Well, as -- as you know from the

conversation I had with Assemblyman Slater in -- in the Assembly's

one-House, we did propose a -- a large increase, but through the final

negotiations, we were only able to get to the point of the extra -- going

back to last year's level and also localities, municipalities that have

CHIPS funding can also apply for the State roads funding.

            MR. PALMESANO:  So based on the amount of

money that we're spending, obviously we talked about the, you know,

we're going to see $2.4 billion for the migrant crisis, $700 million for

the Hollywood Film Tax Credit, you know the funding for the

discretionary funding.  In all of that, we couldn't have done an

increase, found a way to get an increase to our local infrastructure

because we know that impacts the local property taxpayer and the

deficiency in the roads and bridges as well and now especially on our

local infrastructure, wouldn't that have been a good priority and a

good message to send?

            MS. WEINSTEIN:  As -- as you know, the budget is

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

--

MR. PALMESANO:  It's a negotiation.

MS. WEINSTEIN: -- a negotiation between, right.

MR. PALMESANO:  I understand.

MS. WEINSTEIN: -- between --

MR. PALMESANO:  But wouldn't this have been a good one to draw a line in the sand?  We talked about drawing a line in the sand yesterday on the prison closures that you had in your budget, not to accept the 90 day but the Governor won out on this.  It looks like the Governor's winning out on this one.  She wanted to cut it which is ridiculous, I don't know who's advising her on that just like I don't know who advises her on her education policy, but it just seems like this would've been a good program given the impact it has and the impact -- just like the MTA, we know that's the lifeblood of the Downstate transportation network, the CHIPS is the lifeblood of our Upstate transportation.  I don't think it's being treated fairly and on parity, especially when you look at the DOT five-year Capital Plan and the MTA cap.  So, that wasn't -- that wasn't really a question.  That was more of a statement, I'm sorry.

MS. WEINSTEIN:  I appreciate your feelings on the issue.

MR. PALMESANO:  I'm sorry.  I thank you for your time.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

34

**NYS ASSEMBLY**                                      **APRIL 19, 2024**

MR. PALMESANO:  Yes, Mr. Speaker.  I am going to be voting no on this bill.  I know there's some good things in here.  I am concerned about the -- what I -- I perceive to be a cut to the volunteer emergency -- for our volunteer fire departments, this $25 million to the program that started last year.  We should still keep the money and put the money in there because there's such demand more than just $25 million.  We should help them with the program and help them do that.  This is something they're hopeful about.  I think this just sends the wrong message.  It seems like we're pulling the rug out from underneath them and could really hurt our rural communities, especially what our volunteer firefighters do for us each and every day.  If the services they provide to our communities had to be paid services, it would cost property taxpayers more than $4 billion annually.  So I would just wish we would be more clear and keep the funding in there and add funding to it, just like we're adding funding, as my colleague said, to the discretionary funding programs.  We should be doing that to let them know that this program exists and is there to help them.

I do want to talk about the CHIPS program.  Every municipality in the State benefits from the CHIPS program; Long Island, New York City, Upstate.  We want to have -- in my opinion -- in our opinion, restoration of the CHIPS cut is not enough.  That's not a win.  We need parity between the MTA and our DOT Capital funding.  The MTA five-year Capital Budget plan was $55 billion.  The DOT five-year Capital Plan is $32 billion, that's not parity.  Now

35

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

I understand that my colleagues, especially from Downstate, the MTA
is the lifeblood of the Downstate transportation network, I -- I respect
that, I appreciate it.  I support the MTA, I want funding for the MTA, I
have more companies in my district - Alstom and Hornell, (inaudible).
We have companies that work on the MTA projects that benefit from
that so we want to support the MTA.  But my colleagues, especially
from Downstate and across the State, CHIPS is the lifeblood of our
Upstate transportation network.  Sometimes that's the only funding
some of these local municipalities receive is that funding through the
CHIPS program, and we know some of our municipalities are facing
fiscal challenges with the tax cap.  You know, health insurance costs
are arising for them, the highway construction costs.  I already said
that a 58-and-a-half percent increase over the past 30 months, so just
going flat is not enough to maintain.  It's eating away at that because
we need to do better on this.  I just wish more people would
understood this.  I mean -- an increase is -- is justified.  Listen, just
some statistics you should know about, maybe you'll think a little
differently in the future.  Eighty-seven percent of the roads in New
York State are owned and maintained by our local municipalities, 52
percent of the 18,000 bridges in New York State are owned and
maintained by our local municipalities, 48 percent, nearly 50 percent
of the miles driven are driven on our local roads, and nearly 50
percent of the sales tax at the gas comes on our local roads.  Every
dollar that we invest in the CHIPS program saves local property
taxpayers a dollar.  Every dollar we invest in the CHIPS program

36

NYS ASSEMBLY                                    APRIL 19, 2024

saves 6- to $14 in long-term rehabilitation cost.  Studies have shown

that our local roads are deteriorating and our bridges are becoming

structurally deficient.  Reason just did a highway report and ranked

New York number 49th in the nation.  TRIP, a transportation

advocacy groups said that it's costing New York motorists $36 billion

annually, more than $3,600 per driver for higher vehicle operating

costs, accidents and congestion delays.  The Comptroller in his report

said to me the local infrastructure system has $89 billion in unmet

needs, including $27 billion for our local bridges.  Our local town

highway superintendents that we all represent updated their analysis

and said that outside of New York City there's a $2 billion funding

gap on our local highway system.  That's unacceptable.  That's not

parity, we need balance.  And again, I will stress this, the Federal

Highway Administration construction cost index for highway

consumption cost, the inflationary increase, 58-and-a-half percent

over the past two-and-a-half years.  We can do better than this.  We

should be doing better than this.  The economic impact has proven,

already $150 million invested in local roads creates 4,200

construction-related jobs, and what are we doing with this budget?

We're keeping CHIPS flat.  That's not a win.  That's wrong.  We have

to do better.  This is unacceptable, we should be doing better.  It's just

more misplaced priorities from the Governor and this -- the

Majorities.  We talked about the discretionary funds, a $385 million

increase in discretionary funds in one program, 100 million in another

program, but zero for CHIPS.  And at the same time putting -- not

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

putting the money in for the volunteer fire departments.  We're
sending $2.4 billion for the migrant crisis, but zero for CHIPS as far as
an increase.  That 2.4 billion is an increase above last year for the
migrant.  We're spending $700 million on a Hollywood film tax credit
to benefit the Hollywood elites, but a zero percent increase for CHIPS.
We're spending money to plant trees and build swimming pools, but a
zero percent increase for CHIPS.  It makes no sense to keep CHIPS
and local infrastructure funding for our local municipalities flat not
whatsoever.  Again, especially with that inflationary increase of
58-and-a-half percent over the past two-and-a-half years which is just
going to eat that up.  They're going to be behind the eight ball and that
funding gap that I cited from the town highway superintendents of $2
billion is going to continue to grow further in the wrong way.  We
need to be proactive on this, my colleagues.  We see bridge collapses
happening all the time at different places.  How many of us put our
kids on a school bus every morning and it rolls over a local bridge or a
culvert.  What happens if there's a collapse, we don't want to be
reacting to a tragedy, we need to be proactive.  Our first responders,
they go over local roads, bridges and culverts to get to emergency.
That can affect the timing of incidents or an accident, that's about
saving lives.  Flat is not helpful.  It's not acceptable.  We can do better,
we should've done better if we drew the line in the sand with this
Governor.  Unfortunately, we only draw a line in the sand with the
Governor if it's a program that is important to those who are doing the
negotiation.

NYS ASSEMBLY                                    APRIL 19, 2024

And Economic Development perspective.  Listen, it's great to have a great interstate system, but businesses located in towns, villages and cities.  So if the interstate is great but if they get off that interstate at the towns, if the local infrastructure is not good, that's not going to help draw business to that local community.  We talked about tourism.  I represent the wine country.  It's great to have the interstate to get there but if those local roads getting there -- and there's problems and it causes damage, people aren't going to come there.  We should be increasing the CHIPS program, period.  Especially when we're talking about again, a $385 million increase on one discretionary program and $100 million increase on the other, couldn't 100 million of that been added to the CHIPS program?  Yes, it could've.  You just chose not to do that.  And that's unfortunate and that's very, very sad.

Talked about the Economic Development, the public safety, about tourism, ladies and gentlemen, it's long past due to put parity in our local infrastructure funding in our DOT Capital funding with the MTA.  If we do that, then we would show that local roads aren't just essential but they do matter, but unfortunately this budget does not reflect that so I'm going to be voting no.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Norris.

MR. NORRIS:  Thank you, Mr. Speaker.  Will the Madam Chair yield for a few questions?

ACTING SPEAKER AUBRY:  Ms. Weinstein will

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

yield?

        MS. WEINSTEIN:  Yes.

        MR. NORRIS:  I noticed in the memo that I received

that there will be $50 million for canal infrastructure investments.

Can you explain what that is for?

        MS. WEINSTEIN:  That's to make sure that the Erie

Canal can continue to operate.

        MR. NORRIS:  Is that new funding?

        MS. WEINSTEIN:  Yes, yes.  That is (inaudible).

        MR. NORRIS:  You know, oftentimes I'm critical of

the State budget and how much money we spend.  And but I -- I will

commend the Majority when I feel it's appropriate.  In this case, this is

very good.  I represent the City of LockPort along the Erie Canal and I

also represent many communities around -- along the Erie Canal and

this is long overdue.  We need to continue to make investments into

the Erie Canal.  As we're celebrating the 200th birthday coming up of

the completion of the Erie Canal, this is very, very important.  I would

encourage the Majority to continue to examine that from a tourism

and economic standpoint and I commend you for putting those dollars

into this budget.  It will be very useful and quite frankly it will need

more.  The other questions that I have regarding the NY SWIM [sic]

program.

        MS. WEINSTEIN:  Yes.

        MR. NORRIS:  Could you give me a breakdown of

the $150 million that's going to be spent on this program, what it's

**NYS ASSEMBLY**                                      **APRIL 19, 2024**

actually going to be used for?

MS. WEINSTEIN:  What it's going to be used for?

MR. NORRIS:  Yes.

MS. WEINSTEIN:  Because the locations are not yet determined, it's by application, municipalities will apply.  But it's to help to build swim facilities, not only freestanding swim facilities but also facilities that might be adjacent to utilizing water that -- or some of the lakes of -- of New York.

MR. NORRIS:  Will the whole $150 million be used in infrastructure for swimming pools or the rehabilitation for the construction of swimming pools?

MS. WEINSTEIN:  Yes.

MR. NORRIS:  Will any of those dollars be used for the recruitment and retention of lifeguards?

MS. WEINSTEIN:  No, because this is capital but we do have separate money in the budget to do that that we can talk about in a later bill.

MR. NORRIS:  Oh, good.  I look forward to seeing that.  Is there any additional dollars for community partners such as the YMCA and other organizations that provide swimming lessons for our children and people of all ages quite frankly.

MS. WEINSTEIN:  Not in this Capital bill but in the Aid to Locality bill we'll be able to talk about that and there will be some additional funding.

MR. NORRIS:  Great, thank you very much.  When I

NYS ASSEMBLY                                    APRIL 19, 2024

go on the bill I'm going to have a couple more comments --

        MS. WEINSTEIN:  Sure.

        MR. NORRIS: -- about the importance of that

program.

        I want to go back to that volunteer fire department

$25 million, which I consider a cut to our volunteer fire service.  Why

is those dollars again not being placed in this year's budget?  There is

a tremendous need for our volunteer fire departments.

        MS. WEINSTEIN:  I think there just was a delay in

both getting the information for -- for these local fire departments to

start to go through the process.  So none of that money has gone out

yet so that'll be -- it will first be starting very soon in this year's budget

going out to where we've reappropriated all of last year's funding to

this and through this year's budget.  Hopefully that money will start to

flow and it's something that next year and years going forward will be

able to continue based on what we see as a result of it going out the

door.

        MR. NORRIS:  So in -- in last year's budget there

was 25 million.

        MS. WEINSTEIN:  Correct.

        MR. NORRIS:  And now it's being reappropriated to

this year's budget for --

        MS. WEINSTEIN:  Correct.

        MR. NORRIS: -- $25 million?

        MS. WEINSTEIN:  Correct.

NYS ASSEMBLY                                    APRIL 19, 2024

MR. NORRIS:  So where did the 25 million go?  I mean I know it's being reappropriated but it must be moved around somewhere else --

(Inaudible/cross-talk)

MS. WEINSTEIN:  It's being moved from last year's budget into this year's budget.

MR. NORRIS:  Okay.  I'll go on the bill on that part, too.  I just want to get to a couple questions on Transportation.  As you know I served as the ranking member of the Transportation Committee.  In terms of CHIPS funding, just so I'm clear, that remained flat, right?  No additional dollar for CHIPS.

MS. WEINSTEIN:  It reflects -- it's the same number that was last year.  As a result of negotiations we restored it to last year's level.

MR. NORRIS:  And 50 million was in the one-House budget; is that correct?

(Pause)

MS. WEINSTEIN:  Right.  That -- that was our one-House proposal.

MR. NORRIS:  But not here?

MS. WEINSTEIN:  Not here.

MR. NORRIS:  Okay.  PAVE-NY, I see that remains flat at $150 million.

MS. WEINSTEIN:  Yes.

MR. NORRIS:  The one-House $60 million increase

43

**NYS ASSEMBLY**                    **APRIL 19, 2024**

was proposed?

MS. WEINSTEIN:  The -- the numbers in this bill reflect the result of negotiation.  Obviously our -- our one-House proposal is our desires of -- of where to go with some of these programs, quite frankly, knowing that we're going to end up in a final budget of a lower number.

MR. NORRIS:  Okay.  Pave Our Potholes, $100 million.  Does that remain flat?

MS. WEINSTEIN:  Yes.

MR. NORRIS:  The BRIDGE NY program, $200 million.  Does that remain flat?

MS. WEINSTEIN:  Yes.

MR. NORRIS:  Okay.  Thank you very much.

Mr. Speaker, on the bill.

ACTING SPEAKER BURDICK:  On the bill.

MR. NORRIS:  Thank you, Mr. Speaker.  Again, this Capital Projects bill has many good things in it and I want to focus on that in particular with the NY SWIMS Program.  That program will save lives in the State of New York over a period of time.  I will just mention, Assemblywoman Stacey Pheffer Amato who worked with me together in a bipartisan manner on a commission bill to look as a prevention of childhood drowning throughout the State of New York.

We have -- in the last five years in New York State 1,000 individuals have died because of the result of drowning.  In 2021 alone, 230 New Yorkers died because of drowning.  I represent

44

NYS ASSEMBLY                                    APRIL 19, 2024

an area, as I mentioned before, along the canal -- the Erie Canal, also along the shore of Lake Ontario and by the Niagara River and the Great Lakes.  And you are also faced with areas of your communities, the Ad -- the Adiron -- in the Adirondacks, in the Finger Lakes, in Rockaway.  This impacts every individual in the State of New York.  And unfortunately, particularly children, have not gotten the proper instructions for swimming lessons, and I think this is a public safety priority and a public safety crisis in the State of New York.  And I want to just say that I was pleased that the Governor put this investment of $150 million into our infrastructure.  I also encourage for the future that we work with the partnerships of our YMCAs and our school systems and others to make sure that everyone has the opportunity to be properly trained how to swim beginning at an early age.

            I would like to also just mention that I am very disappointed that the volunteer fire service has been short-changed in this Capital Projects budget.  We need more dollars, not less for our volunteer fire service and we should've put that 25 million in this year's budget and more.  I represent at least 25 volunteer fire companies.  They are all knocking on my door for a new roof, for a new fire truck, for a new ambulance, whatever the case may be.  This saves taxpayers in New York $4 billion a year, is a lifeblood of our communities particularly in Upstate New York.  It's the way that individuals receive their safety protection in that area from fire, accident scenes and so forth.  So this is a cut of $25 million.  And it

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

should be restored and I hope it will be in due course.  And finally, on the CHIPS program.  In our transportation programs for Upstate New York.  Again, it remained flat.  Pave Our Potholes flat.  BRIDGE-NY flat.  Our State budget, since I have been here, has gone up (inaudible) 237 billion, which is projected by all media reports to the tune of $269 billion.  For nine years or so CHIPS remainded [sic] flat.  I don't understand why we are not investing in our roads and our bridges and our culverts partic -- particularly in Upstate New York.  This should be paramount.  And when the costs have gone up to the tune in the last 30 months of 60 percent for the materials, this also is a cut to the hardworking people, particularly in Upstate who rely on their vehicles to get around.

So again, I would like to just say in conclusion, I applaud the fact that the swim -- NY SWIM [sic] program and the investment is taking place.  I'm glad to see that the library construction aid of $10 million is also -- additional 10 million is in there, our libraries need it.  I commend because of the canal system and where I represent and the need to make sure we reinvest for economic development and tourism, but at the end of the day I'm going to have to vote in the negative because of the negative impact on our volunteer fire service and also on our Upstate transportation system.  Thank you very much, Mr. Speaker, for having the opportunity to be heard on this bill.

ACTING SPEAKER BURDICK:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would the sponsor

46

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

yield?

ACTING SPEAKER BURDICK:  Would the sponsor yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER BURDICK:  Sponsor yields.

MR. GOODELL:  Thank you very much.  I had a few questions if I may on the local community assistance program.  I see that we've added 100 million, the program now totals 285 million of which 183 million is reappropriated.  Who decides which communities get which grants?

MS. WEINSTEIN:  So those are grants that are -- are member-driven grants.

MR. GOODELL:  Okay.  And of course I would assume that they're equally available to all members, right?

MS. WEINSTEIN:  There are -- all members have some availability.  As far as I'm aware, all members have some availability to submit proposals for -- for grants.

MR. GOODELL:  Moving if I may on to Housing.

MS. WEINSTEIN:  Yes.

MR. GOODELL:  We've heard a lot about the housing crisis across the State, but I see that the RESTORE Program was cut by 7 million and we also had a $14 million cut in the Affordable Housing Corporation program.  Why are we cutting those programs in this budget?

MS. WEINSTEIN:  This, you know, as you're aware

47

NYS ASSEMBLY                                    APRIL 19, 2024

there are lots of investments for housing capital in -- in this budget so I think it basically was -- there's been a decision that we should focus in other areas of housing development.

MR. GOODELL:  And indeed as you correctly note, there's funding elsewhere.  I saw there's a new program with 75 million called the Housing for the Future Rental program?

MS. WEINSTEIN:  Correct.

MR. GOODELL:  And another 75 million for the Housing for the Future co-op program.

MS. WEINSTEIN:  Yes.

MR. GOODELL:  Both of those programs are described as providing quote, "permanently affordable rental units for households at or under 130 percent of area meeting -- median income, and I'm looking at page 453 of this budget bill.  What happens if your income goes over 130, are you kicked out?

MS. WEINSTEIN:  No.  No, but there -- there -- there could be additional charges that you would -- you would be paying.

MR. GOODELL:  And are those -- you know, I note that the Private Housing Finance Law, as it relates to Mitchell-Lama, has similar provisions and if you go above the initial income threshold you pay a surcharge.

MS. WEINSTEIN:  Correct.

MR. GOODELL:  Once you go over the initial threshold by I think more than 50 percent you have to leave.  Do we

48

NYS ASSEMBLY                                    APRIL 19, 2024

envision similar implementing legislation, and if so when will we see that legislation?

      MS. WEINSTEIN:  No, we do not envision similar legislation.  And I -- I must tell you, I have Mitchell-Lama projects in my district and I have never heard of anybody being kicked out because of their income.

      MR. GOODELL:  And notwithstanding the clear and unequivocal language of Section 31 of the Private Housing Finance Law, is that -- you're saying they just ignore that?

      MS. WEINSTEIN:  I'm just talking about my own district, I don't know what's happened in other -- in other communities, other -- other Mitchell-Lama developments.

      MR. GOODELL:  Now, of course, this language on this quote, "permanently affordable rental units for households under 130 percent," is an appropriation bill.  Do we anticipate any statutory language that corresponds to this that outlines what happens if you go over 130 percent?

      MS. WEINSTEIN:  Yes.

      MR. GOODELL:  When will we see that?  Is that a standalone bill?

      MS. WEINSTEIN:  Hopefully later today.

      MR. GOODELL:  Oh, super.  If it's later today --

      MS. WEINSTEIN:  Depending on when you think today is.

      (Laughter)

NYS ASSEMBLY                                    APRIL 19, 2024

MR. GOODELL:  Not so super.  And I see that we are finishing up a five year $55 billion MTA Capital Program.  How much funding is provided by the State for that $55 billion five year Capital Program?

MS. WEINSTEIN:  Three billion.

MR. GOODELL:  Is that 3 billion from State taxpayers Statewide?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  So Upstaters who might never ever see the MTA are contributing 3 billion, part of the 3 billion to the MTA but only getting less than 600 million back in CHIPS; is that what I understand?

MS. WEINSTEIN:  No, and you -- you can't make those comparisons.  You know, as -- as you know, there are other ways that communities receive funding.  As you know, for example, the City of Dunkirk which I know you care dearly about --

MR. GOODELL:  Indeed.

MS. WEINSTEIN: -- you were able to help direct funds for there to be improvements in the intersection of State Route 5 and Central Ave.  So, you know, this budget contains -- and that's just one instance, but I -- I would dare say that every member could look in this budget and find some project or that they care about that impacts their community.  You know, we -- we don't sort of check off taxes and -- and see what they attribute them to any individuals, communities to -- to fund these projects.

NYS ASSEMBLY                                      APRIL 19, 2024

MR. GOODELL:  As you can appreciate, our local municipal officials are quite imaginative and sometimes ingenious in terms of seeking funding from us.  Along those lines, can a municipality access the NY SWIM program once a pothole is large enough to swim in?

(Laughter)

MS. WEINSTEIN:  I don't think that's specifically outlined in this budget bill.

MR. GOODELL:  Perhaps we'll see enabling legislation on that as well this afternoon.  Out of this Capital Project's budget bill, can you tell us what is the total amount being appropriated and what is the source of funding for that appropriation?

MS. WEINSTEIN:  So the -- I think I may have mentioned in my opening remarks, so the new capital appropriations are 21.7 billion, which is 2 billion above what the Governor had proposed.  But as to actual capital spending in this fiscal year, it's 17.6 billion which is actually a $1.2 billion decrease from what was proposed.

MR. GOODELL:  And where is the source of funding?  Or what is the source of funding?

MS. WEINSTEIN:  Approximately 6 billion is going to be bonded.

MR. GOODELL:  Thank you very much.  I appreciate your comments and your clarifications.  Thank you, sir.

(Pause)

NYS ASSEMBLY                                    APRIL 19, 2024

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  A party vote has been requested.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  As acknowledged by my colleagues, there are many positive aspects of this Capital Project program but obviously a number of concerns.  The Republican Conference is generally opposed, but I suspect they'll be those who want to vote here on the floor in favor of it.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr. Speaker.  The Majority Conference is generally going to be in favor of this budget bill; however, there may be a few that would desire to be an exception.  They should feel free to cast their votes at their seats.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

The Clerk will record the vote.

(The Clerk recorded the vote.)

Mr. Simone to explain his vote.

MR. SIMONE:  Mr. Speaker, on the bill.  Along with my colleagues I have been calling for a comprehensive, all-of-the-above approach to tackle the affordable housing crisis.  We have to be innovative to make our State affordable and liveable for

52

every New Yorker.  The vacancy rate in New York City is 1.4 percent, it's even lower for units that middle and low income New Yorkers can afford.  My parents were priced out of the City and State and so many other middle income families have been as well.  That is unacceptable and it's driving families out of our City and State to places like - I won't mention - in the South.  I am proud to see such significant funding, 250 million for the redevelopment of underutilized sites for housing.  This is a critical resource that has not been taken advantage of which will help ease the strain on the housing market.  In my district, Manhattan Community Board 4, created a housing plan that called for full development of State-owned sites.  I have five of these sites in my district.  Many of them ready to build which would create over 5,000 housing units, almost 2,000 of them being affordable.  That means family will be able to live in the same neighborhoods where they work or where their children go to school.  That is exactly the kind of neighbors I want to see in my City and State.  I want to see housing for the firefighter and the teachers, as well as the bankers.  I don't want the West Side to just be a playground for the well-to-do which it's becoming.  I am proud to see this funding in the budget and I will be the first to raise my hand in saying yes in building significant new housing in my district for every New Yorker.

ACTING SPEAKER AUBRY:  Ms. Levenberg to explain her vote.

MS. LEVENBERG:  Thank you, Mr. Speaker.  I rise to explain my vote.  While I will be voting in favor of this part of the

NYS ASSEMBLY                                APRIL 19, 2024

budget because I know it will help our libraries and it will help our clean water infrastructure and our Environmental Protection Fund and I'm so happy that so many of those areas were actually restored. I know many, many laudable and unnecessary local projects that will be funded through -- through the CREST grants, I know it is plainly not enough. I do wish we were able to use public transportation powered by clean and sustainable energy, but unfortunately we have not quite made it there yet and we're not quite at the George Jetson phase so we do have electric vehicles that are in place. We know we need to build out our electric infrastructure to have more of those but even those vehicles are actually heavier than some of our gas-powered vehicles. So we know we have to do better to maintain our road infrastructure. And even as we see climate change is upon us, we know that our culverts are overflowing and that our dams are busting at the seams and that we have potholes everywhere. Just a few years ago our Governor declared a war on potholes, but unfortunately we haven't seen that war make its way down to the lower Hudson Valley. And as my colleague mentioned earlier, Region 8 which is the region that I represent DOT, our roads are in the worst condition. I just spoke to one of my colleagues yesterday who mentioned that while his roads in Long Island were really bad, he was in -- in our area and he admitted that ours are even worse. So we know we have to do much, much more for our roads and that is why I'm very disappointed that the Governor has not agreed to the adds that we put in our Assembly and Senate one-Houses. So hopefully we will be able to address those

NYS ASSEMBLY                                      APRIL 19, 2024

with the money that is in here and we know it's not enough and I'm hoping that it will be in the future.  I shall be voting no in favor. Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Otis to explain his vote.

MR. OTIS:  Thank you.  Just want to highlight briefly a very important part of this budget which is the full funding at $500 million of clean water programs.  This is so vital and the Assembly should feel very good because we led the way in 2015 in getting these programs going.  New York State has the most robust clean water programs in the country.  We continue to lead the country.  And just for a part of it, the WIA program has provided over $2 billion in grants to local governments, over 800 different projects, over 500 different communities and we're going to keep the momentum going for clean water projects.  Federal requirements are getting stricter, we're going to need even more money next year.  Congratulate everybody in this room who's supporting this bill and this addition to the budget.  Thank you.  I vote aye.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Mr. Speaker.  I rise also to explain my vote and appreciate so much of what is in this budget.  I want to echo the comments of my colleague who just spoke in terms of clean water and I commend his efforts as well as other colleagues on the $500 million and for clean water, it's such a fundamental issue

and it's something all -- all our constituents care about.  The ability to turn on a tap and have clean water, so there's still lots of work to be done there.  Very proud as Higher Education Chair that we have additional Higher Education funding in capital.  I know we still have some work to do and we still have work ahead here this evening I hope on -- on some overall CUNY, SUNY and more funding.  But we did do a restoration on the HECap funding which is for our public and private -- sorry, our private and independent colleges and something that's very important.  Finally, I also want to recommend or recognize the CHIPS funding.  I'm pleased we restored that funding.  We recognize potholes as we heard earlier are a big issue so there is a -- usual more to be done.  On a very, very positive note, I want to say I'm particularly pleased over the $10 million in for the State museum.  We've heard from many, many constituents - this is the New York State Museum - it's been tired and stale and it's time now to completely revitalize it.  We had hoped for a little bit more as with anything else but this is going to give us a great start, and I look forward to an entire children's wing with that State museum and look forward to working with State Ed and a whole host of other group of stakeholders so that we can really make us -- this a New York State Museum we are proud of.

With that, Mr. Speaker, I vote in favor of the budget, thank you, or favor of this bill.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Shimsky.

MS. SHIMSKY:  Thank you very much, Mr. Speaker.  The capital budget is the primary way of course that we fund our infrastructure.  And sometimes these debates end up being do we fund one thing or do we fund another and we cannot perform our Social Services without buildings, without roads and bridges and buses to get people to their services.  We can fund schools to -- to the fairly well but if the school buildings are falling apart, our education system's going to fall apart, too.  Same thing with our hospitals and our healthcare facilities.  There is a lot to recommend in this capital budget.  Much of it has already been spoken about, but at the same time in future years we are going to have to resolve to do better on making sure that we've got the road and bridge infrastructure we need, that the clean water infrastructure is what we need, that the buildings that house the places where we -- where we provide our vital services are taken care of.

So Mr. Speaker, I will be voting in the affirmative and I am hopeful that we will continue to move ever upward in future years on this.

ACTING SPEAKER AUBRY:  Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Page 4, Rules Report No. 35, the Clerk will read.

THE CLERK:  Assembly No. A08807-C, Rules Report No. 35, Budget Bill.  An act to amend Part H of Chapter 39 of

the Laws of 2011, amending the Public Health Law and other laws relating to general hospital reimbursement for annual rates, in relation to known and projected Department of Health State Fund Medicaid expenditures (Part A); to amend the Public Health Law, in relation to extending certain provisions related to the issuance of accountable care organization certifications and State oversight of antitrust provisions; to amend Part D of Chapter 56 of the Laws of 2013 amending the Social Services Law relating to eligibility conditions, Chapter 649 of the Laws of 1996 amending the Public Health Law, the Mental Hygiene Law and the Social Services Law relating to authorizing the establishment of special needs plans, Part V of Chapter 57 of the Laws of 2022 amending the Public Health Law and the Insurance Law relating to reimbursement for commercial and Medicaid services provided via telehealth, Chapter 659 of the Laws of 1997 amending the Public Health Law and other laws relating to creation of continuing care retirement communities, Part NN of Chapter 57 of the Laws of 2018 amending the Public Health Law and the State Finance Law relating to enacting the Opioid Stewardship Act, Part II of Chapter 54 of the Laws of 2016 amending Part C of Chapter 58 of the Laws of 2005 relating to authorizing reimbursements for expenditures made by or on behalf of social services districts for medical assistance for needy persons and administration thereof, Part B of Chapter 57 of the Laws of 2015 amending the Social Services Law and other laws relating to energy audits and/or disaster preparedness reviews of residential healthcare

facilities by the commissioner, Part H of Chapter 57 of the Laws of 2019 amending the Public Health Law relating to waiver of certain regulations, Part Q of Chapter 59 of the Laws of 2016, amending the Mental Hygiene Law relating to the closure or transfer of a State-operated individualized residential alternative, and Chapter 769 of the Laws of 2023, amending the Public Health Law relating to the adult Cystic Fibrosis Assistance Program, in relation to the effectiveness thereof; and to amend Chapter 670 of the Laws of 2021, requiring the Office for People with Developmental Disabilities to establish the Care Demonstration Program, in relation to the establishment of a care demonstration program and the effectiveness thereof (Part B); to amend the Education Law, in relation to removing the exemption for school psychologists to render Early Intervention services; and to amend Chapter 217 of the Laws of 2015, amending the Education Law relating to certified school psychologists and special education services and programs for preschool children with handicapping conditions, in relation to the effectiveness thereof (Part C); to amend the Public Health Law, in relation to reducing the hospital capital rate add-on; to amend Part ZZ of Chapter 56 of the Laws of 2020 amending the Tax Law and the Social Services Law relating to certain Medicaid management, in relation to the effectiveness thereof; to amend Part E of Chapter 57 of the Laws of 2015, amending the Public Health Law relating to the payment of certain funds for uncompensated care, in relation to certain payments being made as outpatient upper payment limit payments for outpatient

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

hospital services during certain State fiscal years and calendar years; to amend Part B of Chapter 57 of the Laws of 2015, amending the Social Services Law relating to supplemental rebates, in relation to authorizing the Department of Health to increase operating cost component of rates of payment for general hospital outpatient services and authorizing the Department of Health to pay a public hospital adjustment to public general hospitals during certain State fiscal years and calendar years; to amend the Public Health Law, in relation to authorizing the commissioner to make additional inpatient hospital payments during certain State fiscal years and calendar years; and to amend Part B of Chapter 58 of the Laws of 2010, amending the Social Services Law and the Public Health Law relating to prescription drug coverage for needy persons and health care initiatives pools, in relation to authorizing the Department of Health to make Medicaid payment increases for county-operated free-standing clinics during certain State fiscal years and calendar years (Part D); to amend the Public Health Law, in relation to freezing the operating component of the rates for skilled nursing facilities, reducing the capital component of the rates for skilled nursing facilities by an additional 10 percent, and eligibility for admission to the New York State Veterans' Home (Part E); to amend the Social Services Law, in relation to the Special Needs Assisted Living Residence Voucher Program (Part F); intentionally omitted (Part G); to amend Part I of Chapter 57 of the Laws of 2022, providing a 1 percent across-the- board payment increase to all qualifying fee-for-service Medicaid rates, in relation to

NYS ASSEMBLY                                      APRIL 19, 2024

eliminating the 1 percent rate increase to managed care organizations (Part H); to amend the Social Services Law, in relation to copayments for drugs; to amend the Public Health Law, in relation to the Preferred Drug Program; to amend the Public Health Law, in relation to the Medicaid drug cap and pharmacy cost reporting; and to amend the Social Services Law, in relation to coverage for drugs authorized by accelerated approval (Part I); to amend the Social Services Law, in relation to renaming the Basic Health Program to The Essential Plan; to amend Part H of Chapter 57 of the Laws of 2021, amending the Social Services Law relating to eliminating consumer-paid premium payments in the Basic Health Program, in relation to the effectiveness thereof; to amend Part BBB of Chapter 56 of the Laws of 2022, amending the Public Health Law and other laws relating to permitting the Commissioner of Health to submit a waiver that expands eligibility for New York's Basic Health Program and increases the Federal poverty limit cap for Basic Health Program eligibility from 200 to 250 percent, in relation to extending certain provisions related to providing long-term services and supports under The Essential Plan; and to amend the Public Health Law, in relation to adding references to the 1332 State Innovation Waiver, providing a new subsidy to assist low-income New Yorkers with the payment of premiums, cost-sharing or both through the marketplace, and adding the 1332 State Innovation Program to the functions of the marketplace (Part J); to amend Chapter 266 of the Laws of 1986 amending the Civil Practice Law and Rules and other laws relating to malpractice

and professional medical conduct, in relation to insurance coverage
paid for by funds from the Hospital Excess Liability Pool and
extending the effectiveness of certain provisions thereof; to amend
Part J of Chapter 63 of the Laws of 2001 amending Chapter 266 of the
Laws of 1986 amending the Civil Practice Law and Rules and other
laws relating to malpractice and professional medical conduct, in
relation to extending certain provisions concerning the Hospital
Excess Liability Pool; and to amend Part H of Chapter 57 of the Laws
of 2017 amending the New York Health Care Reform Act of 1996 and
other laws relating to extending certain provisions relating thereto, in
relation to extending provisions relating to excess coverage (Part K);
intentionally omitted (Part L); to amend the Social Services Law and
the Public Health Law, in relation to authorizing continuous coverage
in Medicaid and Child Health Plus, for eligible children ages zero to
six (Part M); intentionally omitted (Part N); to amend the Public
Health Law, in relation to expanding financial assistance; and to
amend the General Business Law, in relation to additional consumer
protection for medical debt and restricting the applications for and use
of credit cards and medical financial products (Part O); to amend Part
C of Chapter 57 of the Laws of 2022 amending the Public Health Law
and the Education Law relating to allowing pharmacists to direct
limited service laboratories and order and administer COVID-19 and
influenza tests and modernizing nurse practitioners, and Chapter 21 of
the Laws of 2011 amending the Education Law relating to authorizing
pharmacists to perform collaborative drug therapy management with

NYS ASSEMBLY                                    APRIL 19, 2024

physicians in certain settings, in relation to the effectiveness thereof
(Part P); intentionally omitted (Part Q); intentionally omitted (Part R);
to amend the Public Health Law, in relation to establishing the
Healthcare Safety Net Transformation Program (Part S); intentionally
omitted (Part T); intentionally omitted (Part U); intentionally omitted
(Part V); intentionally omitted (Part W); intentionally omitted (Part
X); to amend Chapter 62 of the Laws of 2003, amending the Mental
Hygiene Law and the State Finance Law relating to the Community
Mental Health Support and Workforce Reinvestment Program, the
membership of subcommittees for mental health of community
services boards and the duties of such subcommittees and creating the
Community Mental Health and Workforce Reinvestment Account, in
relation to the effectiveness thereof (Part Y); to amend Part NN of
Chapter 58 of the Laws of 2015, amending the Mental Hygiene Law
relating to clarifying the authority of the commissioners in the
Department of Mental Hygiene to design and implement time-limited
demonstration programs, in relation to the effectiveness thereof (Part
Z); to amend the Insurance Law, in relation to setting minimal
reimbursement for behavioral health treatment (Part AA); to amend
Chapter 723 of the Laws of 1989 amending the Mental Hygiene Law
and other laws relating to comprehensive psychiatric emergency
programs, in relation to the effectiveness of certain provisions thereof
(Part BB); intentionally omitted (Part CC); to amend Part A of
Chapter 111 of the Laws of 2010 amending the Mental Hygiene Law
relating to the receipt of Federal and State benefits received by

individuals receiving care in facilities operated by an office of the department of Mental Hygiene, in relation to the effectiveness thereof (Part DD); intentionally omitted (Part EE); to establish a cost-of-living adjustment for designated human services programs (Part FF); to amend the Social Services Law, in relation to providing contracting flexibility in relation to 1115 Medicaid waivers (Part GG); to amend the Social Services Law, in relation to Statewide fiscal intermediaries and a registration process for such intermediaries; to amend the Social Services Law, in relation to the Consumer Directed Personal Assistance Program; and to repeal certain provisions of the Social Services Law relating thereto (Part HH); to amend the Public Health Law and the State Finance Law, in relation to establishing a New York managed care organization provider tax (Part II); to amend the Social Services Law, in relation to coverage for services provided by school-based health centers for medical assistance recipients (Part JJ); to amend the Public Health Law, in relation to the creation of a community doula expansion grant program; and to repeal such program upon expiration thereof (Part KK); to amend the Public Health Law, in relation to reimbursement rates for medically-fragile children and pediatric diagnostic and treatment centers; and providing for the repeal of such provisions upon the expiration thereof (Part LL); to amend the Executive Law, in relation to establishing the Community Advisory Board for the Modernization and Revitalization of SUNY Downstate Health Sciences University (Part MM); and to amend Part I of Chapter 57 of the Laws of 2022 providing a 1 percent

NYS ASSEMBLY                                    APRIL 19, 2024

across-the-board payment increase to all qualifying fee-for-service

Medicaid rates, in relation to certain Medicaid payments made for

hospital services (Part NN)

ACTING SPEAKER AUBRY:  Governor's Message

is at the desk, the Clerk will read.

THE CLERK:  I hereby certify to an immediate vote,

Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  Explanation has been

requested, Ms. Weinstein.

MS. WEINSTEIN:  I'm sure they'll be questions, so

let me just do a brief -- brief introduction to the bill, which would

enact into law major components of legislation that are necessary to

implement the State Fiscal Year '24-'25 Budget as it pertains to the

Health and Mental Hygiene Budget.  Very -- there are many very

important provisions in this budget and I'd be happy to -- in -- in this

particular bill, to answer questions in that regard.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will Chair

Weinstein yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  The Chair yields.

MR. RA:  Thank you.  So, still not there on a

financial plan or do we have something at this point?

MS. WEINSTEIN:  Not a change in the past -- since

our last debate.

NYS ASSEMBLY                                APRIL 19, 2024

MR. RA:  Okay, thank you.  But with regard to this, obviously Medicaid is the largest program in our State Budget.  This -- this bill does include some significant changes and, you know, that information in terms of Medicaid funding isn't always quite so simple as bill text.  So do we have just in terms of spending on -- on that program a Medicaid scorecard publically available?

MS. WEINSTEIN:  No, we do not.

MR. RA:  Can you provide, you know, any -- I guess a high -- high-level overview of legislative adds that would be in the Medicaid scorecard?

(Pause)

MS. WEINSTEIN:  So, we are adding $1.8 billion to the Medicaid Program.

MR. RA:  Okay.  And does this budget stay within the global cap?

MS. WEINSTEIN:  Yes, it does.

MR. RA:  Okay.  And -- and looking into the future, in what year does the Medicaid budget exceed the global cap parameters?

MS. WEINSTEIN:  I believe next year.

MR. RA:  And can you provide a brief overview of the savings actions that are being taken to stay under the Medicaid global cap?

MS. WEINSTEIN:  So, we are saving about $1.3 billion.

NYS ASSEMBLY                                    APRIL 19, 2024

MR. RA:  And any of the -- can you just detail any of the larger actions that are being taken to -- to get to that savings?

(Pause)

MS. WEINSTEIN:  So, there is just over 200 million by eliminating the 1 percent that was anticipated increase for the health plans, and also the 200 million for -- saving -- for the moving to one fiscal intermediary.

MR. RA:  Okay.  And one of the major items that I know we talked about in the one-House is this managed care organization --

MS. WEINSTEIN:  Correct.

MR. RA:  -- tax.  I know the bill authorized it, but it doesn't really go too much into detail.  Can -- can you explain that proposal?

MS. WEINSTEIN:  Sure.  The reason why we can't go into detail is this has to be -- the ultimate implementation of this tax has to be as a result of the communications between the DOH, the Executive, and CMS.  There have been some preliminary discussions that the Governor actually had with the White House, but the -- our understanding is there'll be a lot of back-and-forth being able to determine what -- how that program will be implemented.  Once that is approved by CMS, then there would be a determination of what the actual rate would be.

MR. RA:  Okay.  So we don't have any framework at this point for what the tax rate actually would look like?

67

MS. WEINSTEIN:  No, but we -- we, you know, have anticipated in our one-House, and I believe the Executive and Senate are in general agreement, that we believe that it would generate approximately $4 billion and that would be the Federal -- we would get, then, Federal dollars to match that and the 4 billion would go back to the Medicaid providers.

MR. RA:  Okay.  Do we -- do you know what the time frame would be on having that waiver processed?

MS. WEINSTEIN:  Well, clearly it'll be submitted this year.  As I said, there'll be some back-and-forth with CMS to get the actual approval and -- and/or appropriate rate.  We are hopeful that by the end of the year or the beginning of the year at a minimum that there would be the ability to implement a tax, and that that would go back to the date that it was first sub -- the tax would go back to the beginning of the quarter that it was submitted to CMS.

MR. RA:  Okay.  Do -- do we know an anticipated amount that would be deposited into this Health Care Stability Fund from this tax in the 2025 Fiscal Year?

MS. WEINSTEIN:  We really won't know that 'til we know the tax rate, but, you know, again, the sort of general understanding is that it would be close to the $4 billion amount. We're only going to be using approximately 900 million of those funds, so the remaining monies would be in the Stabilization Fund.

MR. RA:  Okay.  And what is the anticipated Federal match, is it the same amount?

MS. WEINSTEIN:  Yes.  It would -- it would be similar to other Medicaid matches.

MR. RA:  Okay, thank you.  The funds in the Health Care Stability Fund are not going to be used for calculation of the Medicaid global cap going forward; is that correct?

MS. WEINSTEIN:  Correct, but that would be available for a future budget.

MR. RA:  Okay.  And are we anticipating that there would be any other funding source for that Health Care Stability Fund other than the MCO tax?

MS. WEINSTEIN:  Not at this time.

MR. RA:  Okay.  And am I -- is my understanding correct that what the Federal Government requires in terms of this waiver is that it has to be a broad-based tax, it can't be, you know, looked at to be targeted for, you know, one particular entity in order to get the Federal waiver?

MS. WEINSTEIN:  The -- the waiver -- what -- we're actually applying for the waiver to not require the broad-based implementation of the tax so that the Medicaid Program would be focused on the -- the Medicaid managed care organizations.

MR. RA:  Okay.  And do we have any, you know, contingency plans for what would happen in the event that the Federal Government decides not to give us a waiver?

MS. WEINSTEIN:  We don't, but that's because we are pretty confident that we will get the waiver from CMS.  I think it's

just -- there have been those, as I mentioned earlier, those preliminary discussions between the Executive and the -- the White House, so I -- I think it's really the -- the details that need to be worked out and the time frame.

MR. RA:  Okay.  But is it fair to say if we were not able to get that, that we'd likely have to make either pretty significant cuts or some other tax in order to plug the hole from the -- the money we're anticipating to get from this?

MS. WEINSTEIN:  I -- I don't -- I don't think we'd have to.  You know, we do have the State -- we do have a large amount of reserves and we -- as I said earlier, we're only -- we're taking less than a billion -- less than a billion of the anticipated revenue to use in this year's budget.

MR. RA:  Okay, thank you.

CDPAP.

MS. WEINSTEIN:  Yes.

MR. RA:  This budget contains provisions that move CDPAP to a single Statewide fiscal intermediary with subcontractors.

MS. WEINSTEIN:  Correct.

MR. RA:  In the development of this, has there been discussions in terms of who this individual fiscal intermediary will be?

MS. WEINSTEIN:  It -- this will be an RFP.  The requirement is that the -- the Statewide fiscal intermediary will have to be an organization that has already -- has already participated and running a program in a different state.  It -- the RFP would include

NYS ASSEMBLY                                    APRIL 19, 2024

things like requiring the Statewide FI to demonstrate cultural and

language competencies, experience working with elderly individuals,

people with disabilities, and as I mentioned, provide Statewide FI

services in at least one other state.  And if I could just add that the

Statewide FI would be required to contract with all of the 11

independent living centers in the State and at least one other fiscal

inter -- intermediary entity with each of the four areas of the State.

MR. RA:  On a regional basis?

MS. WEINSTEIN:  Right, the four regional areas.

MR. RA:  Okay.  And who -- so is that RFP being

done by the Department of Health, or...

MS. WEINSTEIN:  Yes.  The -- it's anticipated that

DOH would be issuing the RFP as quickly as possible so that we can

have this new vendor on board by January 1, 2025 at the latest.

MR. RA:  So once the Department of Health then

selects who that single fiscal intermediary is, does that entity then

select the subcontract fiscal intermediaries they'd be working with or

does the Department of Health do that?

MS. WEINSTEIN:  The -- the -- well, it -- it depends

how the contract language would be developed, but the intermediary,

as I mentioned, does have to contract with all of the 11 independing --

independent living centers that currently are providing services, and

then they can pick the regional subcontractors.

MR. RA:  Okay.  And is there anything, you know,

language in here to ensure that consumer choice is -- is protected?

71

NYS ASSEMBLY                                    APRIL 19, 2024

You know, I think one of the concerns everybody has with this is this is a program that allows people, you know, a great deal of flexibility in -- in finding care.  So what are we doing to protect consumer choice and make sure that people that currently are utilizing this program don't have a service disruption as a -- as a result of this being implemented?

MS. WEINSTEIN:  Well, you know, clearly there will be changes with some of the parts of the program.  I -- I think it's important for -- for people perhaps who aren't as knowledgeable as -- others who aren't as knowledgeable about how the system works because of the numbers of fiscal intermediaries, the State is spending 15 percent of our -- of this budget on administrative costs for all of these fiscal intermediaries.  Once we move to the single Statewide and the regional intermediary and the -- that subcontract and the independent living centers, the administrative costs will go down to 3 percent.  So we're not -- and we do not -- it's not anticipated that consumers will be impacted, all it's really the payroll aspects of this program that will be shifting to the single fiscal intermediary.

MR. RA:  Okay.  And you said that the savings that's anticipated is about $200 million?

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  And is that money being utilized elsewhere for other Medicaid investments, or is it a -- a savings action with regard to, you know, (inaudible) staying under the cap?

MS. WEINSTEIN:  It's I would say a little bit, a

72

NYS ASSEMBLY                                   APRIL 19, 2024

combination of both, but it allows us to remain under the cap without having to cut services to the recipients.  And -- and I would just add that, you know, I said no impact on consumers, so it is anticipated that the personal assistant would be able to maintain the same consumer and work the same number of hours as they are currently working under the current program.

MR. RA:  Thank you, Chair Weinstein.

ACTING SPEAKER MEEKS:  Mr. Jensen.

MR. JENSEN:  Thank you very much, Mr. Speaker. Will Chair Weinstein yield for some questions?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER MEEKS:  The sponsor yields.

MR. JENSEN:  Thank you very much, Madam Chair. I want to pick up where Mr. Ra left off on the --

MS. WEINSTEIN:  Sure.

MR. JENSEN:  -- Federal money laundering scheme we're embracing in this budget, the MCO tax.  You mentioned that there's no contingency in the budget for what happens if the Federal waiver is not granted, correct?

(Pause)

MS. WEINSTEIN:  There will be -- many of the investments we have here, just in general in the budget are one-time investments.  So if the waiver doesn't go through, we'll be, as I said, we're using only a small portion of -- we're using about a quarter of what we anticipate we'd get in, so we would have to make changes

73

NYS ASSEMBLY                                          APRIL 19, 2024

going forward.

MR. JENSEN:  So -- and I believe you said that was $900 million is what we --

MS. WEINSTEIN:  Right, approximately.

MR. JENSEN:  -- expect to use for the remainder of the fiscal year, starting with the quarter that it's approved.  Is that $900 million being used to pay for the lump sum Medicaid rate increases for hospitals, nursing homes, assisted living facilities?

MS. WEINSTEIN:  Yes; yes, it does.

MR. JENSEN:  Okay.  So the reason why I ask about a contingency is we had that same idea of a belief of Federal approval on the health care worker bonus.  As we know, that was not approved -- that waiver was not approved by the Federal Government, and New York State had to come up with the full amount to fulfill our obligations.  So my understanding is typically with these types of waivers, maybe not with this one or the health care worker bonus, but these things are usually negotiated well ahead of them being included in budget negotiations or conversations to ensure that we actually have the money.  So would the idea be to utilize existing reserves to cover that Medicaid rate increase rather than take that away from the providers that we're granting it to today?

MS. WEINSTEIN:  Let me just go back to --

MR. JENSEN:  Yup.

MS. WEINSTEIN:  -- you talked about the other program --

74

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. JENSEN:  Yup.

MS. WEINSTEIN:  -- where we apply for a waiver. The difference is that this is something that has been granted to other states, what -- the MCO waiver that we're asking for where the worker waiver was unique.

MR. JENSEN:  Well --

MS. WEINSTEIN:  So --

MR. JENSEN:  Yeah.

MS. WEINSTEIN:  But to get to the meat of -- of your question, where's the money gonna come from, yes, as I -- I believe I said to Mr. Ra, that we're confident that the State has enough funding in reserves to be able to make sure that we don't have to make other cuts in -- in this budget before we get to next year.

MR. JENSEN:  Okay.  So with the -- the revenue coming from this -- this tax and the match would go to the Health Care Stability Fund?

MS. WEINSTEIN:  Correct.

MR. JENSEN:  Is the idea that -- you know, and we're doing this outside of the Medicaid global cap, would it be restricted in this fund to only health care-related uses for Medicaid recipients, organizations, or could the Governor, a future Governor, a future Legislature sweep that fund money into the General Fund to cover other expenditures?

MS. WEINSTEIN:  It could not be swept into the General Fund.  It has to remain for health care.

75

**NYS ASSEMBLY**                                **APRIL 19, 2024**

MR. JENSEN:  So how -- it has to remain in HMH or a --

MS. WEINSTEIN:  Yes.

MR. JENSEN:  -- subsequent appropriation.  Does it have to go to a Medicaid provider?

(Pause)

MS. WEINSTEIN:  I -- I would say generally -- the answer would generally be yes, though I guess in theory, some funding could be used for capital for a non-Medicaid medical provider.

MR. JENSEN:  And is that possibility the reason why it's not included in the calculations of the global cap?

MS. WEINSTEIN:  It -- so, it -- it's not included in the global cap so we can maintain our vibrant health -- health care system.

MR. JENSEN:  Okay.  Well, certainly I would have more commentary on that but I'm restricted on time.

I want to pivot to SUNY Downstate.  I know in the --

MS. WEINSTEIN:  Sure.

MR. JENSEN:  -- previous capital appropriation there was $300 million in reappropriation for SUNY Downstate, and in this bill it makes up the organization that's gonna oversee that process on keeping SUNY Downstate open.  Is it -- am -- is my understanding correct that seven of the nine members are at the direction of the Governor, with only one by the Speaker and one by the Senate

76

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Majority Leader?

MS. WEINSTEIN:  Yes, but I would just put a caveat on that they're on rec -- there are appointment -- appointments by the Governor, but there are recommendations.  For example, Downstate sits at the border of Community Board 17 and Community Board 9, those Community Boards would recommend a representative to sit on this advisory board to the Governor, the Governor would officially make the appointment.  Similarly with labor unions.  There's a labor union appointment that, yes, it's by the Governor, the appointment by the Governor, but it would be recommended by the labor unions.  So while they're Governor appointments, they -- there are restrictions on what could -- the -- the individuals that could be appointed.

MR. JENSEN:  And I -- and I think that's, with the Community Boards and the -- and the two of them, I think that's important.  I think organized labor that's represented by the workforce there is important.  But I guess -- why was the Legislature so willing to give up so much of the appointment authority to the Governor, and was there consideration in allowing the Minority Leader of the Assembly and the Senate to also have appointments?  Because we have members whose communities are also impacted by the going ons at SUNY Downstate.

MS. WEINSTEIN:  We -- you know, we feel this is the appropriate structure for this board.  And with -- with the Downstate bordering on my district over all these years, I'm very familiar with it and with the surrounding communities, and the

77

NYS ASSEMBLY                                APRIL 19, 2024

members who represent the surrounding communities I believe will,
through their community boards and through the interactions with
union leaders, make sure that the community is well represented on --
on this advisory board.  You know, again, the -- I -- I would hope that
the appointment by both the Majority Leader and the Speaker would
also be reflective of recommendations made by the -- the members in
the community who are served by Downstate.

MR. JENSEN:  Okay.

Moving on to EMS provisions.  I did see that an EMS
package, one of which would ensure it is declared an essential service,
was intentionally omitted from this piece of legislation.  What was the
justification for an EMS industry that's in crisis across the State,
removing making it an essential service for communities that are
desperately in need of it?

MS. WEINSTEIN:  You know, this is something that
we believe the Committee could look out -- look at outside of the
budget.  It's a complex issue -- I know I got in trouble online for
saying something else was a complex issue, but these are -- it's -- it's
important, it's something we recognize is an issue.  We would like to
have the Committee and the Committee members' input on this.

MR. JENSEN:  Okay.

I am gonna move to --

MS. WEINSTEIN:  And at some point I would just
say that the Governor at some point, because discussions were going
on, it was withdrawn from the table by the Executive because we

NYS ASSEMBLY                                    APRIL 19, 2024

couldn't get to a quick resolution.

MR. JENSEN:  So, you said the Governor -- or the Executive is the one who withdrew it from the negotiation.  Didn't she propose this investment and this act in her Executive Budget?

MS. WEINSTEIN:  Yes.  But we couldn't get to agreement on how to actually implement it.

MR. JENSEN:  So I just want to be clear that the Governor who proposed investing in EMS, declaring it an essential service, in negotiations said, *No, no, no, just kidding.  I really don't want it anymore*?

MS. WEINSTEIN:  We just --

MR. JENSEN:  I'm probably paraphrasing what her negotiating team said, but...

MS. WEINSTEIN:  Right.  I -- I -- if everything were that easy.  I think it would just -- the concerns were raised and realized that we'd like to have more of the input of the Committee to come to a resolution.

MR. JENSEN:  Very interesting priority setting by the Governor in that respect.

In the same vein with EMS, I know that there was a 3 across -- a 3 percent across-the-board Medicaid rate increase that was contained in the one-House budget, and I believe when asked, EMS was going to be part of that.  I'm guessing that they are not gonna be getting any appropriation, because I see that other Medicaid investment is being made in this bill.

NYS ASSEMBLY                                        APRIL 19, 2024

MS. WEINSTEIN:  Unfortunately, that was predicated on the MCO tax coming -- getting in sooner, us getting those dollars sooner.  Now that we --

MR. JENSEN:  It sounds like we'd have a -- you know, we're only using, in theory, 900 million out of 4 billion.  It sounds like there's a little wiggle room that we could've squeezed in some more investment.

MS. WEINSTEIN:  You know, I think timing is an issue, and being responsible, knowing that we're not going to get this money immediately, that there was the desire to just be more conservative in spending prospective money.

MR. JENSEN:  Okay.  With the Medicaid increases, typically we've seen Medicaid rate increases as percentages.  In this budget bill, we're seeing it as lump sum numbers.  Is that because of the -- the way we're paying for it?  I think I already asked that question, but I feel like asking it again.

MS. WEINSTEIN:  So, it's because we're going through a directed payment template for the hospitals, and then the nursing homes are having the per diem increase, so that's the -- the difference.

MR. JENSEN:  So we are -- so there is gonna be -- there is gonna be per diem percentages increased.  Is that in a subsequent budget appropriation or is that in this budget bill?

MS. WEINSTEIN:  It -- it's not a percentage, it's a per --

NYS ASSEMBLY                                  APRIL 19, 2024

MR. JENSEN:  Per head, per person, per day.

MS. WEINSTEIN:  -- per person.  So in a place like New York, it's -- it's -- it will be about $12 per bed, which will, quite frankly, have a -- a better -- more of an impact outside of the City of New York.

MR. JENSEN:  So is the Medicaid -- is -- is the 400-and -- I have it somewhere -- is the 285 million that nursing homes are receiving as a Medicaid increase, is that paying for the per diem increase or is the per diem increase separate and in addition to --

MS. WEINSTEIN:  No, that -- that is the per diem.

MR. JENSEN:  That is the per diem.

MS. WEINSTEIN:  Yes, that's where the per diem increase --

MR. JENSEN:  So there's no other Medicaid increases that are coming to nursing homes in this budget?

MS. WEINSTEIN:  We -- we are still waiting, though, for CMS to approve our 1 percent increase.  So if that does get improved -- approved, there would be that 1 percent increase.

MR. JENSEN:  Okay.  And that's -- and that's based on the case mix methodology, correct?  Is that what you're referring to?

MS. WEINSTEIN:  That would be outside, on top of that.

MR. JENSEN:  Okay.  Do we -- based on the case mix methodology, do we have a time frame of when the freeze on that

81

NYS ASSEMBLY                                    APRIL 19, 2024

would be lifted, or is it all dependent based on when CMS provides --

MS. WEINSTEIN:  I think we're waiting for -- for CMS which we believe will be January 1st of 2025.

MR. JENSEN:  We're gonna have a lot of conversations with CMS over the next nine months, then, aren't we?

MS. WEINSTEIN:  Well, yes.  I'll only -- I'll only participate in four months of those.

(Laughter)

MR. JENSEN:  Nursing -- staying on nursing homes, the (inaudible) cut was not restored going from 100 million to 25 million.  What was the -- the logic in sustaining that cut?

MS. WEINSTEIN:  You know, probably -- I guess the easiest answer is the money wasn't going out anyway, so we -- we're still waiting to get some of the -- the details of -- of how that would go out.

MR. JENSEN:  Okay.  My understanding is that there may or not be $500 million for financially-distressed and safety net hospitals.  Are we going to see that funding in a -- in a later budget bill?

MS. WEINSTEIN:  Yes.

MR. JENSEN:  Okay.  The Governor made unallocated cuts in her budget proposal, or proposed unallocated budget cuts.  Were these restored --

MS. WEINSTEIN:  Yes; oh, yes.

MR. JENSEN:  Yes?  Okay.

**NYS ASSEMBLY**                                      **APRIL 19, 2024**

Moving on to the Medicaid Capital cut, is there a concern that the cut of the Capital Fund could have a negative incentive for investment by health care facilities, specifically hospitals and nursing homes, to make capital improvements while they deal with the crisis that a lot of them are in based on overcrowding of EDs and staffing concerns, especially in Upstate and the Finger Lakes for our nursing homes?

MS. WEINSTEIN:  So, my understanding that the applications for the nursing homes for trans -- transformation grants are about to go out, so they'll be able to be applying for that -- for funding.

MR. JENSEN:  Okay.  Are we gonna see any of these -- I'm taking my second 15 minute, you're not done with me yet, Madam Chair.

MS. WEINSTEIN:  Okay, okay.

(Laughter)

Happy -- happy to have the conversation

MR. JENSEN:  You're too kind.

Will we be seeing in a later budget bill funding for Early Intervention?

MS. WEINSTEIN:  Yes, we will -- we will be seeing that.  I'll give you a preview:  The 5 percent for inpatient ser -- 5 percent increase inpatient services and 4 percent for outpatient services.

MR. JENSEN:  Okay.  So that's -- I know in the -- I

think in the one-House it was -- we were asking for 7-and-a-half, so that is less.  Is that the Governor's line in the sand on that?  And I can save that question for a later date, probably today or tomorrow depending on when tomorrow begins.

MS. WEINSTEIN:  No, no; not tomorrow.  You know, as -- as I said before, our one-House is sort of our wish list of how we spend -- how we'd like to spend money and knowing that we're -- it would be unusual if all of that came through.

MR. JENSEN:  Okay.

I want to transition now to the CDPAP changes.  So my understanding is that a lot of the crux for these changes was based on what the Governor deemed as explosive growth in the program. You referenced to Mr. Ra that the changes that we're doing in this budget bill is only gonna be about $200 million.  Is -- I guess what's -- when the -- when the Governor's saying it's a -- we've seen explosive growth but we're only saving $200 million out of a $7-plus billion program --

MS. WEINSTEIN:  Well, let me just say that since there's this runway of when these -- when the fiscal intermediary regional -- first when the fiscal -- Statewide fiscal intermediary is -- is selected through the RFP process, and then as they subcontract with the independent living centers and the regional intermediaries, we know that it's -- obviously, it's not taking part -- place tomorrow, so the 200 million is anticipated for this year, with 500 million going forward year to year.

84

NYS ASSEMBLY                                         APRIL 19, 2024

MR. JENSEN:  Okay.  So with a savings of $500 million in the long run once it's fully implemented, I -- I guess when we have a $7.9 billion CDPAP program as it stands today, with I think $1.6 billion of that increase in the program has been because of the minimum wage, is -- is changing the administrative hurdles, or the -- the top FI really going to make a substantial change in bringing down costs when it's only saving half a million dollars -- half a billion dollars a year?  It seems like we're -- we're doing a lot of changes that's gonna impact a lot of individuals with complex medical needs for not a lot of savings.

MS. WEINSTEIN:  Well, you know, again, let me -- let me just reiterate what -- where we anticipate the savings coming from.  As I mentioned, we're spending 15 percent on -- with these multiple hundreds of FIs, we're spending 15 percent of the budget for administration; 1.7 billion that we've spent on that.  So in order to help save the State money and to make sure the Medicaid dollars are going to the residents of New York State, by reduce -- by reducing the numbers of fiscal intermediaries to one, then for the subcontracts we reduce the administrative cost of the program by -- down to 3 percent.  And I'm sure everybody in this Chamber would agree that if we have ways to save money, that this is a very important way to -- to save money.

MR. JENSEN:  And that's -- and I -- and I certainly believe there's -- there's room to -- to make the CDPAP program more efficient and effective.  I -- I would argue that the best way to do that

NYS ASSEMBLY                                              APRIL 19, 2024

is to go after the fraud and abuse and smoke it out, but that doesn't

seem to be what this is doing.  This is saying we're gonna have 700

FIs, we're gonna take that down to 16, with one -- one of those being

Statewide, and I think there leaves a lot of questions.

     MS. WEINSTEIN:  Well, you know, part of the

movement to a single Statewide intermediary which, you know, by the

way, is what every other state in New -- in the United States has, that

it will, in fact, reduce any potential fraud that is -- is currently in the

system.  It'll reduce advertising costs, and it will provide -- again,

provide dollars to the people who need the services by hiring the staff

and not dollars to these organizations that are out there marketing to

individuals.

     MR. JENSEN:  And I -- and I think that's -- that's --

and I -- I would agree 100 percent with that being the goal, but don't

we already have a mechanism that either the State Attorney General,

the Office of Medicaid Inspector General could go after FIs that are

currently operating using deceptive practices that are violating

Medicaid law, DOH regulations?  And -- and I guess how many times

have we gone after any of the bad actors for perpetrating fraud or

abuse?

     MS. WEINSTEIN:  Well, you know, I -- I, you know,

clearly it will be a lot easier to oversee the -- the one Statewide fiscal

intermediary than having to police 6- to 700 of -- of these

intermediaries.  And we will save all of the, you know, the forum

shopping -- plan shopping costs, the advertising costs that, as the fiscal

intermediaries compete with each other to bring in the -- the new enrollee.

          MR. JENSEN:  So will this new Statewide FI, they'll just be handling payroll and administrative duties, correct?

          MS. WEINSTEIN:  Correct, it is only payroll.  We don't anticipate that individuals who need the services, who are approved for the services, will see any change on -- on their end in terms of the workers coming -- workers coming to them.  And, in fact, we've heard reports that some of the workers have not been receiving the minimum wage, so we think that this will also help many of the -- the workers who are participating and providing services in the program financially.

          MR. JENSEN:  So will the Statewide FI be a joint employer?

          MS. WEINSTEIN:  That will be a RFP in the contract.

          MR. JENSEN:  Okay.  So I guess my concern, amongst many with this proposal, is that if you're going to have hiring all of the personal assistants for the CD [sic] program through the one FI and they're gonna be responsible for paying it all, that we could incur huge, ginormous debts and obligations, you know, up to $2.2 billion just for the health insurance alone for the number of personal assistants that are currently employed through the CDPAP program. So is there a concern that while we're trying to save money and reduce the scope, that we may reduce the scope but actually see the costs

increase?

MS. WEINSTEIN:  We do not believe so.

MR. JENSEN:  Okay.  You referenced that it's gonna be one fiscal intermediary, 11 independent living centers, and then four regions.  What are the four regions?

MS. WEINSTEIN:  So Region 1, the Downstate region is the five boroughs of New York City, Nassau, Suffolk and Westchester; Region 2, Hudson Valley, Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster County; Region 3 considered Upstate Metro, Albany, Erie, Madison, Monroe, Montgomery, Niagara, Onondaga, Orleans, Rensselaer, Saratoga, Schenectady, Warren, Washington, Wyoming Counties --

MR. JENSEN:  That's -- that's one region?

MS. WEINSTEIN:  Yes, that's Region 3.  And then Region 4 is the rest of the State, because I can't pronounce -- no, it's the rest of the State.

MR. JENSEN:  Yeah, I mean, that's... okay.  And so will FIs have to bid on being able to serve as an FI in each of those regions to maintain their access to the program?

MS. WEINSTEIN:  Yes.  And I just was clarifying, so there can be more than one subcontract FI if the single Statewide FI believes that there is a need for additional -- for an additional subcontractor in that area.

MR. JENSEN:  So I'm gonna use Region 3 because that's where I live.  So in Monroe County, if somebody wants to be an

NYS ASSEMBLY                                    APRIL 19, 2024

FI and they get a subcontract to provide FI services in Monroe County, would they also have to provide their services for the other cornucopia of locations in the State that you referenced as part of that region, or could they exclusively serve a geographic area that's close --

        MS. WEINSTEIN:  That -- that would be up to the subcontracting -- the subcontract in that -- in that area.

        MR. JENSEN:  So are they --

        MS. WEINSTEIN:  Some of it may be based on, you know, on the number of clients that need to be served, the particular cultural or language needs of the individuals.  So -- but the goal is to have the one Statewide, the independent living centers in these four regions.

        MR. JENSEN:  So would -- if you want to subcontract in one of the regions, would you have to apply to the Statewide FI or do you apply to the DOH?

        MS. WEINSTEIN:  Once -- once DOH contracts with the Statewide, then the Statewide FI will be doing the contracts with the individual regional contract.

        MR. JENSEN:  So, what's the mechanism for the oversight of Statewide FI's actions?  Does -- is there -- are they --- will they constantly be in consultation with the -- the Health Commissioner and their staff?  Is it for a two-year period?  Is that -- would that be something in the contract or the RFP that goes out to select that Statewide entity?

        MS. WEINSTEIN:  Well, I -- I would assume that the

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

RFP will also indicate that, and the contract with DOH will delineate some of that information.  And they would be constantly be under -- continue to be under the oversight of DOH.

MR. JENSEN:  Is there anything preventing the Statewide fiscal intermediary from having a sub -- subsidiary FI that is under the same corporate ownership to serve as a regional FI?

(Pause)

MS. WEINSTEIN:  If -- obviously, we would have to see what the RFP from DOH looks like, but they would -- would not be doing the payroll.  The payroll still is only the one --

MR. JENSEN:  And I -- and I understand.  But I think it's a severe conflict of interest if there's not direct language, either in this authorization to create these changes, or DOH regulation that forbids a Statewide FI from monopolizing the CDPAP program through an FI under the same corporate ownership.  Because if we're talking about fraud and waste and lack of efficiency and effectiveness, that certainly seems like we would be blowing everything out of the water.

MS. WEINSTEIN:  I mean, certainly it's not our -- it's not the intention to have a single FI be Statewide and then also be -- be a regional subcontractor.  You know, it obviously doesn't change the administrative payroll because it's Statewide.  You know, but again, some of this will be determined in the RFP put out by DOH.

MR. JENSEN:  Was there an impact study that was conducted before we saw the language today, either an economic

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

impact study or an impact study on the delivery of services to the
disabled and elderly community that receives CDPAP services, and
where would I be able to see that impact study?

        MS. WEINSTEIN:  No, because, you know, as -- as
we've talked about, the FIs are not the deliverer of services, they're the
payroll agent.  So there was not -- and -- and it is not anticipated that
there will be an impact on delivery of services.

        MR. JENSEN:  So there -- it's your belief that there's
gonna be no impact on the delivery of services, personal aide services
to the disabled or the elderly because of these changes?

        MS. WEINSTEIN:  You know, there -- so, as I
mentioned, this isn't an overnight process.  The --

        (Buzzer sounds)

        I'll finish my sentence.  The DOH anticipates a
phased-in transition to allow the Statewide FI time to refine the
process as it goes forward with realtime information.  So we think any
issues will be resolved during that period of transition.

        MR. JENSEN:  Thank you, Madam Chair.  Thank
you, Mr. Speaker.

        ACTING SPEAKER AUBRY:  Thank you, sir.

        Mr. Maher.

        MR. MAHER:  Thank you, Mr. Speaker.  Would the
Chair yield for some questions?

        MS. WEINSTEIN:  Yes.

        ACTING SPEAKER AUBRY:  Ms. Weinstein

91

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

yields.

MR. MAHER:  Thank you.  So, first I just wanted to clarify the -- this is gonna be on the Human Services COLA.  The 2.84 percent, I just want to confirm that doesn't have any specific language attached to it.

MS. WEINSTEIN:  There is language.  It allocates funding to provide the 2.84 COLA for the fiscal year, and requires that at least 1.7 percent of such funding be used to provide targeted salary increases for support staff, and then also direct care staff -- staff in OMH under -- you know, for programs and services run under OMH -- OMH, OASAS, OPWDD, OTDA and OCFS and SOFA.

MR. MAHER:  So the 2.84 percent doesn't have the restricted language, but 1.7 percent of that 2.84 percent?  Or is it a separate 1.7 on top of the 2.8?

MS. WEINSTEIN:  No, it's 1.7 of that 2.8.

MR. MAHER:  Okay.  So out of the 2.8 percent, 1.7 percent of it is targeted to non-executive DSPs and other staff?

MS. WEINSTEIN:  Yes.

MR. MAHER:  Okay.  And there is no direct wage enhancement?  That was in the one-House Budget for the Senate.

MS. WEINSTEIN:  Not -- not a separate line item, but obviously the 1.7 increase is a targeted wage enhancement.

MR. MAHER:  Okay, so that was gonna be my next question.  So that 1.7 percent was meant to be a direct wage enhancement, and then the remaining 1 percent was that COLA for

NYS ASSEMBLY                                    APRIL 19, 2024

just about anything, including fringe benefits and other costs
associated to these human services organizations?

       MS. WEINSTEIN:  It -- it really will depend on how
the agency wants to spend the funding, but that -- there's nothing to
prohibit that -- the remaining amount for being a wage enhancement
also.

       MR. MAHER:  Got it.  So the 1.7 percent is gonna be
targeted to non-executive personnel, direct services professionals, and
about another 1 percent or so is gonna be for those fringe benefits and
other costs associated with inflation.

       MS. WEINSTEIN:  Yes.  And I -- I would -- I just
want to add that it's -- it's also support staff that are included; cooks,
janitors, drivers.  It's not just the direct care service workers.

       MR. MAHER:  Okay.  Thank you for that
clarification.

       So, can you give me a total number on what that 2.84
percent looks like in terms of what we allocated in the budget?

       MS. WEINSTEIN:  Two-hundred-and-forty-five
million.

       MR. MAHER:  An additional 245 million, okay.  Can
you confirm what the last two-year COLA increases were for our
DSPs in the human service industry?

       MS. WEINSTEIN:  So last year was 4.5 increase, and
the year before it was 5.4 percent increase.

       MR. MAHER:  Thank you.  And in those same years,

NYS ASSEMBLY                                    APRIL 19, 2024

can you also confirm what the rate of inflation was?

MS. WEINSTEIN:  I'm -- I'm sorry, I was just getting clarification --

MR. MAHER:  No, no worries.

MS. WEINSTEIN:  -- so if you could repeat that.

MR. MAHER:  In those same two years where you just named the -- the cost-of-living increase, can you also just inform us of what the rate of inflation was in those two years?

MS. WEINSTEIN:  I -- I don't have it right in front of me, but obviously the inflation rate has, these past two years, been higher than in prior years.

MR. MAHER:  I have my own notes, I just wanted to confirm and -- and see what your numbers were, thank you.

I -- I do have a specific ask, why not include the independent living centers?  I know that there was some advocacy around those independent living centers and that those workers were not included in the COLA.  And was there discussions leading to the final budget, and why weren't those independent living centers included in this COLA?

MS. WEINSTEIN:  During the negotiation they were not able to be included.

MR. MAHER:  Do -- do we have an ability to quantify that number?  Was it a monetary issue is why they were not included?

MS. WEINSTEIN:  You know, my understanding is

94

NYS ASSEMBLY                                    APRIL 19, 2024

it had probably more to do with the fact that they don't provide the same kind of services that these other programs do.

MR. MAHER:  Okay.

Going to another type of industry that -- that does, you know, in my opinion, provide similar services; domestic violence professionals.  They were also not included in this COLA.  Is there any reason why?

MS. WEINSTEIN:  I -- I think it's -- it's more because traditionally they have not been part of these -- this COLA, though we do in other places help with some domestic violence funding.

MR. MAHER:  There were some bills that were out there, some language that was looking to be advocated in the budget I know that were part of our discussions.  At what point in the budget process when you were finalizing this particular bill were those excluded, and why?

MS. WEINSTEIN:  Unfortunately, I can't give you the details.  Not because I can't share them, because I don't have them --

MR. MAHER:  Okay.

MS. WEINSTEIN:  -- the details that respond to your question.

MR. MAHER:  Okay.  Why was the tying of the COLA not tied to the Consumer Price Index?  I know that was something that was also part of discussions and that was left out.  Is there a reason why we left that language out, as well?  That way we're

NYS ASSEMBLY                                    APRIL 19, 2024

not here in future years having the same conversation.

MS. WEINSTEIN:  Well, actually the -- we actually think that, coincidentally, this year it's higher than the Consumer Price Index.

MR. MAHER:  Okay.

MS. WEINSTEIN:  Which is 2.7, so...

MR. MAHER:  That's -- that's this year.  I think the historically the numbers would suggest, especially when you take into account many years of not having the COLA that we have a long ways to go in terms of catching up to the rate of inflation in terms of the cost-of-living adjustments; would you agree?

MS. WEINSTEIN:  You know, I think the -- the last two years have been out of sync with -- not I think, I know that the last two years have been out of sync with the more historical consumer price increases.

MR. MAHER:  All right.  Thank you very much.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. MAHER:  Okay.  So let's dig into this a little bit.  For our direct service professionals, we did not do a direct wage enhancement.  We instead did a 1.7 percent targeted, and I've been trying to quantify all morning what that really means in relation to what a $4,000 direct wage enhancement would have been.  And due to our staff and due to talking to some of the providers myself that work in our district, if you take into account direct service professionals'

NYS ASSEMBLY                                    APRIL 19, 2024

average wage, and this isn't the managers that are non-executive

personnel, just the DSPs that are boots on the ground, doing

everything they can to help our most marginalized, most at-risk New

Yorkers, the average wage is $16.50.  If you take into account a

40-hour week, that's 2,080 hours.  If you do the math, it's less than

$600 per employee.  That is very, very much not even close to the

$4,000 direct wage enhancement.  And let's also put into perspective

why this ask was made.  There's been some words that have been

brought up, it's called keep up -- catch up and keep up, right?  So the

reason why there was a direct wage enhancement on top of the COLA

increase is because we needed both, due to the fact that there were not

enough COLAs over a long period of time.  In fact, what we found is

over the last -- over a 16-year period, the total amount of the rate of

inflation was over 43 percent, okay?  Over 43 percent.  And over the

four COLAs that were provided, which was 0.2 percent, 1 percent,

and over the last two-years, 5.4 percent and 4 percent, that totals 10.6

percent.  So rate of inflation of over 43 percent, and a total

cost-of-living adjustment of 10.6 percent for the employees that are

doing the hard work every single day taking care of people that we

love, people in our communities that need the most help.

            We have failed them.  We have failed those direct

service professionals in this budget.  And by not tying to the

Consumer Price Index moving forward, we've set back those

industries in terms of recruitment.  Because who is going to join an

industry, even if they love and have passion for that work, if they are

97

NYS ASSEMBLY                                    APRIL 19, 2024

not certain on what their salary is going to be compared to other jobs that are out there?  And the thing that I love the most about being here and being in this seat is I look at all the bills.  It doesn't matter if they're Republican, it doesn't matter that they're Democrat.  And there were a lot of bills Democrat bills that I cosponsored, as well as Republican, that addressed this language and they were left out of this budget bill, too.

This issue isn't partisan.  We all care, I do truly believe that.  But in this budget bill, we fell very, very short of supporting our DSPs the way that we needed to, and I'm willing to work with anybody, regardless of party, moving forward in the years ahead to try to really right that wrong.  We certainly have failed our DSPs.  We need to do better.  I'm committed to doing better, and I look forward to seeking out partners in the future years to come.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker.  Will Chair Weinstein yield?

MS. WEINSTEIN:  Yes, yes.

ACTING SPEAKER AUBRY:  The sponsor yields.

MS. WALSH:  Thank you very much, Chair.  These questions have to do with Part HH, the Consumer Directed Personal Assistance Program portion of the budget, CDPAP, which I know you've already -- already answered some questions about.  I have -- I

98

NYS ASSEMBLY                                    APRIL 19, 2024

have a number -- a number more of questions.

   MS. WEINSTEIN:  Okay.

   MS. WALSH:  First of all, and you might have said this earlier, but how many financial -- fiscal intermediaries are currently operating in New York State?  I had heard 700, does that sound about right, 500?

   MS. WEINSTEIN:  We believe it's somewhere between 600, 700.  We don't have the actual number.

   MS. WALSH:  Okay.  And what -- what specific duties do they provide?  Because I see in the -- the budget language, there's a number of things that are lined out as things that they must do.  But I -- I heard you earlier say that they were -- they took care of -- just took care of, like, the payroll, but don't -- aren't -- don't they do a lot more than that really?

   MS. WEINSTEIN:  They -- they get reimbursed from Medicaid by doing the payroll, so there is an incentive to -- for each of these multiple intermediaries to enroll clients in their program, so they're able to have more administrative costs.  The other services that they provide, they don't get reimbursed for.

   MS. WALSH:  Okay.  So and -- and understanding that the -- the -- the FIs are not providing the actual -- providing for the physical needs of the consumer, I -- I know that that's not happening.  But in fact -- well, I just kind of want to ask you about what you just said, because you're not suggesting that the additional things they do beyond payroll are just simply self-serving.  They're --

NYS ASSEMBLY                                      APRIL 19, 2024

aren't they there to support the consumer in other ways?  Are -- are

you suggesting that they're just doing it to enroll more people?

          MS. WEINSTEIN:  In -- in general, they're there to --

to connect the workers through the payroll to the -- the clients.  But,

you know, clearly I've seen in my own communities pretty aggressive

outreach to trying to enroll individuals in these programs.

          MS. WALSH:  Okay.

          MS. WEINSTEIN:  And, you know, they do provide

information to the consumer that the consumer -- the clients are --

explaining the program to the -- to the clients.

          MS. WALSH:  And -- and that's not nothing, because

I mean, I think -- I think it's fair to say that directing your own home

care is difficult, I would think.  And if you consider the wide range of

consumers and their wide range of abilities and disabilities, that could

be more -- more difficult for some than others.  So it -- it would seem

to me that FIs -- like, for example, FIs give guidance to consumers on

how to find and retain personal assistants.  They manage program

compliance, assuring that personal assistants are CDPAP eligible, and

that consumers act within CDPAP rules such as assuring that personal

assistants work only within their authorized hours.  Many fiscal

intermediaries arrange and bear the cost of initial and annual personal

assistant's health assessments.  Fiscal intermediaries help consumers

onboard their personal assistants and maintain their continued CDPAP

eligibility.  That's -- that's a lot more than payroll.

          I'll move on.  I just -- I -- I think the point has -- I've

NYS ASSEMBLY                                    APRIL 19, 2024

-- I've tried to make that point, but I -- I think that understanding that maybe 6- or 700 is too many for the State, there is a grave concern that shrinking it down to the number that -- that this bill does is going to really compromise the program. And -- and I know that you had said in response to an earlier question that one of the reasons for this legislation is to help control costs and to create cost savings for the taxpayers. And, oh my goodness, I mean, in a lot of ways, isn't that music to all of our ears? I mean, that's so refreshing. I -- I support that idea; however, I think it's also a balancing act because we -- we don't want to compromise care. Because if you're just looking at it even from a purely fiscal point of view, isn't nursing home care on -- on average more expensive than having an individual be able to stay in their own home?

MS. WEINSTEIN: Certainly. And I -- you know, I would say that part of the confidence that this system can work comes from looking at what's going on in the rest of the country. And as I mentioned earlier, every other state that has a program has just the one Statewide fiscal intermediary. Some of the factors that you mentioned, roles that the intermediaries, the fiscal intermediaries have now, these multiple intermediaries, will be taken up by the subcontracted intermediary. And while -- as -- as I did mention as a response I think to Mr. Jensen, while there's a requirement that at least one per region along with the independent living centers, there can be more than one if there -- in a particular region if there's more -- more need for that. And the system does allow for if there are individuals

NYS ASSEMBLY                                    APRIL 19, 2024

that need assistance, for that kind of assistance to happen.  If they

need assistance in -- in interacting with the fiscal intermediary, that

assistance is available.

MS. WALSH:  And at whose discretion will that be?

The sub-sub, I guess, is kind of what we're talking about, right?  Will

that be at the -- the -- the regional intermediaries, the sub's -- the sub's

discretion, or will that be at the Statewide FI's discretion?

MS. WEINSTEIN:  Well, some of it I believe will be

in the DOH RFP, and then the contract.  And the whole, as -- as I've

mentioned, as opposed to a different state that just sort of flipped the

next day kind of, we do have this -- this timeline where the DOH will

be staggering the transition by region beginning first in 2025 with the

hope that the Statewide FI will be in place before that and be able --

be chosen before that and they'll be able to develop a policy and get

some individual realtime experience, some stake -- stakeholder

feedback.  And we anticipate that it would take a year before every --

before there's a total transition to this one Statewide and

subcontractors.  So there will be a continuing role during this

transition period for the -- for some -- for a number of these -- for all

of the FIs, if they choose to, to stay in existence, knowing that they

will eventually be phased out.

MS. WALSH:  Yeah.  So let me ask you, you

mentioned other states.  What other states were looked at when

developing this proposal?

MS. WEINSTEIN:  California, Massachusetts and

**NYS ASSEMBLY**                                **APRIL 19, 2024**

New Jersey in particular.

MS. WALSH:  Okay, because my research was that when this transition was done in Pennsylvania it was disastrous. There were over 20,000 consumers who were left a void of essential services as their caregivers went unpaid.  So I imagine we wouldn't want to model after Pennsylvania.

MS. WEINSTEIN:  So the problem with Pennsylvania, I know it's cited a number of times as a place there was a problem, is they had three and they didn't -- and they just went automatic, they just, like, overnight went to one without the staggering.

MS. WALSH:  They implemented too quickly.

MS. WEINSTEIN:  We learned from that -- from that experience, and that's part of why there is this one-year staggering before the complete transition.  So we do not anticipate the same kind of problems they had in Pennsylvania where it was just an overnight switching from the three to one.

MS. WALSH:  Yeah.  Is there a feeling that one year is going to be sufficient?  I mean, if you consider, you know, some recent examples we've had here with, I don't know, cannabis roll out, you know, fill in the blank, things don't happen quite as smoothly as we would like them to.  And sometimes even when we consolidate authority in one organization, you would think that it would bring efficiency and more timeliness, but that's not always the case.

MS. WEINSTEIN:  Well, so I have two responses.

103

**NYS ASSEMBLY**                    **APRIL 19, 2024**

MS. WALSH:  Good, okay.

MS. WEINSTEIN:  Okay.  One is it's not a government agency.

MS. WALSH:  Yeah.

MS. WEINSTEIN:  Number two -- but the more serious response is that we are -- the -- the RFP requirement will be a State -- an organization that already administers a Statewide FI program so that it is not starting from scratch.  It's an organization that already is administrating a program of a single FI in another state in the country.

MS. WALSH:  So by its very nature, the way that this is structured is this is going to be looking outside of our State for a single FI to administer for our State.  We're not doing this in-house, in other words.

MS. WEINSTEIN:  We're looking for -- for an organization that already is administering a program that we desire to have here in New York, yes.

MS. WALSH:  In another state, okay.  Will the Statewide fiscal intermediary -- what's the expected timeline for the Statewide fiscal intermediary to be able to onboard a personal assistance after they've been identified by a consumer?

(Pause)

Are there metrics for that?

MS. WEINSTEIN:  Well, we -- you know, we don't anticipate that there will be any losses of the personal assistants for the

104

-- the clients.  So, you know, again, it's the -- what is happening is the transition of who's administering the payroll, you know, and again, that longer period of time to transition to the single FI.

    MS. WALSH:  Thank you very much, Chair.

    Mr. Speaker, on the bill.

    ACTING SPEAKER AUBRY:  On the bill.

    MS. WALSH:  I had so many more questions, but I see that my time is -- is running short, so I wanted to just simply state my concern for this specific piece of this budget proposal.  You know, the president of the Home Care Association said the CDPAP proposals that have been advanced, including the single Statewide fiscal intermediary, defy the realities of patient need and patient care not only in the CDPAP program, but the crisis in access and care across the entire health care system.  And, you know, as I said before, we -- we -- of course we want to have, if we can, greater efficiencies and save money where we can as a state.  I just hate the idea that we're doing it on the backs, potentially, of the most vulnerable people in our State.  That's -- that's not how we should have done this.  My God, we -- how many things do we study as a Legislature?  We couldn't have studied this first?  You know, we -- we study everything to death.  I -- I think that this should have been something that could have been done more slowly.  And I -- and I think that the concept of perhaps streamlining so we don't have 6- or 700 might be -- might have been a great idea, but what I'm concerned about is, you know, what recourse will consumers have when a -- when they fail to perform adequately,

NYS ASSEMBLY                                          APRIL 19, 2024

when the FI performs inadequately?  What -- what's their recourse gonna be to monitor the performance of the single Statewide FI?  You know, how does the Department of Health plan to address any potential reduction in service quality?  Because it's not just -- it's not just about money, it is about also the quality and continuity of care and access to care that's important.  And if we want to put a dollar sign on it, consider this:  As I mentioned, if -- if we can't keep consumers directing their own care at home and having some autonomy to do so, those consumers are going to be forced, in some instances, to enter nursing homes.  Those nursing homes that have long waiting lists, that don't have adequate staff.  That -- that -- they're gonna be forced to potentially have greater hospital stays, or they're just simply gonna be home not receiving the care that they need.

So I think that this is something that should have been -- should have been studied more carefully, really look at other states and try to pull the best and the worst examples from those states and try to avoid them.  I'm afraid that this -- there's no way that this could be properly implemented within the -- the one-year time frame that's been laid out.  And I do hope that as we move forward we can -- we can make some adjustments in this because I -- I really -- I'm very -- quite concerned, quite concerned about it, and for that reason, unfortunately, it -- it becomes a poison pill, really, for the remainder of this bill for me, anyway.

Thank you very much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

106

**NYS ASSEMBLY**                                  **APRIL 19, 2024**

Ms. Giglio.

MS. GIGLIO:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MS. GIGLIO:  Okay.  So, the contract is not -- am I correct in saying that the contract is not subject to the requirements of accounting approval of contracts with the State Comptroller to hire and go into contract with the State fiscal intermediary?

MS. WEINSTEIN:  Yes, that -- that is correct because we're looking to do this in an expedited manner.

MS. GIGLIO:  Okay.  So we're going to expedite, like, this Medicaid program that provides so many services to so many people in the State of New York and we're gonna expedite and put a State fiscal intermediary that -- am I correct in saying one of the qualifications is that they have to provide services as a fiscal intermediary on a Statewide basis with at least one other state; am I correct in saying that?

MS. WEINSTEIN:  Yes.

MS. GIGLIO:  Okay.  And you mentioned four other states.

MS. WEINSTEIN:  Yes, there are at least four that

107

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

we've looked at.  There are other states that have a --

MS. GIGLIO:  Okay, so the State is going to be --

MS. WEINSTEIN:  I just meant, you know, as far as we're aware, most states have just the single statewide intermediary.

MS. GIGLIO:  So they don't have individual fiscal intermediaries throughout the regions as we have planned?

MS. WEINSTEIN:  Correct, correct.

MS. GIGLIO:  Really?  Is that -- is that correct?

MS. WEINSTEIN:  Yes, yes.

MS. GIGLIO:  So one state fiscal intermediary runs the whole state of all the people that have home care for personal assistance in the State of California, State of Massachusetts, State of New Jersey.  There aren't any --

MS. WEINSTEIN:  Yes.

MS. GIGLIO:  -- individual fiscal intermediaries in regions as we have in this plan?

MS. WEINSTEIN:  Correct.

MS. GIGLIO:  So what do they have?

MS. WEINSTEIN:  Well, I mean, in -- in -- for example, in California they've had a single statewide intermediary since 1978.

MS. GIGLIO:  So they don't have anybody else helping them in any of the regions?  They handle it all, all the payroll for all --

MS. WEINSTEIN:  Well, I think -- I'm sorry, I didn't

108

mean to interrupt.

MS. GIGLIO:  It's okay.  I'm just saying, so they don't have any, you know, regions like we've set up.

MS. WEINSTEIN:  Yes, yes.  I mean, that's -- that's what I was about to say.  While there's the single statewide intermediary that has the -- the fiscal responsibility, there are at times subcontracted intermediaries for different regions.  But the responsibility for the administration of the program, the payroll of the program, goes through the single intermediary.

MS. GIGLIO:  And those contracts are not subject to the requirements of accounting approval of contracts with the State Comptroller?  So it's just an RFP and you can just pick someone -- well actually, there will probably only be four that we would be looking at.

MS. WEINSTEIN:  Well, there still would be a -- a -- a Request for Proposals that would go out, the RFP would -- or the -- the number one, the Statewide intermediary, and it would be anticipated that they would then have RFPs for the subcontractors other than for those independent living centers where we mandate that they subcontract for those, as well as at least one other FI entity per region.

MS. GIGLIO:  So in those other states, do we have any idea as to how many subcontractors they have under the state fiscal intermediary?

MS. WEINSTEIN:  I -- I would just say that I'm

NYS ASSEMBLY                                  APRIL 19, 2024

informed that most of these other states don't have any subcontractors.

MS. GIGLIO:  Wow.  That's amazing.  So we're going to pick one State fiscal intermediary that's going to be responsible for all the people that get home care in the State of New York and another state, possibly two other states, possibly three other states, and expect that the standard of care is going to remain the same.

MS. WEINSTEIN:  Well, the -- you know, again, I guess it's the difference between the -- what the Statewide -- what the intermediary does is provide -- manage the payroll.  They don't provide care.

MS. GIGLIO:  So we're gonna have a Statewide fiscal intermediary that has to have, in order to qualify, services as a fiscal intermediary in another state.  That's one of the qualifications.  So they'll be managing two states or three states or four states, the payroll for everyone.

MS. WEINSTEIN:  Well, you know, I assume they'll have more than one person managing as their employee so that -- obviously, we see lots of organizations, corporations that have multiple locations even though they are a single organization.  So, you know, I think we're confident that they will be able to find qualified employees to manage the program here in New York, building upon the knowledge that they've developed in managing other states' programs.

MS. GIGLIO:  And would you call that a

110

**NYS ASSEMBLY**                    **APRIL 19, 2024**

subcontractor, essentially, or just someone that's on the State payroll? Because it seems like that's what our subcontractors are doing now, no?

MS. WEINSTEIN:  It would be a non-profit -- it -- it would be an organization, not a -- not a State agency, right?  It would be an organization that would be contracted to be the Statewide organization, and then they would have the ability to do the -- the subcontracts.  You know, again, the savings come from all this multiple administrative costs by these large -- by the large number of intermediaries.  So I would think we all would agree that being able to -- to have administrative costs of a program only be 3 percent instead of administrative costs being 15 percent, that saving State tax dollars is something important.  And, again, that one-year transition period is to make sure that aren't any loss of services that you mentioned.

MS. GIGLIO:  So has -- thank you.  Has an audit been done for the current subcontractors that we have?  Has an audit been done of the 700, 600, 700 fiscal intermediaries that we have now to determine that there is problems with the current payroll?

MS. WEINSTEIN:  It -- part of the reason we don't -- in terms of the audit, we don't contract with them, so that's part of the reason why we don't even -- we don't have a handle on what the costs are and why the program has expanded so much.

MS. GIGLIO:  So we don't contract with fiscal intermediaries that exist throughout the State.  Will they just tell us, *This is how much money we have in payroll* and we just pay them?

111

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  They -- they contract with the plans, with the MLTCs.  So they don't -- there's -- there's no direct obligation to the State between the -- the very multiple fiscal intermediaries and -- and New York State.

MS. GIGLIO:  Well, couldn't we just require that the 600 and 7- fiscal intermediaries contract with the State in order to satisfy the State's concerns about the payroll problems that we seem to implicate them for?

MS. WEINSTEIN:  That would cost more money even and wouldn't save us any money.

MS. GIGLIO:  What percentage of the Medicaid budget is CDPAP?

MS. WEINSTEIN:  Right now it's north of 36 percent.

MS. GIGLIO:  How much of the -- how much is -- of the State Budget is Medicaid?

MS. WEINSTEIN:  Probably about 40 percent.

MS. GIGLIO:  So you're saying 40 percent of the State Budget is Medicaid, and then 36 percent is CDPAP.  So what is the portion of Medicaid for safety net hospitals proposed going forward?

MS. WEINSTEIN:  It's -- it's dramatically lower.

MS. GIGLIO:  It's lower, okay.  So what percentage of the Medicaid is for not-for-profits that take care of -- that have the group homes that take care of people with intellectual and

112

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

developmental disabilities?

            MS. WEINSTEIN:  It is lower dramatically lower
than the amount that we spend on CPDAP.

            MS. GIGLIO:  But you don't know how much.
Because we already have 36 percent for CDPAP, we don't know how
much we have for safety net hospitals, and we don't know how much
we have for not-for-profits that take --

            MS. WEINSTEIN:  I mean, we -- I mean, we do
know the amount, I'm just not prepared with the data at this time.

            MS. GIGLIO:  Okay.  So with the $200 million in
savings that's anticipated for the Fiscal Year 2024, which, you know,
we're already into, with that 200 -- is that money just going to be
reallocated to the safety net hospitals?

            MS. WEINSTEIN:  It -- it's for -- it helps fund all of
the Medicaid services that we all care about and, again, that's a
number that's gonna increase 500 -- 500 million and then over -- we
anticipate savings of over $1 billion, ultimately.

            MS. GIGLIO:  Do we know what the anticipated
costs are for the 1115 waivers from the Federal Government for
Medicaid that have been granted?

            MS. WEINSTEIN:  Our State cost is $451 million
this year.

            MS. GIGLIO:  Our State costs are 451 million for
2023-2024, or 2024-2025?  Because we --

            MS. WEINSTEIN:  '24 to '25.

                            113

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MS. GIGLIO:  Okay.  So the 1115 waiver that we just got from the Federal Government to provide more people in New York State with Medicaid services, you're saying that cost is only going to be 450 million out of the 42 percent of Medicaid for the entire State?

MS. WEINSTEIN:  We're going to spend 4. -- 1.5 billion over the -- and over the cost of the waiver we'll be able to draw -- draw down over $7 billion of Federal monies.

MS. GIGLIO:  Okay.  Do we expect that the State fiscal intermediary will cut services for people that are currently getting services at home from family members, where those family members would no longer be personal assistants for the person that is in need of these services, and they would have to hire a nurse or a home care aide to bring into the home while the mother -- I mean, I have a person in my district that is 27 years old, she's had 125 brain surgeries over the last 27 years and her mother cares for her and is considered a personal assistant under the fiscal intermediary, who cares for her child.  So is that person going to be out of a job and we're gonna pay a home health aide to go in and take care of her child?

MS. WEINSTEIN:  No, there should be no disruption in services under this transition.

MS. GIGLIO:  Okay.  Well that's comforting.  Okay.

And then as far as the DSPs and the COLA, a couple of my colleagues mentioned it.  You know, the not-for-profits didn't have a COLA increase for ten years before the last two years, and then

114

**NYS ASSEMBLY**                              **APRIL 19, 2024**

the COLA increase that they got wasn't keeping up with the rate of inflation.  So now we have these not-for-profits, with the State closing over 100 group homes over the last couple of years, and taking these individuals and putting them into the not-for-profits, and we're not funding the not-for-profits to keep up with the cost of living which is probably why we had to close those 100 homes.

And I just -- I don't feel that we're doing enough with -- there's already a shortage of 20 percent of direct service professionals in the not-for-profit industry, and OPWDD is doing a great job.  You know, God bless them, they do the best that they can with what they have.  But we have seen with subcontracting with out-of-State agencies with the CANS and the CAS assessments that it's more and more difficult for people to access services because these people that are at home on independent care enter into the hospital -- I'm sorry.  Thank you, Chair Weinstein.

MS. WEINSTEIN:  Sure.

MS. GIGLIO:  Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. GIGLIO:  So, these people that are at home and being cared for at home enter in the hospital.  The criteria for them to get home health care used to be a much broader scale.  There were 12 items on that list, and there -- if they qualified for five of those items then they would get that home health care.  Now the list is down to five, and if they -- if they meet two of those criteria where they're eligible for services, then they can continue to get those services.  And

**NYS ASSEMBLY**                    **APRIL 19, 2024**

as our nursing homes keep filling up and other nursing homes are closing down, which is the subject of conversation in this Chamber every day, I fear not only for the hospitals that care for these people, because once they get out of the hospital they get reassessed again as to whether or not they're eligible for that home care, or whether or not they're eligible to be in that group home.  And subcontracting to out-of-State agencies to look at this rather than fully staffing and appropriating funds to OPWDD, who is doing a great job, just needed more people.  They were inundated.  And as more and more people are applying for Medicaid or seeking to get services from Medicaid, and the State is seeking 1115 waivers as to who can qualify for Medicaid, it's -- we're going in the wrong direction with taking care of our most vulnerable.

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Brown.

MR. K.  BROWN:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. K.  BROWN:  Mr. Speaker, I just want to cover two important topics under this budget bill.  The first is bad, the second is good.  And the first deals with the cost-of-living adjustment for community-based mental health and human service providers in New York State.  You know, we currently have a broken system when it comes to treating people with behavioral health issues, as well as

substance use disorder and alcoholism.  The statutory cost-of-living increase for community-based mental hygiene service providers, while it's an increase and it's great to see this year, we still have a system that relies on people that can't even make a living when it comes to treating with people who are in need.  And my colleague did a great job before going through the questions of the Chair of Ways and Means, but just to point out the statistics that the cumulative annual CPI inflationary increase over a 16 period for these same people that earn a living as social workers taking care of people in need totals 43 percent, while the COLA for the -- that fiscal year coming up to now, right, has not been funded except for the last four subsequent years.  And in those four years, the COLA that was provided was increases of .2, 1 percent, 5.4 percent, 4 percent, and now the 2.84 percent, which is a total of 13.44 percent.  When you compare that to the 43 percent inflationary increase, you're looking at a differential of about 29 percent.  That's part of the reason why we have the problem that we have.  As a result, the most impacted behavioral health providers and staff have had and will continue to have extreme difficulty recruiting and retaining critical direct care staff positions at a time when mental health and substance use disorder crisis has never been greater in the State of New York.

Yesterday I talked about a lost opportunity.  We had an opportunity in a prior bill to make sure that the Attorney General's Office could go after private health care providers that are not providing parity and have a fine for them if they're not providing

parity as the Federal and State law requires.  So those are two important fixes that need to be made to this system of care, right? Increasing the COLA and get it back up to where it needs to be so people who provide treatment could actually earn a living doing it, and also policing and enforcing the current parity laws to make sure that we could get the help to those people that they need.

            The second topic I want to cover is -- is a victory. Ten years in the making it took to get this bill to the floor in the budget and actually passed, and the treatment providers in my area on Long Island are thrilled.  They can't believe that ten years later this finally occurred.  That Part AA of this Budget Bill has a historic budget provision that will change the ability for our constituents who are having trouble finding care through the State's mental health and substance use disorders systems of care.  Specifically, it's going to open the door to these services for tens of thousands of New Yorkers who have commercial insurance.  Up until now, while Medicaid has required insurers to pay community-based providers a State set rate for these critical services, the State has failed to ensure providers were adequately reimbursed for services provided to New Yorkers with private commercial insurance.  This has created a situation in which our constituents with private insurance are often unable to find a provider that can afford to take their insurance, a theme that you're hearing time and time again.  This provision, though, thank God, finally requires that the commercial insurance providers will pay at least the amount paid by Medicare [sic] program for the exact same

services.  It's a major victory for all New Yorkers who need and deserve access to care to address their mental health and/or substance use issues.

Thank you very much, sir.

ACTING SPEAKER AUBRY:  Mr. Gandolfo.

MR. GANDOLFO:  Thank you, Mr. Speaker.  Would the Chair yield for just a couple of questions, please?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields, sir.

MR. GANDOLFO:  Thank you, Chairwoman.  My question is going to be on the expansion of the Hospital Financial Assistance Law.  So Part O, it looks like it expands the eligibility for financial assistance from low-income uninsured to low-income underinsured; do I have that correct?

MS. WEINSTEIN:  Correct.

MR. GANDOLFO:  Now, what is the definition being added for underinsured?

MS. WEINSTEIN:  So to clarify, it relates to individuals who are under 400 percent of the Federal poverty level. So the -- so the intent -- the language is to capture individuals that, though they are insured, have an unplanned, high-cost medical emergency that is not fully or partially covered by their insurance or have a high-cost insurance coverage.  And it has to be bills that have

NYS ASSEMBLY                                    APRIL 19, 2024

-- that are more than $10,000 of the -- medical bills, more than $10,000 of the individual's income that have been accumulated in the year before they --

          MR. GANDOLFO:  So what I'm reading here, I think it says medical expenses in excess of 10 percent of their gross annual income in the past 12 months?

          MS. WEINSTEIN:  Right, accumulated in the past year, correct.

          MR. GANDOLFO:  Okay.  Now, is there -- it's 10 percent of their gross annual income.  Is there a cap on that gross annual income?  Like, for example, say if someone chooses a high deductible plan, let's say a $10,000 deductible and they have an income of $90,000, would they still be eligible for the hospital financial assistance?

          MS. WEINSTEIN:  In theory, yes.

          MR. GANDOLFO:  Okay.  And that's someone who has insurance, just they chose a high deductible plan, and even though they're not -- not low-income, they could still qualify for these -- either the assistance or a payment plan from the hospital.

          MS. WEINSTEIN:  Well, you know, I would assume that someone would choose a high deductible plan if they feel that they're relatively healthy, and this is really designed to cover very unexpected -- very unexpected, unplanned high-cost medical emergencies.

          MR. GANDOLFO:  Right, but in a -- in a case like

that, someone chose the high deductible plan despite having an above-average income to save themselves money.  But in the event that, God forbid, an emergency happens, they're going to qualify for the financial assistance, correct?

MS. WEINSTEIN:  You know, sometimes it could be an employer plan where they had no choice of...

MR. GANDOLFO:  Okay.  And now, an out-of-pocket medical expense.  What qualifies as a medical expense?  Is that co-pays, could that be transportation to a doctor's appointment?

MS. WEINSTEIN:  Not -- not transportation, but yes, out-of-pocket costs could include co-pays.

MR. GANDOLFO:  Okay.  Now, do we have any projection on how many insured individuals would now qualify for the hospital financial assistance?

MS. WEINSTEIN:  I -- I do not.

MR. GANDOLFO:  Okay.  So we -- we don't know how many new individuals are going to qualify.  So then I guess it's safe to say we don't know how this would increase costs to the hospitals?

MS. WEINSTEIN:  Well, you know, currently hospitals are largely reimbursed for their uncompensated care.  Right now, there obviously are costs that hospitals bear to try and collect the unpaid medical bills.  Having a lien on your home doesn't help the hospital get -- recover dollars, so we do not believe, actually, that it will have much impact on -- on the hospitals.

121

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. GANDOLFO:  Okay, but it could grow costs to the hospitals and eventually, if they are reimbursed for some of that loss, would that then come from our budget in the State?

MS. WEINSTEIN:  You know, it could be from the State-funded ingident [sic] -- ing [sic] -- care pools, yes.

MR. GANDOLFO:  Okay.  All right, thank you.

And just moving on to another provision that's in here regarding separate patient consent for treatment and payment of health care services.  Now, this would provide that consent to pay for the medical services cannot be received from the patient until after the services are provided; is that correct?

MS. WEINSTEIN:  Yes.

MR. GANDOLFO:  Is that only applicable in medically-necessary services, or is that any medical treatment, any medical service, you wouldn't have to agree to pay for the service until after it was provided?

MS. WEINSTEIN:  Any service.

MR. GANDOLFO:  Any service.  So it doesn't have to be medically necessary?

MS. WEINSTEIN:  We assume that hospitals would not be performing medical treatment that wasn't medically necessary.

MR. GANDOLFO:  Okay, thank you.  Thank you for your answers, Madam Chair.

Mr. Speaker, on the bill briefly.

ACTING SPEAKER AUBRY:  On the bill, sir.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. GANDOLFO:  Mr. Speaker, I know a lot of these provisions in here are well-intentioned to try to prevent people from going into medical debt, and I know everything costs a lot more nowadays and where we can help people, we want to help people. But I have a real concern that these provisions will grow the assistance plans and, therefore, increase costs to the hospital at a rate that is too rapid and is unfunded, and eventually it's going to put more hospitals in financial distress and the bill will come back on the taxpayers.

So I will not be supporting the Health Budget overall, but I thank you for time, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Morinello.

MR. MORINELLO:  Thank you, Mr. Speaker.  Will the Chairwoman yield for just a couple of questions?

ACTING SPEAKER AUBRY:  The Chair yields, sir.

MR. MORINELLO:  And I'm -- I'm just going to focus on the Consumer Direct Personal Assistance Program.  Is it my understanding there's approximately 607 intermediaries?

MS. WEINSTEIN:  We don't know the actual number, but that sounds about right.

MR. MORINELLO:  That's -- that's what I thought I had heard.  Has there been any attempt or effort to analyze each of those intermediaries to see which ones perform better, which ones perform wraparound services, and which ones will harm the most vulnerable if they're not allowed to continue?

123

**NYS ASSEMBLY**                                **APRIL 19, 2024**

MS. WEINSTEIN:  Part of the problem is is that they don't submit data.  We don't even know -- that's why we don't even have an exact number.  They contract with the plans.  The plans are looking for -- they're -- they're just, you know, the middle process.  So we do not have any of that information or data about how efficient they -- any individual plan is, intermediary is, or which ones are the most costly.

MR. MORINELLO:  Thank you.  Has there been any attempt or has there been any roundtables with the clients to talk about what their needs are, how they are being treated, and how the agencies may be providing wraparound services?

MS. WEINSTEIN:  I -- I do think that there's interaction with the clients on a -- on a regular basis.  Sometimes if there's a dispute as to the amount of hours that are approved, there can be even a fair hearing where there would be some interaction with the agency and -- and the client.

MR. MORINELLO:  All right.  I'm not referring to hours, I'm referring to the treatment, the type of additional services that the proper agencies may provide.

MS. WEINSTEIN:  Well, these intermediaries do not provide the services, that's part of the problem.  They're just the -- the signup program.  You know, they're the -- the middle folks.

MR. MORINELLO:  Thank you.  That's exactly where I was headed with this.

On the bill.

124

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  Sure, thank you.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. MORINELLO:  I find it difficult to accept that there can be a program that is benefitting some of our most vulnerable, and because of economic concerns of the magnitude of the intermediaries they're just gonna automatically scrap it.  I'm gonna speak more particularly about the Western New York Independent Living, of which I have met with many times.  They are an intermediary, but they are also an agency that provides wraparound services to their clients.  The clients receive wraparound services such as peer counseling, Medicaid reapportion, benefit counseling, housing assistance, transportation, assistance in recruitment, assistance in interviewing, State location to meet potential guidance, technical assistance, independent living skills, individual advocacy, health home coordination, parent-to-parent assistance for those with children with disabilities.  You have to listen to some of the clients and some of the parents that have children to understand the importance of proper agencies that can become the intermediaries.  The regulations and rules that I have heard about today would prevent Western New York Independent Living from providing these services as part of being an intermediary.

I believe that the focus and the goal will harm our most vulnerable.  The focus and the goal, because there's been no analysis of the intermediaries, because this is done in a vacuum, because there has been no input or inquiries of the agents and those

125

NYS ASSEMBLY                                  APRIL 19, 2024

receiving the services, is a failed attempt to look at a budgetary item on an overexposed, over-bloated $237 billion budget on the backs of the most vulnerable.  There are more practical ways to look at this if you look at it as a business model, but not as a budget model.  And for that reason and some other items in here which I won't go into, I am voting in the negative and I urge my colleagues to vote in the negative also.

Thank you very much, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would Ms. Weinstein yield?

ACTING SPEAKER AUBRY:  Ms. Weinstein I believe will yield.

MS. WEINSTEIN:  Yes.

MR. GOODELL:  Thank you, Ms. Weinstein.  I wanted to follow up on some questions my colleague on the possible indigent care pool.

MS. WEINSTEIN:  Mm-hmm.

MR. GOODELL:  Now it's my understanding that the hospital indigent care pool is funded by a surcharge on Medicaid payments.

MS. WEINSTEIN:  Yes?

MR. GOODELL:  That's what, 6.54 percent or is that even higher now?

126

MS. WEINSTEIN:  I -- I think that's about right, maybe even a little bit higher.  I don't have the exact number here.

MR. GOODELL:  And there's a surcharge on non-Medicare, 8.95 percent.  Then there's an annual assessment on hospitals for all in-patient care, and then we also use funds if I'm not mistaken from cigarette taxes and other sources; is that correct?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  And what is the total funding currently for the hospital indigent care pool?

MS. WEINSTEIN:  Unfortunately we don't have that figure here.

MR. GOODELL:  But it runs billions, right?

MS. WEINSTEIN:  I -- I would say hundreds of millions, not billions.

MR. GOODELL:  Unfortunately the report I have, you know, since I just got this bill today, said that in 2008 it was 847 million.  Since that's eight years ago I assume it's probably well over a billion now.  Is that a reasonable assumption?

MS. WEINSTEIN:  I don't necessarily (inaudible).

MR. GOODELL:  Okay.  Now I wanted to take a look if I can at Part O, and Part O changes how the hospital indigent care pool funds are utilized and what hospitals can do in terms of billing patients.  And first I note that one of the first changes is it provides that immigrant status shall not be an eligibility criteria for the purposes of determining utilization of this pool; is that correct?

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MS. WEINSTEIN:  Yes.

MR. GOODELL:  So do we have an estimate on what we anticipate illegal immigrants will cost in terms of healthcare under the general hospital indigent care pool?

MS. WEINSTEIN:  No.  I do not have that data.

MR. GOODELL:  And then I see that there's a number of restrictions on collecting for medical care that's provided by a hospital.

MS. WEINSTEIN:  Correct.

MR. GOODELL:  And for patients that are below 200 percent, the hospital can't do any collections, correct?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  And for patients between 200 and 300 percent of federal poverty, hospitals can only charge up to ten percent of the Medicaid rate or ten percent of the cost sharing, correct?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  And then for patients from 300 to 400 it's 20 percent of those numbers --

MS. WEINSTEIN:  Yes, but this is -- just want to clarify what you're saying, this has to do with once the individual says they cannot pay and their -- and restricts the ability of the hospital to -- to sue these individuals.  It doesn't prevent them from --

MR. GOODELL:  And then I see that a hospital can request and negotiate a -- a payment plan for those who are above 200

128

**NYS ASSEMBLY**                    **APRIL 19, 2024**

percent of poverty, correct?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  Now if someone signs a payment plan and doesn't honor the payment plan and their income is below 400 percent of poverty, can the hospital sue for breach of contract?

MS. WEINSTEIN:  I don't believe so.  I mean obviously, you know, we're talking about hospitals that I think just about every hospital in our State is a charitable institution.  So they are -- I don't believe that they would sue on a non -- be allowed to sue on a non-payment proceeding.

MR. GOODELL:  So on one hand the statute says a hospital can negotiate a payment plan and then on the other it says but it can't enforce the plan; is that a fair statement?

MS. WEINSTEIN:  You know, they can't -- can't sue to enforce a -- a plan if the person is under 4 percent of the federal poverty level based on some of those percentages that you described earlier.

MR. GOODELL:  So just to put that in perspective, 400 percent of poverty if I'm not mistaken for an individual, it would be in New York State $60,240 for 2024?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  Am I correct that the New York City per capita median income is $48,066?

MS. WEINSTEIN:  I don't have that figure with me but I'm sure you -- your number is pretty correct.

NYS ASSEMBLY                                    APRIL 19, 2024

MR. GOODELL:  So in other words that 400 percent limit is 27 percent higher than the New York State or the New York City per capita median income, which means that everyone under the median income could have free hospitalization, right?  Every single one, plus those who are up to 27 percent above the median income.

MS. WEINSTEIN:  You know, we're talking about at -- at what point can a hospital take legal action to sue to recover these funds with the realization that they will likely not be too successful. They have to make their best efforts to ensure that the individual doesn't qualify for financial assistance prior to taking the legal action.

MR. GOODELL:  Well, you don't qualify for Medicaid, right, if you're above 200 percent poverty; am I correct?  It goes to 133, I think, for Medicaid eligibility?

MS. WEINSTEIN:  Right, but they -- they may qualify for the Essential Plan if you're talking about someone who's -- who's not insured, some of the marketplace plans.

MR. GOODELL:  True, but if you go over 200 percent of poverty with the Essential Plan you pay a premium, correct?

MS. WEINSTEIN:  Yes.  I believe it's 250 percent but yes.

MR. GOODELL:  Well, if you get free hospitalization and let's say it's a family of three, that would put your federal poverty level for a family of three at 400 percent at 103,208. You can be earning six figures and get free hospitalization, right?

130

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  This isn't about free hospitalization --

MR. GOODELL:  But the hospitals can't collect. They can't sue you, so from the patient's view it's free, right?  You walk in and say *hey, let me introduce myself, I earn just over $100,000 but I got a wife and a child so here I am*, don't have to pay, right?  Hospital can't sue you.

MS. WEINSTEIN:  You know, medical expenses are, as you well know, are not cheap, and most people if they can afford insurance, have insurance.  It is amazing how expensive an unexpected two week period of time in a hospital ICU unit can be.

MR. GOODELL:  Indeed, that's why we encourage people to buy insurance, right?

MS. WEINSTEIN:  Mm-hmm.

MR. GOODELL:  Well, why would anyone who earns less than six figures buy insurance?  I mean you can get hospitalization free up to 400 percent.  Why would you ever waste money on insurance premiums?  By the way, you could couple that with a -- a private health and what is it called, a health savings account, right?  For what you spend in monthly premiums you could fund a health savings account to cover everything else.  So why would we ever buy insurance if you make less than 103,000 and you have a wife and a child?

MS. WEINSTEIN:  You know, the -- the hospital bill still has to be over 10 percent of your -- of your income and, you

131

NYS ASSEMBLY                                APRIL 19, 2024

know, again it has to do with suing -- this relates to hospitals suing to collect the amount due for medical assistance.  I think most people are not proactively figuring -- doing their calculations as to how much money they earn and anticipating they're going to need some medical care that's going to kick them into this category.

MR. GOODELL:  I see.  And now for a hospital to sue someone who makes over 400 percent of insurance they have to file an affidavit that they think that the patient earns more than 400 percent of the poverty limit.  How is it the hospital would know what the patient's income is?  Can they require the patient to provide them with a copy of their tax return when they come in for services, how would they ever know?

MS. WEINSTEIN:  Well, the --

MR. GOODELL:  There's not a database that's admissible to hospitals, right, that they can look up.  Somebody --

MS. WEINSTEIN:  Right, but the hospital can -- can check -- the hospital can check income information including uniform financial assistance form, which we agreed to in last year's budget, a standardized document where the individual reports their income sources including wages, SSI payments, unemployment compensation, disability payments, et cetera.  It currently exists when -- if you are claiming that you cannot financially pay the -- the bill.

MR. GOODELL:  And this 400 percent cap that you can get free hospitalization for, is that evaluated at the time you apply for the services or at the time the hospital seeks collection?  In other

132

NYS ASSEMBLY                                      APRIL 19, 2024

words, let's say you're just earning a bare six figure salary with you

and your wife or you and your spouse, sorry, and you get a raise.  Let's

say you get a bonus, that puts you well above 400 percent.  Can the

hospital then sue you once you cross that threshold or are they forever

barred from suing you based on your income at the time you received

services?

           MS. WEINSTEIN:  It's at the time that you apply for

the financial assistance.

           MR. GOODELL:  So you can be making a

quarter-million as an individual and as long as you were unemployed

when you went into the hospital you don't have to pay your hospital

bill?

           MS. WEINSTEIN:  You know, I -- I think there's a

whole a lot of assumptions in what you're -- in what you're -- in what

you're saying.  We're talking about the vast -- overwhelming vast

majority of individuals, the people who have debt, many -- the elderly

-- the overwhelmingly majority of elderly people in debt say it's

because of unpaid -- inability to pay their medical expenses --

           MR. GOODELL:  Thank you.  And I -- I appreciate

your comments.

           On the bill.

           ACTING SPEAKER RIVERA:  On the bill.

           MR. GOODELL:  Thank you.  So we have a bad debt

charity pool run by the hospitals, how is it funded?  A surcharge on

Medicaid payments, a surcharge on Medicare payments, a surcharge

NYS ASSEMBLY                                APRIL 19, 2024

on your health insurance payments.  So, when we say we want to
protect the senior citizens from high hospital bills, yet we say that
everyone who is under 400 percent of poverty can get free
hospitalization, let me tell you what's going to happen to this bill.  The
cost of this program is going to be astronomical.  Absolutely
astronomical.  Because every person in the State of New York worries
about how they spend money.  And so if you're in just over six figures
and you have a partner and a child, you're eligible for free
hospitalization.  You know what your employer is going to say to you
as soon as they figure this out?  We have a proposal for ya.  If you're
earning less than 100,000 and it's three people, we'll pay 100 percent
of your contribution to a health savings account because you'll have
free hospitalization.  And the cost of this program, which is currently
about a billion will just explode.  This is like a program for universal
free healthcare, at hospitals for those who are earning 27 percent or
more of the median income in your community.  In my community by
the way, you could earn double -- double the individual per capita,
double and get free hospitalization.  My friends, this is an
astronomically expensive proposal, should not be part of this budget
because you're going to be paying for it long after I leave.  Thank you.

                    ACTING SPEAKER AUBRY:  Ms. González-Rojas
on the bill.

                    MS. GONZÁLEZ-ROJAS:  Thank you, Mr. Speaker.
On the bill.  I came to this Chamber with a long career in public
health, so investments in our healthcare system is a top priority for

                                    134

me.  If the pandemic taught us anything, it taught us that the health of every single one of us is a matter of public safety, economic justice and the well-being of New York State as a whole.  Unfortunately the Governor seems dead set on balancing the State budget on the backs of older adults and disabled New Yorkers.  The proposal in this budget pushed by the Executive to move from 700 fiscal intermediary agencies to one in the Consumer Directed Personal Assistance Program is disastrous and I am deeply concerned for my constituents and the small business that assists patients in getting this vital care. We speak nearly 200 languages in my district alone and we have agencies that are reflective of the religious, cultural and linguistic needs of our communities.  For example, we have Bengali-speaking agencies that provide cultural competent care to my Bengali-speaking community.  This local hands-on cultural competent care will be deeply compromised. I'm glad we are ensuring that the 11 independent living centers will remain part of this program as subcontractors, but I still fear the responsiveness and the quality of care will be severely impacted for a vulnerable population.  Our Executive continue to insist that we needed to look for savings in our health budget.  Well, my coverage for all (inaudible) would have drawn down Federal dollars to allow undocumented New Yorkers to enroll in the New York State Essential Plan.  Not only would that have provided and promoted public health, it would have saved us nearly $500 million in State Medicaid dollars for emergency room care.  But there are really good things in this budget.  As a mom I am grateful that we have

included my legislation to provide continuous coverage for children birth to age six in the Medicaid and Child Health Plus program. The loss of coverage even for a short period of time disrupts care, increases family expenses, cost government and providers money, and ultimately leads to poor health outcomes for our babies. With this move in this budget, we are investing in the health of New York's children. And finally while it's not in this particular budget bill, I am incredibly grateful that we have included my bill, the Reproductive Freedom and Equity Fund in the enacted budget. As an reproductive justice advocate, I believe we have to do everything we can to ensure the right to an abortion. And while we have great protections here in New York, there are still many parts of our State that are abortion deserts and the demand for care is rising.

So I want to thank our Speaker, I want to thank our hard-working staff and team and everyone who has been a part of this budget fight and I plan to vote in the affirmative. Thank you.

ACTING SPEAKER AUBRY: On a motion by Ms. Weinstein, the Senate bill is before the House. The Senate bill is advanced. Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER AUBRY: A party vote has been requested.

Ms. Walsh.

MS. WALSH: Thank you, Mr. Speaker. The Republican Conference will be in the negative on this particular piece

NYS ASSEMBLY                                    APRIL 19, 2024

of legislation.  Although if there are members who wish to vote in the

affirmative, they may so do at their chairs.  Thank you.

ACTING SPEAKER AUBRY:  Thank you, ma'am.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, Mr.

Speaker.  The Majority Conference is in favor of this budget bill;

however, there may be a few that would desire to be an exception.

They should feel free to do so at their seats.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

The Clerk will record the vote.

(The Clerk recorded the vote.)

Mr. Steck to explain his vote.

MR. STECK:  Thank you, Mr. Speaker.  With respect

to alcoholism and substance abuse there is one new program in this

budget.  For the first time we are funding not-for-profit residential

facilities that provide care for cooccurring disorders, that is persons

who have both substance use and mental health issues.  Unfortunately

the funding is only 1.2 million when 5 million was recommended but

this is a start.  The opioid settlement advisory process and the opioid

stewardship fund have proven to be obstacles to legislative direction

of funding to this area.  The Governor, for example, cut over 11

million for job placement for persons in recovery.  We were only able

to restore 3 million.  This is a cut I do not understand.  The

Department of Labor has no experience with this population, it is

understaffed and it makes no sense to send persons in recovery to

another bureaucracy.  Persons in recovery need to get those services from the providers who are assisting them in their recovery.  We are hopeful that the Opioid Advisory Committee can reverse this mistake and change in policy.  Because of the new focus on cooccurring disorders, I will be voting in favor of this bill.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Steck in the affirmative.

Ms. Clark to explain her vote.

MS. CLARK:  Thank you, Mr. Speaker.  I -- I rise to explain my vote here on this bill.  You know, understanding as we all do that no budget bill is perfect, no budget bill does everything we want it to, but understanding we are doing some very important things here for our nursing homes who are really still struggling, our hospitals who are still struggling, the all important COLAs for those who are doing really God's work in so many different places as direct service professionals across our State.  But what I really want to discuss is what we all know and all have and I feel is a similar message with many of us are some concerns about these drastic changes to the CDPAP program.  The Consumer Directed Personal Assistance Program has risen in popularity.  It is because it has given people choices, and it has given them control over how they care for themselves and how often parents care for those adult children with disabilities or seniors and -- and older New Yorkers who need care in their home.  It also allows people to stay in their home.  That has -- that has led to the exploding popularity of it.  That comes with a cost

NYS ASSEMBLY                                    APRIL 19, 2024

and now we are here facing a difficult choice as to how we can reign in some of those costs to ensure that this program can work and continue to work for so many New Yorkers.  I, too, like many of my colleagues have concerns around -- around a quick move to one FI, but I do applaud that we have allowed independent living centers to continue their great work in our State and that we have also fought hard to ensure that at least the rate setting regions will also have subcontractors so that we can ensure that across our State and the regions, with all their very local specific issues, with all our groups that have different cultural or language issues, that those are addressed.  We will all be watching carefully as this unveils itself and we move through this next year and we are all going to ensure that those who rely on this program can continue to do so.  With that, I will still be a vote in the affirmative.  Thank you very much.

ACTING SPEAKER AUBRY:  Ms. Clark in the affirmative.

Mr. Jensen to explain his vote.

MR. JENSEN:  Thank you very much, Mr. Speaker. The -- the moral of this budget bill is yeah, but there are some okay things that are in it.  Certainly we want to help support our -- our nursing homes and our hospitals, but we're not giving them the resources they've asked for to fulfill their obligation to New Yorkers. We're endeavoring to go through our risky Medicaid matching project that may not be approved and would lead to even greater uncertainty for our Medicaid providers.  We're doing this all instead of actually

looking at our Medicaid program in trying to make it more effective and efficient.  But most troubling is the CDPAP reforms in this bill. Rather than try to make common sense reforms to this program that so many New Yorkers rely on, it was decided to make these changes in secret behind closed doors unfortunately without stakeholder engagement in the process.  We would have had mechanisms to go after the bad actors, that did not happen.  We would've found ways to save money without drastically moving to one FI, that has not happened.  We're not ensuring that New Yorkers who rely on this program once it goes to the new model will still have trusted aides that they rely on helping them through fiscal intermediaries that they trust. The concerns and the risk of doing damage to New Yorkers who are disabled and are elderly is much too high to go through a risky reform that we're presenting.  There was commonsense measures that we could've very easily worked together on.  We did not do that, and for that reason I'm voting no.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Paulin to explain her vote.

MS. PAULIN:  Thank you, Mr. Speaker.  This has been a very tough negotiated health budget, and while there are many things that we are leery of, we worry about, CDPAP, its implementation, there are some things that we've been able to achieve over what the Governor proposed and I just want to mention a few of those that we can be proud of here.  First, on one FI.  We've been able to save the independent living centers.  We know that all 11 are

NYS ASSEMBLY                                    APRIL 19, 2024

included here including the two that are separately incorporated in

Newburgh and in Utica.  They, too, are included in the -- in the

proposal that we have before us in this budget.  We have an increase

in early intervention.  First one in about 20 years and that's something

to be proud of.  It is our second year of increases for hospitals and in

particular nursing homes, which have been starved for the 12 years

prior.  We rejected $300 million which translates into $600 million in

unallocated cuts.  Again, we don't know what those cuts would have

been but they would have devastated our programs.  We've maintained

quality pools despite the Governor's attempt to remove them from the

budget.  And 0 to 6, something that I think has been on the radar of --

of us for maybe the entire time I've been a legislator.  So this has

positives, we should be proud of that and I withdraw and vote in the

positive.  Thank you.

            ACTING SPEAKER AUBRY:  Ms. Paulin in the

affirmative.

            Mr. Cunningham to explain his vote.

            MR. CUNNINGHAM:  Mr. Speaker, thank you so

much for the opportunity to explain my vote.  I rise to vote in the

affirmative on this particular piece of legislation.  Like many of my

colleagues have said, voting on any budget bill is not always perfect,

but what is perfect is the unity in this Body felt as it pertained to

Downstate Medical Center in my district which was slated based on a

proposal in January to close because of the $300 million in capital,

$100 million in aid, we're able to keep that fine institution open,

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

which is not just a health hospital but a medical school and a research center.  With that I am grateful to this Body, grateful to my community, grateful for so many folks who have reached out and with that I'll vote in the affirmative.  Thank you so much.

ACTING SPEAKER AUBRY:  Mr. Cunningham in the affirmative.

Mr. Palmesano.

MR. PALMESANO:  Yes, Mr. Speaker and my colleagues.  I rise to speak for those who cannot speak for themselves, those individuals with intellectual and developmental disabilities, our most vulnerable New Yorkers.  At the beginning of this budget process the Governor put a 1.5 percent COLA in.  All they asked for was a 3.2 percent COLA which all of us in this room knew was woefully inadequate.  They asked for a $4,000 supplement, which still was woefully inadequate.  So here we are with a 2.8 percent COLA and the direct support professional workers are only going to get 1.7 percent?  These direct support professionals are responsibile for providing the quality of care and enhancing the quality of life of our most vulnerable citizens, our most vulnerable New Yorkers, those with intellectual developmental disabilities.  This budget fails them.  But yet, again, I'll say it again, $2.4 billion for the migrants, $700 million for the Hollywood film tax credit to subsidize the Hollywood elites.  Where are our priorities?  This is just another example of misplaced priorities by this Governor and this Majority negotiating this budget, and my colleague addressed the CDPAP program as well

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

so I don't need to get into that, but to speak for those who can't speak

for themselves, those individuals with intellectual and developmental

disabilities, this budget fails them, we let them down once again.  We

can do better, we should do better.  Unfortunately this budget doesn't

do it.  I vote no.

ACTING SPEAKER AUBRY:  Mr. Palmesano in the

negative.

Mr. Maher.

MR. MAHER:  Thank you, Mr. Speaker.  Without

repeating a lot of what my colleagues had to say on both sides of the

aisle, I do want to just stress when it comes to mental health the

Governor did invest over $1 billion and several hundred million more

in this budget.  But the real foundation of mental health services are

its employees.  And I cannot echo enough just how important it is to

give certainty to that workforce, for those that want to retain their jobs

and not leave for other less skilled positions that are paying even more

and for those that are coming out of school and looking for a career to

go into to see the history of New York State and have so many years

in a row without a COLA increase without an ability to see a

consistent increase, why would you go into that field even if you have

that passion and love to help people?  So again, I think we need to

look at this in the future, tie it to the Consumer Price Index and really

get to work as soon as possible following the adoption of this budget.

For that reason and many more, I will be voting in the negative.

Thank you.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  Mr. Maher in the negative.

Mr. Colton to explain his vote.

MR. COLTON:  To explain my vote, thank you, Mr. Speaker.  Every budget involves compromises and I think this budget is exactly -- does exactly that.  There are good things that are in this budget.  There are things where we gave additional moneys to hospitals and nursing homes that desperately needed them.  This budget includes increases in salaries to workers in the hospitals.  I wish the increases had been more but they are in there.  There are assistance in mental health area that this budget includes increases.  However, the one thing that is of great concern to me is the CDPAPs.  These organizations, these groups provide tremendous services to those who are particularly in need.  And in the fact that they may have recruited more people, I don't think is a negative if more people in fact need it.  I think if there is anyone that was abusing it that should've been investigated.  So I understand that, you know, cuts need to be made to keep us under the Medicaid cap which I'm not so sure is that legitimate, but I also understand that we must provide services to people who need it.  We have a responsibility now to look very carefully how the new FI is going to be maintaining the services, the language and the cultural aspects of them that need to be done in order to be able to meet the needs of people who are frail, people who are need of help and need aides and assistants that can speak their language.  But as I said, this is a budget that involves compromises.

144

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Therefore, I think I am going to vote in the affirmative because I believe that there are many good things and we will have to be responsible to examine how this new FI operates and whether it serves the needs of the people who need that service. Thank you, Mr. Speaker. I withdraw my request and I vote in the affirmative.

ACTING SPEAKER AUBRY: Mr. Colton in the affirmative.

Ms. Bichotte Hermelyn.

MS. BICHOTTE HERMELYN: Thank you, Mr. Speaker, for allowing me to explain my vote. I want to say that I'm very thankful to see that there's consideration in investing more in Downstate Medical Hospital. Very often we don't understand the importance of healthcare, especially in communities that are vulnerable and communities that really don't have access to health equity. And so I'm happy that the Governor and the whole team is looking into investing more and keeping Downstate open. I do want to say that I also have a concern with having only one fiscal intermediary for our whole CDPAP program. I'm -- I understand that we have to compromise. You know, no budget is perfect, but I do look to hoping that the subcontractors that are selected are diverse, have cultural competencies and are a reflection of the community that's being served. I know this firsthand when I used to take care of my mother, I was her advocate to take care of her and the CDPAP program really worked well and so again, I hope it survives this new policy. Thank you, Mr. Speaker. I will be voting in the affirmative.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  Ms. Bichotte Hermelyn in the affirmative.

Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Mr. Speaker.  I rise as well to explain my vote.  As in any budget, lots and lots of tradeoffs but I think there is lots to be celebrated here or appreciated, if not celebrated, and I need to start with the nursing homes which have been such a big issue.  I have two of the largest hospitals in this region, St. Peter's and Albany Med and they have some of the longest emergency wait rooms in the entire State and they often say that's because they don't have nursing homes to be able to -- they don't have nursing home beds to be able to transfer patients.  So I think adjusting the Medicaid reimbursement rates will go a long way.  I thank so many of my colleagues who have spent so long working on this last year, as well as this year, and hoping that the safety net hospital transformation plan will also go a long way.  The direct service, the DSP, the wage that we have put in is not exactly at the 3.2 percent that we had hoped, but we think we've come very close with the -- the way it is measured out with the 1.7 and the 1.5 percent.  Obviously we need -- we know we need to do more, these are such valued, valued workers but at least we're moving in the right direction.  SUNY Downstate I know has been a very contentious issue.  The good news is we all have eyes on it, I'm glad there is funding and an advisory council so that we can have a serious plan on how to move forward. The CDPAP, the Consumer Directed Personal Assistance Program, I,

146

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

too, share the -- the cautionary option or cautionary optimism there.  I think that one just began to follow its own weight so we will all be watching this as we go forward to make sure that people and their families and their loved ones will continue to be served let's hope in a -- in a more effective way.  I also look forward to addressing a whole host of healthcare issues in legislation as we go forward including through Higher Education.  With that Mr. Speaker, I vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Fahy in the affirmative.

Ms. Shimsky to explain her vote.

MS. SHIMSKY:  Thank you, Mr. Speaker.  I share the concern of many of my colleagues about the restructuring of the CDPAP system and the salaries for DSPs.  We obviously need to continue looking at these situations and others presented by this budget very carefully and promptly to ensure that we don't have any adverse unintended consequences.  But this is a very tough budget year with the end of COVID aid and so much underfunding in so many areas in our healthcare system, many of which were chronic over the course of many years.  Actually, it's a near miracle that we've accomplished as much as we have in this budget.  And for that reason I'll be voting in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Shimsky in the affirmative.

Mr. Goodell to explain his vote.

147

MR. GOODELL:  Thank you, sir.  Yesterday, today, and hopefully not tomorrow but possibly tomorrow we'll be voting on the budget and what's interesting to me is that there are huge portions of the State budget that we don't vote on, at least not directly.  And so we have as an example, a State-approved, voter-approved debt, it's a very small fraction of our debt, and then we have agency debt that we authorize that's not carried on our books, that runs to hundreds of millions.  And likewise, New York City as an example has a constitutional debt cap.  A constitutional debt cap.  Yet, this Legislature authorized an agency to borrow on behalf of New York City and this budget increased their borrowing over the next two years from 13 billion to 24 billion off the books, not part of the City's debt authorized by us.  And what we're doing here today when we authorize free health, free hospitalization for everyone who makes up to four times the poverty level, which is what we do because we say hospitals cannot collect on it, is we force a massive tax increase that doesn't go through our budget.  So HCRA, which funds the bad debt and charity pool, HCRA raises 6 billion, billion, in tax revenue that we've authorized.  It's off our books, 6 billion.  That's like the fourth largest source of tax revenue in the State of New York is off our books, it's part of HCRA.  If you go to a hospital there's a 9 percent sales tax, a hospital charges another 1 percent.  You buy a health insurance plan, there's $1 billion surcharge on health insurance plans.  And by saying that hospitals must provide free hospitalization for everyone who makes up to four times the poverty level, we're driving

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

up those costs dramatically.  Thank you, sir.  I vote against this budget.

ACTING SPEAKER AUBRY:  Mr. Burdick to explain his vote.

MR. BURDICK:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  Like so many here I, too, share the concerns about the substantial changes in the CDPAP program and we need to be as a Body laser-focused on our oversight obligations in ensuring that this new plan actually rolls out in the way that it's being promised.  And part of that is to ensure that the request for proposal is really watched and taken a very hard look at to ensure that it does in fact incorporate all of the aspects that we're most concerned with; language, cultural aspects, how it's going to impact those that are being served.  I am pleased to hear that the RFP proposal is going to be rolled out through the Department of Health and we have to be sure that we continue to follow that through.  And I am pleased with the significant positive aspects of this proposal.  Increases in support of hospitals and nursing homes, long overdue and very much welcome.  And while the increases in COLA are much less than we would have wanted, at least we have embarked on that path and we need to build upon that going forward.

I thank the Speaker and the staff for doing a tremendous job in putting together this highly complex budget and I will be voting in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Burdick in the

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

affirmative.

Ms. Simon to explain her vote and close.

MS. SIMON:  Thank you, Mr. Speaker.  Just briefly, I think I'm echoing a lot of my colleagues about the concerns around what we're doing with the CDPAP program.  We do need to reign in cost, but we really should be giving thought to this and planning this out over I believe at least two years.  But we are in fact going to be making a lot of effort that will really make a difference to ensure that people are getting the culturally competent care that they need and to get the care that they need and that we will be paying the workers what it is that they are entitled to in terms of the cost of living increase.  I also want to express my gratitude that we are finding our way out of the issue with Downstate and we will -- are planning and have a plan a place -- in place a plan that will ensure that we have sustainability of the healthcare in Central Brooklyn which is a systemically-disadvantaged population and a hospital that provides some very important services to everyone in our borough, including the Level 4 NICU Center which is the only one we have.

So I will be voting in favor of this and I'm looking forward to moving on to the next bill.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Simon in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

This bill is passed.

150

Mr. Goodell.

MR. GOODELL:  Sir, I was just beginning to read this 1,400 page bill.  I'm on page 1.

(Laughter)

ACTING SPEAKER AUBRY:  I don't think we allow props, but I don't know if that stands at that.

MR. GOODELL:  Sir, would you call on Mr. Norris for a much more helpful announcement?

ACTING SPEAKER AUBRY:  Mr. Norris for the purposes of a announcement.

MR. NORRIS:  Thank you, Mr. Speaker.  There will be an immediate Republican Conference via Zoom.

ACTING SPEAKER AUBRY:  An immediate Republican Conference via Zoom.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, please call on Mr. Jacobson for the purposes of an announcement as well.

ACTING SPEAKER AUBRY:  Mr. Jacobson for the purposes of an announcement.

MR. JACOBSON:  I have a surprise for the Majority. We're going to have conference immediately following this Session as far as during the break and it will be in the Speaker's Conference Room.  First time this year in the Speaker's Conference Room.

ACTING SPEAKER AUBRY:  Conference in the Speaker's Conference Room.

151

**NYS ASSEMBLY**                                              **APRIL 19, 2024**

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, will you please put our House at ease?

ACTING SPEAKER AUBRY:  The House will stand at ease, Majority to the Speaker's Conference Room.

(Whereupon, at 5:02 p.m. the House stood at ease)

\*          \*          \*          \*          \*

MRS. PEOPLES-STOKES:  Mr. Speaker, will you please call the House back to order?

ACTING SPEAKER AUBRY:  The House will come back to order.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir. Members have on their desks a B-Calendar.  I would like to move now to advance that B-Calendar.

ACTING SPEAKER AUBRY:  On Mrs. Peoples-Stokes' motion the B-Calender is advanced.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank you, sir.  We're going to begin our evening process on this -- completing our budget process with Rules Report No. 37 on page 3 of that B-Calendar.

ACTING SPEAKER AUBRY:  Page 3, Rules Report No. 8803-D, the Clerk will read.

THE CLERK:  Assembly No. A08803-D, Rules Report No. 37, Budget Bill.  An act making appropriations for the

152

**NYS ASSEMBLY**                          **APRIL 19, 2024**

support of government Aid to Localities.

ACTING SPEAKER AUBRY:  Governor's message is at the desk, the Clerk will read.

THE CLERK:  I hereby certify to an immediate vote, Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Weinstein.

MS. WEINSTEIN:  Mr. Speaker, this is the Aid to Locality Budget.  It is for our State fiscal year '24-'25 and it includes an All-Funds appropriation, 215 -- 215.6 billion.  The enactment of this legislation is necessary for local assistance payments.  The bill authorizes disbursements of up to 87.5 billion from the General Fund and up to 215.6 billion, as I mentioned, on an All-Funds basis.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will Chair Weinstein yield?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. RA:  Thank you.  So let's start with some of the general picture of this budget.  The -- the members note that they have been passed out a financial plan.  So can we just go through again those numbers?  How much this budget spends on an All-Funds basis and how that compares to the closeout of the previous fiscal year and

**NYS ASSEMBLY**                                **APRIL 19, 2024**

the Governor's Executive proposal.

MS. WEINSTEIN:  Certainly.  So All-Funds 236.8 billion, which is an increase of 4 billion over the Executive's proposal and 1.9 billion or .8 percent over fiscal year '23-'24.  Would you like me to explain how we get to that number?

MR. RA:  Sure, that would be great.

MS. WEINSTEIN:  Okay.  So it's largely attributed to an additional 1.3 billion spending in Medicaid, 524 million commitment to School Aid, 300 million in Human Services, 219 million in Higher Education, 60 million in Public Protection and 80 million Aid to Localities.

MR. RA:  Okay, great.  And can you give me the numbers on what'll be this enacted budget on a State operating fund basis compared -- and that compared to last year as well as the Executive?

MS. WEINSTEIN:  So want me to do State funds and State operating?

MR. RA:  Please.

MS. WEINSTEIN:  Okay.  So State funds is 170 -- I'm sorry, 147.2 billion, which is an increase of 2.8 billion over the Executive, and 4 billion or 2 percent over fiscal year '23-'24.  On State -- for State funds, State operating funds it's 131.9 billion, which is an increase of 2.7 billion over the Executive's estimate and 3.4 billion or 2.7 percent over fiscal year '23-'24.

MR. RA:  Okay.  And just for the record, because I

NYS ASSEMBLY                                    APRIL 19, 2024

know we did talk about this in committee, but we do not know at this point in terms of out-year gaps?

   MS. WEINSTEIN:  Not -- not yet at this time.

   MR. RA:  Okay.  And I would note for -- for the record, the Governor's Executive had a cumulative deficit of about $20 billion so we will look forward to having that information to know where we stand going forward.

   MS. WEINSTEIN:  It -- it will be somewhat similar, but I don't think probably not the exact number.

   MR. RA:  Okay, thank you.  In terms of reserve funds.  Are any deposits being made into reserve funds in this enacted budget?

   MS. WEINSTEIN:  There is no -- no change in reserve funds but we are using 263 million to close out this year.

   MR. RA:  Using 263 million to close out this year?

   MS. WEINSTEIN:  Correct.

   MR. RA:  Is that what you said?  Okay.  And can you tell me how much we have in our principal reserve funds at this point?

   MS. WEINSTEIN:  So it's -- it's unchanged from the Executive budget --

   MR. RA:  Okay.  And --

   MS. WEINSTEIN:  The total -- I'm sorry, the total would be about 28 million.  Though some of that is restricted.

   MR. RA:  Yes, and do you have that -- what's in the rainy day, what's in the tax stabilization and what's in economic

uncertainties?

(Pause)

MS. WEINSTEIN:  So the Tax Stabilization Reserve fund is 1. -- 1,018,000,000.  The statutory rainy reserve fund is 4,638,000,000.

MR. RA:  And economic uncertainties?

MS. WEINSTEIN:  An economic uncertainty is 13,000,000,782 and the other large one is reserved for the timing of PIT credits is 14 billion.

MR. RA:  Thank you.  You mentioned the reserve funds that we use to close out this budget.  Are there any reserve funds that are being used for additional spending in this enacted budget for fiscal year 2025?

MS. WEINSTEIN:  No, there are not.

MR. RA:  Okay.  And then lastly, the $500 million from the economic uncertainty fund that was to be transferred in fiscal year 2026 for migrant cost.  Is that in this enacted budget?

MS. WEINSTEIN:  That proposal is unchanged from the Executive.

MR. RA:  Okay.  Thank you.

MS. WEINSTEIN:  That is -- you know, that is for fiscal year '26 --

MR. RA:  Yes.

MS. WEINSTEIN: -- not as you mentioned, yes.

MR. RA:  And that's reflected in the total migrant

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

spending numbers in this bill.

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  All right.  So moving to this Aid to Localities budget bill itself.  How much does this bill appropriate in total?

MS. WEINSTEIN:  So the total is 215,574,014,000.

MR. RA:  Okay.  And then what is the fiscal impact of the bill?

MS. WEINSTEIN:  I'm -- I'm not sure what -- what you're looking for.

MR. RA:  Well, the -- the actual amount to be spent. I know there's April -- the cash.

MS. WEINSTEIN:  A hundred and eighty-six million, five hundred and one thousand.

MR. RA:  Okay, thank you.  Going through a couple of the pieces of this bill.  I want to start with, there's a $50 million appropriation of new funding to ensure that low and moderate income customers including on Long Island will fully electrify their homes through NYSERDA do not spend more than 6 percent of their income on electric bills.  So how is -- how is this going to work in order to ensure that, you know, the individual doesn't spend more than that percentage, but to make sure it doesn't end up being spread to all the other ratepayers in -- in that (inaudible)?

MS. WEINSTEIN:  Well, as you mentioned there's an appropriation so it gets funded through the appropriation and not

157

**NYS ASSEMBLY**                                **APRIL 19, 2024**

through -- not by ratepayers.

MR. RA:  Okay.  But if -- if the amount of people who could be impacted in excess of that number, are the -- are the utilities still unable to charge them more than that percentage?

(Pause)

MS. WEINSTEIN:  So -- so the homeowner would first have to gotten a capital grant to electrify their home and then this is the -- sort of the ongoing charges we feel that that amount is more than sufficient to cover anybody who would apply.

MR. RA:  Thank you.  Education.  Obviously something that we've all talked a lot about this year.  I -- I think we're all glad and I'm sure school districts throughout the State are relieved that we have rejected the Governor's original proposal with regard to Foundation Aid.  And moving forward, you know, with trying to come up with what the formula is going to look like into the future.  So starting there, we -- what is the total amount of restoration in Foundation Aid in this bill?

(Pause)

MS. WEINSTEIN:  So we -- so the school year funding would total 35.9 billion, which is an increase of 578.7 billion over the Executive and 1.3 billion over school year '23-'24.  So this reinstatement of -- we also reinstate the hold harmless provision preventing the loss of 164 million in aid to 337 districts.  We have an inflation factor of 2.8 percent which is .4 percent increase over the Executive's proposed inflation factor.  We deal with the data change,

NYS ASSEMBLY                                    APRIL 19, 2024

which is 179 million and an increase of the .91 maximum State

sharing ratio, which is 44 million over '23-'24.

MR. RA:  All right.  And am I correct in another

budget bill we'll see the funding for the study that has been talked

about to update the formula going forward?

MS. WEINSTEIN:  Yes, that'll be in State operations.

MR. RA:  Okay.  So I think that's -- that's a good start

in terms of the fact that we talked about this with enrollment but we've

talked about so many other factors that come into play so, you know, I

look forward to that happening and -- and really looking at what a --

what a formula should like in 2025 and beyond.

As we move into future years, is there anything else

we're doing to mitigate the potential of another proposal like we had

this year that would -- would see cuts to districts?

MS. WEINSTEIN:  Well, that is the -- the purpose, I

mean we can -- I don't know if it'll actually be in I guess the ELFA

bill, but there is a study that will be conducted to look at the

Foundation Aid formula and that would be with the requirement that it

come back by April 1 of 2025, maybe, or be -- before next year's --

December 1st so that by April 1st -- so by the time the budget is due

we'll have that Foundation Aid study back.

MR. RA:  Okay.  With regard to Special Education

program funding.  Each year we have a series of line items for a

number of the 4201 schools, which assists them with some of the

medical care and things that they provide to students.  Those are all in

NYS ASSEMBLY                                    APRIL 19, 2024

the budget bill as they have been in the past?

MS. WEINSTEIN:  Yes.

MR. RA:  And they're the same totals as last year?

MS. WEINSTEIN:  There's a -- there's an increase for the 4201 schools of 1.5 million.

MR. RA:  Yes.  And that's -- in terms of the General Funding to the -- to the 4201 schools, I was talking about those particular line items --

MS. WEINSTEIN:  Yes.

MR. RA: -- I don't know if they all get them but a number of them get them.

MS. WEINSTEIN:  Right.  The line -- individual line items have been restored.

MR. RA:  Okay.  And then, so there's an increase of 1.5 million overall for 4201 schools.

MS. WEINSTEIN:  Correct.

MR. RA:  Is there any direct funding for teacher salary at 4201 schools?  They've had, you know, a lot of issues retaining staff and that's one of the things that they have been asking for is some assistance in teacher retention.

MS. WEINSTEIN:  Nothing -- nothing specific but it's hoped that that 1.5 million increase will -- can assist in teacher retention and hiring.

MR. RA:  Okay, thank you.  In terms of the free school meals program.  There's an increase over last year?

NYS ASSEMBLY                                                         APRIL 19, 2024

MS. WEINSTEIN:  The -- the program remains the -- the same.  There's just an increase because of increased costs.

MR. RA:  Okay.  So do we -- so do we believe then additional schools might not be able to be included if this is just keeping up with the costs?

MS. WEINSTEIN:  Any -- any schools that would qualify under the formula would be added into this system.

MR. RA:  Okay, thank you.  Do we -- do we have a sense as now we've gotten through a year of funding that how many districts are -- are not able to provide the school meals with the current appropriation amount?

MS. WEINSTEIN:  I -- I believe that any -- anyone that any school district that's eligible and applied has been able to be funded.  It provides free meals to 2.35 million students in 4,200 buildings.

MR. RA:  Okay.  And with regard to non-public school funding.  This budget provides significant investments to students who attend non-public schools.  How will the additional funding be provided to non-public schools?

MS. WEINSTEIN:  As you said there -- there is significant increases.  There's a 1.9 million increase over the Executive for non-public school aid, which is a 24.9 million increase over fiscal year '23-'24 for a total of 241.1 million.  There's a total of 75.5 million for non-public STEM, which is a 2.5 million increase.  There is a $5 million appropriation for non-public arts and music, $1

161

million for the State school immunization program, 500,000 for academic intervention services for non-public schools for a total of 1.4 million.  In addition, the budget provides 25 additional million for non-public school health and safety projects, which brings that program to a total of 4 million and there's increased funding for after 4 p.m. school transportation.

MR. RA:  Okay.  And how-- how is that funding awarded?  Is it an application process?  How is it awarded to non-public schools?

MS. WEINSTEIN:  Most -- it -- it may depend on the program, the STEM programs are I know and the arts program are application as is the health and -- the non-public school health and safety projects.  The -- the non -- the first numbers I gave, the 241.1 million relates to the cost of -- of the school, of those schools, not application.  It covers those mandated costs that we are imposed on the schools.

MR. RA:  Thank you.  In terms of prior year aid claims, is there anything done in this bill with regard to that issue?  Many districts have, you know, been in the que for this for over a decade hoping to have those costs covered.

MS. WEINSTEIN:  Unfortunately there is not funding for that.

MR. RA:  Okay, thank you.  With regard to Higher Education.  What -- what does this do with regard to base aid support for community colleges?

162

MS. WEINSTEIN:  So for the community colleges, which are the -- for the CUNY and SUNY colleges, provides 13.3 million for a community college aid above the 100 percent funding floor so that it comes out to the 8 million for SUNY for the academic year, 6 million for the fiscal year, CUNY it's 5.3 million for the academic year, 4 million for the fiscal year.

MR. RA:  Okay.  And is there anything with regard to our community colleges?  As we may know you have local sources, State sources of -- of support.  Is there anything that encourages local sponsors to increase their support for -- for community colleges?

MS. WEINSTEIN:  Nothing -- nothing in -- in this bill.

MR. RA:  Okay, thank you.  With regard to Health. You know, we talked earlier about our Medicaid spending.  Do we know the breakout of Federal, State and local sources of Medicaid?

(Pause)

MS. WEINSTEIN:  I know that it increases.  Do you want the actual numbers?

MR. RA:  If you have them.

MS. WEINSTEIN:  Hold on one moment.

MR. RA:  Sure.  And -- and if you want to answer while you're -- while you're waiting --

MS. WEINSTEIN:  Sure.

MR. RA:  The other question I have is we're using a one-year Medicaid appropriation as opposed to a two-year.  Is there a

NYS ASSEMBLY                                    APRIL 19, 2024

specific reason for that approach?

        MS. WEINSTEIN:  I -- I think there was just a

decision that it would be less confusing and more transparent to just

do a one-year.

        MR. RA:  If you'd like, you can do that offline --

        MS. WEINSTEIN:  Sure.

        MR. RA: -- rather than lose all the time.  Lastly with

regard to Health.  Is there any funding for health homes in this budget

bill?

        MS. WEINSTEIN:  There's no change to that

program.

        MR. RA:  Okay, thank you.  With regard to the

migrant spending.

        MS. WEINSTEIN:  Yes.

        MR. RA:  So we have 1.9 billion that was spent in the

current fiscal year.  We -- we have a total of 2.5 billion in this budget?

        MS. WEINSTEIN:  Two point four billion.

        MR. RA:  I'm sorry.  So do we expect that to be the

number or do we expect it to go up, because last year we appropriated,

as you know, a billion and we ended up -- up -- upwards of 1.9 billion

once it was all said and done.  So do we think that something similar

might happen this year or do we think that is going to be sufficient to

cover the cost for -- for this coming fiscal year?

        MS. WEINSTEIN:  Well, we don't expect it to be a

higher number this year.  We think it was the unique situation of the

opening of the HRCs, which had State money that generated the need for additional State money.

MR. RA:  Okay.  We know that there's the $500 million from reserves for fiscal year 2026.  Do we have a sense of how long we believe the State will be covering these costs for New York City in terms of going into our future budget years?

MS. WEINSTEIN:  Well, you know, as of now only half of last year's 1 billion has been claimed.  So we're hoping that the situation will stabilize in the near future.

MR. RA:  Okay.  And can you just -- I mean in general, detail the type of services that this budget is reimbursing New York City for with relation to the migrants?

MS. WEINSTEIN:  For -- for the City it's -- it's really just the -- the shelter costs.

MR. RA:  Okay.  And are -- are any other municipalities that are sheltering migrants receiving reimbursements?

(Pause)

MS. WEINSTEIN:  So other -- other localities in the State aren't required to provide shelter so they're not having their reimbursement.  If it was such a requirement, I assume we would provide the reimbursement.

MR. RA:  Okay.  With regard to this funding more generally, are there any changes being made with regard to oversight, approval of contracts?  We've seen obviously a -- a number of instances where -- where there's been concerns with -- with certain

NYS ASSEMBLY                                APRIL 19, 2024

contractors that the City has contracted with.  Has there been any --
any change with regard to that?  Any additional oversight by the
Comptroller?  Any additional accountability measures to make sure
these funds are being properly spent?

MS. WEINSTEIN:  Not on -- that I'm aware of by the
Comptroller, not on our level.  These are reimbursements to New
York City.  So it is very possible the New York City comptrollers
looking at some of these costs.

MR. RA:  Okay.  And you said that about half of the
-- of the bill was still available.  So do you have that actual number in
terms of what New York City has been reimbursed as of -- as of today
for those costs over the last year?

MS. WEINSTEIN:  They've been reimbursed the 500
million that I -- I mentioned. I would just add that it is a
reimbursement system.  It's not (inaudible).  The claims are -- are
vetted, too, before the money goes out.

MR. RA:  Okay, thank you.  Totally different topic
quickly, the Unemployment Insurance Trust Fund.

MS. WEINSTEIN:  Yes.

MR. RA:  There's nothing in this budget to deal with
the Unemployment Insurance Trust Fund debt; is that correct?

MS. WEINSTEIN:  That's correct.

MR. RA:  And do you -- do you have the numbers as
to how much the debt sits at today?

MS. WEINSTEIN:  Seven -- seven-and-a-half billion.

MR. RA:  Okay.  And I know last year we -- we talked about how long we thought that might take to repay.  Do we have any sense as to what that time frame looks like?

MS. WEINSTEIN:  We -- we think around 2028, though obviously if we got some forgiveness from the Federal Government, it would clear up much sooner.

MR. RA:  Okay.  Do we have any reason for hope that -- I mean it's been three years of the -- and it hasn't been forgiven, do we have any particular sense that they may be considering doing that?

MS. WEINSTEIN:  We'll know better on November 6th.

(Laughter)

MR. RA:  Hope springs eternal.  Thank -- thank you. Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RA:  Yeah, we don't want to go too far down there.  I mean I don't -- I don't know.  We'll -- we'll leave that aside for now.  You know, I'm still in too good of a mood because of listening to a lot of Taylor Swift today so... Just quickly with regard to this bill in the short time I have.  Like I mentioned, a lot of good, right? Restoration to school aid are important, it's something that had broad bipartisan support.  I do want to again mention our Special Education school programs.  And fortunately yes, we're increasing support for them which is great, but I'd like to see them get the same type of

167

NYS ASSEMBLY                                    APRIL 19, 2024

support as our public school system in general gets.  These are -- these are in particular 4201 schools, they're schools for -- for individuals with low incidence disabilities.  If you've never visited one and you have one near your region, go visit it.  They're amazing, amazing places.  So I think we need to continue to look at how we can better support them.  And -- and one of those pieces is teacher retention so that they can retain staff, those dedicated individuals that want to work with those populations.  But then, you know, we look at some of the other things in this bill, we're looking at $2.4 billion going out the door with regard to migrants in New York City.  I do think we should have included some more accountability measures.  Given what we've seen over the last year with regard to this, my colleagues on my side of the aisle have -- have put forth a number of proposals with relation to that.  As we've seen in any number of instances, emergency contracting gets to be tricky because, yeah, sometimes you need those services yesterday, but it -- it does become a -- a pretty good excuse to not have that accountability and transparency when we're spending money.  And when we're talking about over $2 billion, I think we want to -- we want to be a little bit more careful and make sure those -- those dollars are being spent responsibly.

So I thank -- I thank my colleague, the Chairwoman for answering my questions.  And we will stay tuned for the last few bills.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Slater.

NYS ASSEMBLY                                APRIL 19, 2024

MR. SLATER:  Thank you, Mr. Speaker.  Will the Chair yield for some questions?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields, sir.

MR. SLATER:  Thank you, Madam Chairman.  I appreciate your efforts here tonight, I hope you enjoyed a little bit of dinner.

MS. WEINSTEIN:  Certainly.

MR. SLATER:  I had just a few questions starting with HPNAP.  Can you tell me what HPNAP is used for?

MS. WEINSTEIN:  Basically food banks and pantries.

MR. SLATER:  And can you tell me what this proposal does in regards to HPNAP?

MS. WEINSTEIN:  It adds 23.25 million on top of the base.

MR. SLATER:  I'm sorry.  You said it adds 23 --

MS. WEINSTEIN:  Yes.

MR. SLATER.  -- point 2?

MS. WEINSTEIN:  Yes, 23.25.

MR. SLATER:  Very good, very good.  Thank you, I appreciate that.  I want to pivot then if we can to a topic my colleague was talking about, which is the migrant funding for New York City.

169

NYS ASSEMBLY                              APRIL 19, 2024

So there was -- I just want to make sure I understand because there were some numbers being tossed about.  Can you tell me, again, how much to date have we spent as a State on the ongoing migrant crisis?

        (Pause)

        MS. WEINSTEIN:  I mean there -- there have been some various -- various expenditures.  For example, the National Guard in a -- in a couple of incidents but primarily it's been the shelter reimbursement that I discussed with Mr. -- Mr. Ra.

        MR. SLATER:  But do we have a firm number today how much money the State has had to spend to deal with this crisis, because I've seen a number from New York City, I've seen a number from the State Comptroller, I've seen a number from the Governor.  Do we know the legitimate number that taxpayers have been asked to spend here?

        MS. WEINSTEIN:  I would say 1.295 billion.

        MR. SLATER:  1.29, thank you, I appreciate that.  Now the Executive in her financial plan put out that the State intends to spend 4.3 billion through the 2025-'26 fiscal year.  Do you agree with that number?

        MS. WEINSTEIN:  Yes.

        MR. SLATER:  Great.  Now --

        MS. WEINSTEIN:  Let me just say, that's how much it's being budgeted for.  It may not all get spent.

        MR. SLATER:  Understood.  Now according to the Comptroller, monthly spending by OTDA has doubled in the first

NYS ASSEMBLY                                    APRIL 19, 2024

three months of this year compared with July through December of last year. Can you tell me when that increase was approved and is that reflective of doubling the number of migrants who have been brought to New York in that time frame?

MS. WEINSTEIN: I -- unfortunately I can't give you that -- that correlation because OTDA provides funding for a lot of different purposes. You know, it's public assistance primarily so, you know, it's -- that number can't be broken down, or at least I don't have the data to break it down to --

MR. SLATER: Are they required to provide that to us? I'm looking at the Comptroller's website right now, $253 million in October, November, December and then beginning in January that number goes to 506 million.

MS. WEINSTEIN: We just get those -- those numbers. They're not (inaudible) aggregated.

MR. SLATER: And we again, just to make sure I'm clear, we can't predict, there's no indicator that the increase in expenditures related to the increase in number of individuals who have been brought to New York State as migrants.

MS. WEINSTEIN: I -- I can't, you know, give you figures that we don't --

MR. SLATER: Understood.

MS. WEINSTEIN: -- don't have.

MR. SLATER: I understand. Do we -- do we at least know how many migrants we're currently providing services to?

171

NYS ASSEMBLY                                            APRIL 19, 2024

MS. WEINSTEIN:  Well, it's the City that's providing the services to the migrants.  I don't have the -- those figures in front of me.

MR. SLATER:  I understand.  But we're reimbursing the City for those services, correct?

MS. WEINSTEIN:  For shelters.  Primarily for shelter services.

MR. SLATER:  So if we're reimbursing them for the shelter services, do we know how many migrants we are paying the City to shelter?

MS. WEINSTEIN:  So the reimbursement is -- is based on the shelter.  It is -- doesn't delineate how many people are in that shelter.  It's not a per person reimbursement.  It's for the shelter itself.

MR. SLATER:  But we really -- you're telling me you really have no idea how many migrants we're helping right now.

MS. WEINSTEIN:  I don't have -- have that information in front of me.  I know the number changes and I know on, I believe, a weekly basis the City puts out the numbers of how many asylum seekers have come into the City, how many have come into the system, how many left the system, so it's a fluctuating number.

MR. SLATER:  Okay, thank you.  So it's my understanding that the Governor has issued multiple Executive Orders related to this crisis.  Can you tell me when the last Executive Order

172

**NYS ASSEMBLY**                    **APRIL 19, 2024**

was issued?

MS. WEINSTEIN:  I don't have that information since it's not part of the budget.  You know, maybe you have it, you know, Mr. Slater, but --

MR. SLATER:  Earlier this month.  But one of the things I'm wondering about, since the Comptroller is projecting those expenditures in 2026 and there's this proposal before us that increases funding, do we anticipate these emergency declarations to continue? Is there a need?  Seems like we're doing a good job planning.  We're allocating dollars, it seems like you have -- it seems like you have an idea as to what the dollars are going for.  I'm just trying to ascertain why the Governor feels the need to make sure that she issues another declaration of emergency dealing with this issue.

MS. WEINSTEIN:  You know, because of the inaction in -- in Congress, even though there had been a proposal that I believe passed the Senate and was killed in the -- in the House, we still have an ongoing situation.  So obviously, changes out of -- if that -- if there was to be action in Washington, that could help relieve some of the issues so it's really hard to -- to be able to plan with -- without knowing what's happening.

MR. SLATER:  Understood.  Let me ask -- let me ask if you could, I'm not sure if you know, but are there any protocols in place related to receiving, and again I understand what you're saying that it's New York City, it's a (inaudible) New York City, we reimburse New York City, but for those who are benefitting from

173

NYS ASSEMBLY                                    APRIL 19, 2024

State tax dollars, are there any protocols in place for the people who are receiving those services?  Do we perform background checks?  Do we do any verification?  Do we communicate with our Federal partners?  Any of those protocols in place?

MS. WEINSTEIN:  The -- I believe that the overwhelming majority of -- of people are in fact asylum seekers, which means they have filed paperwork to be able to enter the -- the country before they come to New York.

MR. SLATER:  Right.  I --

MS. WEINSTEIN:  So New York is not doing that -- is not doing that but that -- those kind of checks have -- or some of that information has already taken place before they come to New York State.

MR. SLATER:  I understand that.  Unfortunately, according to the Biden Administration, 80 percent of asylum seekers are actually being rejected once they get a court date, but we don't have to go into that here.  Do we -- and I asked this before but just to make sure I'm clear.  So once we have an asylum seeker in one of these State-funded shelters, do we notify Federal authorities of that individual?

MS. WEINSTEIN:  I -- I don't believe so.

MR. SLATER:  Okay.  And do we -- as a State, do we participate in any of the Federal programs like SAVE, which is administered by the US Citizenship and Immigration Service Agency?

MS. WEINSTEIN:  Not that I'm aware of.

174

NYS ASSEMBLY                                    APRIL 19, 2024

MR. SLATER:  Understood.  And like I was -- we -- we just touched on this.  There's a rejection rate of 80 percent according to the Biden Administration, and these court dates that we've seen years away, some almost ten.

MS. WEINSTEIN:  You know --

MR. SLATER:  But my question, Madam Chair --

MS. WEINSTEIN:  Sure.

MR. SLATER:  Do we provide any type of assistance to make sure that those asylum seekers who are benefitting from State tax dollars, are we ensuring that they're complying with those court dates once they arrive?

MS. WEINSTEIN:  I don't have that information, you know, but again, to complain about the delay in hearings while at the same time colleagues are in Washington preventing increased hearing officers is, you know I think is a little disingenuous.  I'll just leave it at that.

MR. SLATER:  I hear what you're saying and I appreciate it.  I appreciate you answering my questions, as always.  I know it's a long day and I know it's a tough subject, but thank you very much.

Mr. Speaker, on the bill with my remaining time if I -- if I may.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. SLATER:  Thank you very much.  You know, this is a -- a tough topic, I understand that, and I think everyone

175

recognizes that the Federal Government immigration system is broken but it doesn't mean that we need to sit here sitting on our hands doing nothing. Now we're giving a lot of money to New York City, a lot of money to provide services to people who are here either as asylum seekers, illegally, migrants, whatever phrase you want to use, but according to the Biden Administration again, their statistics, not mine, 80 percent are rejected. And when you're looking at how much money we're spending on this particular issue, billions of dollars, billions of State taxpayer money, I just wonder what the message that we're sending is, because we already have the highest tax burden in the country. We already have the worst economic outlook in the country. But really what we're doing, and I know my colleagues on the other side won't agree with this, but what we're doing is we're incentivizing illegal immigration, and it's problematic and it's very, very unfair I believe to hard-working taxpayers, some of which are working two or three jobs just to stay in New York, to raise their families. And if you look at how we're spending money just in this budget alone, our investment in childcare that's in this very bill is less than what we're spending on the migrant crisis. The amount that we actually allocated in CHIPS is four times less than what we're spending on the migrant crisis. We're spending more on the migrant crisis in this budget than we are in mental health investments and spending more on migrants than the increased funding for public schools. For these reasons, I simply cannot support and I will not support this bill. We are sending the wrong message to New Yorkers.

NYS ASSEMBLY                                    APRIL 19, 2024

They are -- they are overworked trying to survive here, trying to deal with the crushing tax burden and I think we should be taking care of them first and foremost.  So Mr. Speaker, I will be in the negative. Thank you.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would you mind calling on Mr. Norris for a moment?

ACTING SPEAKER AUBRY:  Not at all.

Mr. Norris.

MR. NORRIS:  Thank you, Mr. Speaker.  There will be an immediate members-only Republican Conference in the Parlor.

ACTING SPEAKER AUBRY:  Republican Conference in the Parlor.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, there will also be an immediate Democratic Conference in the Speaker's Conference Room and if you would put our House at ease, please.

ACTING SPEAKER AUBRY:  Democratic Conference Speaker's Conference Room and in the meantime the House will stand at ease.

(Whereupon, at 8:02 p.m. the House stood at ease)


*          *          *          *          *

MRS. PEOPLES-STOKES:  Mr. Speaker, if you

177

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

could please call the House back to order so that we may resume our debate.

ACTING SPEAKER AUBRY:  The House will come back to order.

Mr. Durso.

MR. DURSO:  Thank you, Mr. Speaker.  Will the sponsor yield for some questions?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields, sir.

MR. DURSO:  Thank you, Ms. Weinstein.  I appreciate it.  So I just have a couple quick questions starting with the $5.3 million for the Buffalo Bills.  In the Capital Budget there was $2.3 million in for the Buffalo Bills.  This one says Retention.  Could you explain that, the differences between the moneys and what they're for?

(Pause)

MS. WEINSTEIN:  It's -- it's nothing new.  It's an annual appropriation.

MR. DURSO:  I'm sorry, ma'am?

MS. WEINSTEIN:  It's -- it's not -- it's an annual appropriation.  It's not new this year.

MR. DURSO:  Okay.  So but -- so it's not due this year, the $5.3 million?

NYS ASSEMBLY                                      APRIL 19, 2024

MS. WEINSTEIN:  Well, there is new -- there is 5 -- there's 2.3 --

MR. DURSO:  Well, there's 2.3 in the Capital Budget and there's $5.3 million in this portion of the budget.

MS. WEINSTEIN:  This is for contractual obligations that are ongoing.

MR. DURSO:  Okay.  Well, from my reading it says retention, is that to keep -- so it's $5.3 million to help keep the Buffalo Bills in New York State?

MS. WEINSTEIN:  Yes.

MR. DURSO:  Okay, thank you.  In regards to Foundation Aid, so we'll jump to that part.

MS. WEINSTEIN:  Okay.

MR. DURSO:  It says there's $35.3 billion in Foundation Aid, which I think is roughly $1.3 billion more than last year; is that correct?

MS. WEINSTEIN:  That -- that's the school aid in -- in general, not just --

MR. DURSO:  School aid, I'm sorry.  Excuse me, ma'am.

MS. WEINSTEIN:  Yes.

MR. DURSO:  Okay.  Does the $1.3 billion keep up with the rate of inflation?

MS. WEINSTEIN:  Um...

MR. DURSO:  You're saying it's $1.3 billion more

179

NYS ASSEMBLY                                    APRIL 19, 2024

for our school aid.  Is that equal to the rate of inflation as of right now?

        MS. WEINSTEIN:  It's -- I don't know that it's equal to the rate of inflation but it is equal to what the rate we have it is generating.

        MR. DURSO:  What?  I'm sorry.  Can you say that again?  Equal to the rate that...

        MS. WEINSTEIN:  We have the inflation rate at 2.8 percent for the upcoming school year.

        MR. DURSO:  So you have it at 2.8 percent but this past year it was roughly at 3.5 or currently at 3.5?  That's my understanding.  So we're hoping that the rate of inflation goes down.

        MS. WEINSTEIN:  Well, we did have a much bigger increase last year so this is the number we have for this year.

        MR. DURSO:  Okay.  So if it -- if for some reason it doesn't go down to the 2.8, the amount of money that the schools are getting for some if anything would be flat, correct, in regards to what that they got last year?  Not an increase but at least flat.

        MS. WEINSTEIN:  Yes.  I mean -- you know, those are the districts the Governor had originally proposed cutting so the will be -- we included that -- the restoration of the hold harmless provision so that we'll keep them -- may keep some of them flat.

        MR. DURSO:  Okay.  And the hold harmless provision is staying within the budget and with the -- within the education portion of the budget this year, correct?

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  Yes, for this year and I think I -- I'm not sure who I spoke with, had the conversation with, possibly Mr. Ra that the -- we have a study that -- to look at the Foundation Aid that will be in SED. We hope for them to get back by the end of the -- the year with that information.  That would help guide going forward with the Foundation Aid formula.

MR. DURSO:  So when you say by the end of the year just so it's -- it's clarified, we're talking about this year, correct?

MS. WEINSTEIN:  Yes.

MR. DURSO:  So that way for next budget season we'll have --

MS. WEINSTEIN:  Correct.

MR. DURSO: --  a better idea of what the --

MS. WEINSTEIN:  By December 1st of 2024.

MR. DURSO:  Okay, great.  Thank you.  In regards to the BOCES vocational aid and reimbursable aid that was in the Governor's budget that was going to raise the reimbursable amount from 30 to 40 to 50 to 60 over three years.  That's no longer in this portion of the budget?

MS. WEINSTEIN:  That was our one-House proposal.

MR. DURSO:  I'm sorry.  In the one-House --

MS. WEINSTEIN:  Yes.

MR. DURSO: -- excuse me, I apologize.

MS. WEINSTEIN:  Right.

181

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. DURSO:  That was -- that was in the Assembly one-House?

MS. WEINSTEIN:  One-House, correct, you're correct that it's not in this budget.

MR. DURSO:  So the -- so currently they're only going to be reimbursed 30,000 for vocational teachers and BOCES, correct?

MS. WEINSTEIN:  Yes.

MR. DURSO:  Okay, thank you.  Talking about the expanded free school meals.

MS. WEINSTEIN:  Yes.

MR. DURSO:  Currently, do you know what it's funded at, the total amount?  I understand it's going up this year, correct?  I think 11 -- $11 million?

MS. WEINSTEIN:  You're correct that it's a $11 million increase and that would make a total subsidy of 145.6 million, which reflects that, the additional usage.  I think I mentioned to -- I mentioned earlier before we broke that that provides free meals to 2.35 million students in 4,200 buildings.

MR. DURSO:  But it's not -- it's -- it's not a universal free school meal program as it sits right now, correct?  Because I think we had talked about it last year, it was going to be roughly $280 million and we're only at 145 million, correct, if I remember correctly, just roughly.

MS. WEINSTEIN:  Right.  The Federal requirement

182

went down from 40 percent to 25 percent of eligibility in the school district in order to qualify.  That's why there's been an increase over the past year for the additional free meals.

MR. DURSO:  Okay.  So the money that went into the expanded free school meals for this year, is that just going into the complete fund or is that specific for certain areas?

MS. WEINSTEIN:  It's for the fund with the anticipated additional usage of the free meals.

MR. DURSO:  Okay, thank you.  And then my last question would be obviously, you know, it's something that we've all been talking about, the migrant funding for New York City which is $2.3 billion, correct, in this year's budget?

MS. WEINSTEIN:  Approximately, yes.

MR. DURSO:  Approximately, okay.  And that brought it to - and I know we answered this question already - over $4 billion, correct?

MS. WEINSTEIN:  The cumulative total?

MR. DURSO:  Yes, ma'am.

MS. WEINSTEIN:  Yes, through the next estimated through fiscal year 2026 to be over $4 billion.

MR. DURSO:  Okay.  And do we have a total idea of what this year's budget is going to be total price-wise?

MS. WEINSTEIN:  The -- the biggest -- the largest estimate sort of outside number would be 2.2 billion.

MR. DURSO:  Two point two...

NYS ASSEMBLY                                          APRIL 19, 2024

MS. WEINSTEIN:  That would be the cash spending, yes.

MR. DURSO:  I'm sorry, ma'am?

MS. WEINSTEIN:  That would -- anticipate that would be the cash spending.

MR. DURSO:  No, so the total budget.  The total budget for New York State for this coming year.  Do we have -- do we have an idea of what the total number would be at?  I know there's estimates of roughly, it's gone up about $8 billion since last year.  Is that about right?

MS. WEINSTEIN:  Of the -- the State budget?

MR. DURSO:  The State budget, yes, I'm sorry.  I apologize.

(Pause)

MS. WEINSTEIN:  It's 1.9 billion over last year.

MR. DURSO:  It's 1.9 billion over last year?

MS. WEINSTEIN:  Correct.

MR. DURSO:  Okay.  Thank you, Ms. Weinstein.  I appreciate you answering the questions.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. DURSO:  So Mr. Speaker, once again, we're in a year where the budget's going up and New York State's going to be spending much more money.  And in my opinion, we're missing the marker on a couple things here.  One, is I asked the Chair about,

184

again, and we're just talking about to me throwing money in the garbage.  Five point three million [sic] dollars for the Buffalo Bills, a retention bill, to keep them here.  Let's be honest, they're not going anywhere and I'm a Giants fan so I really don't care.

(Laughter)

But to be perfectly honest, I don't need to be giving $5.3 billion to a billionaire owner to try and talk them into staying here.  That's $5.3 billion.  We're not going to fund the BOCES vocational schools so that they can bring in instructors to teach kids skills by getting people into the trades and getting them a job.  The ability to get a job, to learn a trade, to have something to fall back on to me is priceless.  As someone who has gone through the BOCES program I find it invaluable.  Once again, for at least the four years I've been here, we're refusing to do that.  But again, we'll give $5.3 million [sic] to the Buffalo Bills.  We're going to give or not fund the expanded free school meals.  For the past two years, I along with many others in here believe that school meals should be free for all kids.  We're sitting here dumping money into mental health constantly.  There is nothing worse than for your mental health to be not sure if you are going to eat.  You're going to school and not sure if you're going to be able to afford to eat.  If you're not going to be able to sit down with your peers and eat lunch, have someone look at you and maybe not be sure if you're poor, if you have problems at home, you don't want to sit with your friends, there's nothing worse for your mental health than sitting there saying, *I can't eat lunch, I feel left out*.

185

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

That has something to do with mental health.  So instead of putting money into mental health or not putting enough money into mental health issues, I don't know, let's give kids lunch.  It's really simple and I doubt that there's anybody in here that believes we shouldn't.  That -- the difference in that is roughly $150 million to make sure that every kid in New York State can have free lunch, but we could not sit here and find the money to do that?  And I understand, everybody doesn't want to sit here and talk about the migrant crisis or illegal immigrants or anything like that.  But the fact of the matter is that we are once again spending $2.3 billion in this State, and Mr. Ra had asked before about if that was going to any rural areas, any suburban areas, moneys going in to help with the schools, to -- for housing, anything like that and we're not really sure, I didn't understand the answer.  But I know this, if you took $2.3 billion away from people that are getting our tax dollars for taxpaying New Yorkers, and I don't know, gave kids lunch, maybe that's a good idea.  Maybe we could save some money on mental health that somebody could have a breakfast or lunch that may not have food at home.  It's a very simple thing.  We want to bring people out of poverty, give them jobs.  I don't know, train them to have a job, give them a skill.  But once again, we're not going to fund it so that we can actually get qualified teachers to come in and teach them a basic skill.  A skill that's going to help them learn, grow, grow a family, stay in this State, afford to live in this State, maybe become an apprentice, maybe get a great union job, which I think everybody should.  But once again, we refuse to do that and we're going to ignore

**NYS ASSEMBLY**                              **APRIL 19, 2024**

it, nobody brings it up.  We want to take care of our kids, we want to take care of our schools, we want to take care of the future for the kids.  Give them a future, give them a chance.  We're not doing that. Once again, every single year we do this and we say *oh, it's left out of the budget*.  Last year it was the Governor's idea to take it out of the budget, this year it just didn't make it in. Every year there's another excuse to not give someone a chance.  We want to sit here and talk about equality, we want to give people jobs, we want to get people out of poverty.  Give them a skill.  Every single person that goes through a plumbing program learns to be a carpenter, can go for cartoon animation, can learn to, you know, do hair, do nails, work on a car, they can get a job.  They can actually feed their families, but once again, every single year we refuse to put the money into the budget to train kids.  If we're sitting here talking about funding and students, let's actually give them an opportunity.  That to me is why this budget missed the mark and I'll be a no. Thank you, sir.

        ACTING SPEAKER AUBRY:  Thank you.

        Mr. Gandolfo.

        MR. GANDOLFO:  Thank you, Mr. Speaker.  Would the Chair yield for a couple of questions, please?

        ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

        MS. WEINSTEIN:  Yes.

        ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. GANDOLFO:  Thank you, Madam Chair. We're going to go back to our topic of the night which is -- which is the migrant funding for New York City.

MS. WEINSTEIN:  Sure.

MR. GANDOLFO:  So this budget has 2.4 billion for reimbursing for migrant services in New York City.  I think I heard earlier that this is only for housing and residential services.  So my question is, how exactly is that accounted for?  How did we arrive at 2.4 billion?  Was there documentation submitted from New York City?  What requirements are on them to show that this is only for the housing?

MS. WEINSTEIN:  Well, first I -- I would just say, you know, that some of this money is for National Guard deployment, some of it is for Medicaid and health expenses.  And the State HRC's budget, it's estimated based on the population figures I assume that New York City has -- has submitted -- has described to the -- to the State.

MR. GANDOLFO:  Okay.  Can any of this funding be used to let's say pay for New York City's prepaid debit card program that is going out to migrant families?

MS. WEINSTEIN:  This is shelter funding and shelter support, so I do not believe so.

MR. GANDOLFO:  Okay, so shelter support, okay. Well, would you then agree that since money is fungible by continuing to reimburse New York City for some of these expenses, they can then

NYS ASSEMBLY                                    APRIL 19, 2024

afford to spend their tax dollars on some of these other services to free up that funding for them?

MS. WEINSTEIN:  I -- they can spend on other expenses.  Originally the mayor had announced there were cuts to education, to fire at the libraries, and because of us being -- the State being able to reimburse the City for shelter money, this mayor has reinstated the -- those cuts that he had announced earlier, I believe the end of last year, but certainly earlier this year.

MR. GANDOLFO:  Okay.  And staying on the topic of the 2.4 billion.  Are there any strings attached that -- that makes the funding contingent on some policy changes from New York City?  Has the State asked that they end their sanctuary city status to continue receiving this kind of funding?

MS. WEINSTEIN:  This is a reimbursement policy -- reimbursement program and it is not policy-oriented.

MR. GANDOLFO:  Okay.  So this would conceivably continue next year for their expenses as well?

MS. WEINSTEIN:  We're contemplating that there would be continuing expenses, but again, as we've had prior -- prior conversations with some of your colleagues, the situation on -- in terms of who is entering the country and applying for asylum and then ending up in New York City fluctuates.  So it's hard to predict that far down the line how much -- how the needs will be.

MR. GANDOLFO:  Are there any changes to the State's policies within this budget pertaining to migrants?  Are we --

189

NYS ASSEMBLY                                    APRIL 19, 2024

are there any plans that the Governor has to rescind the 2017

Executive Order that effectively made New York State a sanctuary

state preventing State agencies from cooperating with Federal

immigration authorities?

       MS. WEINSTEIN:  There's nothing in this budget.

       MR. GANDOLFO:  Okay.  Is there anything to foster

or compel local law enforcement to cooperate with Federal

immigration authorities when it comes to criminal migrants?

       MS. WEINSTEIN:  There -- there are no

policy-related issues in that regard in this budget.

       MR. GANDOLFO:  Okay.  And -- and the reason I'm

asking these things is because if we're sending $2.4 billion this year

and we're not asking any changes of the City or making any changes

to State policy, when is this funding going to end?  I don't see an end

in sight if we're not making any other changes to disincentive the flow

of migrants to come to New York City.  I know we can't secure the

border as a State.  We can't control who's traveling here but we can

certainly make changes.

       MS. WEINSTEIN:  You can join with the rest of the

colleagues and we can write to the New York State Congressional

Delegation and ask them to support legislation that would increase the

number of hearing officers and help secure the border, but without

that we're sort of on our own.

       MR. GANDOLFO:  Well, respectfully, I would

counter that H.R.2 to Secure the Border Act was passed by the House

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Republicans last May and it's been collecting dust in the

Democratic-controlled Senate, so that's neither here or there.  Of

course we can't control what our friends at the Federal Government

are doing but, Mr. Speaker, on the bill, please.  Thank you, Madam

Chair.

        ACTING SPEAKER AUBRY:  On the bill.

        MR. GANDOLFO:  Mr. Speaker, again, there's $2.4

billion to reimburse New York City for migrant services and the most

frustrating part about that is not necessarily the $2.4 billion being

spent there, but what it's not being spent on as some of my other

colleagues pointed out.  Every dollar that is spent to pay for this

migrant crisis is a dollar that cannot be spent for services for lawful

New York residents such as free school meals.  I know in my district a

lot of my school districts are receiving flat funding in Foundation Aid.

And while it's great that they're not receiving the cuts that the

Governor proposed, with the rate of inflation we've seen, flat funding

might as well be a cut.  It's not keeping up with the rate of inflation so

services for our students are going to go down.  That's why I'm asking

the questions of whether or not we as a State are asking New York

City to change any of their policies that encourage migrants to travel

to New York or as a State if we are making any changes to our

policies.  So I think it's important that we do.  Otherwise, I don't see

how we're not going to be spending billions every year to help

reimburse for these migrant costs.

        So with that I will not be supporting this budget and I

**NYS ASSEMBLY**                              **APRIL 19, 2024**

encourage others to vote no as well.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. REILLY:  So here we are with a migrant budget of $2.4 billion to New York City, an increase since last year.  And then there's also an additional 5 million for refugee basic needs assistance, refugee resettlement 180 million.  You know, there was a Executive Order issued by the prior Governor, and of course it was political in nature and it was declaring New York State a sanctuary state much like New York City declared itself a New York -- a city, a sanctuary city.  Now, what really sticks out to me is one of the words used, the phrase used in Governor Cuomo's Executive Order that was continued under the current administration, protecting New York's immigrants.  New York State has and continues to serve as a beacon for immigrants.  Yes, those that come here legally, we want to support.  The beacon has now become a flashing red light that says Vacancy.  And all we are doing is feeding into more people coming to New York because they know that we are going to give them a free ride.  We are -- we have to fight every year in the budget for our veterans to do the Dwyer Fund.  We have to write a letter every year trying to support veterans.  And here we are giving away $2.4 billion with no end in sight.  Colorado, they went to El Paso, they told them

192

NYS ASSEMBLY                                        APRIL 19, 2024

we can't afford you anymore, you should go to New York.  It's all over

the news, we all saw it, and what do we do?  We continue to flash that

light saying come here.  We are going to give you everything.  We

have people on social media on TikTok telling people to come here

that are here illegally, find a home that's vacant and the home is yours

if you can prove that you got something delivered there.  We know

that's not the way the law is supposed to work.  We know that that

wasn't our intent in the Legislature.  But like I say all the time, the

words we put on paper do not transition to the real world or to the

courtroom the way it's intended.  When is enough enough?  When are

we going to allow the agencies that need to cooperate with the Federal

Government when we have someone who commits a crime that's here

illegally.  We don't even let them communicate with the Feds.  But no,

we want to pass moneys along to pay for their attorneys.  And we are

going to have taxpayer funding to help them remain in the United

States when they should be deported because they committed a

vicious crime.  When does it end?  When do we stand up for the New

York residents that pay taxes?  We're not.  Until we do that, that

flashing vacancy light is going to continue, and we are going to throw

money at it.  Enough is enough.  We got to stop somewhere.  We're

going to keep talking about this forever and ever if we don't shut the

faucet.  Sometimes it takes a tough decision where you got to put New

Yorkers first that are here.  Those New Yorkers that are here and the

ones that aren't legally here are just going to drive up the costs.  And

I'll remember this next year when I'm fighting for the Dwyer Fund

again.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Tannousis.

MR. TANNOUSIS:  Thank you, Mr. Speaker.  I have spent the better part of the last year fighting along side my constituents as New York City continues to become an unsustainable place to live.  The migrant crisis, $2.4 billion, $2.4 billion in our New York State budget for the migrants, $1.4 billion more than last year.  And who wants to bet that next year it'll be another $1 billion more.  And another $1 billion more and continue and continue and continue with no end in sight.  As I have said many times in this Chamber, I am the son of immigrants.  My parents are refugees.  They left a war-torn nation to come here for the American Dream.  They came here legally.  Nobody gave them a damn thing.  They worked hard.  I represent a district also full of immigrants, just like many people in this room.  Those immigrants as well as myself are angry.  We are angry because we -- they have worked hard for everything they have, and now because of the laws of New York City and of New York State we have to continue giving billions and billions of dollars to fund an unsustainable situation.  When will the madness end?  It has to stop.  We are on a one-way road to financial ruin.  I vote no. Thank you.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.  Would Ms. Weinstein yield?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein

yields.

MR. GOODELL:  Is it okay if I ask you about

something other than the migrant crisis?

MS. WEINSTEIN:  I'd be -- I'd be delighted.

MR. GOODELL:  Let me see if there's anything else

on my list.  I was particularly interested in the Energy Affordability

Guarantee.  That's on page 1,260 of this budget bill.  I see that those

who are participating have to be low income and that if they're

participating their total electric bill for the household is limited to 6

percent of the household income.

MS. WEINSTEIN:  Correct.

MR. GOODELL:  And I was hoping you would have

some more details.  What's meant by a low income residential

customer?  Is there a threshold on that?

MS. WEINSTEIN:  I believe that it's 80 percent of

AMI for the capital portion of the program.

MR. GOODELL:  Eighty percent?

MS. WEINSTEIN:  Yes, of the AMI in order to apply

for the capital portion.

MR. GOODELL:  I see.

MS. WEINSTEIN:  Which then becomes the -- if

you're eligible for the capital portion, you're then eligible for the -- on

the utility bill.

195

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. GOODELL:  Okay.  And then if you qualify, the State will help pay to convert your house to all electric, and then you're eligible for a utility cap of 6 percent, correct?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  And are there any limitations on what you can include in that conversion?  For example, are there high-energy use appliances, hot tubs, things like that that are excluded from consideration?

(Pause)

MS. WEINSTEIN:  The -- the capital program only funds certain appliances.

MR. GOODELL:  I see.  Now this caps their utility rate to 6 percent of household income.

MS. WEINSTEIN:  Correct.

MR. GOODELL:  How is the utility to ascertain household income?

MS. WEINSTEIN:  So since they already had to apply for the capital project, which is -- it then shows that -- then that goes to the eligibility for their -- for the utilization portion of the program.

MR. GOODELL:  As you know part of this challenge is even knowing who an owner is.  Certainly many people will transfer as part of an estate plan, transfer title to the property, keep a life estate.  I assume it's not tied to their children who are now the remaindermen.  It stays with the life tenant or whose income is being

NYS ASSEMBLY                                    APRIL 19, 2024

considered?

MS. WEINSTEIN:  It stays with the person.

MR. GOODELL:  The person who's residing there,
not necessarily the owner; is that correct?

MS. WEINSTEIN:  It stays -- it stays with the
residents, not the individual.  So a new owner could then have the
benefit of -- of the program if they would then qualify income-wise.

MR. GOODELL:  I see.  And what is the penalty if
the residents fail to report income?  They get an increase in salary, a
new resident comes in, they get married or they bring in or they have a
domestic partner or whatever, what is the penalty?  Do they then
retroactively have to pay any excess?

MS. WEINSTEIN:  I -- I think some of that will be --
is to be worked out in the regulations.

MR. GOODELL:  I see.  Thank you on that.  Can you
-- I see that we have some funds put aside for the community
reinvestment related to the marihuana program.  When we first
adopted this program we were told that the cost far -- I mean the
benefits far exceeded the cost.  We were given a projection that we
would be making in the range of 363 million net, the taxpayers.  Am I
correct that this year we're projected to make 158 million but we
actually only brought in less than half of that?

MS. WEINSTEIN:  I -- I would say you're
approximately correct.

MR. GOODELL:  And am I correct that when you

197

**NYS ASSEMBLY**                                              **APRIL 19, 2024**

include the costs that we've invested in terms of the staffing and what
we all acknowledge as inadequate enforcement, but nevertheless at --
at this point in time we're upside down by over 200 million?

        MS. WEINSTEIN:  I wouldn't disagree.

        MR. GOODELL:  So then my question --

        MS. WEINSTEIN:  You know, you know, I would
just say that, you know, clearly there have been news reports and we
all know that the rollout of licenses has been much delayed, there's
been a longer term for a license to be awarded then have been initially
anticipated and these are some of the problems you do have with a --
when you start a new program.

        MR. GOODELL:  And when we were originally sold
this program and with promises of lots of revenue, part of that revenue
was to go to help disadvantaged communities for sure.  But since the
program is $200 million upside down in the red and hasn't been
profitable, it's been a loss leader.  Why -- where is the 5 million that is
coming up to help disadvantaged communities, because I thought that
was coming out of the profits, or is that just another part of the loss for
the program?

        MS. WEINSTEIN:  So it's -- it's really just the
appropriation -- appropriation authority and I would hope that with the
new legislation that we enacted to be able to padlock immediately
these illegal shops, the revenues - both the increased number of legal
dispensaries as well as the closing of the illegal will have a dramatic
increase in the amount of revenue that we'll have available from the

legal sales.

MR. GOODELL:  I -- I certainly hope that is the case. Shifting gears a little bit on the public campaign finance.  Am I correct that last year we put in 25 million and this year's budget has 100 million?

MS. WEINSTEIN:  Yes.

MR. GOODELL:  So with 125 million and this year there's what, 150 Assembly members, perhaps not all of them are -- are even in contested elections, 62 senators, am I correct that there's about 300 people that have asked for funding?

MS. WEINSTEIN:  I'm not -- I'm not sure that it's -- I haven't looked recently but I -- I think it's less than 300.

MR. GOODELL:  Less than 300?  So if it's less than 300 and we put aside 125 million, isn't that like a third of a million to a half a million per person who is participating in terms of total cost? I mean you can't get a half a million --

MS. WEINSTEIN:  Well --

MR. GOODELL: -- but why does it cost the taxpayers close to a half a million per --

MS. WEINSTEIN: -- this is just the appropriation that if there was full -- if there was full participation, if all the people participating maxed out on the amount that would be matchable, that number would -- we believe would cover, the amounts that need to go out.

MR. GOODELL:  Yeah, I apologize.  I -- I -- my

estimate was high.  It was over $400,000 per person in this election cycle.  It seems strange that we would spend more money in terms of the cost of the public campaign finance program per candidate than we all pay the winner to serve on the floor of the Assembly or on the floor of the Senate.  Doesn't that seem like a kind of a perverse use of -- of public financing?  I mean I would hope that our service here on the floor of the Assembly would be more valuable to the taxpayers than our campaign to get here.

MS. WEINSTEIN:  You know, the purpose of the public financing legislation and program is to be able to allow a wide range of candidates to be able to run for office and -- and be competitive and obviously that is an important goal of a democratic process.

MR. GOODELL:  Certainly, certainly I would support the Democratic process.  I see that - if I can shift a little bit to Bullet Aid.  This year's budget includes 15 million for Bullet Aid for the Assembly.  There's 150 members, roughly.  So that's -- doing some quick math, 100,000 per member.  Will this Bullet Aid be distributed in a fair and equitable manner regardless of political affiliation?  In other words, can we anticipate that roughly 4.8 million will be available for those schools in districts represented by Republican members and the balance in districts represented by Democrat members?

MS. WEINSTEIN:  I believe that that will be determined later based on needs of the individual schools.

NYS ASSEMBLY                                    APRIL 19, 2024

MR. GOODELL:  I see.  But no -- no particular groups are excluded, right?  I mean we certainly wouldn't want to discriminate against minorities in this Body, right?

MS. WEINSTEIN:  I do not believe that there's a system of allocation that's in place yet.

MR. GOODELL:  I see.  And just one last question just to make sure you understand that I was listening to all the debate.  This is the only question on migrants that I haven't heard asked but I'm hopeful that you'll answer it.  I looked up the data under OTDA --

MS. WEINSTEIN:  Okay.

MR. GOODELL:  And according to OTDA we're providing financial support for 620,000 people who are on public assistance at a cost of 3.2 billion.  Why is it that we can help 620,000 New Yorkers for 3.2 billion but it costs us 2.4 billion to help an estimated 150- to 200,000 refugees or migrants?  I mean it seems like we ought to be -- if we can help New Yorkers for a fraction of the cost, shouldn't -- shouldn't we be looking at ways to make the system more efficient?

MS. WEINSTEIN:  The OTDA is, you know, is a monthly benefit that family gets the reimbursement for the City is because of the lack of -- has been increased because of the lack of available space so that they -- the City has had to resort to hotels and other more expensive housing than would otherwise be needed.

MR. GOODELL:  It just seems a little ironic that we gave cash.  If we made all those migrants eligible for OTDA we could

201

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

cut our costs by about 30 or 40 percent, which seems kind of a strange situation, but then again every time I went to New York my wife and I had to take out a loan to stay in a hotel, maybe we should claim we're migrants, I don't know.  You don't need to answer that question.  I'm just pointing out that we're spending an awful lot less to house and feed our own than we are per person for the migrants, that's all.  And again, thank you very much.  Surely appreciate taking all of our questions and -- and answering our inquires.

On the bill sir.

ACTING SPEAKER ZACCARO:  On the bill, Mr. Goodell.

MR. GOODELL:  Thank you very much.  As my colleagues mentioned before, a budget reflects our priorities.  And obviously there's a great deal of frustration on the fact that a few years ago we changed the law so that if you were here illegally and you committed a crime, Class A misdemeanor and you were sentenced to a maximum sentence we wouldn't deport you.  We actually changed the Penal Law so we wouldn't deport convicted criminals if you were illegal, and we made it illegal for law enforcement to cooperate and we gave illegal immigrants the opportunity to get driver's licenses in the hopes that would facilitate their ability to get a job illegally.  And in the meantime we're feeling the squeeze right now, and while I have a lot of compassion, I think we ought to focus on how can we be compassionate, how can we help individuals and do it in a way that's affordable to New Yorkers.  So we should certainly work with the

202

City and others to address the underlying causes of the migrant crisis, look for ways we can be compassionate, look for ways where we can welcome lawful immigrants, open our doors and be helpful. In the meantime, we're spending 2.4 billion in this year's budget to help migrants and zero, zero to help all of our employers throughout the State of New York help pay off that unemployment fund debt. Zero to help our employers. Zero tax cuts for our employers or our residents. We can do better and I hope we will next year when I'm not here. Thank you, sir.

ACTING SPEAKER ZACCARO: Read the last section.

THE CLERK: This act shall take effect immediately.

ACTING SPEAKER ZACCARO: A party vote has been requested.

Mr. Goodell.

MR. GOODELL: Thank you, sir. The Republican Conference will be generally opposed to this bill, although as noted by colleagues, some of my colleagues may want to vote in favor of it because it also has many positive aspects. Thank you, sir.

ACTING SPEAKER ZACCARO: Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES: Mr. Speaker, the Majority Conference is generally gonna be in favor of this piece of legislation; however, there may be a few of us that would desire to be an exception. They should feel free to do so at their seats. Thank you,

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

sir.

ACTING SPEAKER ZACCARO:  The Clerk will record the vote.

(The Clerk recorded the vote.)

ACTING SPEAKER AUBRY:  Ms. Williams to explain her vote.

MS. WILLIAMS:  Thank you, Mr. Speaker, for allowing me to explain my vote.  Mr. Speaker, New York City has seen more than 175,000 migrants, and as some of our colleagues have said, last year $1.5 billion and this year we're looking at $2.4 billion.  Mr. Speaker, it bothers me that next year around this time how much more billions will we need.  And, you know, some might say, *Well, you know, we're doing the right thing*.  Some might say, *Well, you know, I hope you don't ever have to go through this*.  Many of us in this room, we are immigrants that came from another country and have had to work very hard to get to where we have to be right now.  However, when we are taking all this money, $2.4 billion, this is not a solution.  I'll say it again, it is not a solution.  We are going under the notion that we are going to be reimbursed.  I will tell you, hold your breath right now.  Hold your breath.  That $2.4 billion is our taxpayers' dollars that we are abusing.  We are abusing our taxpayers' dollars and our ability as electeds.  This is not a solution, but it's incentivizing.  And, Mr. Speaker, where is the common sense in this?  This is not common sense, it -- it's nonsense.

So I just want to say that I vote in the negative.

204

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Thank you.

ACTING SPEAKER AUBRY:  Ms. Williams in the negative.

Mr. McGowan to explain his vote.

MR. MCGOWAN:  Thank you, Mr. Speaker.  I rise to explain my vote.  Simply put, I have to be in the negative on this.  $2.4 billion, more than double of what was allocated in last year's budget for the migrant situation, the migrant crisis.  And during the debate, we heard justification for this that fell far short of something that I could support.  No real answer to how this money will be spent.  We heard about so-called "shelter costs", but no data on the number of individuals, no data on the status of the asylum cases, no data on when this crisis will end.

But what we have, Mr. Speaker, are excuses.  Blaming other levels of government for their failures, blaming the Federal Government for its lax immigration policy, blaming New York City.  But we have a responsibility, because this is money that we are allocating, money that comes from taxpayers who we represent and are responsible for ensuring, as one of my colleague says, that our budget reflects our priorities as a State.  So we cannot have excuses.  We cannot blame other levels of government for their failures when we are the ones who are allocating this money to this situation.  It's throwing money at a problem, and this money will not fix it.  There is no end in sight.  Every dollar that we put into this budget is a real dollar.  These come to us as numbers on a page, but these are real

205

**NYS ASSEMBLY**                              **APRIL 19, 2024**

dollars. Every single dollar we have to take with utmost responsibility, as our legislative duty. And we have a situation that really has no end date. We don't know when it's gonna be resolved, and we really don't know what this money is going towards.

So I wanted to support this. I wanted to support some of the good things in this bill, especially the money that is being allocated for our schools. But I simply can't when there's a $2.4 billion price tag attached to it. Mr. Speaker, I will be in the negative. Thank you, sir.

ACTING SPEAKER AUBRY: Mr. McGowan in the negative.

Ms. Lee to explain her vote.

MS. LEE: Thank you, Mr. Speaker. I rise to explain my vote. I applaud this budget for the investment it makes in minority communities, including the Asian and Jewish communities in my district. For the second year in a row, it sets a record for the amount of funding allocated to the Asian-American community, including $30 million to non-profits serving Asian communities, a $350,000 investment for CUNY's Asian American/Asian Research Institute, and $350,000 for the creation of an Asian Leadership Institute at SUNY. It supports Jewish New Yorkers by providing $25 million to enhance security at non-public schools and houses of worship; funding which can be used to provide Yeshivas and synagogues in my district stronger protection and valuable peace of mind.

I represent a community also with disproportionately

206

high poverty -- poverty rates, so I also want to recognize this budget for the investments it makes to support low-income families.  It commits $140 million in capital funding to NYCHA, and it allocates $4 million to increase funding for settlement houses for the first time in 20 years, helping the historic settlement houses in my district expand their safety net services to help low-income immigrant communities.

Together, these investments will make a real difference for marginalized members of my community, and I thank the Speaker for his support and my colleagues for their tireless work for this budget.  Thank you.

ACTING SPEAKER AUBRY:  Ms. Lee in the affirmative.

Ms. Jean-Pierre to explain her vote.

MS. JEAN-PIERRE:  Thank you, Mr. Speaker. Recently, the Amityville Union Free School District was listed as a financial distressed school district, and it's experiencing a stark financial shortfall.  The District has already seen serious cost-cutting measures, laying off multiple teachers and administrators, canceling school trips and cutting important programs, such as an AP class. Even after these cuts, the District's continued to discuss additional cuts, including the potential closure of the Northeast Elementary School.  In a recent budget meeting for the community, the potential closure of the school was discussed, highlighting the urgent need for immediate and impactful financial intervention to sustain and preserve

NYS ASSEMBLY                                      APRIL 19, 2024

the students' educational environment.  These unpreceded [sic] proposed cuts were extremely concerning to the Amityville community.  Many of the concerned parents and community members reached out to my office seeking help.  Today, I am proud to say under the leadership of the Speaker and with the Majority colleagues, we are able to answer their cry for help.  This legislative Body offered the District a lifetime [sic], offering $2 million in order to keep the el -- Northeast Elementary School open and hire a fiscal consultant who will assist the District in future planning, future financial planning.  This funding also saves the District from cutting their pre-K program and the jobs of 32 hardworking teachers.  I cannot thank Mr. Speaker enough for all of the hard to make this happen.

I would like to thank the many colleagues and the many parents who reached out to my office, and I'll be voting in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Jean-Pierre in the affirmative.

Ms. Glick to explain her vote.

MS. GLICK:  Thank you, Mr. Speaker.  I rise to explain my vote.  There are many, many organizations, school districts and communities that are going to benefit from this budget, from this -- the monies allocated in this bill.  From my district, the western edge of my district, you can look into the harbor and you can see the Statue of Liberty.  And the Statue of Liberty is holding a tablet and a torch, lighting the way into this country that has accepted so many of our

NYS ASSEMBLY                                    APRIL 19, 2024

antecedents who came here when the people who were here weren't so happy about them coming.  It's a tablet and a torch, not a ladder to be pulled up behind her.

I am proud that we are providing support to people who have come here just like every other wave, many of whom were not accepted.  Many of whom were told to go away.  Many of whom arrived and saw, *Not wanted.  Do not apply.  Leave.  Build our railroads but then we're going to exclude you.  You're running away from a Holocaust?  Too bad, we don't want you.*  I'm proud that we have struck a balance that we're supporting New Yorkers and new New Yorkers.

I withdraw my request and proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Ms. Glick in the affirmative.

Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Mr. Speaker.  I rise to explain my vote, and there's a number of things that I want to note as well.  Let me start with a number of local issues that I'm so proud of that are in this -- in this bill, and that is UAlbany, their RNA Institute which is for research and therapeutics.  It's really going to fuel the bioeconomy here locally.  It's a Center of Excellence and so pleased that the Speaker has recognized this.  It will go a long way toward research money for UAlbany.  Alive Downtown, so pleased with my Upstate colleagues.  We've worked hard to get theater money for a

whole host of theaters, including in this district.  The Albany Damian Center will also benefit with health and wraparound services for those with HIV.  The MAP program, we're gonna try again on the Multicraft Apprenticeship Program here locally, and as well as AIM overall, including the Albany City -- Capital City funding and the Albany Law Clinic.

Let me also mention how pleased I am as Higher Ed Chair that we've included additional funding for community colleges, not everything we wanted.

And then let me also stand in support of the $2.4 billion for migrants, including -- I'm pleased the Speaker gave us money for some of the non-profits here Upstate.  I try to never forget where I came from.  I am the daughter of immigrants.  Both my parents looked at that Statue of Liberty when they came off the boat into this country.  And as with any other immigrant, most immigrants that have come to this country, they, too, came for two reasons:  The chance at a job, they had no education, the chance that their children would have an education.  Neither of my parents sought a secondary school.  So it is the same universal goal.  I readily admit, we have an immigration mess, we are desperately in need of immigration reform. We can't solve that, but we also can't ignore what is right here on our doorstep here in Albany, but mostly in the City.  So I'm pleased we have non-profit money.  And none of us should forget where we come from.  And just as my parents had that opportunity, I want to make sure others do, and with that I vote in the affirmative.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Ms. Fahy in the affirmative.

Mr. Burdick.

MR. BURDICK:  Thank you, Mr. Speaker.  I wish to thank the Speaker and all of our tremendous staff for putting together this budget.  And it's one which I think we all can be proud of.  And also, as others have said similarly, being the grandson of immigrants from Italy, I am very pleased to see funding for immigration and legal services to help those coming to our shores for a new life.  And I want to thank the Speaker for providing for funding for organizations, community-based organizations in Westchester County that serve our county so well, including the Holocaust Human Rights Education Center, Arts Westchester, Make the Road New York, Legal Services of the Hudson Valley, Boys and Girls Club of Northern Westchester, Latino U College Access, El Centro Hispano, Hope's Door, Pace Women's Justice Center, and My Sister's Place.  All of these do incredibly good work for the people of our county, and I'm very pleased to see this funding here in this bill.

Thank you very much, and I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Burdick in the affirmative.

Mr. Lavine to explain his vote.

MR. LAVINE:  Thank -- thank you.  So this issue of the migrants, and I'm fully aware that some of my colleagues here

211

today have referred to them as the illegals; some of them have been fairly kind and referred to them as undocumented. And perhaps I feel a certain alliance with them because I grew up in an immigrant home. All of my grandparents who came here from Russia had seen the worst, as of that time, of anti-Semitic acts. One grandmother hid in a hay wagon as a little girl and watched her friends butchered by the (inaudible) axe. Another grandmother lost 11 of her brothers and sisters and all their families in the Holocaust.

So the question to me seems to be this: Many of my relatives wouldn't have been able to come here from Europe had it not been for the Johnson-Reed Act of 1924, which severely limited Jewish immigration to the United States. And it seems as if history sort of repeats itself because today, immigration restrictionists create the problem and then demand even more restrictions to fix the problem, which makes no sense whatsoever. So the question is, of all the immigrants who have -- have come here, many of them bused by our sister States of Florida and Texas, what the heck do you expect we're supposed to do with these folks? Just let them hang out in the streets? Let them beg, let them starve? That's not America, and that's un-American. But I will say this: That I do want to express gratitude to at least one person on the other side of the aisle who referred to them as *refugees*. I am a refugee, many of us here are refugees. Let's do what we can to live in the world of reality and to protect everyone who --

ACTING SPEAKER AUBRY: Mr. --

MR. LAVINE:  -- who is here in our State of New York.  I certainly --

ACTING SPEAKER AUBRY:  Mr. --

MR. LAVINE:  -- vote in the --

ACTING SPEAKER AUBRY:  How do you vote?

MR. LAVINE:  -- affirmative.

ACTING SPEAKER AUBRY:  Thank you very much.

Mr. Brook-Krasny to explain his vote.

MR. BROOK-KRASNY:  Good afternoon --

ACTING SPEAKER AUBRY:  Good afternoon.

MR. BROOK-KRASNY:  Good evening, Mr. Speaker.

ACTING SPEAKER AUBRY:  Well -- okay, good evening.

MR. BROOK-KRASNY:  I came here in 1989 as a refugee, Mr. Speaker.  There is a definition of being a refugee, a legal definition of being a refugee in this country, but I'm not going to spend the time on that because every person who's sitting here in this Chamber understands what a refugee is and what's the difference between a refugee and illegal immigrant, Mr. Speaker.

I left Soviet Union in 1989 with $90 in my pocket.  I spent 11 months in Italy working as a fisherman, getting about 5 milos (phonetic) per hour -- per hour, yes.  Five milos (phonetic) was about $4.50.  And I'm not talking about myself now.  Right now I'm

213

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

speaking about thousands, thousands, hundreds of thousands of refugees who came to this country legally.  By giving money to illegal immigrants I think you, ladies and gentlemen, you're just spoiling people.  You're not giving them a chance to build their own American Dream.  But you're not only spoiling illegal immigrants, you're spoiling a lot of people in the City, in this State and the country, people who are looking at those who came here illegally and asking us legislators why are we doing it.  I think it's un-American to let illegal immigrants come -- come into this country, it is un-American.

                    Mr. Speaker, unfortunately I have to vote --

                    ACTING SPEAKER AUBRY:  And you need to vote now.

                    (Laughter)

                    MR. BROOK-KRASNY:  Mr. Speaker, it's very hard for me --

                    ACTING SPEAKER AUBRY:  I understand.

                    MR. BROOK-KRASNY:  -- because there are a lot of good stuff in this budget, a lot.

                    ACTING SPEAKER AUBRY:  I understand, but you --

                    MR. BROOK-KRASNY:  But I just cannot support this $2.4 billion for illegal immigrants.

                    ACTING SPEAKER AUBRY:  I presume.  Mr. Brook-Krasny --

                    MR. BROOK-KRASNY:  I'm sorry.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Nay, thank you.

ACTING SPEAKER AUBRY:  -- in the negative, thank you.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Thank -- thank you, Mr. Speaker, to explain my vote.  I'm -- I am a little bit concerned about a lot of the conversation that I'm -- I'm hearing here of late, because I know that there's not -- I believe there's not one Native American in the room right now, which means that the only natural American is Native Americans.  Everybody else came here as an immigrant, either stolen from their country to work, or deciding to come because there were terrible things happening in their country and they wanted a better life.  And that Statue of Liberty that our colleague talked about earlier offered them that glimmer of hope.

Now, that hope is slim, but it is a glimmer that there is some hope.  And honestly, when I think about the number of people who came to Texas, came to Florida and got put on some other vessel, a plane or a boat or whatever and sent to New York, they probably thought to theyself [sic], *Oh, I thought I came to the right place, these people are shipping me off already*.  Unfortunately for those refugees, immigrants, however you want to call them, they are not gonna be treated fair in this country.  They're not gonna be treated fair, they're gonna run into the same racism, classism and sexism that my people have suffered in this country and still suffer.  You can hear it being spewed in this Chamber as we speak today on a regular basis.

215

NYS ASSEMBLY                                    APRIL 19, 2024

So I say to them that are coming, yes, they are welcome by some.  But be aware, because when you get here you're gonna find some people who call themselves true Americans and patriots.  They're gonna wanna send you home and let -- or either let you live on the street, hungry, not educate your children, not allow you any of the freedoms that you thought you were coming to get, period.  That's not fair, that's not right.  It's not only un-American but it's un-Godly.

Mr. Speaker, I am pleased to vote in support of this legislation, even though I quite honestly believe there is a better way to do this.  I wish we could figure that out for New York State, quite frankly, let us be in charge of that.  I guarantee we'll have it worked out by next year.  But we're not in charge of it, there are 50 states in this country.  They all have representatives that are supposed to be making this decision, and they should do it.  Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER AUBRY:  Mrs. Peoples-Stokes -- Mrs. Peoples-Stokes in the affirmative.

Mr. Chang.

MR. CHANG:  Thank you, Mr. Speaker.  You know, my family just came overseas, all right, from the -- from the Trans Exclusion Act [sic].  That's how my family came over legally.  My first late-wife came to this country legally.  My current wife came to this country legally.  I born in Chinatown, I lived in a railroad apartment, we struggled.  It wasn't pleasant, I remember that.  But we

216

NYS ASSEMBLY                                APRIL 19, 2024

paid our dues.  We struggled, legally.  I served my country, went to war and dutifully pay my taxes.  Refugees like our Member Brook-Krasny, several years ago Ukrainian [sic] bomb -- bombed by Russians.  They came over here, they're refugees.  The one at the borders down in Texas, I don't know if they are refugees or not in a true sense, being labeled as asylum, who knows.  But there are ways to process legally.  It takes time, but you pay your time.  You -- there's a process to do this, and I believe in that process.  But the way this current system, this migration that -- dumping New York all these migrants in here all at once without the process is unfair to us, unfair to our taxpayers.  A hundred years ago there was Ellis Island, processed boatloads of migrants, but there's a process.  We can't even process by the busload right now.

So Mr. Speaker, I vote negative on this bill.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Chang in the negative.

Mr. Durso.

MR. DURSO:  Thank you, Mr. Speaker.  I rise to explain my vote.  Obviously, tensions can get high especially in this Chamber with this type of bill and some of the language that's in it, but I'd like to say I -- I don't think this is about -- when we're talking about the $2.3 million for the migrant crisis, I know personally this has nothing to do with racism or place-ism, or -- or putting people in their place or people being afraid of people coming into this country.

217

I believe most of us -- I don't want to speak for everybody -- believe in immigration.  My grandparents, as others here, came, immigrated from Italy.  They did it legally, they worked hard.  I believe in that.

I believe we also shouldn't be fixing the Federal Government's problems.  This is the Federal Government's problem, this is not New York State's problem to deal with.  The Federal Government should be giving me -- giving us money in this State to deal with this problem.  It's not something that we should be doing with taxpayer money from New York State, and we sure shouldn't be balancing the budget on the backs of our students.  This is something that we talked about leading up to this budget, whether is the money for education and the stuff that I brought up before when it comes to the BOCES funding; $55 million could have got vocational programs and the necessary teachers to teach kids, to give them an education, to give a skill.  That's something I'd said before.  You could fund free school meals four-times over with the amount of money that we're giving New York City for the migrant crisis that should be paid for by the Federal Government.  But New York State, once again, instead of feeding the kids of our taxpaying New Yorkers, are gonna give that money to those that are coming into this country, some legally, some illegally.  If they're seeking asylum, if they're -- you know, we're calling them migrants, however you wanna call it, the fact of the matter is is that we're not taking care of the children of this State.  That is what we're charged to do.  We're charged to and we're elected to take care of the children of our constituents.  That's what we should

218

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

be doing here, not taking care of everybody.  That's the Federal

Government's problem.

Thank you, sir.

ACTING SPEAKER AUBRY:  Mr. Durso in the

negative.

Ms. Simon to explain her vote.

MS. SIMON:  Thank you, Mr. Speaker.  I've been

listening to the debate this evening, and it's focused on one thing, even

though this bill provides a lot of support to localities for those projects

and those programs that our cities and our towns and our villages

need.  But the reality is that this conversation about the migrants who

are here with us has come up again and again and again.  I have a lot

of the new migrants in my district as well, and not everybody's happy

about it.  But every single one of us came here from somewhere else,

and many of our relatives came here not legally because, in fact, there

really wasn't a legal process at that time.  They bought a ticket, got on

a boat and arrived.  And if they were not obviously ill, they were kept

here.  They were not sent back.  That's in the old days of Ellis Island.

But the reality is that someone who is seeking asylum is legal.  It is

legal to seek asylum and to enter this country seeking asylum.  So if

you think that everybody who comes in seeking asylum is somehow or

other illegal, you are just wrong on the law.

Thank you, and I will be voting in the affirmative.

(Applause)

ACTING SPEAKER AUBRY:  Ms. Simon in the

219

**NYS ASSEMBLY**                    **APRIL 19, 2024**

affirmative.

Mr. Tague.

MR. TAGUE:  I don't know if I want to go after Mrs. Simon now.

ACTING SPEAKER AUBRY:  I think you might think about that.

MR. TAGUE:  Mr. Speaker, I rise to explain my vote.  And as many have said before, some of the funding in this bill, it's very hard to vote against this, especially the education funding.  However, I, too, am against the funding going for the migrant crisis.  And the reason why is is I don't remember us spending $2.4 billion on our veterans; the people that have paved the way for this country, the people that have died and spilt their blood for us.  Yesterday, we stood back here with a whole bunch of veterans and everybody rushed over there to get their pictures with them.  But we sure don't have that kind of money in the budget for the veterans, especially those that are sleeping on the streets of our cities because they've come upon hard times.  I don't see three- or four-hour debates in here on those veterans, but boy, everybody's dander gets up when we talk about illegal migrants.

So, unfortunately, I cannot go back to the taxpayers in my district and tell them that they have to foot the bill for people that are here illegally when we fail to take care of the veterans that have fought to keep this country free and safe.  So I'll be voting in the negative, Mr. Speaker.  Thank you.

220

**NYS ASSEMBLY**                                          **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  Mr. Tague in the negative.

Mr. Simone.

MR. SIMONE:  I rise -- I rise in support of this legislation.  My mom is an immigrant from Peru.  Our nation gains in strength from immigrants.  When you have no solutions, you only want to spread fear.  Look at the tabloids constantly claiming that all these immigrants coming to this nation are simply here to commit crimes.  That is so false.  The vast majority here are to find work.  They are fleeing persecution and poverty, climate crisis, many things -- many of these things caused by our own nation and other world powers.  Most have come just to fulfill and find the American Dream.  They contribute far more in billions of dollars than they take from this economy, yet it's easy to point a finger to them.  It's been happening for decades.  When a certain party or certain individuals have no solutions, it's easy to blame the other.  There is a labor shortage in this country and in this State and nation.  Most of these families I visit at the (inaudible) in my district want to work, they beg to work.  Mothers have told me in native Spanish, even though my Spanish isn't the best, that they want to work, *Just let me work.  I don't want to go back to my country where I've been persecuted, or -- or people have come after my family because of government strife*, sometimes caused by our own nation.  If we really wanted to solve this problem, the other party and our party would demand that the national government, both parties, sit down and pass comprehensive immigration reform, like the

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

past President Ronald Reagan did with the Democratic Speaker.  If they really wanted solutions to this, but they prefer to use this for political gain, they prefer to make us scared of the immigrants coming here, that they're gonna hurt us and attack us, even when there's only a few crimes that they can point to, because they don't really want to solve this problem.  They rather help spread fear, because fear mongers don't have solutions.  I prefer hope.  Hope always defeats fear.  And if we really want to solve this problem, when we push the national -- Federal Government to pass immigration reform --

ACTING SPEAKER AUBRY:  Mr. --

MR. SIMONE:  -- we would push to make sure we employ these folks.

ACTING SPEAKER AUBRY:  Mr. -- Mr. Simone.

MR. SIMONE:  Thank you very much, and I vote in the affirmative.

ACTING SPEAKER AUBRY:  I do appreciate that, sir.

Mr. Dais.

MR. DAIS:  I rise to explain my vote.  I understand this is a complex issue, but the reality is, as many have said, many of us were migrants at one time.  If we take this time period back to 1824, that sentiment would have been against if you were Irish.  If you go 70 years after that, it's if you were Italian.  If you look at it in the 1920s, the first -- the first anti-immigration act in New York State was against Italian Americans because they said too many were coming in.

222

NYS ASSEMBLY                                    APRIL 19, 2024

They created a quota limiting how many Irish -- how many Italians were coming into the country, specifically from Southern Europe. And then what happened -- and we talk about (inaudible) racism exists, there's this nonbelief that non-White immigrants did not -- or the White immigrants did not sneak into this country.  The reality is there were members of your family that were likely illegal immigrants.  But what we do in America is to make sure that when you are on our shores we do take care of you.  Because if we do not solve this problem now, if we do not try to feed the children, school or house the children, where will they end up?  Yes, it is too much money.  We need a Federal solution.  But it's our duty.  Our security of our State is making sure those who are in our care are taken care of.

This is complex, we need to work together.  We have to understand that America, we do the right thing first, always, even when it's hard to do.  For that, Speaker, that's why I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Dais in the affirmative.

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker, to explain my vote.  So this, folks, this is 1,449 pages of what we've just been debating over the last couple of hours.  And I -- I offer this as Exhibit A as to what we've been doing over the last few hours.  I -- I mean, there is a lot in here that I would love to be able to cast a yes vote in support.  I'm really happy that we fought as hard as we did to get that

hold harmless language back in there for this year, understanding that we gotta -- we gotta figure out the Foundation Aid formula for next year.

But the school aid, I -- I think that this is -- that's a fair result for this year for our schools, many of whom have gotta go out with budget proposals and budget votes within the next couple of weeks.  So I think that was the right thing to do and I'm very glad for that.  There's a lot in here that I support.

I want to leave you with a little story.  I was feeling a little nostalgic listening to everybody talk about where their family came from.  When we took a trip to Ireland last fall, I had a chance in Belfast to go and look up my great-grandmother's roots.  When she left Belfast and came to New York, she had to have a sponsor in New York.  She had to have a sponsor and she was indentured for seven years to the Tilley Ladder Company as a presser with a family. She was sent and sponsored by the church.  She had to certify that she had a job waiting for her and that she would not be a ward of the State, that she would a positive member of society who would be contributing to society before she was allowed to come, and she had to be in good health.  So it's a little different now.  And I agree with what the previous speaker said, this is a complex issue.  We do need to work together, and it is a lot of money.  And I think we had this discussion last year, and we have it again this year.

At this time I'm gonna vote no, but I appreciate the conversation.  Thank you.

224

ACTING SPEAKER AUBRY:  Ms. Walsh in the negative.

Ms. Shimsky.

MS. SHIMSKY:  Thank you, Mr. Speaker.  There's not too much to be added about the debate that we've been having for the last hour or so, and I do have my opinions about the cynical behavior of certain Governors in other states dropping all this on our doorsteps and expecting us either, number one, to support them, or number two, let them starve to death.  But that's all I'll say about that.

I am standing up to celebrate the increase in aid and incentives to municipalities, or AIM aid, that our municipalities are getting.  I think it amounts to something a little less than a 7 percent increase.  It's been a long time since our municipalities have gotten a raise, and I'm so glad we were able to do it this year.  Thank you to the Chair of Local Governments, thank you to all of us for -- for advocating for it, and I'm sure our cities, towns and villages will be grateful.

Thank you.

ACTING SPEAKER AUBRY:  Ms. Shimsky in the affirmative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  I appreciate the comments from all my colleagues.  Yeah, I'm half Swedish, the other half I always hope is heavy cream.

(Laughter)

225

I love heavy cream and I love my Swedish ancestry.

When I first started practicing law before some of you were born, I practiced Immigration Law in Washington, D.C.  And Dave Crosland, who was the Acting Immigration Commissioner under President Carter, had joined our firm and he couldn't practice for two years, so I had the opportunity of taking on a nationally-renowned immigration practice from scratch.  It was very exciting and very challenging.  But there's a huge difference between those who go through the legal process and those who seek asylum, and those who are refugees.  And we should recognize there's huge differences.  And as my colleague noted, those who come through the legal process, they do a health background check so they don't come in with tuberculosis or a communicable disease.  We do a criminal background check through their home country.  They have an Affidavit of Support from someone in the U.S. that guarantees they won't be on public assistance for at least five years.  They typically have an employment offer.  That's missing when you just cross the border and you have no -- you don't follow any of that.

Refugees are in a special category.  Refugees are those that we acknowledge as a country are coming from another country that has a very serious problem, whether it's Ukraine or Russia or -- or other countries.  But just coming across the border or overstaying your visa is a whole different matter, and we need to treat them differently, and that is part of the crux of the problem.

And so I hope as we move forward we can do so

NYS ASSEMBLY                                    APRIL 19, 2024

compassionately, that we can look for efficient ways to be humane, but that we also expect something in return; a criminal background check, a health care check, and being committed to making New York better.  Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Hyndman.

MS. HYNDMAN:  Mr. Speaker, thank you for allowing me to explain my vote.  When I was 14 or 15 years old trying to get a job is when I found out I was here illegally.  That's when my parents let us know we had come into the country, overstayed our visa and that we were now living under the radar so I was not able to gain working papers.  But that -- at that young age is when I found out that because I wanted to work to contribute to my household, that -- that we here illegally.  And it took several years for us to become resident aliens and then for us to gain citizenship.

So when I think about the immigrants, migrants, asylum seekers, refugees who come here, like my family, we came here for a better way of life.  We came here because my parents felt that the education system here was robust and that I could go to college, which I did, and lo and behold, I became an Assemblywoman.  So I think about the dreams of a lot of these asylum seekers, migrants, whatever you want to call them, and how coming here was a stepping stone for that American Dream.  The possibility of owning your own home, the possibility of owning a business, the possibility for growth.  Because believe it or not, everyone wants to come to this country and everyone wants to come to New York City.

227

NYS ASSEMBLY                                       APRIL 19, 2024

And so the fact that we're putting this money in here is because we want to make sure we help them.  New York City needs this help so, guess what, they don't have to go to your district.  New York City needs this money so that we don't have the cuts to our education system, to our schools, to our hospitals, for housing.  That's why they need this money, because you don't want them in your districts.  So the Mayor of New York City is gonna use this money wisely to make sure that they have the opportunities like I did.

I vote in the affirmative.  Thank you, Mr. Speaker.

(Applause)

ACTING SPEAKER AUBRY:  Ms. Hyndman in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Mrs. Peoples-Stokes.

MRS. PEOPLES-STOKES:  Mr. Speaker, I now move that the Assembly stand at ease until 9 a.m. Saturday, April the 20th.

ACTING SPEAKER AUBRY:  The Assembly stands at ease.

(Whereupon, at 9:59 p.m., the Assembly stood at ease.)

            *               *               *               *

228

ACTING SPEAKER AUBRY:  The House will come to order.

Ms.  Solages.

MS.  SOLAGES:  Members have on their desk the C-Calendar.  Mr.  Speaker, I now move to advance the C-Calendar.

ACTING SPEAKER AUBRY:  On Ms.  Solages' motion, the C-Calendar is advanced.

MS.  SOLAGES:  Can we now take up Rules Report No. 39?

ACTING SPEAKER AUBRY:  Rules Report No. 39, the Clerk will read.

THE CLERK:  Assembly No. A08806-C, Rules Report No. 39, Budget Bill.  An act to amend the Education Law, in relation to Contracts for Excellence; to amend the Education Law, in relation to Foundation Aid; to amend the Education Law, in relation to allowable transportation expenses; to direct a Foundation Aid formula study by the Nelson A. Rockefeller Institute; to amend the Education Law, in relation to Transportation Aid and the Clean Water, Clean Air, and Green Jobs Environmental Bond Act of 2022; to amend the Education Law, in relation to Transportation Aid for zero-emission school buses and establishing the New York State Zero-Emission Bus Resource Center; to amend the Education Law, in relation to Academic Enhancement Aid; to amend the Education Law, in relation to High Tax Aid; to amend the Education Law, in relation to universal pre-kindergarten and the Statewide Universal Full-Day

229

Pre-Kindergarten Program; directing a study on consolidation of pre-kindergarten funding; to amend the Education Law, in relation to implementation of the Smart Schools Bond Act of 2014; to amend the Education Law, in relation to special apportionments and grants-in-aid to school districts; to amend the Education Law, in relation to extending certain provisions of the Teachers of Tomorrow Teacher Recruitment and Retention Program; to amend the Education Law, in relation to maximum class sizes for special classes for certain students with disabilities; to amend Chapter 82 of the Laws of 1995, amending the Education Law and other laws relating to State aid to school districts and the appropriation of funds for the support of government, in relation to the effectiveness thereof; to amend Chapter 756 of the Laws of 1992 relating to funding a program for work force education conducted by the Consortium for Worker Education in New York City, in relation to reimbursement for the 2023-2024 school year withholding a portion of Employment Preparation Education Aid and in relation to the effectiveness thereof; to amend the Education Law, in relation to funding for employment preparation education programs; to amend the Education Law, in relation to the financing of charter schools; to amend part A of Chapter 56 of the Laws of 2023 directing the Education Department to conduct a comprehensive study of alternative tuition rate-setting methodologies for approved providers operating school-age and preschool programs receiving State funding, in relation to extending the date for the submission of such recommendations; to amend Chapter 537 of the Laws of 1976

relating to paid, free and reduced-price breakfast for eligible pupils in certain school districts, in relation to a State subsidy; to amend Chapter 169 of the Laws of 1994, relating to certain provisions related to the 1994-95 State Operations, Aid to Localities, Capital Projects and Debt Service budgets, in relation to the effectiveness thereof; to amend subpart F of Part C of Chapter 97 of the Laws of 2011, amending the Education Law relating to census reporting, in relation to the effectiveness thereof; providing for special apportionment for salary expenses; providing for special apportionment for public pension accruals; to amend Chapter 121 of the Laws of 1996 authorizing the Roosevelt Union Free School District to finance deficits by the issuance of serial bonds, in relation to an apportionment for salary expenses; providing for set-asides from the state funds which certain districts are receiving from the total Foundation Aid; providing for support of public libraries; to repeal certain provisions of the Education Law relating to phase-in foundation increase; to repeal certain provisions of the Education Law relating to Foundation Aid; and providing for the repeal of certain provisions upon the expiration thereof (Part A); to amend the Education Law, in relation to establishing evidence-based reading instructional best practices for students attending prekindergarten through grade three (Part B); to amend the Education Law, in relation to directing the Commissioner of Education to require the completion of a free application for Federal student aid or a waiver of such requirement and requires school districts to issue annual reports on

students completing the free application for Federal student aid and the waiver (Part C); to amend the Education Law, in relation to eligibility for unrestricted aid to independent colleges and universities (Part D); intentionally omitted (Part E); to amend Chapter 260 of the Laws of 2011 amending the Education Law and the New York State Urban Development Corporation Act relating to establishing components of the NY-SUNY 2020 Challenge Grant Program, in relation to the effectiveness thereof (Part F); to amend Part N of Chapter 56 of the Laws of 2020, amending the Social Services Law relating to restructuring financing for residential school placements, in relation to the effectiveness thereof (Part G); to amend the Social Services Law, in relation to increasing the standards of monthly need for aged, blind and disabled persons living in the community (Part H); intentionally omitted (Part I); to amend the Labor Law, in relation to nursing employees' right to express breast milk (Part J); intentionally omitted (Part K); intentionally omitted (Part L); to amend Chapter 25 of the Laws of 2020, relating to providing requirements for sick leave and the provision of certain employee benefits when such employee is subject to a mandatory or precautionary order of quarantine or isolation due to COVID-19, in relation to providing for the expiration and repeal of such provisions (Part M); to utilize reserves in the Mortgage Insurance Fund for various housing purposes (Part N); to amend the Criminal Procedure Law and the Penal Law, in relation to the crime of deed theft; to amend the Executive Law, in relation to authorizing the Attorney General to prosecute crimes involving deed

theft; to amend the Real Property Actions and Proceedings Law, in relation to the partition of heirs property; and to amend the Real Property Law, in relation to allowing transfer on death deeds (Part O); intentionally omitted (Part P); to amend the Multiple Dwelling Law, in relation to authorizing a city of one million or more to remove the cap on the floor area ratio of certain dwellings (Part Q); to amend the Labor Law and the Real Property Tax Law, in relation to the exemption from real property taxation of certain multiple dwellings in a city having a population of one million or more (Part R); to amend the Multiple Dwelling Law, in relation to establishing a program to address the legalization of specified basement and cellar dwelling units and the conversion of other specified basement and cellar dwelling units in a city with a population of one million or more (Part S); to amend the Real Property Tax Law, in relation to eligible multiple dwellings under the Affordable New York Housing Program (Part T); to amend the Real Property Tax Law and the Labor Law, in relation to enacting the Affordable Neighborhoods for New Yorkers Tax Incentive (Part U); to amend the Executive Law, in relation to requiring the State Fire Prevention and Building Code Council to study and adopt uniform fire prevention and building code standards to promote fire safety and accessibility in certain single-exit, single stairway multi-unit residential buildings; and providing for the repeal of such provisions upon the expiration thereof (Part V); to amend the Education Law, in relation to permitting Tuition Assistance Program awards to be made to part-time students enrolled in certain degree-

granting institutions chartered or authorized by the New York State Board of Regents (Part W); to amend the Education Law, in relation to increasing the income eligibility threshold for the Tuition Assistance Program (Part X); to amend the Social Services Law, in relation to establishing differential payment rates for child care services provided by licensed, registered or enrolled child care providers (Part Y); to amend Chapter 277 of the Laws of 2021 amending the Labor Law relating to the calculation of weekly employment insurance benefits for workers who are partially unemployed, in relation to the effectiveness thereof (Part Z); to amend the Vehicle and Traffic Law, in relation to owner liability for failure of an operator to stop for a school bus displaying a red visual signal and stop-arm; and to amend Chapter 145 of the Laws of 2019, amending the Vehicle and Traffic Law relating to school bus photo violation monitoring systems and owner liability for failure of operator to stop for a school bus displaying a red visual signal, in relation to the effectiveness thereof (Part AA); to amend the Insurance Law, in relation to prohibiting discrimination because of the affordability of residential buildings (Part BB); to amend the Education Law, in relation to requiring the use of project labor agreements for large-scale construction projects under the State University Construction Fund (Part CC); relating to the City of Dunkirk Fiscal Recovery Act; and providing for the repeal of such provisions upon expiration thereof (Part DD); to amend the Real Property Tax Law, in relation to establishing an optional local tax

**NYS ASSEMBLY**                    **APRIL 19, 2024**

exemption for affordable multi-family housing and an optional local tax exemption for newly-converted or constructed fully income-restricted rental multiple dwellings (Part EE); to amend the Emergency Tenant Protection Act of 1974, the Administrative Code of the City of New York, and the Emergency Housing Rent Control Law, in relation to increasing the amount recoverable by an owner for individual apartment improvements (Part FF); to amend the Executive Law, in relation to including an accessory dwelling unit in the term housing accommodations in the Human Rights Law; and to amend the Real Property Tax Law, in relation to providing a tax exemption on the increase in value of property resulting from the addition of an accessory dwelling unit (Part GG); to amend the Real Property Law and the Real Property Actions and Proceedings Law, in relation to enacting the "Good Cause Eviction Law"; and providing for the repeal of such provisions upon the expiration thereof (Part HH); to amend the Real Property Actions and Proceedings Law, in relation to further establishing when a landlord-tenant relationship exists (Part II); to amend the Real Property Tax Law, in relation to directing the Department of Housing Preservation and Development to develop a program to conduct annual audits of compliance with the Affordable New York Housing Program (Part JJ); to amend the Private Housing Finance Law, in relation to establishing the New York Housing for the Future Homeownership Program and the New York Housing for the Future Rental Housing Program (Part KK); to amend the Election Law, the Civil Practice Law and Rules and the Education Law, in

relation to regulating public data maintained by county and city boards
of elections (Part LL); to amend the Alcoholic Beverage Control Law,
in relation to permitting the use of contiguous and non-contiguous
municipal public space by certain licensees; and to repeal Chapter 238
of the Laws of 2021, relating to permitting the use of municipal space
for outdoor dining (Part MM); to amend the Transportation Law, in
relation to clarifying certain provisions of the Stretch Limousine
Passenger Safety Act (Part NN); to amend the Vehicle and Traffic
Law, in relation to establishing speed limits in cities with populations
in excess of one million people (Part OO); to amend the Public Health
Law, in relation to enacting the Reproductive Freedom and Equity
Grant Program (Part PP); to amend the Retirement and Social Security
Law and the Administrative Code of the City of New York, in relation
to the calculation of the final average salary for purposes of the
calculation of a pension benefit (Part QQ); to amend the Tax Law, in
relation to reducing the rate of tax applicable to certain authorized
combative sports under Article 19 thereof (Part RR); authorizing the
lease of certain lands located at the State University of New York at
Stony Brook (Part SS); to amend the Public Authorities Law, in
relation to bonds issued by the New York City Transitional Finance
Authority (Part TT); to amend the Public Authorities Law, in relation
to fare enforcement by the Metropolitan Transportation Authority
(Part UU); in relation to directing the Office of Children and Family
Services to conduct a study to evaluate the feasibility of providing
after-school programming to every school-aged child in New York

(Part VV); to amend the Vehicle and Traffic Law, in relation to obstructed or obscured license plates and the penalty imposed upon the operator of a vehicle with an intentionally-altered or obscured license plate while on a toll highway, bridge or tunnel or in a tolled central business district; to amend the Vehicle and Traffic Law, in relation to authorizing law enforcement to confiscate license plate coverings; to amend the Vehicle and Traffic Law, in relation to authorizing vehicle registration suspension for failure to comply with the removal of materials or substances altering or obscuring a license plate; and to amend the Public Authorities Law, in relation to authorizing public authorities with bridges, tunnels or highways under their jurisdiction to enter judgments for unpaid liabilities for a violation of toll collection regulations and enforce such judgments without court proceedings (Subpart A); and to amend the Public Authorities Law, in relation to the payment of tolls under the Tolls by Mail Program (Subpart B) (Part WW); to provide for the administration of certain funds and accounts related to the 2023-2024 budget, authorizing certain payments and transfers; to amend the State Finance Law, in relation to the administration of certain funds and accounts, in relation to the effectiveness thereof, and in relation to interest owed on outstanding balances of debt; to amend part D of Chapter 389 of the Laws of 1997 relating to the financing of the Correctional Facilities Improvement Fund and the Youth Facility Improvement Fund, in relation to the issuance of certain bonds or notes; to amend the Private Housing Finance Law, in relation to

housing program bonds and notes; to amend the Public Authorities Law, in relation to the issuance of bonds and notes by the Dedicated Highway and Bridge Trust Fund; to amend the Public Authorities Law, in relation to the issuance of bonds and notes for City University facilities; to amend the Public Authorities Law, in relation to the issuance of bonds for library construction projects; to amend the Public Authorities Law, in relation to the issuance of bonds for State University educational facilities; to amend the Public Authorities Law, in relation to the issuance of bonds and notes for locally-sponsored community colleges; to amend Chapter 392 of the Laws of 1973, constituting the New York State Medical Care Facilities Finance Agency Act, in relation to the issuance of mental health services facilities improvement bonds and notes; to amend Part K of Chapter 81 of the Laws of 2002, relating to providing for the administration of certain funds and accounts related to the 2002-2003 budget, in relation to the issuance of bonds and notes to finance capital costs related to homeland security; to amend Chapter 174 of the Laws of 1968 constituting the Urban Development Corporation Act, in relation to the issuance of bonds and notes for purposes of funding Office of Information Technology Services project costs; to amend Chapter 329 of the Laws of 1991, amending the State Finance Law and other laws relating to the establishment of the Dedicated Highway and Bridge Trust Fund, in relation to the issuance of funds to the Thruway Authority; to amend Chapter 174 of the Laws of 1968 constituting the Urban Development Corporation Act, in relation to the issuance of

238

bonds and notes to fund costs for Statewide equipment; to amend the
Public Authorities Law, in relation to the issuance of bonds for
purposes of financing environmental infrastructure projects; to amend
Part D of Chapter 389 of the Laws of 1997, relating to the financing of
the Correctional Facilities Improvement Fund and the Youth Facility
Improvement Fund, in relation to the issuance of bonds and notes for
the Youth Facilities Improvement Fund; to amend the Public
Authorities Law, in relation to the issuance of bonds and notes for the
purpose of financing Peace Bridge projects and capital costs of State
and local highways; to amend Chapter 174 of the Laws of 1968
constituting the Urban Development Corporation Act, in relation to
the issuance of bonds for economic development initiatives; to amend
Part Y of Chapter 61 of the Laws of 2005, relating to providing for the
administration of certain funds and accounts related to the 2005-2006
budget, in relation to the issuance of bonds and notes for the purpose
of financing capital projects for the Division of Military and Naval
Affairs; to amend Chapter 174 of the Laws of 1968 constituting the
Urban Development Corporation Act, in relation to the issuance of
bonds for special education and other educational facilities; to amend
the Public Authorities Law, in relation to the issuance of bonds and
notes for the purpose of financing the construction of the New York
State Agriculture and Markets Food Laboratory; to amend Section 1
of Part D of Chapter 63 of the Laws of 2005, relating to the
composition and responsibilities of the New York State Higher
Education Capital Matching Grant Board, in relation to higher

education capital matching grants; to amend Chapter 392 of the Laws of 1973, constituting the New York State Medical Care Facilities Finance Agency Act, in relation to including comprehensive psychiatric emergency programs and housing for mentally-ill persons in the definition of mental health services facility; to amend the State Finance Law, in relation to the private sale of certain revenue bonds, and in relation to including assets that provide a long-term interest in land in the definition of fixed assets; to amend the Public Authorities Law, in relation to bond issuance charges; to amend the State Finance Law, in relation to the redemption price of certain revenue bonds; to amend Chapter 174 of the Laws of 1968 constituting the Urban Development Corporation Act, in relation to the issuance of personal income tax revenue anticipation notes; to amend the Public Authorities Law, in relation to the issuance of bonds or notes for the purpose of assisting the Metropolitan Transportation Authority in the financing of transportation facilities; and providing for the repeal of certain provisions upon expiration thereof (Part XX); to amend Chapter 141 of the Laws of 1994, amending the Legislative Law and the State Finance Law relating to the operation and administration of the Legislature, in relation to extending such provisions (Part YY); to amend the Education Law, in relation to school governance in the City of New York; and to amend Chapter 91 of the Laws of 2002 amending the Education Law and other laws relating to reorganization of the New York City School Construction Authority, Board of Education and community boards, and Chapter 345 of the Laws of

2009 amending the Education Law and other laws relating to the New York City Board of Education, chancellor, community councils and community superintendents, in relation to the effectiveness thereof (Part ZZ); to amend the Economic Development Law, in relation to establishing the Newspaper and Broadcast Media Jobs Program; and to amend the Tax Law, in relation to establishing the Newspaper and Broadcast Media Jobs Tax Credit (Part AAA); and to amend the Tax Law, in relation to a payment of a supplemental Empire State Child Credit (Part BBB).

ACTING SPEAKER AUBRY:  Governor's Message is at the desk, the Clerk will read.

THE CLERK:  I hereby certify to an immediate vote, Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  An explanation has been requested, Ms. Weinstein.

MS. WEINSTEIN:  Thank you, Mr. Speaker.  With this bill we're -- we will begin to finish our work on the State Budget, the next -- this bill and the next two bills.  Our work began on January 16th when the Executive Budget was released.  Since then, members have been working hard, talking to constituents and examining how the proposed budget would impact the State and their individual districts.  So I would like to thank my colleagues whose feedback and perspectives have been essential to crafting this spend -- spending plan.

Just some highlights, some we've discussed and many

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

that are in this bill include major investments in health care, including 1.2 billion in investments in hospitals and nursing homes over the Executive Budget.  The Assembly created a new funding mechanism to help secure the future of -- of our health care system.  The nationwide housing crisis is particularly acute in our State.  This budget provides incentives to create new housing, as well as protections for tenants, and invests 585 million in additional funding to preserve and create affordable housing, including funding for 100 percent affordable housing in perpetuity under the Assembly's new Housing for the Future Program.  The budget invests 66 million to enhance TAP benefits, doubling the minimum award and raising the income limit for TAP to 125,000, first increase in this limit in 24 years.  We enhanced benefits for public employees to help recruit a new generation of public servants.  This budget contains enhanced enforcement powers, as we discussed, for the Office of Cannabis Management and local governments to help address unlicensed cannabis sales.  And in addition, there are provisions to help accelerate the pace of clean energy development.  The budget also provides 500 million for clean water projects, and an increase of 11 million for agricultural programs over the last year.

There are many other important programs, exciting programs in -- that we're funding in this budget, and I look forward to having questions with my colleagues now on the issues in the -- in this, the ELFA bill.

ACTING SPEAKER AUBRY:  Mr. Ra.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. RA:  Thank you, Mr. Speaker.  Will the sponsor -- will the Chairwoman yield?

MS.  WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  The Chairwoman yields.

MR. RA:  Thank you.  So I -- I do want to start with some of the global picture just to the extent any of this that was not previously available might be.  Yesterday, you know, we -- we got the financial plan later on in the day so we now have those overall spending numbers for -- for this fiscal year.  Do we have any further information regarding out-year gaps?

MS. WEINSTEIN:  Unfortunately, we still don't have information on out-year gaps.

MR. RA:  Okay, thank you.  But you said yesterday I guess the -- the 20 billion cumulative deficit from the Executive is probably -- probably a good ballpark figure --

MS. WEINSTEIN:  Yes.

MR. RA:  -- for where we are?

MS. WEINSTEIN:  Yes, I still believe that.

MR. RA:  Okay.  In terms of some of the other measures with regard to how money is -- is being appropriated, there's a transfer of $350 million from the General Fund to the Health Care Stability Fund to cover the potential revenue from the MCO tax in the current fiscal year; is that correct?

MS. WEINSTEIN:  Yes.

243

NYS ASSEMBLY                                    APRIL 19, 2024

MR. RA:  And I know, you know, we talked about it yesterday the likelihood of this waiver being approved, but what is the plan should the waiver not get approved to address a gap that would be created in this fiscal year?

MS. WEINSTEIN:  I -- I think I may have mentioned, perhaps with someone else, that we believe there are sufficient reserves that could be available in the what we think is unlikely case that the MCO tax is not approved before the end of this fiscal year.

MR. RA:  Okay.  And if -- if that was the case -- case, I mean, would this potentially create a recurring gap in the General Fund that we would need to address in the future fiscal years?

MS. WEINSTEIN:  Potentially it could be, though we continue to see the receipts from this -- the closing out the year that could ultimately be available to cover those costs.

MR. RA:  Okay, thank you.

With regard to debt, do we have an updated outstanding debt number for Fiscal Year 2025?

(Pause)

MS. WEINSTEIN:  It hasn't really changed since we did the debt, so say it's about 60.9 million -- billion, I'm sorry.

MR. RA:  And how does that compare to the Governor and to -- to last year?

MS. WEINSTEIN:  It is 6.6 billion over the Governor.

244

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. RA:  Okay, thank you.

And then just a couple of other measures that we
have seen in recent years that date back to COVID.  So the liquidity
financing measure that was put into law to address cash flow needs
during COVID, that authorization is extended again?

MS. WEINSTEIN:  Yes.  It's 3 billion for one year,
which is down from the previous 4 billion.

MR. RA:  Okay.  And have we been utilizing that in
the last couple of fiscal years?

MS. WEINSTEIN:  No, we have not.

MR. RA:  Is there a particular reason why we're
extending it, then?

(Pause)

MS. WEINSTEIN:  The Executive had recommended
a proposal was to keep the 4 billion in perpetuity and we reduced that
by the 1 billion to get to the 3 billion number.

MR. RA:  Okay.

And then with regard to the MTA, we did a
authorization during COVID to allow the MTA to issue 50-year
bonds, and that authorization continues going forward?

MS. WEINSTEIN:  Yes.  There's a three-year
extender for the M -- in -- in this proposal.

MR. RA:  Okay.  Do -- do we have any sense or
concerns that with the interest rates being at -- at a high right now that
this will increase the costs for the MTA in terms of that length of

245

NYS ASSEMBLY                                    APRIL 19, 2024

bonding?

        MS. WEINSTEIN:  I would think that it -- clearly, they'd be able to refinance in the future when rates would be lower.

        MR. RA:  Thank you.

        So I'm gonna move -- move into, I guess, the -- the meat of the bill at -- at this point.

        MS. WEINSTEIN:  Sure.

        MR. RA:  I want to start with education provisions.  I know that we talked about, you know, yesterday in Aid to Localities, Foundation Aid, but I want to start with the Foundation Aid inflation factor.  At our budget hearing, Commissioner Rosa mentioned that the change to a multi-year inflation factor reduces finan -- Foundation Aid gross significantly in a year when inflation remains high.  How much are we limiting the Foundation Aid increase due to the change in the inflation factor calculation?

        MS. WEINSTEIN:  We did not make a permanent change to the inflation factor.  I think as we mentioned yesterday, the -- the restoration -- that the Education Budget includes that -- the restoration of the hold harmless provision and the increase of the inflation factor to 2.8 percent.

        MR. RA:  Okay.  And how is that -- that 2.8 percent number chosen?  Is it -- is it based on something in particular, or is it a, you know, compromise number in terms of, you know, the Majorities and the Governor?

        MS. WEINSTEIN:  Well, I -- I think that it was a

246

NYS ASSEMBLY                                  APRIL 19, 2024

compromise both looking at amount available and the -- the needs of the -- of the school districts.

MR. RA:  Okay.  One of the -- one of the points that I believe the, you know, a lot of our superintendents and -- and school board members have talked about with regard to this is obviously, you know, I think they'd be more okay with this change if they could still buy, you know, the goods and services they need at prices from -- from years past.  Do we know why the inflation factor was originally part of this formula back in 2007 when it was implemented?

MS. WEINSTEIN:  When -- back in -- back in -- back then when inflation was around 3 percent and looking -- we were looking for some metric to be able to predict growth going forward, it was -- it was adopted.

MR. RA:  So do -- with the number that we're going with here, is -- do you feel we're remaining consistent with that purpose of -- of having that factor?

MS. WEINSTEIN:  It -- it helps provide some guidance as -- as we put together and review the budget.

MR. RA:  Okay.  And then going forward -- and we -- we can talk in particular about the parameters of who's doing the Foundation Aid study I know when we get to State Ops -- but is the intention of this study to basically do a wholesale shift away from the common current formula structure, or do we think it's just going to be, you know, updating data sources, modernizing data sources to how we come out with what a particular district gets on the Foundation Aid?

MS. WEINSTEIN:  Well, the -- the Foundation study, I don't think we talked about who was doing it, it's the SUNY Rockefeller Institute of Government in consultation with State agencies and stakeholders to recommend updates and changes to the -- to the formula.  And, you know, then their report would be nonbinding recommendations for updates to the existing formula, but it will provide guidance to both the Executive and the Legislature as -- as to needs going forward and what we should -- what we should do to the education -- to the Foundation Aid formula.

MR. RA:  Okay.  And again, I think we'll -- we'll talk a little further about the study later on, but that's -- that's due to come back in December, correct?

MS. WEINSTEIN:  Yes, December 1.

MR. RA:  Okay.  The -- the Back to Basics Reading Initiative, is -- is the Department of Education gonna be recommending textbooks or -- or curriculum for the districts to adopt to comply with this new mandate?

MS. WEINSTEIN:  That level of detail is not -- will not be specified.

MR. RA:  Okay.  Do -- do we anticipate districts having to incur costs associated with having, you know, to update curriculum to comply with the new mandate?

MS. WEINSTEIN:  No, it -- it's really just to provide guidance to the school districts.

MR. RA:  And is there any particular provisions as to

248

**NYS ASSEMBLY**                                          **APRIL 19, 2024**

how the Department will determine districts that are in compliance or out of compliance, really, with the best practices that the Department comes up with?

MS. WEINSTEIN:  The school districts would have to identify as that they are -- identify that they are complying with the best practices.

MR. RA:  Okay, thank you.

Higher education.  So, you mentioned a change to TAP, increasing the maximum income eligibility threshold.

MS. WEINSTEIN:  Yes.

MR. RA:  So does that now mirror the Excelsior Scholarship number?

MS. WEINSTEIN:  Yes.

MR. RA:  And then also it will also increase the minimum award?

MS. WEINSTEIN:  Yes, it doubles the minimum award from 500 to 1,000.

MR. RA:  Okay.  Do we know how many additional students these changes might benefit?

(Pause)

MS. WEINSTEIN:  Sorry, I don't have that information.  It also -- we also -- I just want to add that we provide part-time TAP to proprietary college students for the first time.

MR. RA:  Yes, so that -- so that -- that was gonna to be my next question, do we know how many additional colleges are --

NYS ASSEMBLY                                APRIL 19, 2024

are gonna benefit from -- from that change with regard to part-time

TAP?

MS. WEINSTEIN:  I would say approximately 11.

MR. RA:  Okay, thank you.  Now, going back a

number of years, and I -- and I think these are -- I think these are great

changes to TAP, so I applaud that -- that effort.  Back before 2011, the

maximum TAP award was linked to SUNY tuition.  Are we doing

anything with regard to language that would return us back to having

that linkage between TAP awards and SUNY tuition?

MS. WEINSTEIN:  No, we don't.  But students who

are eligible for the maximum TAP award can continue to go to SUNY

and CUNY for free.

MR. RA:  And then with regard to independent

colleges.  So this -- we had this proposal regarding limiting Bundy Aid

based on the size of endowments?

MS. WEINSTEIN:  Correct.

MR. RA:  And can you -- can you detail how -- what

-- what that ultimately looks like?

MS. WEINSTEIN:  We -- we didn't accept the

Governor's proposal for an -- not providing Bundy Aid for colleges

and universities that had above $750 million in their reserve -- in their

endowment assets at the end of Fiscal Year 2021.

MR. RA:  So do -- do we have any sense as to what

that looks like for different independent colleges in the State given,

you know, we have right here, right, we have Saint Rose that is

250

NYS ASSEMBLY                                    APRIL 19, 2024

closing, what impact this might have on -- on our independent

colleges and universities and their ability to continue to operate?

      MS. WEINSTEIN:  Smaller -- you know, some of the

-- you mentioned Saint Rose, some of the smaller independent

colleges are not affected by this.  There are about 15 or so universities

with some very high amounts of endowments, some as much as

$14 billion, that will -- have been getting Bundy Aid that starting this

year will not.

      MR. RA:  Okay, thank you.

      I want to ask about a couple of provisions, or

proposals that -- that didn't ultimately make it into this budget.  There

was -- in the original Executive Budget in Part K, there was a

provision regarding a -- a lawsuit that limited liquidated damages for

pay violations, the 2019 *Vega v. C.M. and Associates Construction*

*Management* decision that found that paying manual workers other

than a weekly basis was wage theft, even if they were paid their full

wages.  And this would have remedied this situation, and I know, you

know, a lot of employers were concerned with that.  So do we have a

concern without adopting that language that employees [sic] could

still be sued and forced to pay the employees' paid wage even if

they've already paid it?

      MS. WEINSTEIN:  So, we couldn't really come to

agreement within the budget, but since it is a policy issue we can

certainly take -- intend to take it up after the budget, later in Session.

      MR. RA:  So we -- we do expect to possibly take

**NYS ASSEMBLY**                              **APRIL 19, 2024**

something up with that on its own outside of the budget?

MS. WEINSTEIN:  Yes, because we are looking for a solution that would work.

MR. RA:  Great, thank you.

With regard to, again, something that I guess was -- was really I would say more in the one-House than in the Executive, but do we have any particular property tax relief provisions in -- in this budget?

MS. WEINSTEIN:  Not for property tax relief, but there are some other relief -- right, there's no property tax relief, per se.

MR. RA:  Okay.  But there are, I guess, a number related to housing proposals, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  So do we know how, you know, how the local governments feel about this?  Because I believe these are opt-ins?

MS. WEINSTEIN:  Outside of New York City, yes.

MR. RA:  Okay.  So if a -- like, I know there's the one -- there's one related to accessory dwelling units, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  And it provides a partial exemption that phases out over, is it three years?

MS. WEINSTEIN:  Five years.

MR. RA:  Five years?

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MS. WEINSTEIN:  A five-year tax exemption.

MR. RA:  So if a municipality were to opt into that, since it's an exemption, right, I guess the cost of that benefit being provided to a particular taxpayer is -- is spread to the rest of the property taxpayers that that levy impacts, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  And then -- and then over -- once the five years is up, the, you know, the property owner will be paying the full assessed value of -- of that property?

MS. WEINSTEIN:  Yes.  Yes, that's true.

MR. RA:  Okay, thank you.  I want to get into some other issues with regard to the housing proposals in general.

MS. WEINSTEIN:  Sure.

MR. RA:  So, the Good Cause provisions.

MS. WEINSTEIN:  Yes.

MR. RA:  So we have -- this is mandatory in New York City, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  And then it's an opt-in outside of New York City?

MS. WEINSTEIN:  Correct.

MR. RA:  Okay.  And how -- what is the interplay between a -- a municipality, whether it's a city, whether it's a village, whatever, that is subject to our current rent control laws versus subject to Good Cause Eviction and -- and the -- the, you know, the -- the

253

**NYS ASSEMBLY**                                 **APRIL 19, 2024**

protections that are associated with regard to rent in the Good Cause Eviction local rent standard?

MS. WEINSTEIN:  Right.  So regular -- regulated units are not part of this proposal, the Good Cause Eviction.

MR. RA:  Okay.  Now, am I correct that under our rent control provisions, when a municipality opts into those, they're required to do a -- a vacancy survey?

MS. WEINSTEIN:  Yes.

MR. RA:  And is any -- any such survey required for a municipality who opts into Good Cause Eviction?

MS. WEINSTEIN:  No.

MR. RA:  Okay.  So, you know, I think the difference there being, you know, we've always required basic -- basically that survey to show a emergency of -- of housing, so that's something that I -- I think may be concerning that is not part of this system which is going to similarly limit, you know, the rent that can be charged on a particular unit.

Now, with regard to the -- the eviction provisions themselves, how -- under what circumstances can a landlord remove a tenant, right?  We're talking about a situation where perhaps there's been a lease that has expired, right, but the landlord, despite the expiration of that lease, will now be limited in their ability to have that tenant vacate the unit, correct?

MS. WEINSTEIN:  Correct.  Would you like me to go through the various --

254

NYS ASSEMBLY                                    APRIL 19, 2024

MR. RA:  Yes, please.

MS. WEINSTEIN:  -- (inaudible)?  Okay.  So Good
Cause on behalf of a landlord not renewing the lease or evicting
would be nonpayment of rent; the tenant is violating the terms of the
tenancy and has not cured the violation after written notice; the tenant
is committing or permitting a nuisance maliciously or negligently
damaging the property or interfering with the comfort of the landlord
or other tenants; the tenant is living in the unit in violation of law and
the State or municipality has issued an Order to Vacate; the tenant is
using the unit or allowing the unit to be used for an illegal purpose;
the tenant unreasonably denies access to the landlord when the
landlord is attempting to make repairs or sell the property.  The
landlord in good faith -- seeks in good faith to recover the unit for
their own use as a primary residence, or the use of a family member as
a primary residence where there are no other units available to recover
and the occupant is not a senior or disabled.  The landlord seeks in
good faith to demolish -- demolish or significantly repair the housing
accomodation.  The landlord seeks in good faith to withdraw the
housing accommodation from the housing rental market, the tenant
fails to agree to reasonably -- to reasonable changes to a lease at
renewal including rent increases that are not unreasonable.  And I
would add that exempted from these provisions are landlords who
own no more than 10 units in the State, or an owner-occupied premise
[sic] with no more than 10 units, and then there are exemptions for
units which rent for more than 245 percent of the fair market rent for

the unit size and the rental area, though that number can -- that percentage can be adjusted by a local -- a municipality that opts in, and it exempts build -- buildings built after January 1st, 2009 for a period of 30 years.

MR. RA:  Okay.  With regard to the piece for personal use and occupancy for a -- a relative, and I know there -- there's a list of what relatives that would qualify, but it says when no other suitable housing in the building is available.  Now, does that mean a unit, or could -- or -- or, I mean, could it be a situation where, hey, there's -- there's a room somewhere, somebody that -- that you could put them in, or does it mean if no other unit is available?

MS. WEINSTEIN:  Well, unit refers -- refers to an individual apartment.

MR. RA:  Okay.  So -- so under those circumstances, if somebody wanted to give a -- a particular unit to that relative, you know, a qualifying relative under the language of this, but they had maybe a -- a smaller unit available in the building, how -- how would that work?  Would they be -- would they have to give their relative a -- a different unit and not be able to have the unit that they want to give that relative be vacated?

MS. WEINSTEIN:  It would -- it talks about a suitable unit.  So if there's a need for a certain size unit and, for example, a two-bedroom versus a studio that might be available, that would control.

MR. RA:  Okay.

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  If there was the need for the larger apartment.

MR. RA:  And it would -- with regard to -- say it's an elderly relative and you're trying to get -- you have a unit available on the fifth floor, but there's one available -- you're -- you're looking to give that elderly relative one on the first floor so that they don't, you know, maybe they don't do stairs well, whatever.  Would -- would you be able to give that unit to the relative under those circumstances?

MS. WEINSTEIN:  Yes.  As -- particularly as someone who had trouble walking up several flights of stairs, it certainly would not be suitable to have someone who has trouble walking be on a fifth floor.

MR. RA:  Okay, thank you.

And we have a couple minutes left, and I'm gonna just shift to a -- a -- maybe one of the more dry topics with regard to sweeps and transfers and the -- and the Comptroller's oversight.  Now, we've rejected the proposal to limit the Comptroller's review of bond transactions, correct?

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  So it wasn't omitted, but rather it looks like it's a different provision has been -- just replaced that particular section?

MS. WEINSTEIN:  Yes, that's correct.

MR. RA:  Okay.  And are we confident at this point that -- well, we've seen all the bills, so that -- that -- that provision is

257

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

not anywhere else, correct?

MS. WEINSTEIN:  Correct.

MR. RA:  Okay.  And then when we had discussed the Capital Budget it included increases to the CREST and LCAP Capital Grant programs.  Why were those bond cap increases not included in sweeps and transfers?

(Pause)

MS. WEINSTEIN:  So, since they do get bonded through DASNY, my understanding is that it's included in the aggregate number but not lined out in that way.

MR. RA:  Okay.  Thank you very much, Madam Chair.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Goodell.

MR. GOODELL:  Thank you, sir.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GOODELL:  Oftentimes our debate highlights our differences and rather than highlight our commonalities, and so I wanted to take a minute to discuss where I think all of us have a common interest and where we might differ as it relates to Good Cause Eviction.  I think everybody in this room has a lot of compassion, a lot of concern and a lot of desire to address the housing crisis.  Everyone in this room would like to see more housing, more supply, more competitive market, lower rents and better quality apartments.  On that, on the objective, I think we all agree.  Where we

258

disagree is how to get there. Most of my colleagues are of the opinion that if we harness the power of the private sector and the capitalist market, we can achieve those objectives. And in -- in support of that, we look at how housing markets have successfully adapted to changes all across the State of New York, outside of New York City, and all across the nation. The concern I have, and it's deeply frustrating to me, is that when we address these housing issues, particularly in New York City, we seem to be ignoring some fairly fundamental unequivocal concepts that govern the law of supply and demand. And we know them, we're just not applying them. So we all know that if you want to increase the supply of housing, for example, you need to make it more attractive for investors to go into that field and invest their hard-earned money. And when investors are looking at where to put their money, they look at the risk that they'll lose money, and they apply it against the opportunity to make a profit. And so when we make it riskier to make an investment or if we make it more difficult to cover your costs by capping your profitability, we reduce the supply, we reduce the investments. And this bill does both. It makes it riskier to invest in real estate by a putting government-regulated cap on rent, and it caps your profitability. It does both; it makes it riskier, more likely you'll lose money, and it limits your ability to offset that risk.

So, sadly, this bill, in my opinion, will make the housing crisis worse, not better. And so we recognize parts of it in this bill, so we have this very unique situation in this bill where, as

NYS ASSEMBLY                               APRIL 19, 2024

noted by the *Wall Street Journal*, we impose universal rent controls
which have proven to depress the market, then we create massive tax
breaks for certain developers but not others.  We increase a
disincentive to make investments for everybody else, and then we
layer on various subsidies.  It's a crazy approach.

Five years ago in 2019, we passed the Tenant
Protection Security Act and the galleries here were filled with tenant
advocates who were cheering.  And I just shook my head, I -- I said to
myself, *Forgive them, God.  They not -- they know not what they ask
for.*  Because in 2019, as an example, we limited the security deposit
to one month and then we extended the eviction process.  Upstate, the
fastest you can go is about two-and-a-half months, and you have to
bring two lawsuits if you want to recover damages and rent because
you can't do it in a single lawsuit anymore.  And in New York City,
it's my understanding that landlords would be delighted if they could
do it in two or three months.

So what happens when you limit the security deposit
but raise the risk of loss by extending the eviction time frame?
Landlords raised the rent.  They had no choice.  They had to raise the
rent to cover that increased risk of loss, and that's exactly what
happened.  It happened Statewide.  And then in the same year, we
dealt with substantial improvements on rent-controlled apartments in
New York.  And we did a couple of things:  First, we eliminated any
possible return on your investment.  And we did that because we said
if you renovate an apartment, the only thing you can get is the cost of

260

the renovation paid out over a number of years with zero rate of return, zero interest. And that was if you could keep the increased costs below an artificially-low cap. Now, how many of you would take your own money and invest it in an area where, at best, you've got nothing in return? Think about that. Would you put your money in a -- in a -- in a CD where they promised you that, at best, you'd get zero? But that's exactly what we did.

And so what do we do in this law? Well, we make some minor changes. We raised the ability to make renovations to individual apartments, still no rate of return. Still zero. Which means if you want to lose more money, you can do it. And we don't adjust at all the cost of making building-wide investments. So while the New York City Council is saying you must convert to all-electric, you must, and we know it's a massive cost, we say to everyone who owns a rent-controlled apartment, *You can't raise rents to pay for that massive cost of converting to all-electric*. So what's happening in the New York City rental market? The vacancy rate, as all my New York City colleagues are quick to point out, is just over 1 percent. I mean, that's a horrifically tight market. But what's the vacancy rate in rent-stabilized apartments? That, my friends, is around 25 percent. Why? Because the landlords can't afford to maintain them. They simply can't afford to maintain them because we made it impossible for them to get any return on investment.

So what's Good Cause Eviction do? It takes the rent-stabilized program that was a disaster in New York that's resulted in a

25 percent vacancy rate across the State -- City of New York, and we take that concept and apply it Statewide.  The 25 percent vacancy rate was based on a survey of a quarter-of-a-million apartments that was done a few months ago.  And do we think for one moment if we tell everyone who is involved in the real estate market that, *You won't be able to make a decent return and it will increase your risk of losing your money* that they're all gonna to flock to this field?  No, they'll buy something else.  You'd buy -- you'd buy a utility stock.  Our Public Service Commission guarantees a rate of return of 9 percent.  You invest in real estate and this Legislature makes sure you don't lose any -- you don't make any money.  It's a recipe for disaster, and it has been proven to be a disaster.  So why after 50 years of failed public policy do we want to double down?

Now, one of my colleagues mentioned yesterday in an unrelated debate that if we're gonna complain about something, we ought to have a solution.  And I agree.  So I'll give you a simple solution.  Let's reduce the risk to landlords and investors to encourage more investment.  Let's reduce the risk.  How do you reduce the risk?  You make it easier, not harder, to evict a tenant that's not paying.  Let's allow them to get a market rate of return.  How do you do that?  Let the rent rates fluctuate with the market so individuals, when they're looking at investing their hard-earned money, know they can make a reasonable rate of return in real estate as opposed to taking their money and putting it into the stock market.  For Pete's sakes, you could put your money in a CD and make five times more than you can

make in real estate in New York City.  The fact that we have made real estate so unprofitable and real estate has far-reaching ramifications, in addition to driving up market rents in the unregulated area, we have created a banking crisis.  As noted in *The Wall Street Journal* just this morning, and I quote, "One predictable result of these rent regulations is that multi-family housing values and investment have plunged."  How much?  The FDIC unloaded loans from the failed Signature Bank they were backed by rent-stabilized apartments at a 40 percent discount.  These rent regulations have resulted in these buildings being worth 40 percent less than their fair market value. New York Community Bank warned this year that a -- that 14 percent of its rent-regulated loan book was at risk of default.

We have a housing crisis.  The housing crisis was created by this Legislature by driving out investment.  The solution is to encourage investment back in.  That's how you do it.  Not by extending a failed public policy Statewide.  So my friends, five years ago when we passed the Tenant Protection and Security Act, I wrote an essay, and I said this is bad for landlords and it's bad for tenants. Because landlords are gonna be forced to raise rents where they can, tenants are gonna face a housing shortage.  That housing shortage is gonna drive up the rents further.  It's bad for landlords and it's bad for tenants.  So let's harness the power of the private sector to help address the housing crisis, not exasperate it.

Now, on a completely unrelated issue, I always think it's fun, sometimes, to look for humor in the budget.  And I found it

NYS ASSEMBLY                                    APRIL 19, 2024

this morning in reviewing this bill when I read about the new proposals from the Blue Ribbon Task Force by the MTA in how to address fare beating for those who violate paying fares. Now, how big of an issue is it? Well, the MTA tells us they lose about 690 million a year, about two-thirds of a billion, on fare beating. And so what's their recommendation to address it? Well, first, if you get a ticket they eliminate any fine at all. No fine. Yeah, that's really gonna encourage enforcement. Instead, you'd get a written warning and then presumably there's some database where it keeps track of all this. And then what happens if you get second fine? Well, if you get a second fine there's a fine unless you enroll in the Fare Fine Program. And if you enroll in the Fare Fine Program, they'll give you half the fine back on -- on an MTA card. (Laughing) That's really gonna help enforcement. So you wonder how is it that New York City is losing 690 million on fare enforcement and their Blue Ribbon Task Force says, *We'll eliminate any fines and we'll just tell you, you really need to pay*. And then you have DA Bragg who says, *And by the way, if you ever do get a ticket, I'm not going to enforce it anyway*. It's -- it's astounding that anyone pays. And by the way, only about 40 percent of those who ride the bus don't pay, they just walk right by the bus driver and the bus drivers are told, *Don't even ask for a fare because we don't want to offend anyone*. If we were running a business in the private sector, this would be a bad joke and, sadly, it is a bad joke, and it's a bad joke on us.

Thank you, sir.

264

NYS ASSEMBLY                                    APRIL 19, 2024

ACTING SPEAKER AUBRY:  Mr. Reilly.

MR. REILLY:  Thank you, Mr. Speaker.  Will the Chairwoman yield for a few questions?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  The Chairwoman yields.

MR. REILLY:  Thank you, Madam Chair.

So I want to start off on talking about Mayoral Control.

MS. WEINSTEIN:  Yes.

MR. REILLY:  So in this legislation there is a piece that would revamp the Panel for Educational Policy, what's better known as PEP, on the New York City School Board.

MS. WEINSTEIN:  Yes.

MR. REILLY:  So it says that the -- the Chair of the PEP will be selected -- there'll be three select -- three people selected to -- to the mayor for him to choose -- or he or she, whoever's the mayor at the time -- one by the -- one by the Assembly Speaker, one by the Senate Temporary President and one by the Chancellor of the Board of Regents.

MS. WEINSTEIN:  Correct.

MR. REILLY:  Is that correct?

MS. WEINSTEIN:  Correct.

MR. REILLY:  So reading further into it, it says that if the mayor doesn't select one of those members, there would be up to

265

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

two more groups of three submitted to the mayor for his selection --

        MS. WEINSTEIN:  Correct.

        MR. REILLY:  -- is that accurate?  So if we get past those three rounds and the mayor still hasn't selected an individual, what happens?

        MS. WEINSTEIN:  The -- whoever's mayor at the time would have to select somebody from round number three.

        MR. REILLY:  So is it a "shall" select, where the mayor would be required to take one of those three in the --

        MS. WEINSTEIN:  Yes.

        MR. REILLY:  -- third group?

        MS. WEINSTEIN:  Yes.

        MR. REILLY:  Is there any mechanism if the mayor does not select a person?  Is there any type of penalty?

        MS. WEINSTEIN:  There's nothing in this statute, but the -- the mayor would then be out of compliance with Education Law.

        MR. REILLY:  And what would -- how would we hold the mayor accountable for being out of compliance with Education Law?

        MS. WEINSTEIN:  I would believe that the Commissioner of Ed -- Education, State Ed, could take certain actions to make sure that the City would be in compliance.

        MR. REILLY:  Okay.  If the mayor did not select one of those last three candidates and the mayor had valid reason, what

**NYS ASSEMBLY**                                **APRIL 19, 2024**

would the appeals process be?

MS. WEINSTEIN:  I -- we don't believe that the candidates that would be submitted now in round three would not be qualified to -- that neither of the three candidates -- a situation where neither of the three candidates would not be qualified to be appointed Chair of the PEP.

MR. REILLY:  So based on this legislation and reform that's an extension for two years, we as a Legislature and as the Board of Regents believe that we'll definitely find a candidate that will be selected?

MS. WEINSTEIN:  Yes.

MR. REILLY:  Is there a possibility that that may not happen?

MS. WEINSTEIN:  We do not believe so.

MR. REILLY:  Is there anything that can guarantee that?

MS. WEINSTEIN:  The letter of the law will be clear that the -- the Chair of the PEP should be selected by one of these three, or the scenario you described, one of these nine candidates that was submitted to the mayor.

MR. REILLY:  So the -- so the legislation in this bill does not clearly define if we do come to a roadblock after that third attempt and they can't be -- and the mayor maybe refuses to select a person because they don't think they're qualified enough for them?

MS. WEINSTEIN:  Correct.

MR. REILLY:  Okay.  All right.  So I guess we'll be discussing that in future years.

Moving on to basement dwellings.

MS. WEINSTEIN:  Yes.

MR. REILLY:  In that -- in that piece it says that someone who resided in the basement apartment, they would have the -- the right of first refusal if that basement apartment fits the criteria to be modernized and it would be legalized.  Would the -- if -- if the resident moved out six months before the owner decided that they were going to create that new legal basement apartment and they haven't lived there for six months but they were the last tenant, would they have the option for the right of first refusal?

MS. WEINSTEIN:  I don't believe so.  I believe it would be the existing tenant.

MR. REILLY:  So how do we document that that is the existing tenant?  Is that delineated in the legislation?

MS. WEINSTEIN:  The current -- current law describes and designates how you become a tenant and who is a tenant.

MR. REILLY:  But the current law doesn't allow legal occupancy in a illegal basement apartment.

MS. WEINSTEIN:  That -- that -- that's correct, though the tenant could clearly prove that they are, in fact, the tenant.

MR. REILLY:  But if no one resided there before the six months that they moved out -- after the six months that they

268

NYS ASSEMBLY                                    APRIL 19, 2024

moved out, would they still be considered that last tenant because --

MS. WEINSTEIN:  No, they would not have a tenant. They would -- by moving out, they would -- will -- would have broken the tenancy agreement, whether it -- there was a lease that expired or if they were a month-to-month tenant then by vacating the premises, there was -- there would no longer be a tenancy in place.

MR. REILLY:  So currently, if they are in an illegal basement dwelling, they would be considered a legal tenant?

MS. WEINSTEIN:  They, you know, now -- they would meet the definition of tenant under our -- our law in the -- in relation to this provision.

MR. REILLY:  Okay.  I'll move on.  I think that we're gonna have to have some clarity in the future, I think, on that.

I'm gonna move on to the New York City speed limit, 20 mile per hour zone.

MS. WEINSTEIN:  Sure.

MR. REILLY:  So in this legislation it authorizes New York City to lower the speed limit to 20 miles per hour.  There are some other areas in this legislation that would allow them to reduce it to 10 miles an hour in designated areas.  So that 10 mile an hour designated area, is there a definition of what that designated area would be in this legislation?

MS. WEINSTEIN:  It's a street where traffic calming measures are going to be used, and I'm sure you're -- as a fellow New Yorker you're familiar with currently by a number of schools in

269

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

particular, there are reduced speed limits.  So I believe that that is --
that is some of where it would be anticipated that those reduced limits
might be reduced further.

      MR. REILLY:  Okay.  So -- so currently in this
legislation it'll say that school speed zones can't be lower than 15
miles per hour.  That's why I didn't mention those, because I knew that
was already standard.  I think what you may be referring to are those
neighborhood slow zones, which were a pilot program and they were
able to be reduced to 20 miles per hour with speed bumps.

      MS. WEINSTEIN:  Yes.

      MR. REILLY:  So this would allow that now those
neighborhood -- neighborhood slow zones to be lowered to 10 miles
per hour; is that what you're indicating?

      MS. WEINSTEIN:  Yes.

      MR. REILLY:  Okay.  All right.  In this legislation, it
actually states that the City cannot lower it to 20 -- 20 miles per hour,
if they choose to do so, outside of Manhattan.  So the other four
boroughs, if it's on a highway, which is known as a street, in a street in
the four boroughs with three lanes of traffic going the same direction;
is that correct?

      MS. WEINSTEIN:  It's vehicle travel lanes, three
travel lanes in each direction.

      MR. REILLY:  Same direction, correct?

      MS. WEINSTEIN:  Right, outside of Manhattan.

      MR. REILLY:  Okay.  So a question I have for

clarification, so a zone like -- a street like Highland Boulevard in Staten Island, three lanes in each direction, but one of those directions is a designated bus lane only.  Would that bus lane be ded -- be designated as a travel lane even though most travelers are restricted from using those vehicles during certain times, and if it's an off-sidewalk, middle of the lane bus lane, then they would be prohibited at all times.

MS. WEINSTEIN:  Yes.  The answer -- just to restate what you said, three lane -- three vehicular lanes in one direction -- in each direction, right.

MR. REILLY:  So the bus lane under this legislation would allow for traveling in the bus lane, but only restricted to buses still would consider it a travel lane even though the general public is not allowed to drive in that lane?

MS. WEINSTEIN:  Yes, that is what I am informed.  And as you know, some of the bus lanes are -- have hour restrictions so that there are times that motorists -- individual motorists can drive in those lanes.

MR. REILLY:  Okay.  So those -- so that -- like -- like I mentioned earlier, so that bus lane that's next to the sidewalk would be certain hours, but the one that's offset in like a middle lane that's a bus lane, say on Richmond Avenue in -- in the Borough of Staten Island, would that lane count as a travel lane?

MS. WEINSTEIN:  It -- it's -- it's three vehicular travel lanes in the same direction.  And not being so familiar with

271

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

some of the roads in Staten Island, not the road that you described, I
believe the answer is yes, that it would be exempt.

MR. REILLY:  Okay.  So in this legislation it
actually states that it would have to be changed to 20 miles per hour
using a local -- local law.  So does that mean that the New York City
Council would have to pass legislation?

MS. WEINSTEIN:  Yes.

MR. REILLY:  And the mayor would have to sign it?

MS. WEINSTEIN:  Yes.

MR. REILLY:  And --

MS. WEINSTEIN:  Unless they would override a
veto.

MR. REILLY:  Okay.  So the Community Board
would have advisory input?

MS. WEINSTEIN:  Correct.

MR. REILLY:  So basically, *Thanks for stopping by,
we appreciate your opinion*, right?  Okay.

MS. WEINSTEIN:  So similar to the advisory
opinion role they have in other instances.

MR. REILLY:  So does this allow for a New York
City Council -- for the (inaudible) of the New York City Council to do
one blanket law to reduce the speed limit on all streets outside of
Manhattan to 20 miles per hour?

MS. WEINSTEIN:  It -- it does allow them to enact a
local law that would make 20 miles an hour the default speed limit

272

NYS ASSEMBLY                                    APRIL 19, 2024

throughout the City of New York.

MR. REILLY:  Is there anything in the legislation that would allow individual New York City council members to discuss areas in their district and carve it out?

MS. WEINSTEIN:  There certainly would be opportunity during the normal City Council process for members to describe both the positions of the community boards that cover parts of their council districts and own opinions about individual communities -- individual roads, but there is not a provision to carve out individual sections of roads beyond the three mile -- the three lanes in each direction.

MR. REILLY:  Okay, thank you.

Moving on to the toll enforcement.  So, looking at the toll enforcement, the legislation, one piece that specifically sticks out to me is allowing police officers or law enforcement to remove license plate covers without issuing a summons.  So, is that accurate?

MS. WEINSTEIN:  My understanding it's sort of like a fix-it ticket where they can ask the driver to remove the illegal license plate -- that license -- or that license cover, and if they do so they would not be issued a ticket.

MR. REILLY:  All right, thank you.  Thank you, Madam Chair.

On the bill, Mr. Speaker.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. REILLY:  So just to be -- just to note, I think

273

NYS ASSEMBLY                                      APRIL 19, 2024

we're gonna have an issue with Mayoral Control if a selection cannot

be made after those three rounds.  Obviously, we've noted today that

there is some little issue there that's gonna have to be addressed.

Basement dwellings, discussed that.  Speed limit, just remember,

speed cameras will now be able to be issued at 31 miles per hour.  I

think we can walk faster than we can get around at that point.  And we

won't be issuing summons to those electric scooters that are going

around that actually go at 40 miles per hour, more than a car will.

And let me tell you, when you try and use 10 miles an hour in a zone

or 20 miles an hour in a zone, be prepared to pay for more brake pads

because that's what you're gonna be paying because it's gonna have to

slow you down.

When it comes to the toll enforcement, we're going

down a very slippery slope.  In this legislation you're allowing police

officers to remove things from a vehicle without issuing an accusatory

instrument.  We talk about the public being treated -- when you allow

that to happen, I guarantee your civilian complaints are gonna go

through the roof.  And when you're discussing it here and next year,

two years from now when they do this, and you stand up here and you

try and do rent revisions because of complaints to police officers, this

is part of it.

Once again, we put things on paper that we don't

truly think about how they will be in place in the street and in the

courtroom.  All the things I talked about today are things that are

going to come up, mark my words.  We will be making an amendment

NYS ASSEMBLY                                        APRIL 19, 2024

to this at some point, and I hope that the Governor's listening because maybe that's what has to be done.  Because that's the only way that you're really going to make some real changes here.  And just to be clear, you're talking about removing a piece of property from someone's vehicle without giving them their day in court.

ACTING SPEAKER AUBRY:  Mr. Reilly --

MR. REILLY:  What communities do you think are going to be impacted by this the most?  Remember that.

ACTING SPEAKER AUBRY:  Mr. Reilly.

MR. REILLY:  Thank you, Mr.  Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Mr. Slater.

MR. SLATER:  Thank you, Mr. Speaker.  Will the Chair yield for some questions this afternoon?

ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

MS. WEINSTEIN:  Yes.

MR. SLATER:  Good afternoon, Madam Chair.  I hope you're having a good start to the day here as we come down to the end of this budget process.  I have some questions regarding the Good Cause provisions --

MS. WEINSTEIN:  Sure.

MR. SLATER:  -- that are being proposed here, and I appreciate some time talking about this.  I think it's important to note as we start, you know, local control is something that I believe very

275

**NYS ASSEMBLY**                                **APRIL 19, 2024**

firmly in and so I'm very happy to see it's an opt-in provision in -- in this regard. But can you tell me why it's being proposed as an opt-in and not an opt-out?

        MS. WEINSTEIN: We really wanted to make it a locality choice so that they affirmatively take a position and want to be part of the Good Cause Eviction protections for their residents.

        MR. SLATER: Fantastic, I appreciate that. And in order for a municipality to opt-in, are there any requirements for that municipality to comply with, such as a vacancy survey?

        MS. WEINSTEIN: No, there are not.

        MR. SLATER: And so I know that we've talked about vacancy surveys in the past, but just to make sure I'm clear, so we are not requiring municipalities to establish the fact that there is a housing need in their individual community in order to opt-in?

        MS. WEINSTEIN: There is no -- no requirement.

        MR. SLATER: Understood. Regarding the local rent standard, does a municipality that opts in, are they required to perform a means test?

        MS. WEINSTEIN: No.

        MR. SLATER: No means test. Once a local rent standard is established, can the municipality change that level at any point in time, or is it locked in for 12 months, 24 months?

        MS. WEINSTEIN: The standard is the 5 percent plus CPI, no more than 10 percent. So those amounts could change based on the CPI change, but the percentage is --

MR. SLATER:  So it's not up to the individual municipality to set those rates based on their particular community?

MS. WEINSTEIN:  No, but they can set at what point -- what rental point Good Cause doesn't apply to.  So in -- in New York, I mentioned the exemption of luxury units, that the locality can decide what the dollar amount of a luxury unit that would be excluded is in their locality.

MR. SLATER:  So then they have the flexibility when it comes to luxury, but not the flexibility when it comes to the other measures that you provided; is that -- is that correct?  The 10 percent or the 5 percent of the -- of the current monthly rate plus the CPI?

MS. WEINSTEIN:  They can -- correct about the percentage increase of rent.  I mean, they can also a -- the provision in New York City for small -- to exempt small landlords who own no more than ten units can be also adjusted, or -- or occupy -- owner-occupied can also be adjusted by local law.

MR. SLATER:  So while we're saying it's locally controlled since the municipality outside of New York City opts in, it's really not locally controlled with regards to the 10 percent or the 5 percent plus the Consumer Index [sic], correct?

MS. WEINSTEIN:  Right, correct.  Once they opt in, they -- the amount of increase in rent is controlled by the statute.  They control the number of small units, what they consider a small homeowner, and they can control what the rent threshold is that is

NYS ASSEMBLY                                    APRIL 19, 2024

above the Good Cause Eviction proceeding -- provisions.

MR. SLATER: I understand. What happens if you start seeing a checkerboard across counties of municipalities that opt in while other municipalities don't? What is the anticipated impact on a situation like that?

MS. WEINSTEIN: Each municipality can come up with their -- can decide to participate, it can be based on housing availability, affordability in their particular community. It is -- and -- and just to clarify, counties cannot opt in, it's just the municipalities.

MR. SLATER: Correct, it's just the individual municipalities.

MS. WEINSTEIN: Yes.

MR. SLATER: Now, I just want to go back to the local control aspect because I'm still, I guess, confused on some of the things that we discussed, then. So if -- if two municipalities opt in, they're opting into the State levels, correct? That's what we established just before, they're opting into State levels on the --

MS. WEINSTEIN: The only part of State levels they're opting into is the percentage increase in rent that is considered reasonable.

MR. SLATER: And then so where -- where would their control come in?

MS. WEINSTEIN: I'm sorry?

MR. SLATER: Again, if you have two municipalities that opt in.

278

MS. WEINSTEIN:  Correct.

MR. SLATER:  So what would the potential conflict be in how they set their rates?  Because you're saying, again, that we're -- we're in line with the -- with the State statute.  So where is the local control?

MS. WEINSTEIN:  The local control is what is considered -- what -- what rental level is considered to be subject -- which will -- which will be considered subject to the Good Cause Eviction provisions.  So one community may decide that this -- the levels in the exempt units in New York City, which is considered luxury at 200 -- at 60 -- at 6,000-plus, one community may decide that 3,000 is their -- based on housing stock and availability that only rental units that are monthly rents of 6 -- of 3,000 or less should be protected, and the neighboring municipality may decide that based on housing costs and prices and -- and availability that rents up to -- tenants up to $5,000 --

MR. SLATER:  Okay.

MS. WEINSTEIN:  -- should be protected.  You know, the -- the whole notion of opting in is really the big part of -- of local control.  So the control is over what -- first to opt in, and then what level of rental costs for tenants, what tenants need to receive this additional protection at a time of renewal.

MR. SLATER:  Understood.  And I appreciate that.  I want to just make sure that when we're talking about local control, there actually is some semblance of local control.  What about in a

279

NYS ASSEMBLY                                    APRIL 19, 2024

situation where we have a village located within a municipality, and the village opts in and the municipality does not.  How does that get managed?  Or a town?  So the village opts in, the town does not.

MS. WEINSTEIN:  Then that's okay, but not the other way around.

MR. SLATER:  So then a town -- you wouldn't be able to have a town opt in and a village say no?

MS. WEINSTEIN:  Oh, wait.

(Pause)

So if the village adopts its own law, the village law would apply.  If the town -- if the town hadn't adopted a law, the town adopts a law that is then controlling.

MR. SLATER:  So the village can opt in on its own, the town can say -- the town says no, but if the town opts in the village is stuck.  So aren't we taking away local control from the village in that aspect?

MS. WEINSTEIN:  They -- but the village could -- the village could enact a local law to come out of the Good Cause town protection.

MR. SLATER:  So they can remove themselves from the town's opt in of the Good Cause provisions that we're discussing here?

MS. WEINSTEIN:  Yes, I am informed they can.

MR. SLATER:  Okay, thank you.  Now, what happens if a municipality opts in, and time goes by and they decide

280

**NYS ASSEMBLY**                    **APRIL 19, 2024**

that they want to opt out?  Are they able to repeal the law?

      MS. WEINSTEIN:  Yes.

      MR. SLATER:  Fantastic.  And I'm just gonna continue to just focus on the local government aspect here a little bit longer.  We do have villages that don't have their own village courts and they rely on town courts to adjudicate their cases.  So once again going back to the scenario where a village opts in, a town does not, is the town court still expected to adjudicate those cases?

      MS. WEINSTEIN:  Yes.

      MR. SLATER:  And is there any funding that's being proposed along with these measures to support the town courts that are gonna be seeing an increase, potentially, of cases so we can avoid some of the backlog that we see down in the City?

      MS. WEINSTEIN:  No, there is not.

      MR. SLATER:  If we can focus a little bit on the IAI.

      MS. WEINSTEIN:  Sure.

      MR. SLATER:  The $30,000 level, where did that come from?  How did we decide that $30,000 is the right number?

      MS. WEINSTEIN:  We looked at costs of maintenance and it was a doubling of the amount that was in -- established in 2019.

      MR. SLATER:  Right.

      MS. WEINSTEIN:  Which proved to be inadequate based on the facts from -- conversations we've -- we've had and heard from individual landlords.

MR. SLATER:  And we're sure that the 30,000 level is now the adequate level?

MS. WEINSTEIN:  Well, as you know, that it -- the legislation also provides an ability for an owner to claim an IAI between 30,000 and 50,000 based on certain criteria.

MR. SLATER:  Right.  But again, though, I just want to make sure that we're -- we're certain when we're setting these levels that these are the levels that we feel are adequate enough to renovate these units?

MS. WEINSTEIN:  As of today, yes.

MR. SLATER:  Okay.  Can we talk about the overcharge determination which disqualifies property owners from the IAI?  One of the questions that I'm just wondering is, when we're talking about that particular provision, does that apply to an overcharge within the specific building?  Is it within the entire portfolio of a -- of a property owner?  Is it -- what happens if they have multiple LLCs?  I just want to try to get my hands around that as well, please.

MS. WEINSTEIN:  Yes, the answer is that it is not specific to that building, it's any determination or overcharge or guilty of harassment of tenants within the past five years in any properties that they have an ownership interest in.

MR. SLATER:  And those overcharge costs, I've heard anecdotally from property owners who say that their overcharge costs can be anything from a refrigerator charge to something else.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

Are we able to quantify or are we looking at what those overcharge

costs are to make sure that it's not a, we'll call it a miscellaneous

overcharge and not just -- obviously, I understand a rent overcharge,

but if we're talking something less substantive.

MS. WEINSTEIN:  This refers to being charged over

the legal rent, so I don't think a refrigerator coming in at -- at the

wrong dollar amount would relate to this determination.

MR. SLATER:  Fantastic.  I appreciate that, and I

appreciate your time, as always, and I appreciate you answering my

questions.  Thank you very much, Mr. Speaker.

ACTING SPEAKER ZACCARO:  Mr.

Blumencranz.

MR. BLUMENCRANZ:  Thank you.  Will the

Chairwoman for some questions, please?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER ZACCARO:  The sponsor

yields.

MR. BLUMENCRANZ:  So, Chairwoman, I'm gonna

ask my questions first regarding the affordable housing discrimination

provisions in Part BB, Section 1.

MS. WEINSTEIN:  Sure.

MR. BLUMENCRANZ:  So with regards to the

changes in underwriting and rating that are within the provision, how

would you say -- so in the insurance business when you're writing a --

a multi-family dwelling like this, you'd go to a few insurers who

283

insure this class of business, right?  So there are other insurers who do
not categorically insure anything but specific types of housing,
specific types of buildings.  So for instance, I have a insurer that I
work with who only writes mobile home parks.  Now, under this
provision, will they have to comply if I send a submission to them and
they write me back, *I don't write this class of business.*  Are they
breaking New York State law if this passes?

      MS. WEINSTEIN:  I do not believe so.  It has to be --
it prohibits the insurers -- it -- this is relating to buildings and whether
they contain rent -- they cannot ask whether they --

      MR. BLUMENCRANZ:  Yes, sorry.  Just to -- what
it does say is an insurer that issues or delivers in this State a policy or
insurance covering loss or damage to real property of residential
purposes or legal liability nor cannot discriminate based on a cancel or
refuse to issue or renew or increase premium based on all the
provisions provided.  So if that's the case and I ask them to insure a
piece of property and they do not write this class of housing, will they
be required to write this class of housing now?

      MS. WEINSTEIN:  I don't believe if they don't insure
that class -- this class of property that they would have to follow these
provisions.

      MR. BLUMENCRANZ:  Why not?  It says if you
insure real property in New York State, you are required not to deny
coverage and not to deny writing the -- the business if you don't want
to, or if you don't feel like it fits within your underwriting guidelines.

MS. WEINSTEIN:  You know, I would say that we don't really read it that way but if, in fact, they were to insure these properties, it couldn't be based on the fact that the owner or tenant received government housing subsidies.

MR. BLUMENCRANZ:  So if I write multi-family dwellings that include affordable housing, I can continue to do so, but it does not require insurers who do not write this class of business, because this is a class of business that you would check the box on the form, right, that this -- this is an affordable housing building that has, you know, rent-stabilized units or whatever it may be, they will then no longer -- they will still be able to write, but people who don't write this don't continue to -- they continue to not have to write it?

MS. WEINSTEIN:  I -- I believe you are correct.

MR. BLUMENCRANZ:  Okay.  Then I'm just -- I'm trying to figure out what this bill does do, then, right?  Because if it's -- it's just requiring that you can't be canceled because it's affordable?

MS. WEINSTEIN:  Well, not -- not just canceled, I mean --

MR. BLUMENCRANZ:  You'd have to write it, right?  You'd have to write it if --

MS. WEINSTEIN:  -- you are --

MR. BLUMENCRANZ:  -- you can't not write it because it's affordable.

MS. WEINSTEIN:  If you insure this class of housing, you can't then --

MR. BLUMENCRANZ:  Cancel or non-renew, or say I don't write this because of what it is.  But an underwriting guideline --

MS. WEINSTEIN:  The type of -- the type of housing, but you -- you cannot ask for the details as to whether the building has rent-stabilized units, whether the --

MR. BLUMENCRANZ:  So can I still ask what the rent roll is in the building?  That's required, I want --

MS. WEINSTEIN:  Yes; yes, certainly.

MR. BLUMENCRANZ:  -- to see.  Okay, so I can see that the -- all of the units or some of the units are paying way below market rate.  So I can't ask if it's affordable, but I can see it's affordable.

MS. WEINSTEIN:  That's correct.

MR. BLUMENCRANZ:  Yeah, okay.  So I'm just, again, trying to navigate what this provision does besides sound good.

So I'm moving on.  Good Cause Eviction.

MS. WEINSTEIN:  Yes.

MR. BLUMENCRANZ:  So under -- does Good Cause Eviction interfere with the obligation of a contract, such as a rental lease?

MS. WEINSTEIN:  Do you want to -- say -- say that again?  I'm sorry, Mr. --

MR. BLUMENCRANZ:  Does it interfere with the obligation of a contract such as a rental lease?

286

NYS ASSEMBLY                              APRIL 19, 2024

MS. WEINSTEIN:  This would be part of the lease at -- at the time of a renewal or an initial lease.

MR. BLUMENCRANZ:  Okay.  So does Good Cause Eviction law under this budget provision confer a right to perpetual occupancy?  So a lifelong lease, essentially.  You're required to continue so long as they don't have a, quote, "good cause" under this, they are required to have a lifelong, or could have a lifelong lease, a perpetual lease.

MS. WEINSTEIN:  Subject to the exceptions for what good cause would be.

MR. BLUMENCRANZ:  So at its core, does the Good Cause Law require that a party to an expired contract or lease under penalty of law offer a contract lease at a capped rate to another party?

MS. WEINSTEIN:  Yes.

MR. BLUMENCRANZ:  So by mandating these renewals for -- absent of good cause, does the Good Cause Eviction Law violate the contract clause of the United States Constitution?

MS. WEINSTEIN:  No.

MR. BLUMENCRANZ:  Why not?  If all of what you just stated is true, then there's a very good faith argument that it does.

MS. WEINSTEIN:  You know, we've -- we've done the contract clause analysis and we do not believe so.  Similarly, you may recall there were constitutional -- there were challenges to the

287

NYS ASSEMBLY                                  APRIL 19, 2024

2019 law that we enacted and that has been upheld.

MR. BLUMENCRANZ:  But did the 2019 law allow for lifelong contracts so long as the -- I mean, you're defining what contracts can and can't be broken based on New York State Law, I -- I see the argument there.

MS. WEINSTEIN:  Well, you know, other states do have Good Cause Eviction laws and they have been upheld as --

MR. BLUMENCRANZ:  So speaking of other states, states like in Minnesota, in I believe it's St. -- St. Paul, they implemented Good Cause to the extent we originally wanted, but you saw, you know, 80 percent reductions in new development, you saw severe increases in rents because there's no new housing stock.  Do you believe that the changes you're making here, the removals of a lot of those provisions that we originally wanted that they implemented will not cause that to happen here in New York State?

MS. WEINSTEIN:  No, but I -- I would just clarify, I'm told that the law that you refer to was an establishment of a rent stabilization program, not a -- a Good Cause Eviction protection -- tenant protection program.

MR. BLUMENCRANZ:  Yeah, it just did the same thing with a different name, but...  Okay.

So I'm moving on to Section 13(b), the -- the School Emission Resource Center.  So with regards to the resource center, so does the apparent need for this resource center in the first place seem like a -- a validation that there are some serious concerns with the

NYS ASSEMBLY                                    APRIL 19, 2024

program?  If schools feel like they need a hotline to call, that they

don't understand how these laws should be interpreted and how many

millions of dollars they should be spending that there -- there should

be a need for a delay in a program like this?

         MS. WEINSTEIN:  This -- this is really just helping

-- just making sure that the State resources can be brought to bear

on --

         MR. BLUMENCRANZ:  So the State resources

available here -- I apologize, just for time -- the State resources

available here through this hotline, will they provide any new

information or would they provide specialists in this topic area?  Will

they be reading the frequently asked questions portion of the page, is

this is an outsourced hotline?  I'm just curious, what -- what new

resources are being provided to school districts who are continuing to

struggle to understand how they can implement such an expensive

program?

         MS. WEINSTEIN:  It will be State employees

providing that information.

         MR. BLUMENCRANZ:  So will these be specialists?

Will these be green energy or EV specialists?  Will these be people

who will help them understand, you know --

         MS. WEINSTEIN:  Yes, they will be specialists with

--

         MR. BLUMENCRANZ:  Specialists.  What kind of

specialists would they be?

MS. WEINSTEIN:  Knowledge of the areas.  And -- and they will help assist with other State agencies to help districts interact with other State agencies.

MR. BLUMENCRANZ:  Will they be able to provide any insight if a school has extenuating circumstances that might not allow them to implement the program?  Will they have the purview to really guide them through some changes they may need in the law, or...

MS. WEINSTEIN:  Yes.  They -- they would help guide them -- could guide them through the changes they may need to make to be able to conform to the law.

MR. BLUMENCRANZ:  So when -- when this -- you know, it specifically says it will help them with questions and concerns.  So if they have serious concerns, not necessarily questions, what exactly will this -- this resource center be able to do for them?  Will it be able to help them navigate the department to make the changes they need?

MS. WEINSTEIN:  Yes, yes.

MR. BLUMENCRANZ:  In what capacity?

MS. WEINSTEIN:  Any --

MR. BLUMENCRANZ:  So say a school needs to build a transfer station because they need a significant amount of power.  Will they help them navigate them building that?  Will they pay for it?  Will they provide them avenues that it can be paid for?

MS. WEINSTEIN:  They -- they are not providing

290

NYS ASSEMBLY                                    APRIL 19, 2024

funds, but they can provide guidance and referral to other State
agencies that -- and perhaps direct them to where there may be funds
available to help make these -- those changes.

MR. BLUMENCRANZ:  Okay.  So will the school
districts be any more informed as a result for the creation of this task
force?  Is there -- there will be new information provided that's not
currently provided by the State to the schools who need more
information at a -- at a bare minimum?

MS. WEINSTEIN:  You know, one of the complaints
that we have heard from school districts is there is no single place for
them to go to be able to get this information and guidance.  So that is
the -- the goal of -- that is our -- our response to some of these
complaints that we have heard.

MR. BLUMENCRANZ:  Okay.  All right, thank you.
I'm gonna move on to the Part B, evidence-based and
scientifically-based reading instruction.

MS. WEINSTEIN:  Okay.

MR. BLUMENCRANZ:  So with regards to that Part
B, so does Part B mandate that culturally-responsive sustaining
education framework for school districts?

(Pause)

MS. WEINSTEIN:  It -- it merely has to align with
the existing SED regulations.

MR. BLUMENCRANZ:  So you mandate that it has
to rely on those existing mandates.

291

**NYS ASSEMBLY**                    **APRIL 19, 2024**

MS. WEINSTEIN:  Align, yes.

MR. BLUMENCRANZ:  Okay.  So has the CRS

reading curriculum been approved by the State Education

Department?

MS. WEINSTEIN:  The -- the State Education

Department has already developed a culturally-responsive framework,

and that would -- they would help provide that guidance.

MR. BLUMENCRANZ:  Yes, they have Phase One,

Phase Two and Phase Three of implementation, raising awareness and

building capacity for the program, but does this budget provision, does

its timeline comport with the timeline outlined by the State

Department of Education previously?

MS. WEINSTEIN:  We don't change anything in this

budget about that timeline.

MR. BLUMENCRANZ:  Sorry?

MS. WEINSTEIN:  We -- we do not change anything

in the budget about the timeline.

MR. BLUMENCRANZ:  Okay.  You -- there's a

mandated timeline here, but is it the same as the -- the timeline that

the State Department -- Education Department provides?

MS. WEINSTEIN:  Well, this is just -- the timeline

here is just for the reading best -- reading best practices.

MR. BLUMENCRANZ:  Okay.  So not -- I mean, it's

more than that, but does the required -- does requiring the alignment

of curriculum and instructional practices for students in pre-K through

3rd grade, what does it look like for these school districts?  Is there an idea as to, like, what this -- this program will look like when rolled out?

MS. WEINSTEIN:  The -- this legislation does not have that delineated, though that's something that SED will have to determine as -- as they look it.

MR. BLUMENCRANZ:  Okay.  So just to understand and -- and hammer down on some of those specific definitions, so under the text of the bill, what does "evidence-based" mean within the context of --

MS. WEINSTEIN:  That's something that SED will be looking at.

MR. BLUMENCRANZ:  Okay.  That goes the same with "scientifically-based" when it comes to culturally-sensitive --

MS. WEINSTEIN:  Correct.

MR. BLUMENCRANZ:  -- education.  Okay.  So the CRS framework published by the State Department of Education does cite a culturally-appropriate solution for teaching reading to our students.  What does that look like?

MS. WEINSTEIN:  Again, you know, SED will help determine that.

MR. BLUMENCRANZ:  So they are going to be providing us -- we're -- we're giving them that blank check without us exactly what "culturally-sensitive reading" looks like, but our schools are mandated to teach it.

293

MS. WEINSTEIN:  They are the agency that has that expertise.  Thank you, Mr. Blumencranz.

MR. BLUMENCRANZ:  Thank you.

ACTING SPEAKER ZACCARO:  Mr. Maher.

MR. MAHER:  Thank you, Mr. Speaker.  Would the Chair yield for some questions?

ACTING SPEAKER ZACCARO:  Does the sponsor yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER ZACCARO:  The sponsor yields.

MR. MAHER:  Okay.  I wanted to chat a little bit about the newly-constructed or converted fully income-restricted rental multiple dwellings, specifically the new 421-pp exemption.  A couple of questions.  So the first is, is this an opt-in as well?  Is this a separate opt-in or could a local municipality create one local law that would opt them into both Good Cause and this exemption?

MS. WEINSTEIN:  I -- I don't think that there is a prohibition about them opting into one and not the other, or opting into both.

MR. MAHER:  Okay.  When it comes to this specific real property exemption, it looks like it's 30 years with the first three years of construction being completely zero.  Was there any local labor language in here, any prevailing wage?

MS. WEINSTEIN:  No.

294

**NYS ASSEMBLY**                                **APRIL 19, 2024**

MR. MAHER:  No?  Okay.  So we're looking at giving 30-year real property tax exemptions out and not having any local labor or prevailing wage?

MS. WEINSTEIN:  It -- the -- the wage protections are for the building service workers, not the labor agreement.

MR. MAHER:  I'm sorry, I couldn't hear that.

MS. WEINSTEIN:  There -- there is a carveout of -- of prevailing wage if 25 percent of the units are affordable.

MR. MAHER:  Okay.  So if ten or more units are affordable, they get to take part in a potential 30-year real property tax exemption.  Is there a percentage of units -- so for example, if somebody wanted to build 500 units, they would only need ten units or is there a percentage of units that would need to be affordable before the tax (inaudible) kicks in?

MS. WEINSTEIN:  It's 25 percent of the total units needing to be affordable.

MR. MAHER:  Is that just for the prevailing wage, or is that specifically as well for the tax exemption?

MS. WEINSTEIN:  That's to receive the tax exemption.

MR. MAHER:  Okay.  So you have a prevailing wage at 25 percent of the units, but no local labor language?

MS. WEINSTEIN:  There is -- there is not prevailing wage for the construction, only for the building services.

MR. MAHER:  Okay.  So there is no mandated

295

prevailing wage and no local labor during construction related to this potential 30-year real property tax exemption?

MS. WEINSTEIN:  Yes, that's correct.

MR. MAHER:  Okay.  We'll get to that in a little bit.

What entity will oversee the enforcement and the details?  Right now when you have a pilot -- an IDA gives a pilot you have the ABO.  So is there an entity that's going to be out there just making sure things are done the right way in terms of these exemptions and the release of the subsidy?

MS. WEINSTEIN:  The -- the local governments.

MR. MAHER:  The local governments.

MS. WEINSTEIN:  Correct.

MR. MAHER:  Okay.  I'll get back to that, too.

Okay, it says that up to three years during construction there will be zero property taxes paid, and then it says up to three years.  So is it at completion, or would you have three years even if the project was completed to receive zero real property tax exemption?

MS. WEINSTEIN:  It would be at completion if that took less than the three years.

MR. MAHER:  Okay.  During the discussion and the new exemption that was created, this is also based on the New York City exemption that exists, right?

MS. WEINSTEIN:  Yes.

MR. MAHER:  Okay.  So the 421-pp is a New York

City incentive that's used to help build more housing stock.  Does that specific program in New York City that currently exists have a local labor agreement?  Does it guarantee local labor?  Not prevailing wage, but local labor.

MS. WEINSTEIN:  Well, actually, there is no existing 421-a [sic] program.  We reinstate this program for -- we extend this program for certain eligible projects.

MR. MAHER:  Okay.  So a new 421-pp exemption is created that allows local option in city, town or village outside of New York City.  Right now I know that there is in New York City an incentive program that exists, and this is, I'm assuming, mirrored off of that.  But you know what?  We'll get to that later because that's not in this bill and I can understand that.

All right, when it comes to ADUs, accessory develop -- dwelling units.

MS. WEINSTEIN:  Yes.

MR. MAHER:  It looks like there are incentives for real property, but there are no incentives for municipalities, is that correct, if they wanted to promote creating the -- allowing for ADUs?

MS. WEINSTEIN:  No.  There -- there isn't an incentive for -- an immediate incentive for the locality.  As we had discussions earlier, it -- there is a -- a five-year exemption and then it becomes fully available.

MR. MAHER:  Okay.  My concern there is you have incentives being given to developers, which I think is a good thing.

297

**NYS ASSEMBLY**                                          **APRIL 19, 2024**

You -- you definitely want to create that.  But in a lot of municipalities they don't have the infrastructure or the need to update their infrastructure in order to support ADUs.  So if we don't provide incentives for the municipalities, how is that really gonna change creating more ADUs?

MS. WEINSTEIN:  The -- by local law, the locality can decide to lower the exemption amount and the types of ADUs that are allowed, which also means they can decide not to allow ADUs in their locality if they believe that it will not help the residents of -- of their locality.

MR. MAHER:  Okay.  Back one more question now to the -- the new 421-pp exemption.  Right now with the 485-b tax exemption, a warehouse being built, each school district in the Upstate communities has the option to opt out of the 485-b.  Is there an opt-out for the school district for when a municipality decides to give a real property tax exemption in one of their communities?

MS. WEINSTEIN:  Well, the school district can decide -- yes, they can opt out whether they want to or don't want to be a part of that.

MR. MAHER:  They can.

MS. WEINSTEIN:  Yes.

MR. MAHER:  So when a municipality, a town puts together this 30-year real property exemption, the school district can come in and say, *Hey, we don't want to be part of this*, so 70 percent of that benefit is not going to happen.

298

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  The school district would have to pass a resolution if they wanted to give an exemption on the school taxes.

MR. MAHER:  But similar to a 485-b, that exemption exists for the 421-pp where a school district would have a procedural route to not be impacted by the real property tax exemption?

MS. WEINSTEIN:  Yes, that's correct.

MR. MAHER:  Okay, thank you.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. MAHER:  Okay, so last year I had the opportunity to debate a few members on creating a monitor for one of our local IDAs.  These IDAs were demonized, saying that they're taking our taxpayer dollars and we're not seeing the return or they're not necessary, yet we're creating a workaround for our IDAs by creating this exemption and there is no local labor guarantee.  IDAs are demonized often.  It's the cool thing to do, it's -- it's got some political, you know, clout there to just kind of say, *Hey, these are the bad guys, here's who -- here's whose to blame*.  But IDAs, especially the ones in my district and most throughout New York State, they have local labor agreements.  So what we're doing here by creating this tax exemption with no labor local policies, similar to a 485-b, is we are hurting the opportunity for local labor to get work on the construction of the expansion and creation of new housing units.

299

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

That's a problem, and I truly hope it gets addressed after this budget is adopted, maybe it's an oversight.  But I think at the end of the day when we talk about creating incentives and using taxpayer money that should be going toward our school districts or our villages or our municipalities and we're giving folks a break on that, we should get something back in return, like local employees from our own towns, cities and villages and counties to make sure that the funds go in their pocket and not from workers coming up from North Carolina, South Carolina, Texas, which are probably a lot of former New Yorkers. That -- that notwithstanding, we want to make sure that we stimulate our local economy, that we have that multiplier effect and that the construction workers working and building these new housing units are contributing and invested into the local economy.

                    Thank you, Mr. Speaker.

                    ACTING SPEAKER AUBRY:  Thank you.

                    Mr. Tannousis.

                    MR. TANNOUSIS:  Thank you, Mr. Speaker.

                    On the bill.

                    ACTING SPEAKER AUBRY:  On the bill, sir.

                    MR. TANNOUSIS:  Thank you.  Toll evasion costs the MTA $690 million a year, but yet the MTA is utilizing congestion pricing to say that it will bring in a necessary $1 billion a year. Instead of us trying to figure out how to get back that 700 million that the MTA says they do not have because of toll evasion, our answer is to forgive the first ticket you get for evading the fare with a written

NYS ASSEMBLY                                APRIL 19, 2024

warning, to get people that evade the fares into programs where they do not actually have to pay that fine, and not hold them responsible for any of their actions.

A few weeks ago, I was in Downtown Manhattan. I was taking train from Downtown Manhattan to go to Bay Ridge, Brooklyn. As I'm going down at the station, in front of me I saw that one of the doors was open. I counted seven people that entered the train station, one opening the door for the next, seven people did not pay the fare. Nobody there to stop them, nobody there to say anything. But yet the MTA wants to push congestion pricing on us because they say it will bring $1 billion a year, even though their own environmental impact study clearly shows that congestion pricing will increase traffic, congestion and pollution on Staten Island, in the Bronx and the outer boroughs.

But hey, who needs to pay the toll? You've got the suckers in Staten Island that are gonna pay for it. You got the suckers in the outer boroughs and the Bronx and Queens, everywhere else, that are gonna pay for it. Go ahead, jump the turnstile. Nobody is going to hold you accountable for your actions. Let's just continue to be an unaffordable and unsustainable place to live.

As I've said many times during this budget, once again I vote no.

ACTING SPEAKER AUBRY: Mr. Durso.

MR. DURSO: Thank you, Mr. Speaker. Would the sponsor yield for a couple of quick questions?

301

NYS ASSEMBLY                                    APRIL 19, 2024

ACTING SPEAKER AUBRY:  Ms. Weinstein, will you yield?

MS. WEINSTEIN:  Yes.

MR. DURSO:  Thank you, Ms. Weinstein.  So I just wanted to continue on what my colleague was talking about with the tax exemptions for these multi -- multi-unit dwellings.  So -- and just to -- to touch on what he said, so we're saying there could be multi-million-dollar projects that these developers will get tax breaks on, but there's no guarantee of local labor or a PLA in -- in this bill, requiring them to have them, correct?

MS. WEINSTEIN:  Correct.

MR. DURSO:  Okay.  Was there any thought or was that ever brought up in discussions about these?  I mean, these are -- these -- these could be large-scale projects that we are not guaranteeing local labor and PLAs on this to where our local unions and tradespeople could actually have multi-year jobs creating these units.  Isn't that really kind of part of why we're doing this, so that people can afford to live in a place, stay here in New York, but we don't want to give them the work to do it?

MS. WEINSTEIN:  Current law is that there is no project labor agreement if there is over 25 percent affordability.  So we don't change the law in this regard, we just provide a -- a template for how to get to these incentives.

MR. DURSO:  So just -- okay.  So if there is a 25 percent affordability rate in the amount of units that are created, it is

302

then required to have a PLA, or no?

(Pause)

I'm -- I'm sorry, ma'am.  No, that's okay.

If there's 25 percent or more of the units, right, that are going to be affordable, there will be a PLA on all those projects despite there's no --

MS. WEINSTEIN:  No, the opposite.

MR. DURSO:  I'm sorry.  If it's less than 25 percent?

MS. WEINSTEIN:  Right, which is not covered, but that's not what this -- this bill is about the exemptions for over 25 percent affordability.  So we don't change the current law regarding the PLAs that exist today.

MR. DURSO:  So if there's 50 percent affordability, if there's 500 units that are being created and 50 percent of them are made out to be affordable, there has to be a PLA on it or am I reading it the opposite way?

MS. WEINSTEIN:  No, I think you're reading the opposite -- if there -- if there's less - current law -- I'm told if there's less than 25 percent -- well, current law.  If there's more than 25 percent affordability under current law, there's no P -- PLA requirement.  You know, and that has to go with the fact to make sure that this affordable housing could be financed and can be completed.

MR. DURSO:  Understood.  So in other words, it's a protection for, I guess, the developer and the local municipalities who are doing this, to make sure that they can have those built at a cost --

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

at the proper cost?  I guess keep costs down; is that what we're saying?

MS. WEINSTEIN:  If it costs too much, then the units will not be able to be affordable.

MR. DURSO:  So we're saying that the cost of union labor's too high?  Is that what we're saying in this Chamber?  I hope not.

MS. WEINSTEIN:  No, we're just want to make sure that more affordable apartments could -- can be developed.

MR. DURSO:  So we're -- we're guaranteeing that more affordable apartments could be developed at the expense -- what it seems like to me, I mean, we could have put language here guaranteeing a PLA but we didn't.  So we're really making sure that more affordable housing could be built, but not with a guarantee of local labor and proper wages.  I mean, right, there's no new language put in this, they're just following the old law.  So --

MS. WEINSTEIN:  Correct.  It will follow current law which --

MR. DURSO:  So we're -- we're incentivizing people to build affordable housing, but we don't want it built by people in the trades union members --

MS. WEINSTEIN:  We --

MR. DURSO:  -- because it costs too much.

MS. WEINSTEIN:  We already have that law in place.

MR. DURSO:  It could've very easily been put into

304

this language.  I mean, there's -- I mean, we -- our -- our staff did a great job of breaking this all down and they put it onto a couple of pages, I'm sure the bill was much bigger.  But we could've definitely put language in here to protect union workers and make sure that they got the work that the State's gonna pay the incentives for, but the State didn't find it important enough to make sure that union labor actually got the work.

MS. WEINSTEIN:  There -- there is nothing that requires a PLA, but there's nothing that prohibits a PLA either.

MR. DURSO:  There's nothing guaranteeing that it's union labor either, so I'll move on from that point.

So working backwards, one of the parts that was omitted in this bill also was the expanded recovery tool for stolen wages that could've been done by the Department of Labor.  That was intentionally omitted out of this bill.  Can you tell me, was it in another bill, did I miss it?  Which is possible, we've been in for a couple days doing this.  You know, just to hold the bad actors accountable to make sure we can get those stolen wages back, especially from the developers who are gonna be creating these affordable housing that we didn't put a PLA on to make sure that local labor gets it, we actually omitted out of the budget to protect those union workers.  Why would we do that?

MS. WEINSTEIN:  It -- it was removed from the budget since it is a policy issue we intend to look at outside the budget.

305

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MR. DURSO:  So there's no other policy in the budget, just this one piece we're gonna omit?

MS. WEINSTEIN:  No, at various -- at various places we've omitted policy issues that we intend to look at after the budget is adopted.

MR. DURSO:  Okay.  And I -- and I do appreciate, obviously, in this bill there's the SUNY PLA, something I know myself and plenty of colleagues throughout this Chamber.  I appreciate it being there.  I'm -- I'm actually -- I could say thank God it's in there.  I wish it was at a lower threshold of the original 3- to 5 million, I know now it's at 10-.  But we have to fight with SUNY about, again, supporting local labor and our unions, which is a shame.  But that's -- that's two, I don't want to say anti-labor, but two not very labor-friendly pieces of this piece of legislation that we're voting on today.

Another question I have will be about the opt-in for the housing.

MS. WEINSTEIN:  Yes.

MR. DURSO:  I don't know if you need to switch there.

MS. WEINSTEIN:  The opt out?  Is that what you're --

MR. DURSO:  Opt in, opt out, however we want to call it.  We want to call it the Good Cause provision in this.

MS. WEINSTEIN:  Sure.

306

MR. DURSO:  I apologize.

MS. WEINSTEIN:  Yes.

MR. DURSO:  Okay.  And I know it's asked already, I just wanted to get it on the record and just ask in my own way.  So, towns, villages have an option to opt in or opt out, correct, of this provision?

MS. WEINSTEIN:  Well, to --

MR. DURSO:  Other than New York City.

MS. WEINSTEIN:  Outside New York City, initially to opt in, okay?  If a town opts in and the village contained within that town doesn't want to be -- have these protections for their ten -- their residents, their tenants, they -- that village can opt out.  If the town doesn't take any -- doesn't decide to opt in, the village itself could opt in.

MR. DURSO:  What about the -- the -- right.  So the town that the village falls in doesn't supercede the village's local zoning or codes, correct?  It's -- it's -- it would be individualized.  If -- I live in the Village of Massapequa Park, which is within the Town of Oyster Bay.  If the Village of Massapequa Park wanted to opt into this, the Town of Oyster Bay did not, they can't stop the village from opting in, correct?

MS. WEINSTEIN:  Correct, right.

MR. DURSO:  Okay.

MS. WEINSTEIN:  It can go either way.  So the town adopts a law --

307

**NYS ASSEMBLY**                                              **APRIL 19, 2024**

MR. DURSO:  The village doesn't have to.

MS. WEINSTEIN:  -- decides to opt in, the village can adopt a local law to opt out.

MR. DURSO:  Okay.

MS. WEINSTEIN:  The town doesn't -- yeah, just so we don't get back and forth --

MR. DURSO:  It could be either way, right, so...

MS. WEINSTEIN:  Right, so the town decides not to opt in, the village then can independently decide to opt in.

MR. DURSO:  Okay.  So with that being said, the county, right, so like I live in Nassau County, if the county wanted to opt in any way, shape or form, it does not supercede the villages, town or cities that fall within that county, correct?

MS. WEINSTEIN:  No, the count -- you're correct.  The county cannot opt in, it's just the towns and villages that have the choice of opting in, opting out depending on what the other does.

MR. DURSO:  What -- now, what if the county, or let's say in this case the State, owns property within those towns or villages and wanted to build housing or anything else in those towns or villages that didn't opt in but it's State-owned or county-owned land and they want --  would they -- would they be able to supercede those local zoning laws (inaudible) if they opted in or opted out?  So in other words, if New York State owns a piece of property in the Village of Massapequa Park and they could build housing on it, can they supercede what the village or town or county opts in or does not

NYS ASSEMBLY                                    APRIL 19, 2024

opt in to?  Because I'm sure this will come up with a later bill towards
the end of Session.

MS. WEINSTEIN:  We believe that if the -- the State
were to, or county were to build -- were to build property, they could
have an agreement for that particular property that could be different
that whatever the town or the village has.

MR. DURSO:  Agreement with who?  Would they
have to make that agreement with that local town or municipality, or
can the State come in and say, *Okay, we own two acres by
Massapequa Park Train Station*, right, it falls within the Village of
Massapequa Park who did not change their local zoning laws or opt in
to this, can they then build housing in that area without the local
municipality opting in to this provision because it's State-owned land?

MS. WEINSTEIN:  Yes, yes.

MR. DURSO:  They could.  So the -- the State could
supercede the local municipalities and the laws whether they opt in or
not, even if it falls within those municipalities who did not opt in.  So
the State basically can just do whatever they want.

MS. WEINSTEIN:  For that particular building and
tenants, yes.  There can be restrictions the same way that there are
different income levels for people coming into a facility or a building.

MR. DURSO:  So if the State can do it, if the State
can do it and opt -- you know, use that property in those areas, what
stops the county or the town who may own property within those
municipalities that didn't opt in from doing that also?  If the State can

309

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

force themselves upon those municipalities, why can't the county or the towns do the same? Because we're saying the State could do it, but you're saying nobody else is allowed to do it.

MS. WEINSTEIN: If it's a government-owned -- a government development and owned development, they can set their own rules in regard to tenants in that building, irrespective of the county or town -- or the town or village law.

MR. DURSO: So the -- again, so if it's a State-owned property, State-owned land, the -- the local municipalities or the county cannot tell the State what to do when it comes to this, when it comes to an opt in. The State could do whatever they want.

MS. WEINSTEIN: It's not -- it's not limited to this. I mean, the locality cannot tell the State --

MR. DURSO: So it's not really --

MS. WEINSTEIN: -- what to do with that --

MR. DURSO: -- it's not an opt in, it's really, you just better hope that the county or State doesn't own any land in your municipality that you don't want this to be opted in on.

MS. WEINSTEIN: The -- the State can decide, or a county can decide to build a building for -- for tenants and they can charge what rent they want to charge and put restrictions on it them -- themselves.

MR. DURSO: Right. So again, just to be clear, the State or the local county can supercede the local municipal laws on an opt in and opt out if they own property within that municipality that

**NYS ASSEMBLY**                    **APRIL 19, 2024**

didn't opt in.  That's what we just said.

MS. WEINSTEIN:  I don't believe we're changing the law --

MR. DURSO:  No, we're just making it clearer.

MS. WEINSTEIN:  -- and I'm not quite sure what the objection would be for a town or -- that a town or village would have an objection to having ten -- to having residents in their community that have protected rents.

MR. DURSO:  Well, but if we're not sure if their -- what the objection would be, then it would just -- you wouldn't have opt-in option, it would just be forced upon everybody, which it really actually is as long as the State owns the property.

MS. WEINSTEIN:  There is nothing we've done in this legislation that changes any of the rights or obligations of the State as in regards to a building.

MR. DURSO:  Thank you, Ms. Weinstein.  I appreciate it.

On the bill, sir, with the couple seconds I have left.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. DURSO:  So I -- I appreciate the Chair taking the questions, and -- and like she just finished up saying, there's nothing that changes the law that's currently stated.  It actually just puts window dressing on it, which is basically saying the State could do whatever they want, and there is no such thing as local control.  If they own property within your municipality who does not want these

311

NYS ASSEMBLY                                      APRIL 19, 2024

-- more housing built, they don't feel that they have the infrastructure for it, the State could supercede the local municipality and do that. What we're also doing with that is telling them that not only can you do it, and not only can you supercede the local municipalities, you don't have to do it with union labor.  You don't have to give our local unions the jobs.  We'll give you a tax break and maybe we'll protect you by omitting it and expanded recovery tool so that we don't have to hold bad actors accountable.  Which way are going with this bill? Actually, the more I look at it, I don't want to vote for this bill.  I was pretty convinced not to, and now I'm sure of it.  This is not protecting labor, this is not protecting our local municipalities, it's putting them in danger.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mr. McGowan.

MR. MCGOWAN:  Thank you, Mr. Speaker.  Would the Chairwoman yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. MCGOWAN:  Thank you, Madam Chair.  It's been a long day already, after a long couple of days, so I appreciate your indulgence to some of my questions.

MS. WEINSTEIN:  Sure.

MR. MCGOWAN:  I'm gonna try not to cover many

312

NYS ASSEMBLY                                    APRIL 19, 2024

of the areas that my colleagues have gone into, but I want to pick up
on some questions I have about -- about the opt in provision.

MS. WEINSTEIN:  Sure.

MR. MCGOWAN:  I believe you stated earlier that if
a town opts in and a village that is located within the boundaries of
that town, they essentially opt in as well unless they take action to opt
out; is that correct?

(Pause)

MS. WEINSTEIN:  So I'm glad you asked the
question, because I think I'm correcting something that said I earlier.
So, the town opts in, the -- it covers the village unless the village takes
action.  The village cannot opt out -- the village cannot opt out of this
program, but they can change the parameters.  So they can lower the --
the level of what's considered luxury, they can reduce the number of
units.  But they will need to maintain a Good Cause Eviction policy
within their jurisdiction.

MR. MCGOWAN:  Okay.  So although this bill states
that outside of New York City, municipalities must opt in, a village
that's located within the boundaries of a town that opts in is bound by
that town's decision.  Is that what my understanding is now?  The
village is bound by what the town -- if the town opts in, the village is
bound.

MS. WEINSTEIN:  Only -- the village is only bound
if the town opts in.  If the town does not opt in, the village can, on its
own, opt into this program.

313

**NYS ASSEMBLY**                    **APRIL 19, 2024**

MR. MCGOWAN:  Okay.  So it's -- the -- the village would then be bound and -- and it cannot pass, then, its own local law to not participate in this program, it can only change some of the, I guess, the implementation of this law based upon the town's decision to opt in.

MS. WEINSTEIN:  Yes.  Consistent with what I said, they can pass -- the village could pass their own local law and lower that -- what units are covered, the dollar value of units that are covered.  You know, depending how they lower it, it could effectively mean that they're not participating.

MR. MCGOWAN:  But they're still stuck with the town's decision.  It's a separate entity, it's got its own elected leadership, a mayor, trustees, their own zoning, their own village law, and they're stuck with the decision the town makes.  Is that my understanding?  They can't get out of it, they can only move the goal posts, if you will.  They can adjust the standards, but they're stuck with this program.  So it really isn't local, it's really up to the town.

MS. WEINSTEIN:  Yes, if the town opts -- opts in.  But, you know, it can change the goal posts, but they could bring the goal posts pretty far back so that effectively, it will not make -- and that's certainly not the -- the desire, but they could bring the goal posts back so that it effectively would not cover many units.

MR. MCGOWAN:  I mean, my understanding of the point of this was to allow -- for the State not to come in and create situations where we eradicate local zoning and control.  And although

314

I'm glad I don't live in New York City, I represent a district outside of New York City, and the two towns that I represent certainly could make that decision, but there are a number of villages located within those towns.  So it's not really -- I mean, it does, in some ways and in substantial ways, because there are quite a number of residents in my district who live in these villages in Rockland County who are gonna potentially be bound by the decision that the town makes.  So this is not -- this does eradicate some level of local zoning and control.

MS. WEINSTEIN:  You know, again, the village can come up with a scheme of what they consider luxury, and also limit or increase the number of units that would be protected and can effectively -- while they can't actually opt out, they can effectively limit the number of residents that would be impacted by this law.

MR. MCGOWAN:  Was there any consideration given to allowing actual, a true opt in to not eradicate in any way local zoning or control?

MS. WEINSTEIN:  Lots of things were considered, and this is the proposal that we came up with.

MR. MCGOWAN:  So then why was the decision made to bound a village by a town's decision?

MS. WEINSTEIN:  You know, we -- we do believe that, obviously, that these protections are important, but giving the local control to not be forced to accept the proposal and the limits that are imposed upon New York City.

MR. MCGOWAN:  My last question about the opt in.

315

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

What if a village is contained within -- is not wholly contained within one town, but is located and crosses the border and is located within two towns?  What would happen then?

MS. WEINSTEIN:  We will have to take a look at that.  I don't think I can give you a quick answer.

MR. MCGOWAN:  Okay, I would appreciate that.

I want to switch to rent regulation under Good Cause.

MS. WEINSTEIN:  Yes.

MR. MCGOWAN:  The rent regulations, the local rent standard, does that apply to any residence or only a primary residence of a tenant?

MS. WEINSTEIN:  Any -- any residence.  I do not believe it has to be the primary residence, as is in New York City, as in rent stabilization where it has to be your primary residence.

MR. MCGOWAN:  So, correct, as opposed to current rent stabilization and regulation where it must be a primary residence of the tenant.  Under this law, the local rent standards, the regulations would apply to any residence.  So in other words, a tenant could be renting ten different units and they would all -- and obviously, all ten can't be the primary residence, only one could.  Or in fact, none of them could be, they could be domiciled in another state, but all of them would be subject to this regulation, correct?

MS. WEINSTEIN:  Yes.

MR. MCGOWAN:  Does the local rent standard apply to subleases?

MS. WEINSTEIN:  We believe that subleases are exempted.

(Pause)

They are not subject to -- or they -- they -- it -- it goes back to the original tenant in terms of an ability to the prohibition on the renew -- removal of the tenant and the renewal.  Does that make sense to you?

MR. MCGOWAN:  I -- I don't think so, but...

MS. WEINSTEIN:  So let me -- let me go through it.

MR. MCGOWAN:  Please, thank you.

MS. WEINSTEIN:  So there's a subtenant, the original tenant's lease is ending, the term of that original lease ends. Now in terms of -- in terms of whether that lease ends as it relates to the original and sub -- subtenant, it goes -- the -- it is the renewal goes back to the original tenant who has subleased.  The protection does not carry over to the sub -- to the subtenant.

MR. MCGOWAN:  So then there's no control, essentially there's no regulation under this law of any subleases that -- so you have the original lease from the landlord/tenant, and then any other sublease arrangements would not be subject to this law.

MS. WEINSTEIN:  It does not protect the sub -- it does not provide the ability for a subtenant so say, *I cannot be -- I -- I cannot be removed because I'm now a tenant*.  It's the original tenant who signed the -- the terms of the lease that is covered by these protections.

317

**NYS ASSEMBLY**                    **APRIL 19, 2024**

MR. MCGOWAN:  So under the eviction, the Good Cause protections, but also the -- the regulation of what that sublease rent would be is not regulated under this law, correct?

MS. WEINSTEIN:  Yes, the current law.

MR. MCGOWAN:  Okay.  Thank you, Madam Chair.  I appreciate your time.

On the bill, sir.

ACTING SPEAKER AUBRY:  On the bill.

MR. MCGOWAN:  You know, we look at this massive bill and there is so much contained within it.  There is so much policy.  And it's very unfortunate that we've only had it in our possessions for a few hours and we're -- we're taking a look at it and trying to analyze and digest all of this that's packed into this bill.  There is so much policy in here, and there are things that -- that don't make sense.  We don't really have an opt in when it comes to these Good Cause protections.  We have sort of an opt in, and villages are bound by what the towns do.  There isn't really an answer, at least on what I heard this morning, about a village that borders two towns, which is something -- or is contained within two towns, which is a situation that I certainly have in my district and I know applies in other places in the State.  And when it comes to the rent regulation, there is nothing under this law stopping someone from buying up as many apartments as they want or renting as many apartments as they want, and not living in any of them and then renting those out, subleasing those out, and these protections don't apply.  So there's

318

NYS ASSEMBLY                                    APRIL 19, 2024

nothing stopping someone from creating a situation, creating more

scarcity of housing.  If this is meant to address the housing

affordability crisis and create more housing, I don't see how it does it.

As my colleagues have pointed out, there are many deficiencies within

this, and when you rush something like this into the budget

proceedings, this is the result you get; a lot of questions and not a lot

of great answers.

Contained within this are so many other things that

we didn't even touch upon today; the transfer on death deed, which is

another -- a tool somebody could use in their estate planning.  But I

find it interesting that we also have new laws for deed theft, which I

think is great because certainly someone could fraudulently acquire

property by recording a -- a fake or fraudulent deed.  So whereas we

have those protections, but now we're allowing somebody to transfer

their property through a deed.  So again, I think those things should be

standalone and should allow debate and analysis to -- to take place to

get to the best result possible for New Yorkers, not to jam everything

into one budget bill.

We talked about fare evasion on top of it.  We're

gonna listen to the MTA Blue Ribbons panel on let's just give them a

warning?  It's theft.  We are allowing theft to occur at the cost of New

Yorkers.  Because the MTA is continually complaining about how

they don't have enough money to provide services to New Yorkers,

but we're gonna excuse fare beaters, we're gonna put that in this bill as

well.  Congestion pricing.  So many things that are put into this bill,

NYS ASSEMBLY                                    APRIL 19, 2024

ELFA, as we refer to it.  It should be the LOL bill in my opinion and,

Mr. Speaker, I will be in the negative.

Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Gandolfo.

MR. GANDOLFO:  Thank you, Mr. Speaker.  Would

the Chairwoman yield for some questions, please?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes.

MR. GANDOLFO:  Thank you, Madam Chair.  So

my question is about something that didn't make it into the ELFA bill,

or the LOL bill.  So there's the provision that was proposed, it was

talked about by the -- talked a lot by the -- by the Governor that would

repurpose real property owned by SUNY and DOT for the purpose of

housing.  That was omitted.  So I was curious, why was that omitted?

MS. WEINSTEIN:  Normally we have the

description of what is being done with the purposes, and we just have

not gotten those parameters about -- as regard to that language, so it

was omitted.  It is possible that -- that we will, after the budget, get the

exact -- we didn't even get the exact locations that were being

discussed.

MR. GANDOLFO:  Because I am aware of a couple

of exact locations that were discussed and mentioned, especially on

Long Island; SUNY Farmingdale, SUNY Stony Brook and a property

owned by the Department of Transportation within the Town of

NYS ASSEMBLY                                    APRIL 19, 2024

Babylon were all publicly-named locations that were being targeted to
be repurposed for housing.  And just going even a little further on that,
back in the Capital Budget we approved the $250 million in
RUSH-NY [sic] funding, and that, to me, was billed as supporting
some of these initiatives.  So how is that connected?  What will the
RUSH-NY [sic] funding be used for if not for these SUNY and DOT
repurposings?

MS. WEINSTEIN:  In order to -- in order for us to --
to do these -- this type of legislation in -- in the past, it's not just sort
of identifying in an online or newspaper or whatever, it's the actual
metes and bounds, the real description of the property, and we do not
have that yet.

MR. GANDOLFO:  Okay.  So we -- we don't know
what this -- where exactly this funding will be used to repurpose; is
that correct?

MS. WEINSTEIN:  Yes.

MR. GANDOLFO:  Okay, it's to -- to be determined.
And now, as we know, this was for loans and grants for the
acquisition of real property; the plans, designs, construction, all to
help with that, and I know that the SUNY and DOT properties were
being considered in the budget because they were -- required statutory
changes in order to be repurposed; is that correct?

MS. WEINSTEIN:  Yes.  That's correct.

MR. GANDOLFO:  So now that that is out, is the
State considering any lands that do not require statutory change to --

321

to repurpose for the -- for housing?

MS. WEINSTEIN:  It -- it's really still early in the process so we wait for -- to have those properties specifically delineated before we move forward on that.

MR. GANDOLFO:  Okay.  And I mean, so is there any plan geographically, I mean I know we don't have the exact metes and bounds, but are there any general locations that the State is looking at?  Any types of properties, any general types of locations that will be considered?

MS. WEINSTEIN:  Where we know that I think agencies, have the State agencies have been directed to look for appropriate property, that they may be under their control and identify those properties, and when that -- when those properties are identified to us with more -- with the specifics, then we can certainly look at -- at those properties.

MR. GANDOLFO:  Okay.  So now that the funding is appropriated, the State can just kind of do a search and pick out which properties they might be able to acquire to repurpose for housing.

MS. WEINSTEIN:  Yes, yes.  I think that's a fair description.

MR. GANDOLFO:  Now are you aware -- are properties that the State could acquire or currently own, if they go to repurpose them, is that subject to local zoning?

(Pause)

322

MS. WEINSTEIN:  You know, I would say generally no, but any individual project could be determined.

MR. GANDOLFO:  Okay.  Thank you, Madam Chair.

Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. GANDOLFO:  Just looking at the way this budget has been crafted, a couple of days ago we voted to approve $250,000,000 in RUSH funding, and at least to me with everything that was said publicly by the Governor, what was reported, there was specific areas that this was going to be used for, namely SUNY Farmingdale, SUNY Stony Brook, a DOT-owned property within the Town of Babylon.  So we approved the $250 million in RUSH funding to support those re -- that repurposing of that property, but then overnight the ELFA bill drops and suddenly those are no longer on the table, they're out.  So now there's this $250,000,000 pot of funding that is going to be used to repurpose land that the State either currently owns or will acquire, and as the Chair said, it might not be subject to local zoning.  So this to me is a bait and switch where in the middle of the night the whole landscape has changed.  We don't know where the State is going to look to buy property, what towns, villages, regions.  And forgive me if I'm cynical, but over the last couple of years we've seen the Governor lambaste local zoning laws, make attempts to either mandatorily approve ADUs to override local zoning for certain density when it's on local municipalities.  So something

323

doesn't feel right about this approving the funding first, getting rid of where it was originally supposed to go, and I just think it speaks volumes on how dysfunctional this budget process is, how it's just put together piecemeal, bills are dropping in the middle of the night and at the end of the day now we don't know, there's a lot of uncertainty.  So although there are some positive things in this bill, I am happy to see the POA requirements for large-scale SUNY projects, I think that's great.  I'm disappointed that we did not approve the wage theft protection for our workers.  And again, this seems to be an end run around local zoning and it's something that I just can't support.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Walsh.

MS. WALSH:  Thank you, Mr. Speaker.  Will Chair Weinstein yield for just a quick question?

MS. WEINSTEIN:  Sure.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MS. WALSH:  Maybe more than one question.  The question has to do with actually Part Y, I don't think that we covered this yet.  It's the change to the Social Services Law.  It talks about -- it says that OCFS can -- shall establish a differential payment rate for certain types of child care services that are going to be provided by licensed or registered day care providers.  Now I remember during the budget hearings, there was some talk about helping in the instance

NYS ASSEMBLY                                      APRIL 19, 2024

where people need to work non-traditional hours, and I -- I do see that in Section B, subdivision B.  But it also talks about establishing a differential payment rate for those who provide care to a child or children experiencing homelessness.  Why are we doing that?

(Pause)

MS. WEINSTEIN:  My understanding is this is already being done.  We're just increasing the rate.

MS. WALSH:  To 10 percent?

MS. WEINSTEIN:  I believe it's 5 percent currently.

MS. WALSH:  Oh, so go from 5 to 10 percent, okay. And then I also see in Part Y that it also says in the catchall last subsection that *nothing in the subdivision shall be construed to limit the authority of OCFS to establish additional differential payment rates by regulation*.  So in other words not having to come back to us; is that correct?

MS. WEINSTEIN:  Yes, that's accurate.

MS. WALSH:  Do you happen to know if there are any more differential pay rates that are being contemplated?

MS. WEINSTEIN:  Not at this -- I'm not aware of anything at this time.

MS. WALSH:  Okay.  Do you -- do you happen to know what the fiscal impact would be of the establishment of these two differential pay rates or they actually increase from 5 to 10 percent, as you just said, for those two non-traditional hours and also the homeless children?

325

MS. WEINSTEIN:  We -- we have appropriated $13 million in the budget to -- for this provision.

MS. WALSH:  Okay, very good.  Thank you.  I was just curious about that one.  I do have one other question that came in under the wire --

MS. WEINSTEIN:  I saw that question coming in.

MS. WALSH:  Did you see that get slid over?  All right.

So this has to do with Good Cause Eviction.  Would the Good Cause Eviction law impair the enforcement of existing contracts that have an escalation clause that exceeds CPI plus 5 percent.

(Pause)

MS. WEINSTEIN:  It would -- so at -- I understand where the -- well, first of all, I don't think there are that -- I would just think that's more traditional in a business lease than in a residential lease where you would have a long schedule of going forward of -- of what the rents would -- would be, but at -- at renewal time that -- that would be determined as the renewal lease would need to say that it is either part of Good Cause.  I -- I would say that if -- hold on one second before I say anything.

(Pause)

Just didn't want anybody to correct me afterwards.  I would say that if it is -- if there is a lease that's in place where perhaps just very low amount below what would otherwise may get that lease

326

**NYS ASSEMBLY**                    **APRIL 19, 2024**

exempt, that tenant exempt because it's right below the level of what would be considered luxury, and then within that -- that lease there was an escalation -- there was a right of renewal at a certain rent that would then bring it above the -- above what is considered the luxury -- would bring it into the luxury exemption that it would no longer be subject to Good Cause.  Subject to be corrected by some lawyers around me.

MS. WALSH:  Thank you very much, Madam Chair.  And at this point, those are the questions I had and, Mr. Speaker, on the bill.

(Pause)

On the bill, please.

ACTING SPEAKER AUBRY:  On the bill, Ms. Walsh.

MS. WALSH:  Thank you so much.  So I want -- I want to focus on the positive aspects of this legislation before I largely - I guess - I think repeat a lot of what my colleagues have -- on this side of the aisle have said and -- and will be saying as they explain their votes.  I'm glad for the Foundation Aid study, I think it's really necessary.  I think that the Transportation Aid Reimbursement on the zero emission school buses, that -- that was a fix that needed to happen.  We heard about that all through the Education Budget Hearing so I'm glad to see that that was fixed.  And also on UPK, the supplement, not supplant, the fix in that language was also something that was asked for and I -- I think will be very helpful.  And I'm glad

that that change was made.  I'm always glad to see the locally-sourced food reimbursement in the Education portion of the budget.  I -- I feel that that's a great support for some of our local ag, and I like the idea -- I like the fixes that I saw with TAP, I really did.  I thought that TAP for part-time students and the -- the change in threshold, that's helpful as the -- the parent of our youngest is getting ready to go to school, every single bit helps and -- and TAP will help a lot of families and a lot more families now.  So I'm grateful for that.  And I just have to say that as far as Sammy's Law, you know, my -- my dear friend Amy Cohen worked so hard for that and I'm -- I'm glad to see for her that this was done to feel that something good came from such an awful tragedy with her son, and I'm glad for her.

On the negative side, which I'm afraid I have to get to.  All right.  So this -- this school bus resource center, so the -- the gentleman to my right found humor in a different section of the budget.  I got laughing about the zero emission school bus resource center because I feel like the -- there should be a hotline that's called 1-800-We-Can't-Afford-This.  I -- I just -- you talk about doubling down in the budget on this school bus electrification.  I mean my goodness, between all of the different pressers that we've had, the -- the time -- the time that I personally, not just me, but so many of us spent during budget hearings really exposing just the complete unworkability to our school districts of that proposal and the fact that none of it got rolled back in the slightest, but we're going to have a resource center now to be able to -- to tell these I found extremely

328

knowledgeable pupil transportation heads. They -- they know how much this costs. They know that they can't afford it. I got a school district in my -- in my district that was told that they're -- it's going to cost them $30 million to just bring the power on to the campus to be able to charge the fleet that they're going to be required to have. It is just incredibly unworkable and I -- I'll say it again. I said it during I think the debate on the one-House budget. We've got to do some work in this area and get real because that's not real and creating -- creating a resource center to give more documentation to school districts who already know they can't afford it, it's -- it's just silly, it did make me laugh. The FASFA completion for high school students is -- I personally am offended by it. I think it's just one more way to make a non-college-bound student feel stupid, and I don't think it belongs in our budget, I don't think it belongs -- I don't think it belongs there. There are plenty of people within any school that are encouraging kids to get any kind of financial aid that they can get and certainly the FASFA is a heck of a lot more accessible than -- than the kind of financial aid forms that my poor father had to -- had to do down in the basement when I was getting ready to go to college, but I -- I just think requiring it or requiring a waiver to be signed is just -- I think it's a slap in the face to all of those kids for whom going on to secondary -- going on to college is just not something that's in their game plan, you know. I don't like it.

        The last thing I'll really talk about is really the most talked about thing. I will say that, you know, if this is our Big Ugly,

you know, aside from Good Cause Eviction and those -- which is the big part of it, it's really -- it's -- it's not as ugly as it usually is.  I mean I guess it -- we can, you know.

(Laughter)

Maybe -- I mean we're going to come back and we've got plenty -- plenty more weeks to -- to really continue to add onto it, but as far as what's actually in this, you know, Good Cause is the big -- is the piece obviously that we're all kind of choking on a little bit.  So I'll say this:  You know everyone keeps referring to a housing crisis, and when I think of a crisis I think of something that is immediate, emergent, hair on fire, we got to fix it right now.  But this has been going on for a really long time.  I started doing some research and I was digging, I did a deep dive one night and was reading the *New York Times* from 1974.  And articles back from that time in the City and what -- what was happening with housing in a big inflationary time in New York City.  And one of the quotes that stuck out to me was, "Discussions about fairness of rents to tenants are meaningless if no one can afford to operate and maintain the buildings."  And I think that that's a lot of the conversation that we've been having today and that we've been having about this part of the budget.  Since, you know, since 2019 I think that there have been as my -- the colleague to my right detailed I think better than any of us could, there's been a worsening of the situation, and I won't talk about all of those again, but you know there have been a number of things that have been put into place that are really making it nearly

impossible, certainly not attractive to entice the -- the voluntary creation of additional housing opportunities.  And I mean, I think that my constituents have been telling me loud and clear that, you know, as we talk about our declining population in New York State, they're afraid and I'm afraid that we're going to lose more if they can't live, work and own property here or rent property here at a reasonable rate. So I think that one of the things I would point out is that in my neck of the woods we don't have housing court.  We've got town courts. We've got a couple of cities, small cities, city courts and some village courts.  They're the ones that are going to be handling all of these issues that are going to rise from the -- the new way of approaching the evictions.  And I -- I just think that if you look at what happened during COVID and the backlog that we experienced because we essentially, you know, blocked almost all evictions, I can only imagine what this is going to do to our court system, our local court system, so I have a lot of concerns about that.

You know, New York State already offers a number of subsidies, rent controls, tenant protections and I think if we really want to see the amount of housing stock to increase, we need to give the free market a chance to work and to serve the demand and to put forward their own creative solutions rather than having it try to come from this Body.  I think with the passage of time, if we do that, we might be able to undistort the housing market, but I think that this needs to be done not with State mandates and draconian I think legislation like Good Cause Eviction but with persuasion, with

enticements, with -- with taking -- taking the -- the barriers away and making it seem more attractive.  The Governor I think and overall, and I know that in this way I am different maybe from the bingo-loving, puzzle-making colleagues I've got on the other side of the aisle, sometimes.  I think we need to meddle less sometimes and I think we need to allow market forces to work.

So primarily for the reason of Good Cause Eviction I -- I will not support this ELFA bill, but I thank you, Mr. Speaker, for the chance to speak.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Giglio.

MS. GIGLIO:  Thank you, Mr. Speaker.  Will the sponsor yield?

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes, Mr. Speaker.

MS. GIGLIO:  Okay.  So I'd like to talk to you about the Good Cause Eviction and then also the affordable neighborhoods for New Yorkers, so your team can prepare to help you answer the questions, thank you.  So when it comes to Good Cause Eviction where it says that a sublessor cannot be eligible for eviction actually, they would not be able to be evicted, but what if --

MS. WEINSTEIN:  No. They -- they wouldn't be eligible for the protections.

MS. GIGLIO:  Oh, for the protections.

MS. WEINSTEIN:  Not that they wouldn't be eligible

**NYS ASSEMBLY**                                         **APRIL 19, 2024**

--

MS. GIGLIO:  But what if somebody who is the original sublessor that now subleases it, what if it's in the original sublessor's lease that they can't sublet the unit and they're caught subletting the unit and now they're trying to recover the unit.  And so would that person be able to be evicted because they illegally sublet the unit?

MS. WEINSTEIN:  Yes.  That was -- when I went through all of the list of reasons you could be evicted with Mr. Ra, one of them is that the tenant is violating the terms of the tenancy and has not cured the violation after written notice.  So if the landlord were to find that the tenant who would be protected had sublet their unit and the lease said you can't sublet, that would be a violation that if they didn't -- if they were notified and didn't regain their apartment, they could be -- the lease could be terminated.

MS. GIGLIO:  Okay.  And then my next question is the units that qualify as a seasonal dwelling unit.  What definition are you using for a seasonal dwelling unit, because local laws have requirements that say that it can't be transient housing, it has to be 27 days or more.  So if someone is renting it for say an Airbnb for a couple nights here and a couple nights there.  Would -- would this law usurp local zoning laws that say that you can't have transient housing for less than 27 or 30 days?

MS. WEINSTEIN:  No, and the definition is within existing General Obligation [sic] Law.

333

MS. GIGLIO:  Okay.  So the -- the town could pursue the landlord that's using or this property as transient rental and if it's in violation of the town laws they can evict not only the tenant but then the owner of that seasonal housing would be -- and -- and you were still going to get me the definition of what seasonal housing is.

MS. WEINSTEIN:  The General Obligation [sic] Law has the definition of seasonal.

MS. GIGLIO:  Okay.  So on to the affordable neighborhood for New Yorkers.  So it says that they may be eligible -- an applicant may be eligible for a 40 year, 35 year, 20 year or 10 year exemption.  Who qualifies eligibility?

(Pause)

MS. WEINSTEIN:  New York City would.

MS. GIGLIO:  So the -- the city council, the mayor, the city council, the -- you know...

(Pause)

MS. WEINSTEIN:  HPD, similar to how they have in the past.

MS. GIGLIO:  Okay.  And this says that it would be able to apply to any projects between June 15th of 2022 and June 15th -- and projects through June 15th of 2034.

MS. WEINSTEIN:  Correct.  And it would have to be completed before June 15th of 2038.

MS. GIGLIO:  Okay.  So are the current taxes that that property is generating in order to pay for the schools and to pay

for the sewers and to pay for the, you know, all the taxes that New York City buildings pay, if it's a renovation or if it's a new building, you know, are any of those -- are those just wiped away to zero and then picked up by the rest of the residents of New York City?  Or will the base taxes that they're already paying have to be continued to be paid and anything that may be more of what they're currently paying would be delayed for a full taxation?

(Pause)

MS. WEINSTEIN:  They continue to pay the tax as they've been paying but if it's over -- if it's a unit that's over 150 -- a building that's over 150 units, then they would -- in 150 total units or more located within the Zone A or Zone B, they would be exempt from taxation.

MS. GIGLIO:  So you could potentially convert an office building to housing and wipe away all the taxes that that commercial building is currently paying and put kids into the school district and school system without paying any taxes for maybe 25 -- 10, 20, 35 or 40 years?

MS. WEINSTEIN:  I believe you are correct and I appreciate your concern about the health of New York City's tax base.

MS. GIGLIO:  Yeah, well, I think that a lot of my colleagues should probably be concerned about that, too.  Sorry, Mr. Speaker, just a little commentary.

So what if -- so would it be retroactive?  So if it's June 15th of 2022, the project's already completed, they're already

335

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

paying taxes, can they go and say *well, we don't want to pay taxes anymore*?

MS. WEINSTEIN:  No, it's from the time of the law going forward.

MS. GIGLIO:  But it says that it's to any projects, the tax benefits for creating multiple dwellings would apply to any projects between June 15th of 2022 and June 15th of 2034, so we're in 2024.  So from June of 2022 until now, if any of these conversions have happened and they have had to pay taxes on the residential units, can they come in and say *well, it says June of 2022, I'm eligible so I don't want to pay those taxes*?

MS. WEINSTEIN:  Right.  So I think you are talking about when you go to the June 20 -- 15 of 2022, the 421-A -- what we're just talking about what we labeled 421-A vested project extender.  So these are projects that were started with the contemplation that 421-A would be a continuing program and then at the time they are close to -- so they commence.  When they commence their construction, 421-A program was -- was in effect, it then lapsed.  We are allowing those projects if once they submit a letter of intent to HPD indicating that they will apply for 421-A.  Once construction is complete, then they would yes, be subject to the tax exemption provisions.

MS. GIGLIO:  Okay, so it's not automatic.  They have to apply, anybody has to apply for these exemptions, 10, 20, 25, 30.

336

MS. WEINSTEIN:  Yes, for the ones that are -- had started construction before the June 2022 date with the --

MS. GIGLIO:  Okay.

MS. WEINSTEIN: -- and had contemplated the cost, et cetera, as being having had that exemption and then the exemption disappeared.  We are allowing by application for them to in effect reapply to be covered by the older program.

MS. GIGLIO:  Okay.  And then it says that the, you know, depending on the location, the construction project labor agreements would be required but right now New York State law says that if the benefits to an applicant are 30 percent or more, then they have to use a project labor agreement.  So does this do away with that section of the law?  I mean because property tax for 10, 20, 35, 40 years, I mean those benefits, plus who knows how much money they're going to get out of the budget that we just adopted to build these affordable housing units, but if those benefits equate to more than 30 percent of the cost of the building, then project labor agreements are currently required.  So does that just do away with that 30 percent threshold?  Because it's definitely going to be more than 30 percent 'cause -- unless they're going to spend, you know, hundreds of millions of dollars on a building, and who's analyzing the construction costs to make sure that those are honest numbers and that it's not exceeding the 30 percent?

MS. WEINSTEIN:  So, you know, since we're talking about New York City projects, they currently have an elevated

minimum wage requirement.

MS. GIGLIO:  So they don't have the 30 percent
threshold over 250,000 as I believe it says in the State law?

MS. WEINSTEIN:  So the construction work -- the --
the minimum wage for 100 or more units for a large rental project is
$40 an hour.  It increases 2.5 percent a year for over 150 or 150 more
units is $72.45, plus, you know, again, that's 2.5 percent or 65 percent
of the greatest prevailing wage.

MS. GIGLIO:  Again, I think it contradicts the State
law because the project labor agreements and what is paid and
whether apprenticeship is required is really based on what the local
unions are paying their employees per hour.  And those rates sound
much lower than what they would pay the -- what the unions would
pay their employees, especially in New York City.

MS. WEINSTEIN:  Well, these are the -- carved out
for the Zones A and Zones B which are listed in the -- in the statute as
the affordability --

MS. GIGLIO:  Which is probably where the most
construction is going to happen and probably could be employing a lot
of apprentices, which is part of a workforce program, workforce
development, getting people good jobs, paying good wages so they
can afford to stay in New York.  So we're going to exempt the two
biggest areas in New York City from having to, you know, do this
requirement.  I mean there's not enough money in the budget this year
for public works projects that would keep living wages or high union

NYS ASSEMBLY                                    APRIL 19, 2024

wages going for the entire year.  Now you're going to exempt two big
-- two of the biggest construction areas in New York State and -- and
you're going to block unions and -- and apprentices out of it.  So I -- I
have a problem with that, and I also want to know if the schools have
been asked about this because you're talking about thousands and
thousands of units.  We were facing cuts in the budget for education
and now you're going to be adding all these schools -- all these kids to
the school without any taxes.  Who's going to pay for -- to educate all
these kids?

       MS. WEINSTEIN:  The -- the total taxes for New
York City will remain -- that are collected will remain the same.

       MS. GIGLIO:  Okay.  So if a -- if a project developer
-- I mean is this going to totally eliminate IDAs from reviewing these
projects because the State law will trump local IDAs?

       MS. WEINSTEIN:  IDAs will not be involved in any
of this.

       MS. GIGLIO:  Well, what if they have a current IDA
and somebody comes in and says I want a 40 year, you know, tax
exemption, because there is a provision for 421-P, which I consider
*problem* pre-exemption that allows a local option any city, town or
village outside of New York City to provide a 25 year real property
tax exemption.  So I guess it's an option for them to say okay, we're
not -- you don't have to go through the IDA, we're just going to give
you 25 years?

       MS. WEINSTEIN:  I think that you're mixing up the

IDAs with these affordability zones so --

MS. GIGLIO:  Well, is that a -- is that a -- is that -- can they exempt a project or do they have to exempt any project within the town or the jurisdiction?

MS. WEINSTEIN:  So now that we've moved out of New York City per the IDAs are not impacted by this statute.  This is outside of the IDA law.

MS. GIGLIO:  Okay.  Thank you, Madam Chair. And Mr. Speaker, on the bill.

ACTING SPEAKER AUBRY:  On the bill, ma'am.

MS. GIGLIO:  So in the interest that we're calling this bill the ELFA:  Education Labor and Family Assistance, where's the labor?  We're talking about millions of New York State dollars going to build projects to help people have affordable housing but at the same time we're telling skilled workers that there's nothing in it for you.  I -- I don't understand that.  And to me, the language is contradictory when it comes to the 30 percent threshold for Project Labor Agreements on any job that the State provides funding for in New York State.  And to me, a -- a 40 year tax break is a State payment to this -- to this developer or this project.  So Mr. Speaker, I'll be voting in the negative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you. Mr. Bronson.

MR. BRONSON:  Thank you, Mr. Speaker.  Would the Chair yield for a couple of quick questions?

**NYS ASSEMBLY**                          **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  Ms. Weinstein?

MS. WEINSTEIN:  Yes.

MR. BRONSON:  Thank you, Chair.  You know, I'm -- I'm really pleased to see that we have some measures in this budget that will encourage the building of housing stock, and in particular affordable housing, as well as tenant protections.  Of course we could have done more but this is a really good approach at the beginning.  That said, I have a clarifying question on the housing provisions in Part U. This establishes a new tax incentive in Section 485-X of the Real Property Tax Law, and the proposal also applies certain requirements under Section 220 of the Labor Law in relation to the payment of construction workers; is that correct?

MS. WEINSTEIN:  Yes, you are correct.

MR. BRONSON:  All right.  So just that we're clear though, there's a particular definition in Part U relating to the definition of wages.  But I want to make sure that in no way is that changing the calculation of wages under the current Labor Law Section 220 as it relates to certain payroll taxes.

MS. WEINSTEIN:  You know, certainly our intent is not to alter the prescribed calculation of wages under Section 220 of the Labor Law.

MR. BRONSON:  Great.  So -- so that's going to remain the same.

MS. WEINSTEIN:  Correct.

MR. BRONSON:  And -- and I really appreciate it.

341

Thank you, Chair.

MS. WEINSTEIN:  Sure.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  Hold on.

On a motion by Ms. Weinstein, the Senate bill is before the House.  The Senate bill is advanced.

Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  A party vote has been requested.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  The Republican Conference will generally be in the negative.  Those who would like to vote or feel compelled to vote in the positive should do so at their desks.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Solages.

MS. SOLAGES:  The Majority Conference will be voting in the affirmative.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Mr. Dinowitz to explain his vote.

MR. DINOWITZ:  Thank you.  Let me start off by

saying I am voting yes.  I'm voting yes enthusiastically and I'm grateful to our Speaker, our Chair of Ways and Means, our amazing staff because this bill has so much in it that is going to do so much good for so many people in the State of New York, but I did want to talk about one thing.  IAIs.  We've created a two tier -- two tiers of individual apartment improvements in this legislation and the higher tier is intended to apply to limited, limited situations where there's a need for additional improvements to be made in an apartment.  HCR has to issue robust rules to ensure that IAIs are not abused and in the past they have been abused and abused not just in isolated instances. We have to make sure that the only apartments that can access the higher tier are those apartments which need it.  The purpose of this change is not to reward the landlords who are warehousing apartments, and as we know lots and lots of apartments in the City of New York have been warehoused contributing to the housing shortage that has been used as a justification to try to build more and more housing, warehousing.  But rather it's to enable substandard apartments to be returned to the market.

Also, I want to end up by saying that nothing in here should be taken as a signal that any efforts in the future to backslide on the HSTPA will be tolerated.  I'm talking about MCIs and things like that.  These are things that are going to be fought in the future if we try to take back the wonderful things that we have done in 2019 in the HSTPA, so with that I vote yes.

ACTING SPEAKER AUBRY:  Mr. Dinowitz in the

**NYS ASSEMBLY**                          **APRIL 19, 2024**

affirmative.

Mr. McDonald.

MR. MCDONALD:  Thank you, Mr. Speaker.  I just want to mention a few items in regards to this budget that I think benefits all New Yorkers and items that actually I think my constituents are pleased about.  First of all, for the first time in over 15 years an increase in AIM funding to local governments, long, long overdue.  Yes, we restored CHIPS funding, but let's also not forget that between the four other categories, over $1 billion in aid of various different role recovery projects are out there each and every year.  We continue to hold the line on Medicaid costs for our local counties.  I think people forget that in the last several years we have taken over $37 billion of Medicaid funds off the backs of counties, and many of our counties have responded by lowering property taxes for our constituents.  We invest in economic and workforce development projects, on ramp a new project I'm very excited about that will have an impact in the Capital Region, and a MAP program that will have a major impact on workforce development here in the City of Albany and the Capital Region.  We restored a half-a-billion dollars in clean water infrastructure funding, which is critical for our local governments.  We had our third year of COLA increases for those individuals who care for the disabled and infirmed.  Another year of increases on Medicaid rates for hospitals, nursing homes and assisted living facilities.  Another year, a second year of funding for alive downtowns to help our historic venues that are critical to our

344

NYS ASSEMBLY                                APRIL 19, 2024

downtown cities recoveries.  And yes, we took aggressive steps to
address retail organized crime and repeat shoplifting.  Items that the
public are surely concerned about.  And at the same token I think it
goes without -- that it should not go without mention that this $237
billion budget did not raise taxes on many of the individuals
throughout this State.  That is something that my taxpayers, my
residents are also concerned about.  I do have concerns about the
changes of the CDPAP program, but I know that DOH and the
Governor working together with the Legislature can work hard for a
very seamless transition.

So Mr. Speaker, I thank you for your leadership.  I
thank our colleagues for working towards compromise on issues that
we always didn't agree on, and at the same token, Mr. Speaker, I really
thank you for your patience.  Thank you.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. McDonald in the
affirmative.

Mr. Epstein to explain his vote.

MR. EPSTEIN:  Thank you, Mr. Speaker.  I rise to
explain my vote.  I just want to thank the Chair of Ways and Means
and the Speaker.  First, I want to outline a huge problem for my
community which is the changes in individual apartment
improvements or IAIs.  As we heard earlier, this increase in this
two-tiered system is ripe for fraud and will really detrimentally hurt
my community.  It's something that we should really look back at.
But on the upside, just a few years ago the idea of passing legislation

345

to enable accessory dwelling units and legalizing basement cellar apartments seemed impossible.  Today we're standing up for those tenants who have been left behind.  We cannot forget the 11 New Yorkers we lost in basement apartments due to flooding just a few years ago.  We are making tenant safety a priority by taking steps to make these apartments safer and legalizing and recognizing tenants rights and tenant protections.  We are -- we are protecting the first responders who go into these units by sharing that these units have appropriate exits to safe features.  We want to support the homeowners who want to do the right thing in these -- in our communities.  We're helping families who want to stay together by creating incentives to build accessory dwelling units around the State that fit into their communities, provide housing for generation and newcomers as well as environmentally-sound developments.  We're investing in housing and getting back to the (inaudible) programs created like Mitchell-Lama.  We're also standing up for market rate tenants, for tenant protections like in my district in Waterside Plaza, this tenant protection will help 700 families gain new protections which they don't have today.  This will help potentially millions of tenants across the City.  I know we need to do more, but we need to continue to fight for tenant protections.  Eleven of my NYCHA developments will get $140 million City-wide for the capital needs.  You know, we're making our streets safer by Sammy's Law and taking a loss of life and changing it to lower our speed limits.  We can't ignore our investments in education, funding pre-K through 12 and

making sure there's a maintenance after to make sure that funding goes to our schools.  We're supporting CUNY and SUNY, the capital and funding, increase capital for our institution which is critical.  Increasing TAP awards will help middle-class New Yorkers to ensure that they can get to New York.  For forming Tier 6, affecting those people who obstruct their place in trying to get hundreds of thousands of dollars from folks who do obstruct their place to stop and to ensure that those who do have consequences.  While I don't support this mayoral control because the State Education Department recently wrote a report --

ACTING SPEAKER AUBRY:  Mr. Epstein.

MR. EPSTEIN:  Yeah, but it's a mistake in policy.  I encourage us to --

ACTING SPEAKER AUBRY:  How do you vote?

MR. EPSTEIN:  -- to keep up fighting and I will vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

Mr. Steck - three minutes is what you get.  No, two minutes is what you get.

MR. STECK:  As one of my economics professor said, *our capitalist economic system is a democracy*.  We vote with our dollars as to goods and services we want produced. However, some have billions of votes, while others have thousands.  An overproduction of luxury goods is the inevitable result so government has to step in.  That is what we see in the housing market.  There's no

347

shortage of growth in luxury apartments, anywhere.  In Albany we see many new apartments advertised as luxury.  On the other hand in Schenectady, we see beautiful new public housing.  I support public housing.  The *New York Times* did an excellent series about how the City of Vienna, Austria solved its housing crisis by building public housing in the 1920s and maintaining it in the future.  Not like here where we pledge allegiance to the dogma of the market.  I note also an excellent article by Andrew Waite in the *Daily Gazette*, the Schenectady paper.  He wrote that people leaving expensive large cities and going to less expensive parts of other areas like parts of Upstate New York is a national phenomenon.  The middle class that cannot afford outrageous housing costs is moving.  My own daughter is moving from New York City to Poughkeepsie for this very reason, and high housing costs adversely affect economic growth since people lack sufficient disposable income to spend on other goods and services.  I vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, sir.

Ms. Glick to explain her vote.

MS. GLICK:  Thank you, Mr. Speaker, for allowing me to explain my vote.  I want to thank the Speaker and the Chair of Ways and Means for all their work.  I am thrilled that Sammy's Law will be included in the budget.  It will allow New York City to lower speed limits in some places.  A big thank you to families for safer streets who have lost loved ones to traffic crashes.  Turning their grief into advocacy, they deserve to be honored.  However, I am

disappointed at the wholesale lifting of the floor area ratio putting thousands of smaller buildings with affordable housing at risk because of real estate speculation and greed.  The appropriate first step to convert commercial buildings to residential housing, those buildings many of them would need the lifting of the cap and that is a good and fine idea, as long as affordable housing is included and protection labor -- and labor protections.  The guardrails included in the FAR lifting are weak in comparison to the power of real estate interest and will need to be vigorously enforced though I have little confidence in the ability of agencies to stem the tide of displacement, especially in districts like mine.  Further, the erasure of the urban sky limiting air and light is counter to the goals of the CLCPA.  It will make New York less liveable.  We had the upzonings of Mike Bloomberg and the result was a huge increase in homeless families.  Something that hadn't been the case before.  This will be a new and dreadful wave of gentrification, not an increase in affordability.  The Governor's agencies will have to redouble their protection of tenants in New York, though the real price will be paid by average New Yorkers who will have to fight to keep a roof over their heads and I'm pleased at the updating of TAP, long overdue.

With that, I withdraw my request and vote in the affirmative.

ACTING SPEAKER AUBRY:  Thank you, Ms. Glick.

Mr. Simone.

349

MR. SIMONE:  Thank you, Mr. Speaker, to explain my vote.  I am filled with relief at the inclusion of Sammy's Law in this budget.  New York City has long needed the ability to increase control over our own speed limits.  This is a commonsense solution to traffic violence and I applaud the hard work of all who helped bring this bill to fruition.  So many of us know someone who was tragically taken away from us or who is fighting for their life in a hospital right now due to car violence.  With this vote, we are saying no more to needless tragedies on our streets.  I commend the advocates who have worked tirelessly to make this happen along with my colleagues who led on this.  For Sammy and all the victims of traffic violence, we can proudly say that in this budget we save lives and make our communities more livable and safer.  On housing, New York State has been in a housing crisis that was decades in the making.  I am proud to vote yes on a budget that starts us on the path to finally tackle this crises head on, we've waited too long. This was not a perfect deal, but the groundwork is laid with some historic first steps that we will build on.  The current vacancy rate is extremely low.  Never before have we needed to build new housing more than we do now.  This budget will get shovels in the ground with new incentives for affordable housing. A Mitchell-Lama program for the next generation.  This is a big deal converting vacant offices to residential, and allowing New York City to build denser residential buildings like we did back when so many of our architectural gems were built.  When the supply of housing finally meets and exceeds demand, prices will fall and tenants will control the

market, not landlords.  We also recognize that it will take years for supply to grow where it needs to be.  Why we need far stronger tenant protections to keep people secure in their homes.  For the first time rent protection for market rate tenants are in the budget.  The version of Good Cause in this legislation is not good enough.  I am concerned that there are so many questions on eligibility and enforcement waiting for a court interpretation of which tenants are protected.  I will work endlessly to ensure that we build on this in the future.  Our work will not be done until we build a housing market of abundance and choice for all New Yorkers.  Thank you, Mr. Speaker, for negotiating a budget that sees New York in the path to solving our housing crisis. We must build housing for every New York.  I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Simone in the affirmative.

Ms. Cruz to explain her vote.

MS. CRUZ:  Thank you, Mr. Speaker.  The changes to our housing regulations passed today are not Good Cause Eviction. They represent steps to protect additional New Yorkers from possible evictions but they also leave many tenants still unprotected.  I wish our colleagues would stop calling it Good Cause because it is a far cry from the full set of protections that we would've seen under Good Cause.  Other changes like the increase in IAIs will likely result in higher rents for some of our neighbors and their inevitable eviction if they cannot ultimately pay that increase.  We're not giving up and coming back next year to continue fighting for tenants.  I want to

NYS ASSEMBLY                                    APRIL 19, 2024

briefly talk about Mayoral Control which is supposed to provide the
BOE an opportunity to seamlessly plan for and support Citywide
challenges such as remote learning during a pandemic or snowstorm
or even the influx of migrant children.  However, the way in which
this current administration has chosen to leverage that structure is
questionable.  Many in our community have questions, including me.
Where is the shared leadership?  Where are the open lines of
communication with stakeholders including elected officials?  Where
are the transparency around the holistic approach to family support?
How is the DOE using both quantitative and qualitative data to
understand these challenges and help the families.  The ones that have
led some families and children to sell candy during school hours.  I am
still waiting for my meeting three months later on this issue.  What
oversight does the central administration have over the school and
district and budgets to ensure administrators are spending the money
the right way?  It is clear that the current administration is that using
the power that comes with Mayoral Control to its full capacity in order
to ensure students are attending school, and I'm hoping that by
continuing to give them control, they finally learn the lesson that they
need to work with us and work with the community.  And I hope that
the mayor and the chancellor are listening and take this opportunity to
work with us.  But this budget also includes key positive changes for
my community, increased funding for the Lorena Borjas Fund,
increased money to provide -- to end food insecurity and actually
codifying the reproductive freedom and equity fund.  Additionally, too

NYS ASSEMBLY                                     APRIL 19, 2024

many children and adults in my community have been killed or badly injured because of speeding cars.  Just last month Miss Elisa, the leader of our Little Friends School in Elmhurst died after she was hit by a car.  She led the school for 25 years and now I get to go back to our neighborhood and say that we're changing the law and hopefully saving lives.

I'll be voting in the affirmative and I thank you for that, Mr. Speaker.

ACTING SPEAKER AUBRY:  Thank you, Ms. Cruz.

Ms. González-Rojas.

MS. GONZÁLEZ-ROJAS:  Thank you, Mr. Speaker. We're facing a housing crisis in our State.  I stood with tenants in my district who were being pushed out of their homes and who are experiencing abusive tactics by landlords.  We could have passed Good Cause Eviction but this watered down version pushed by the Governor will only cover 30 percent of tenants we are trying to protect and we could have strengthened labor requirements to ensure that our union siblings get work.  It is not the billionaires that are leaving the State, it is the Black and Brown and working-class neighbors.  The major reason for this is housing.  I'm grateful the Speaker fought hard for tenant protections but the Executive (inaudible) sided with the corporate interest over tenants.  The basement apartment legalization pilot which I support will only be piloted in one district in Queens even after several residents in Queens died in their basement

353

apartments from drowning due to Hurricane Ida.  I hope we can expand this in the future in order to provide safe and dignified housing for my constituents.  Central to my vision for cleaner air, faster commutes and safer streets is a strong public transit system.  The funding we secure to improve MTA bus frequency is important for every day New Yorkers.  We must treat public transit as a vital public good that it is.  This is a great start for bus frequency.  And lastly, in January I was hit by a car in a crosswalk.  I became another statistic of the increased traffic violence in New York City.  But I'm lucky to be here today.  So many families cannot say that.  Giovanni Ampuero, nine years old of Jackson Heights; Bayron Palomin Arryo, eight years old of East Elmhurst; Dolma Naadhun, seven years old of Astoria.  They were not so lucky.  Their families will never see them again.  Passing Sammy's Law will make our streets safer.  I'm grateful to Amy Cohen and my colleagues who helped get it done today.  As a mom and as a legislator there's nothing more important to me than keeping our neighbors safe.  I proudly vote in the affirmative.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Shimsky for the purposes of an explanation.

MS. SHIMSKY:  Thank you, Mr. Speaker.  First, I rise in gratitude for the media tax credit.  My district is developing the risk of increasingly large media deserts.  We don't know what's going on in our Local Governments, we don't know what's going on in our schools, we don't even know who died.  Having this tax credit will help assist current -- currently struggling and new media outlets to get

the -- to get on the path to fiscal response -- fiscal sustainability.  We also have many first steps to deal with major issues here.  Number one with housing.  We finally have some substantial steps to deal with our housing affordability crisis in this State.  We're probably going to have to do an awful lot more, however.  And certainly in Westchester County, I don't know how much good what we have passed will do for an area that has a housing affordability crisis almost as bad as New York City's.  We will have to see and as I said, we are going to have to do more in future years.  I am so glad that Foundation Aid Hold Harmless has been restored.  It will provide critical consistency of funding for our school districts.  And it will help our school districts plan for the future.  Of course we have a study coming in this year, now that's very important.  We not only need to update data, but we need to take a clear-eyed view of the needs of our schools and what the goals of a good public system in our great State should be.  We need a public process, a long thoughtful process where all stakeholders can voice their views.  With that, also the clean water infrastructure.  We just got a study this week from the State Comptroller's Office talking about how much more we have to invest in our clean water infrastructure and how much more we have to do to help our municipalities access the funds.  I am hopeful that what we did this year to restore funds will just be the beginning of a many year step --  many year journey in making sure that's taken care of.

So for all these reasons and the others in the budget, I proudly vote in the affirmative.

NYS ASSEMBLY                                    APRIL 19, 2024

ACTING SPEAKER LEE:  Thank you.

Ms. Shimsky in the affirmative.

Mr. Slater to explain his vote.

MR. SLATER:  Thank you, Madam Speaker.  I rise today to explain my vote, but first I just want to take a moment to acknowledge and thank Chair Weinstein for taking endless questions during this process as well as the ranker of Ways and Means for the Minority, Ed Ra and of course the great staff that we have here helping us all through this process.  You know, there's some really great things in this particular budget bill that I have supported throughout this Legislative Session.  Fixing Tier 6 and the SUNY PLA being two of them as well the media tax credit, but I still have grave concerns over the bill that -- that we're dealing with as it relates to Good Cause.  I think that we have some serious questions still on the impact of local control.  And the IAI reimbursement, while very important to deal with the tens of thousands of vacant units in New York City, I still question whether the $30,000 is going to be enough.  All you have to do is think about renovating your own kitchen and that clearly surpasses that amount.  I also just want to remind my fellow colleagues here of a study that was done by the Brookings Institute in 2018 and it reads as follows:  While rent control appears to help current tenants in the short run, in the long run it decreases affordability, fuels gentrification and creates negative spillovers on the surrounding neighborhood.  So I think we have to be very, very careful with the steps that we are taking with Good Cause Eviction

NYS ASSEMBLY                                    APRIL 19, 2024

and for that reason I will not be supporting this budget bill and I'll be voting in the negative.  Thank you very much, Madam Speaker.

        ACTING SPEAKER LEE:  Mr. Slater in the negative.

        Ms.Woerner to explain her vote.

        MS. WOERNER:  Thank you, Madam Speaker, for allowing me the opportunity to explain my vote.  I'd like to begin by thanking the Speaker and our great Ways and Means Chair and all of the staff for their incredible work to prepare this budget.  And I'd like to thank all of you, my colleagues, for your strong support of the Journalism Act this year.  We have all seen locally-owned newspapers subsumed by the national media.  Their once vibrant newsrooms replaced by national news producers.  Local journalists, people who are well-trained, on the ground are so critical for making sure that -- that all of us in our communities are -- are well-informed about what's happening in our counties, our cities, our towns and our villages and even in our neighborhoods.  With this bill we are hopefully reversing that trend, and I want to thank you again for your strong support of this.  I have to say, though, that as we go into the next year, we have got to get serious about understanding and addressing the challenges that the shift to electric school buses is presenting for our school districts.  From having to bring in additional power capacity, to rebuilding their garages to accommodate the larger vehicles, to a reimbursement schedule that extends many years past the expected life of those buses, and of course the actual cost of a higher cost of

357

NYS ASSEMBLY                                    APRIL 19, 2024

these buses.  These are real fiscal challenges faced by our school

districts and we have to get serious about understanding them and

creating a path and a process and some funding to make this happen.

So I look forward to working with all of you in the

coming year as we face these -- these challenges head on.  Thank you

all very much and with that I vote in the affirmative.

ACTING SPEAKER LEE:  Ms.Woerner in the

affirmative.

Ms. Fahy to explain her vote.

MS. FAHY:  Thank you, Madam Speaker, for

allowing me to explain my vote.  I rise today in support of this bill

because I think we have many wins, there's a lot to like.  Let me start

with Education.  Very pleased to see that we've addressed some of the

earlier cutbacks that were proposed and I really hope that the increases

as well as the anticipated formula change next year will allow some

stability in the school districts and allow them to address this very,

very critical issue of absenteeism.  Also pleased to see universal

FASFA adopted because I'm hoping that will boost Higher Education

enrollments as we again address a whole host of issues with this

COVID cohort.  I'm particularly pleased as Higher Education Chair

that we have some of the most significant increases in years, almost a

quarter century since we have significantly increased the Tuition

Assistance Program or TAP.  And finally, addressing the need for not

only low income families but also more the middle income families

with raising the income eligibility levels as well as the minimum aid

358

for everyone receiving TAP, and more critically really addressing more aid for nontraditional students, particularly independent students which is incredibly significant and going after again, the non-traditional students.  Also, SUNY operating and CUNY operating dollars, wish we could've done more on Bundy Aid, and regret that. With Housing, also pleased with a whole host of changes, this has been a rather contentious debate for five years.  There were two sides of the coin here at all times.  We need to grow our housing which is some of the most severe -- we see some of the most severe housing shortages in the country here in New York.  So I think this is going to go a long way, and at the same time we've added some critically-needed tenant protections as well as a lot of Upstate flexibility on those protections, including the option to adopt Good Cause and I know here where I live in Albany, I'm assuming there will be an adoption.  At the same time there will be a 30-year exemption for new construction so that we can again grow this critical need for housing.  I also want to note a couple of other things.  Kudos to all my colleagues for joining in on the journalism tax credit which is so critical.  Democracy dies in the darkness and the fact that there are no new taxes, Sammy's Law and Tier 6.  Thank you so much and with that I vote in the affirmative.

ACTING SPEAKER LEE:  Ms. Fahy in the affirmative.

Mr. Zaccaro to explain his vote.

MR. ZACCARO:  Thank you, Madam Speaker.  I

have long said that education is the foundation of a successful life. I'm unwavering in my dedication to working people and families who have built New York for generations and I will always believe housing is a fundamental right. This budget bill uplifts families, protects workers, expands access to higher education. Many of us will soon head back to our districts and tell our constituents what was done in Albany on their behalf. When we go back home -- when I go back home to the Bronx, I am proud to tell part-time students that they will now be eligible for TAP. I have long championed raising the income threshold for these essential programs for New York's college students since I was sworn in. Making college more affordable will open opportunities for students who deserve a bright future. Increasing the income threshold to $125,000 this budget delivers on our promise to expand access to higher education. And countless of students across New York will lead our State for generations to come and will benefit from this long overdue move. We know that housing -- that New York suffers from a housing crisis that requires action. There is no one solution that addresses this complex problem but the proposals before us today move us just a bit closer to ending that crisis. The New York Housing for Future Ownership and Rental Housing Program would allow real property owners by the State, Local Government, non-profits or community land trust to provide housing. A pilot program aimed at addressing the legalization and conversion of basement and cellar units will give the City of New York the ability to create more safe and legal dwelling units, especially in flood zones.

And the Affordable Neighborhood for New Yorkers tax incentive will ensure continued growth of affordable housing units for thousands of New Yorkers.  Strengthening protections that improve the lives of working New Yorkers and their families is crucial and this budget delivered.  This budget will require employers -- will now be required to provide nursing employees 30 minutes of paid time off.  Mr. Speaker, our work will continue but we have accomplished much today and for that I am proud.  I want to thank you, I want to thank the Speaker, our Ways and Means Chair and all the staff who worked so hard to get us to this point and I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Zaccaro in the affirmative.

Mr. Benedetto.

MR. BENEDETTO:  Mr. Speaker, to explain my vote, sir.

ACTING SPEAKER AUBRY:  Please.

MR. BENEDETTO:  We began this budgetary system very concerned with the education of foundation here in the State of New York.  School districts were facing a lot of cuts, drastic cuts because of the proposed budget.  We -- through the efforts, however, of our -- of our Speaker and our very good Ways and Means team, we have come out with a budget that I think educationally we can be proud of where over the years we have funded Foundation Aid fully, something we had been striving for for years and we finally did it the last year.  And we brought that back again this year.  Hold

Harmless was restored.  As a matter of fact, school districts are getting an increase to .8 percent in their -- in their -- in their aid going out to those districts.  It makes me proud to know that New York State when we look at education, we have a commitment there to our students in New York State and we are standing behind our education system and putting forth the money they need to properly deal with the students in this State.  Educationally, I think it's a good budget.  I thank the Speaker, the Ways and Means staff and I proudly vote in the affirmative, sir.

ACTING SPEAKER AUBRY:  Mr. Benedetto in the affirmative.

Mr. Otis to explain his vote.

MR. OTIS:  Thank you, Mr. Speaker.  You know one of the responsibilities we all have here is to make sure that we're getting State resources back to our communities, and so you've heard about the very important work done on Foundation Aid and school aid.  We need to keep that going and I'm going to make a note about the Foundation Aid study that we're going to have done.  We're going to have to look at that study very carefully to make sure that we continue to be driving State funds to our school districts, protect the property taxpayer, very important.  So we didn't just farm out a study, we're going to be looking at the results of that study.  Big, big help there in terms of what we did compared to the proposed budget.  The AIM funding, very important first time in many years that we're increasing funding to local government.  Robust continuation of

NYS ASSEMBLY                                    APRIL 19, 2024

funding for the many different road projects that we're giving State

money that's going to help provide funding for -- for local roads.  I

want to do another -- point out something that you may not have noted

but in the budget is a new $30 million capital fund for 4201 schools,

our schools that serve the disabled.  Need this funding to keep their

very stressed infrastructure going forward and serving kids with high

needs.  This is a very important commitment, not just an educational

commitment but a moral commitment.  We do right by -- by those

schools.  Also, as mentioned not in this bill, but earlier, the clean

water funding, the new $500 million re-installment in clean water, a

lot of that money goes to help local projects and defer costs away from

the local property taxpayer.  So part of our doing our job is to make

sure that we are bringing those resources to the nuts and bolts projects,

nuts and bolts services at the local level.  We've done that in this

budget.  I proudly vote aye.

         ACTING SPEAKER AUBRY:  Mr. Otis in the

affirmative.

         Mr. Jacobson.

         MR. JACOBSON:  Thank you, Mr. Speaker, to

explain my vote.  I'm frustrated and disappointed with the gutted

so-called Good Cause Eviction program because unfortunately it will

lock in high rates of increase in my district.  I'm happy, though and

very glad that we restored the cuts to Foundation Aid for our schools

that we now are going to have a media credit for local media and that

we've increased funding for AIM which municipalities rely upon.  But

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

I'm thrilled that my FASFA bill got into this budget.  And let me explain why this is so important.  FASFA, the Free Application for Federal Student Aid, the reason that it's so important is that the obstacle for people going to college is the high cost.  And the only way to get the high cost down is to get scholarships and grants.  But the only way to get the scholarships and grants is to complete the FASFA, because not only the Federal Government demands this for Pell Grants which can be up to 7,395 a year now, but almost all colleges and those that give grants rely upon it as well.  This will give students a chance to really know what they're able to afford and what they can do.  So I want to thank the Speaker, the Chair of Ways and Means who unfortunately this will be her last time chairing that in this budget, and that this is going to get in there because we can then increase opportunity for all students and that is so important.  So with that I vote in the affirmative.

ACTING SPEAKER AUBRY:  Mr. Jacobson in the affirmative.

Mr. Blumencranz.

MR. BLUMENCRANZ:  Thank you, Mr. Speaker.  Budgets are about priorities.  During a time when our State is facing a holy trinity of a housing crisis and affordability crisis and a migrant crisis, it is incredibly sad to see a budget that seems a bit tone deaf to these issues.  Unfortunately, the invisible hand of government is increasingly becoming a visible choke-hold on so many of the residents of our State.  From the hotline that's supposed to help our

364

NYS ASSEMBLY                                      APRIL 19, 2024

schools foot multi-million bills to implement legislation on our
electric buses, to the CRSE education mandate that will force our
schools to implement a new education program without knowing what
it really looks like, as well as the Good Cause Eviction, a backwards
way of fixing a serious problem in our State.  But all hope is not lost
here.  I am so pleased to see that our steadfast advocacy on squatting
has led to incremental improvements and acknowledging a serious
problem that so many New Yorkers are facing.  I'd like to thank all of
those who share their plight, their horror stories.  It is just sad to see
that the loss of Natalia [sic] due to the murder from squatters as well
as others is what it took to see this being pushed across the finish line.
I'm also so happy to see some of the changes to our school aid to make
sure our schools are fully funded, especially if they have to deal with
so many of these mandates.  But with that being said, I will still have
to vote in the negative.  Thank you.

   ACTING SPEAKER AUBRY:  Mr. Blumencranz in
the negative.

   Ms. Simon.

   MS. SIMON:  Thank you, Mr. Speaker.  I will be
voting in support of this bill, provides much good to our State.  It
restores our Hold Harmless and our Foundation Aid, it expands TAP,
it requires better access to FASFA, it includes evidence-based reading
instruction and it includes Sammy's Law to which we owe Amy
Cohen and families to Safe Streets a great debt of gratitude.  But it
also makes some changes to Mayoral Control that I'm still not a fan of,

but I also want to comment on what we're doing with regard to housing.  We will make a big difference in building more housing which is important.  I'd like to correct for the record the fact that the study that people cite saying that prices went down because they built enough housing, prices did not go down.  The level of increase year over year was reduced, and when the rent is too damn high, it's still too damn high.  So we need to actually think through what we're doing, and the wholesale lifting up the FAR cap destroys one thing that is so critical to us as Americans.  The voice of community in commenting on what is being proposed that will change or alter their circumstances and it may in fact raise their rents.  So the ULURP process, which was created when the Board of Estimate was found to be unconstitutional, gave community a voice in commenting on what was happening when there was change in zoning.  If you lift that FAR cap, there will be no voice of the public at all in what happens in land use.  And if you live in the City of New York you know that our Department of City Planning doesn't plan.  They do zoning.  They do not plan.  And it is the people that help make projects better because they exercise that voice.  I'm very disappointed that that is what will be happening in the City of New York.  It is not going -- I will tell you, ten years from now people will say Jo Anne, you were right.  As it's happened before, we have examples in my district and I will be voting in the affirmative on this despite my reservations on this issue.  Thank you.

ACTING SPEAKER AUBRY:  Thank you.

366

Ms. Rosenthal.

MS. ROSENTHAL:  Thank you, Mr. Speaker, to explain my vote.  One of the bright spots in this budget bill is the inclusion of my legislation called Sammy's Law.  As you know the legislation was made for Sammy Cohen Eckstein who was killed in a crash by a speeding driver in Brooklyn when he was just 12 years old.  His mother Amy Cohen, his grandmother Joan Dean and all of the people who are part of Families for Safe Streets coalition have worked tirelessly in the years since to pass Sammy's Law and other measures to ensure traffic safety.  While the legislation may be named in honor of Sammy, we know that so many other families have experienced the pain of losing a loved one in a preventable crash.  Giving New York City the authority to change its speed limit is a commonsense measure.  I'm glad that we're finally taking it.  I must caution that City agencies should work in conjunction with the local community boards and council members to ensure that everyone has a voice at the table and that the changes made make sense.  On Housing.  As the Housing Chair, I'm glad that we do have some good provisions in here.  For example, the Assembly-conceived New York housing for the future program [sic], which will allow people in the future to rent or own for those who have lower income and that's a -- a great program.  I am quite dismayed that we did not include HAVP in this budget.  This was supported by every manner of developer, tenant.  It was modeled on the Federal Section 8 program.  It's not an entitlement.  It's helping people get off the streets and not be evicted.  This is a major mistake

but we will come back next year and do that.  When it comes to 421a, we know that the prior program had many, many loopholes.  We know what the loopholes are.  We will hold HPD responsible for ensuring that taxpayer money is not wasted and that developers do not take advantage of the program and use those affordable units for people.  The IAI program, we also know in 2019, we took away many of the opportunities to cheat.  There's now a new program.  Believe me, we will all be watching and I tell the City and HCR you have to make sure that the units that are rehabbed are actually rehabbed --

ACTING SPEAKER AUBRY:  Ms. Rosenthal, how do you vote?

MS. ROSENTHAL:  My last -- my last comment is to thank the Speaker, to thank the Ways and Means Chair, to thank Phil Fields on his first budget, to thank Fletcher, to thank Megan --

ACTING SPEAKER AUBRY:  You're welcome.  How do you vote?

MS. ROSENTHAL:  And to thank Marie and to thank Cynthia --

ACTING SPEAKER AUBRY:  Please.

MS. ROSENTHAL: -- for their wonderful work.

ACTING SPEAKER AUBRY:  Ms. Kelles to explain her vote.

MS. KELLES:  Thank you, Mr. Speaker.  I want to first start by thanking leadership and -- and the Majority Conference for fighting so hard to get the things that we did get in the budget

NYS ASSEMBLY                                    APRIL 19, 2024

which really did need to be a huge fight.  We were able to get
strengthening of Tier 6 which enables support, stronger pension for
public employees, we have a hard enough time getting in retaining,
this will help that.  We put 500 million in for water infrastructure,
absolutely critical given that we know that to upgrade our water
infrastructure to update it we need about 80 billion or more.  We need
to be doing this every single year in perpetuity to have any chance of
reaching those needs.  AIM funding, of course, has not seen an
increase in many years as people had talked about.  Increasing that
this year is a huge win.  Foundation Aid.  We were so worried that it
was going to get cut.  I had schools that were falling apart, meeting
week after week after week discussing firing teachers.  They now
don't have to.  They will be seeing an increase but the study will be so
important so that we aren't coming back and having the same problem
year over year.  I am -- I am very frustrated that people are saying that
this bill has -- has Good Cause in it.  I did not read that.  I don't know
what it is that people are reading but that is not what is in this bill.
There are some tenant protections and I am thankful that we have had
that discussion that we've taken a step forward.  This is by no means
strong enough.  There are tremendous exceptions I think that weaken
it.  There is also the inability for making it very strong Upstate.  It's an
opt in and -- and, you know, unfortunately I think that will be a really
difficult conversation that we will have to continue.  The ADUs, the
incentives, fantastic.  Of course it's weakened by the fact that it's an
opt in Upstate but it is a first step.  One of the things that I am very

369

NYS ASSEMBLY                                    APRIL 19, 2024

thankful for to the sponsor, the local journalism tax credit is incredible. We have very little journalism Upstate and we've had gutting of that Upstate. The last thing I'll say is I'm very disappointed at the lack of environmental protections and environmental actions that we have taken in this budget.

ACTING SPEAKER AUBRY: How do you vote?

MS. KELLES: Vote in the affirmative.

ACTING SPEAKER AUBRY: Thank you.

Mr. Reilly to explain his vote.

MR. REILLY: Thank you, Mr. Speaker. Mayoral Control, I think I've explained how there's ambiguity there. Speed -- the speed zone -- the speed limit in New York City going down to 20 miles an hour, speed cameras are now going to be the 31 mile an hour trigger. You know if we were really going to make improvements on the streets in New York City, we would have a designated fund for those speed camera violation fines that we collect, but we refuse to do that. We put it in a New York City General Fund. Really put the money where your mouth is, let's make sure that we improve safety on our streets. Lastly, the point about toll evasion and the blocking of the plates and allowing police officers to remove those without issuing a summons. As a former lieutenant in the New York City Police Department, I want to caution those police officers. You are setting yourself up to be looked at as infringing on their rights and you will be getting CCRBs, Civilian Complaint Review Board violations. And let me tell you, when we look at to see how it is disproportionately

370

applied in communities, the same people that got this in the budget this year will be complaining about who is targeted in that enforcement.  So use caution.  Be careful what you wish for, you may just get it.  I vote negative.

ACTING SPEAKER AUBRY:  Mr. Reilly in the negative.

Mr. Goodell.

MR. GOODELL:  Thank you, sir.  I have the dubious distinction of being the only Republican voting yes on this bill.  At my request, and thanks to our Chair on Ways and Means and the Speaker himself there's a special provision in this bill to help bail out the City of Dunkirk which is on the verge of bankruptcy and would go into default in a matter of a couple months without this special legislation that enables them to cover some of their past deficits under the supervision of the State Comptroller.  Dunkirk found itself in a situation after an electric generating plant in the city was shut down.  Now the owner of the plant had invested over 200 million in state-of-the-art scrubbing equipment but it was still a coal plant.  And the owner came forward and said I'd like to convert this from a state-of-the-art coal plant to a state-of-the-art natural gas facility.  Even though it had state-of-the-art environmental standards being met, that transition would have cut air emissions by 98 to 100 percent depending on the component.  Unfortunately, because this State is extraordinarily reluctant to move forward on any type of generating capacity, even base load capacity which we need on those cold, still

nights.  And so the project ended up not going forward.  And in addition to laying off several dozen very highly-paid individuals, it resulted in about a 40 percent gap in the city's tax base.  So sometimes it's hard for us to even recognize or acknowledge or even imagine what the ramifications of some of our policies are, but this was one of them and therefore I'm voting to help bail them out.  Thank you, Speaker.

ACTING SPEAKER AUBRY:  Mr. Goodell in the affirmative.

Mr. Burdick.

MR. BURDICK:  Thank you, Mr. Speaker, for the opportunity to explain my vote.  I thank the Speaker and applaud Chair Weinstein and the staff for an outstanding job.  I'm very pleased that this bill provides for tenant and homeowner protections including Good Cause protections with the option for localities outside of the City to opt in.  The budget also provides for housing policy and tax incentives throughout the State.  I'm especially pleased with a new provision on an opt in basis for localities outside New York City for tax exemptions for affordable housing development.  I'm hopeful that localities will avail themselves of these options so they then may be deemed pro-housing communities by HCR opening the door to key grants.  While I'm delighted with the restoration of environmental funding, we will need to provide significantly greater investment to meet our commitments under the CLCPA.  And like everyone else, I'm thrilled with the reinstatement of the Hold Harmless provision in

Foundation Aid and that we're on a path to update the Foundation Aid formula.  And lastly, I'm joining so many others in the Chamber in applauding the local journalism tax incentive, local journalism is really essential to our democracy.  I very proudly vote in the affirmative.  Thank you, Mr. Speaker.

ACTING SPEAKER AUBRY:  Mr. Burdick in the affirmative.

Mr. Ardila.

MR. ARDILA:  Thank you, Mr. Speaker.  The reason I want to explain my vote is because I wanted to talk a little bit about Good Cause which I'm happy that we do have some language in this budget but we know it's not the final product and there's a lot of areas for growth that we still need to push for tenant protections.  One of the other things I want to talk about was basement apartments, the ADUs.  I've been an advocate for ADUs since I stepped into the public domain and I'm very excited that we're going to give this opportunity for New Yorkers to have legalized basement apartments.  So that's a huge win for housing, to address the housing crisis and for New Yorkers in Queens and across the State.  And lastly, I wanted to take this time to talk about the importance of Sammy's Law.  The ability to allow New York City to reduce its speed limit to 20 miles per hour.  It is a huge, huge issue in my district in terms of advocating for more pedestrian safety, more cyclist safety, more street safety.  So I'm very excited that we're -- we're having this, we're pushing it through, we're getting it across the finish line and it's a great win for Queens, it's a great win

373

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

for my district and a great win for New York.  So with that said, I wanted to vote in the affirmative.  Thank you.

ACTING SPEAKER AUBRY:  Mr. Ardila in the affirmative.

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

Ms. Solages.

MS. SOLAGES:  We appreciate our colleagues' patience and collaboration.  Mr. Speaker, can you take up Rules Report No. 38 from the C-Calendar and also -- then Rules Report No. 36 from the B-Calendar.

ACTING SPEAKER AUBRY:  Thank you.

Rules Report No. 38, the Clerk will read.

THE CLERK:  Assembly No. A08800-D, Rules Report No. 38, Budget Bill.  An act making appropriations for the support of Government State Operations Budget.

ACTING SPEAKER AUBRY:  Governor's Message -- oh!  On a motion by Ms. Weinstein, the Senate bill is before the House.  The Senate bill is advanced.  Governor's message is at the desk.  The Clerk will read.

THE CLERK:  I hereby certify to an immediate vote, Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  An explanation is requested, Ms. Weinstein.

NYS ASSEMBLY                                    APRIL 19, 2024

MS. WEINSTEIN:  Thank you, Mr. Speaker.  This bill would enact the State operations budget for State fiscal year '24-'25, includes an All-Funds appropriation of 58.9 billion and enactment of this legislation is necessary to provide for the operation of State agencies through fiscal year '24-'25.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.  Will the Chair yield?

MS. WEINSTEIN:  Yes.

ACTING SPEAKER AUBRY:  Ms. Weinstein yields.

MR. RA:  Thank you.  So -- just give -- you said 88.9 billion is the appropriation amount?

MS. WEINSTEIN:  Fifty-eight point nine.

MR. RA:  Fifty-eight, point nine, okay.  And what is the fiscal impact in terms of dollar -- cash dollars?

MS. WEINSTEIN:  Thirty-five billion.

MR. RA:  Thirty-five, thank you.  With regard to the special emergency appropriations.  Now I'm -- I'm happy to see that they'll continue to be subject to the Comptroller's oversight and review.  But can you explain the special emergency appropriation that has increased by $1 billion, what the reason for that is?

(Pause)

MS. WEINSTEIN:  There isn't a specific reason.  It wasn't in the Executive's proposal to be able to have a little flexibility.

375

NYS ASSEMBLY                                    APRIL 19, 2024

MR. RA:  Okay.  And then there were a number of contingency language provisions that were in the Executive proposed State operations bill.  So if we can go through the -- I believe there were three of them in particular.  There was one to delegate the Director of the Division of Budget the authority to increase or decrease interchanges and transfers without limit.  That has not been included in this, correct?

MS. WEINSTEIN:  Yes.  That's correct.

MR. RA:  And then there was the one to condition the effectiveness of the State operations budget bill on the passage of the Aid to Localities bill for certain agencies or if the Director of Budget has determined that those Aid to Localities appropriations are sufficient for the ensuing fiscal year.  That is not in as well, correct?

MS. WEINSTEIN:  Correct.

MR. RA:  But we did include the one regarding refunds, rebates, reimbursements, credits, repayments and just allowances received by the State Comptroller to be credited back to the original appropriation, correct?

MS. WEINSTEIN:  Yes, yes.  That is correct.

MR. RA:  Thank you.  With regard to some of the particular provisions.  On the Health side, this budget bill includes a new appropriation of $695.3 million to include the return of interest or on the basic health program, the Essential Plan Trust Fund.  Do you know what the source of those funds is?

MS. WEINSTEIN:  Well, the increase in State

operations essential plan appropriations of the 600 million you reference, is an interest from the frozen basic health plan trust fund to the Federal Government, and this was an agreement that was made in conjunction with the new 1332 waiver agreement and it also allows the State to use 95 million in 1332 surplus funds to offset expenditure on the administration of the Essential Plan.

MR. RA:  Okay.  So the intended purpose for these funds is going -- is going to be to offset the administration of the Essential Plan?

MS. WEINSTEIN:  Yes.  The 95 million, the 600 we did return to the Feds.

MR. RA:  Okay.  And then I understand these contractual services make up $689.9 million of these funds.  Do you know what -- what these contracts are for and who was receiving these contracts?

MS. WEINSTEIN:  We believe it's with the State of Health Marketplace, Department State of Health.

MR. RA:  Okay.  On Higher Education, we have an additional million appropriated to expand the nursing programs in both CUNY and SUNY, is that correct?

MS. WEINSTEIN:  Yes.

MR. RA:  And I know we've talked about this issue in the past regarding, you know, a shortage of nurses we've had in New York State.  So do we have any sense of how many students this will enable to go to college and obtain a nursing degree to help

NYS ASSEMBLY                                    APRIL 19, 2024

address that shortage?

MS. WEINSTEIN:  We don't have -- have numbers but this is on top of what already is there so for CUNY it would be a total of 3 million for the nursing programs and for SUNY it would be a total of 2.7 million, but we don't have the specifics on how many students that -- that relates to.

MR. RA:  Okay.  And then there also a $1 million addition to the Maritime appointments program at SUNY Maritime. Do we have any estimate on the number of additional students who will be able to attend SUNY Maritime through this program?

(Pause)

MS. WEINSTEIN:  The intention is it wouldn't increase the number of students but it would help off -- offset the cost of the students.

MR. RA:  Okay.

MS. WEINSTEIN:  You know, the number of students that statutorily are allowed to be appointed.

MR. RA:  Okay, thank you.  On Education.  In particular we talked a little bit on the prior bill about the Foundation Aid study.  So the Rockefeller Institute has been selected as the entity who is going to conduct this study with the State Education Department?

MS. WEINSTEIN:  Correct.

MR. RA:  And do we know why the Rockefeller Institute at SUNY Albany was selected as opposed to perhaps having

378

the State Education Department select somebody to partner with them?

MS. WEINSTEIN:  Rather than have SED, we wanted to have an organization that could look at this that wasn't directly part of the SED that could help bring other perspective into the conversations.

MR. RA:  So is SED then supportive of this being the entity to do this study with them?

MS. WEINSTEIN:  I really don't know the answer to that question.

MR. RA:  All right.  The Cultural Education Fund.  The Education Department has raised the alarm about the volatility of the Cultural Education Fund due to its reliance on real estate instruments to fund the various programs including the State museum, the State library, State archives.  Have we done any type of study to identify alternative methods of providing a steady funding stream so we can ensure that those institutions remain accessible and open to visitors?

MS. WEINSTEIN:  No, we did not but we do -- we did in the Capital Budget include $10 million for the State museum.

MR. RA:  Thank you.  On Environmental Conservation.  So we're appropriating $237.9 million which is a $21.9 million increase from last year for various administrative costs, which my understanding includes a database to track the Environmental Bond Act spending?

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

MS. WEINSTEIN:  Yes.

MR. RA:  Okay.  How -- how is that spending being tracked as of right now?  Is the agency asking for additional funding so that they can track it or are they not doing that currently?

MS. WEINSTEIN:  The agency -- the agency is asking for it so that it could be implemented concurrently with the Bond Act.

MR. RA:  And it will -- do we expect that as they're tracking it that any type of information or report will be shared with the Legislature or with the public tracking that spending?

MS. WEINSTEIN:  Yes.  There are reporting requirements.

MR. RA:  Great.  Do we have anything in this budget to provide for additional New York State forest ranger personnel?

MS. WEINSTEIN:  No, there's nothing additional.

MR. RA:  Okay.  And we haven't done anything either with regard to the pension parity that's been talked about in the past for our park police and officers?

MS. WEINSTEIN:  No, we did not.

MR. RA:  Okay.  With regard to lithium ion battery fires.  You know, these have been very difficult to put out, they cause contamination of livestock, food, vegetation, land.  We saw a particular incident up in Jefferson County last summer.  Are we doing anything in the budget to help deal with these dangers?

MS. WEINSTEIN:  No, but we did pass legislation

380

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

regarding the lithium batteries earlier in session.

MR. RA:  Okay.  Are we including any type of funding to help with personnel for environmental cleanup in the case of lithium ion fires and hazardous materials that may be released in those fires?

MS. WEINSTEIN:  We -- we do have -- already have environmental cleanup funds so there's nothing specifically included in this budget relating to lithium batteries.

MR. RA:  Okay.  With regard to Utilities.  There's an appropriation for $26 million to transfer the Office of Renewable Energy Siting from the Department of State to a Renewable Energy Siting and Electric Transmission program under the Department of Public Service; is that correct?

MS. WEINSTEIN:  Yes.

MR. RA:  And this entity then will also oversee with the provisions that were included in a prior bill for transmission lines and all of that?

MS. WEINSTEIN:  Yes, yes.  We're just switching the agency.  There's no additional funds.

MR. RA:  Okay.  Do we know then how, you know, if they're doing this additional work in terms of siting transmission, does the change in the agency impact local governments in terms of their ability to deal with municipal home rule issues and deal with having a say in -- in energy siting?

(Pause)

381

MS. WEINSTEIN:  As I believe we spoke about yesterday, the Article VII bill does provide some additional provisions relating to municipal input.

MR. RA:  Okay.  That one I think we will somewhat agree to disagree and we'll see how it works as it goes forward.  But one other issue I wanted to ask you about, Public Protection.  So we have funding included for the State Police to expand the departments ability to combat retail theft and the retail theft teams. Do we have any specifics as to how the State Police is going to utilize this funding?

(Pause)

MS. WEINSTEIN:  So our understanding is that $17.8 million will be -- are allocated to form a special retail theft unit of approximately 101, so not approximately, 101 FDEs.

MR. RA:  Okay, 101.  And do we know in particular how as they're utilizing this funding and in forming these teams, how or what we're requiring in terms of them working with local law enforcement on these operations to combat retail theft?

(Pause)

MS. WEINSTEIN:  So there is $5 million associated for the implementation of their activities and they will coordinate with the local law enforcement.

MR. RA:  Thank you.  And I -- you know, I hope that will in addition to many of the other things that we've -- we've done in this budget to help with what has become a, you know, a major issue particularly in -- in Downstate.  Lastly, in -- in terms of our Tax and

**NYS ASSEMBLY**                    **APRIL 19, 2024**

Finance.  One of the things that came up at the budget hearing and I believe we have looked at some provisions and there's some bills out there related to enforcement, you know, we have obviously regulations we've -- we've put forth with regard to vaping over the years.  And unfortunately there is a difference in how we treat enforcement related to tobacco products and -- and with vaping products.  And I know we've talked a lot about illicit cannabis but there's also been a major problem with illegal vaping products.  So is any of the -- the funding for tax and finance enabling them to, you know, better be able to enforce those provisions because they -- they are the ones responsible for it as opposed to the Department of Health when it comes to other tobacco items?

MS. WEINSTEIN:  There is nothing particularly specified in that regard.

MR. RA:  Okay.  Do you know if -- when, you know, a Department of Health or Department of -- or tax and finance enforcement agent, you know, encounters something that's within their purview, but -- or I'm sorry, encounters something that's not within their purview while they may take enforcements on something that is, how that is handled by the agencies to ensure that illegal products are -- are not continued to be sold?

MS. WEINSTEIN:  Unfortunately I'm not aware of that kind of detail, Mr. Ra.

MR. RA:  Okay, thank you.

Mr. Speaker, on the bill.

**NYS ASSEMBLY**                              **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  On the bill, Mr. Ra.

MR. RA:  So I thank the Chair again for answering some questions.  You know, I just -- since this is -- this is our second to last bill, just -- just a couple of thoughts that I wanted to share again.  This has been obviously an interesting few weeks between things that were, you know, foreseeable that we knew that were happening, different holidays, a solar eclipse, an earthquake, a -- a surprise double album from Taylor Swift, and even as we're here on a Saturday, we've actually had a Session day on every day of the calendar week during this process as well.  So this -- this seems like one for the -- one for the record books.

I do continue to have the frustration that as we do this we don't really know everything that we ought to know before we're taking action on -- on a budget.  You know, we know the total spending numbers, that's great.  We did about half the bills without knowing that.  We still don't have a complete picture of where we are in the out-years.  As I've said in the past, we want to know that information because we need to know if our revenues and our spending are -- are lining up because we can continue to make wonderful investments in -- in these budgets, and -- and there's some great things here.  I mean I'm -- I'm very thrilled to see the TAP increases that very much mirrors a bill that I've carried for a number of years regarding the income threshold and regarding -- regarding the minimum award.  So I'm -- I'm glad that that has seen fit to come forward after it had been held previously in committee.  You know,

384

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

we're -- we're doing things on terms of the restoration to school aid which are important and -- and so many other issues that many of us have advocated for for years.  But at the end of the day we have a $237 billion budget, and if we have a situation where our tax revenues don't continue to come in as strong as they have, so many of those investments could be on the chopping block as we get into a future budget.  So I -- I think we need to attack the rest of this Session with a hopefully renewed sense of -- of transparency as we do our work.  There was any number of things that came up today, yesterday, the day before about things that maybe we will address outside of -- of the budget, and -- and I hope we do and continue to have those conversations as we move towards a conclusion in June, but I -- I think, once again, we are adopting a budget that spends too much without having some basic transparency and accountability to make sure we are responsibly using the taxpayers' dollars.  Thank you.

    ACTING SPEAKER AUBRY:  Thank you.

    Mr. Goodell.

    MR. GOODELL:  Thank you, sir.

    On the bill.

    ACTING SPEAKER AUBRY:  On the bill, sir.

    MR. GOODELL:  Have you ever had that sense that you've been sold a bill of goods?  A few years ago I think we were sold a bill of goods when we were told that if we legalized marihuana we would see massive amounts of tax revenue and we would undercut criminal enterprises and destroy the black market.  That's what we

were told, right?  Everyone who was here remembers that, it wasn't

that long ago.  And most of us are clean, dry and sober so we can

remember it.  But what's the reality been?  Well, the reality is that

instead of millions and millions of dollars of tax revenue that we were

promised, so far the recreational marihuana program has cost New

York State taxpayers over $200 million, $200 million lost expenses

exceeding revenue.  This year you'll be glad to know that while we

were projected to make over 175 million, we actually made

something, it looks like we're going to clear about 8 million.  So at

least we're now in the black.  We were told that if we legalize

recreational marihuana it would undercut the black market.  So we

legalized recreational marihuana in 2021 so that you could have

two-and-a-half ounces in your possession and then you could have a

duffle bag or two with five pounds at your house.  But at the time we

legalized possession there was no way you could legally buy

marihuana in New York State.  So how do you think all those folks

since 2021 have been able to acquire that marihuana that they can now

use legally?  Answer, there was only one source.  It was the criminal

drug trade.  So now given the black market a three year head start, we

now hope to catch up.  And how are we catching up?  Well, we

simplified the taxes that legal marihuana sellers have to pay.  It's now

22 percent.  Of course they still have to pay FICA, unemployment,

disability and all the other taxes and fees, and of course we charge

them hundreds if not thousands of dollars to get a license.  So having

imposed massive regulations and expenses and fees, do we really

honestly think that they're going to be able to undercut the illegal black market that doesn't pay any of those fees or expenses?  Now if you're not sure, we can look to other states.  For an example, like Colorado or California or Washington or as expected, as anyone with basic economics would recognize, the black market has exploded.  So we, my friends, have been sold a bill of goods.  And I hope at some point we recognize that maybe it's not a good use of taxpayer money to spend millions and millions of dollars to pay for the illegal drugs that weren't even used because the farmers made the mistake of believing us, this Legislature, when we told them this program was moving forward.

There's one other area where I think it's worth reconsidering and that's our campaign finance program.  You know, when I first ran, in fact every time I've run I've had the good fortune of being able to reach out to people that actually thought I could do a good job.  I didn't want to test that theory this year, but in the past I had a lot of support and I'm very, very thankful for that.  But apparently not wanting to rely on people's voluntary contributions, this Legislature, at least the Majority passed a campaign finance bill that forces taxpayers to fund campaigns.  And it's my understanding that this year out of the 212 Statewide races that would be eligible, about 150 races involved public campaign financing.  And in this budget, as part of the State operations, we pay for the cost of managing that program.  Now you all know that we put aside $125 million of our taxpayers' hard-earned money to pay for campaigns, but I wanted to

NYS ASSEMBLY                              APRIL 19, 2024

point out that this budget that we're about to vote on includes 14.5
million for the overhead.  So do some simple math.  Take 14.5 and
divide it by the 150 contested campaigns and we're paying $98,000
per race for overhead.  Now maybe my district is different than yours,
but the first time I ran I had a staffer and the cost of this overhead is
about ten times more than I paid my staffer.  Now think about that.
We're paying ten times more than you might pay for a staffer to
supervise one aspect of the campaign.  Now surely, surely we can
spend less than $98,000 to supervise a program that involves two
candidates running against each other.  Now maybe we're hiring, you
know, unemployed people with a Master's in Business Administration
or maybe Certified Public Accountants.  In my district, by the way, we
should be subcontracting with the rest of this -- rest of you because we
can do it using certified accountants for a fraction of that cost.  So
anyway my friends, as we move forward, let's look for ways that we
can be efficient and let's do our best not to fall for a bill of goods that
we all know isn't going to deliver the way it's promised. Thank you,
sir.

                    ACTING SPEAKER AUBRY:  Read the last section.

                    THE CLERK:  This act shall take effect immediately.

                    ACTING SPEAKER AUBRY:  A party vote has
been requested.

                    Mr. Goodell.

                    MR. GOODELL:  Thank you, sir.  The Republican
Conference is generally opposed to this bill, but those who want to

                              388

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

support it are certainly welcome to vote yes on the floor.  Thank you, sir.

ACTING SPEAKER AUBRY:  Ms. Solages.  Thank you.

MS. SOLAGES:  The Majority Conference will be voting in the affirmative.  Those who wish to vote in the negative can do so now.

ACTING SPEAKER AUBRY:  Thank you.

The Clerk will record the vote.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

ACTING SPEAKER AUBRY:  On the B-Calendar, Page 3, Rules Report No. 36, the Clerk will read.

THE CLERK:  Assembly No. 8801-A, Rules Report No. 36, Budget Bill.  An act making appropriations for the support of government - Legislature and Judiciary Budget.

ACTING SPEAKER AUBRY:  On a motion by Ms. Weinstein, the Senate bill is before the House.  The Senate bill is advanced.  Governor's message is at the desk.  The Clerk will read.

THE CLERK:  I hereby certify to an immediate vote, Kathy Hochul, Governor.

ACTING SPEAKER AUBRY:  Mr. Ra asks for an explanation.

**NYS ASSEMBLY**                              **APRIL 19, 2024**

MS. WEINSTEIN:  Mr. Speaker, very briefly.  This bill would enact appropriations in support of the Legislature and Judiciary for our fiscal year '24-'25, includes an All-Funds appropriation of $4 billion.  Enactment is necessary to provide for the operations of the Assembly, Senate and the Unified Court System.

ACTING SPEAKER AUBRY:  Mr. Ra.

MR. RA:  Thank you, Mr. Speaker.

On the bill.

ACTING SPEAKER AUBRY:  On the bill, sir.

MR. RA:  Thank you.  This is our last budget bill so I would be remiss if I didn't start by saying thank you to our Chair, we know this is her last budget with us.  I've had the opportunity now for five budget cycles to -- to work with Chair Weinstein on a budget. They've been certainly interesting ones from, you know, the COVID budget of 2020 on, but as we all know our Chair has been really a trailblazer in this -- in this Chamber.  When she took over as Chair, obviously she had very big shoes to fill of Mr. Farrell but she has done the job with intelligence, class, grace and it's been my pleasure to have worked with you for through these five budgets.  Many hours up on that dais in the hearing room, many hours on Zoom hearings during the pandemic and -- and many interchanges on the floor this year, but we didn't fill you at all in on, we just wanted all those extenders so we can have additional conversations on the floor this year so...

(Applause)

ACTING SPEAKER AUBRY:  One more time.

390

(Applause)

MR. RA:  So again, thank you for your work.  To your staff, to Rich, thank you for all of your -- accommodating us, all of your communication with our staff.  Certainly Philip and your entire Majority staff, thank you for your work throughout this budget process, and then I have to say for my team here and of course that's immediately when I end up getting emotional.  I have the absolute privilege of doing this job with the confidence of Leader Barclay and working with just incredible people.  Lauren O'Hare, our director leads a dedicated team throughout the clock, all night long the last couple days.  Turning around the information, doing it skillfully but making sure our members knew everything they needed to know about -- about the bills and I -- I couldn't be more proud of the work that they do and that I get to work so closely with all of them.  So thank you to our staff.

(Applause)

And I just really want to again, thank all of our members for participating in the debate.  I think we raised a lot of points that we felt were important, but I -- I think for the most part we had very good debate back and forth, respectful debate which is good because that's what this is about.  We have differences, they should be raised and we can talk about our differences, but, you know, doing it in a way that's not personal, that sticks to the issues at hand.  So I thank everybody for their cooperation through that process and I look forward to seeing you all in a few weeks.  Thank you, Mr. Speaker.

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

ACTING SPEAKER AUBRY:  Thank you.

(Applause)

Ms. Weinstein.

MS. WEINSTEIN:  Mr. Speaker, there will be a time later in the year for longer speeches but I just wanted to say to -- to everyone, but particularly to Mr. Ra, it has been a pleasure working with you on the budget, at the hearings and both in the committee and on the floor.  And thank you for letting me get so many more chapters with these extenders.  And we'll talk -- you will be reading the press releases about the budget but all of that -- the budget that we have before us wouldn't be possible without the input of so many of my colleagues, as I mentioned earlier, and all of our -- I want to take a moment to just publicly thank all of our Ways and Means, staff, our P&C staff that helped make this budget possible.  Those that sat alongside of me --

(Applause)

-- and I know that people are anxious that a week in Albany is enough, so and people are ready to leave.  I just want to say that the staff -- and the Ways and Means staff under the leadership this first year, Secretary of Ways and Means Philip Fields and Matt Golden, the Director of Budget --

(Applause)

-- and I would be remiss if I left out Victor Franco, our Director of Fiscal Studies, all of them and their staff --

(Applause)

392

**NYS ASSEMBLY**                                    **APRIL 19, 2024**

-- all of them and the staffs they work with sit next to me at various times as you've noticed during these debates and make me look much smarter than I am so I thank them.  And with that, Mr. Speaker, I vote in the affirmative, or I will be.

ACTING SPEAKER AUBRY:  Read the last section.

THE CLERK:  This act shall take effect immediately.

ACTING SPEAKER AUBRY:  A party vote has been requested.

Mr. Goodell.

MR. GOODELL:  Thank you.  As much as we love both the Legislature and the Judiciary, the Republican Conference is generally in the negative.  But those who want to express their love by voting yes, are certainly welcome to do so here on the floor.  Thank you, sir.

ACTING SPEAKER AUBRY:  Thank you.

Ms. Solages.

MS. SOLAGES:  The Majority Conference will be voting in the affirmative.  Those who wish to vote in the negative can do so now.

ACTING SPEAKER AUBRY:  The Clerk will record the vote.

(The Clerk recorded the vote.)

Are there any other votes?  Announce the results.

(The Clerk announced the results.)

The bill is passed.

393

**NYS ASSEMBLY**                    **APRIL 19, 2024**

(Applause)

Ms. Solages.

MS. SOLAGES:  Mr. Speaker, do we have any further housekeeping or resolutions?

ACTING SPEAKER AUBRY:  We have neither housekeepings nor resolutions.  Do you have something to tell us?

MS. SOLAGES:  Yes.  Well, before we close out for the day, I do want to recognize a moment in history.  It's the 57th Anniversary of Wayne Jackson being wounded in Vietnam, and I just wanted to give a moment to thank him for his sacrifice and service to our country and State, so if you would join me.

(Applause)

So with that, I move that the Assembly stands adjourned until Saturday, April 20th, that being a legislative day, and that we reconvene at 2:00 p.m. on Monday, May 6th, that being a Session day.

ACTING SPEAKER AUBRY:  The Assembly stands adjourned.

(Whereupon, at 4:16 p.m., the Assembly stood adjourned until Saturday, April 20th, Saturday being a legislative day, and to reconvene on Monday, May 6th at 2:00 p.m., Monday being a Session day.)