UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| PRINCIPLE HOMECARE, LLC, MARTON CARE INC., PROMPT HOME CARE LLC, and CARE CONNECT CDPAP, INC.,<br><br>            Plaintiffs,<br><br>    v.<br><br>JAMES V. MCDONALD, in his official capacity as Commissioner of the New York State Department of Health,<br><br>            Defendant. |

No. 1:24-cv-7071 (MMG)

### DECLARATION OF DIANA YAKHNIS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

I, Diana Yakhnis, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and state as follows:

1. I am the President of Care Connect CDPAP Inc. ("Care Connect"), which is a fiscal intermediary with its principal place of business in Brooklyn, New York.

2. I submit this declaration in support of Plaintiffs' motion for a preliminary injunction to provide an overview of Care Connect's fiscal intermediary business under the Consumer Directed Personal Assistance Program ("CDPAP"), and to explain the devastating and irreparable impact that the impending implementation of the State's amendment to the CDPAP statute (the "CDPAP Amendment") will have on Care Connect's business, employees, and consumers.

### Background

1

3. Together with my husband Alec Yakhnis, I founded Care Connect in 2016 (though it did not commence operations until 2018) on the belief that patients have the right to receive care from those they love and trust and who provide them with happiness and peace. As Ukrainian immigrants, my husband and I view Care Connect's success as the fulfillment of the American dream.

4. Care Connect makes money through its contracts with Medicaid managed care organizations ("MMCOs"), which allow it to deliver fiscal intermediary services to consumers. For example, Care Connect has a contract with Centers Plan for Healthy Living, LLC that has been in effect since June 1, 2018, and has automatically renewed annually since it was formed. At the time the contract was formed, I expected it to remain in effect indefinitely. My understanding was that Care Connect's contracts would terminate only if the MMCOs terminated them, or if Care Connect was "excluded, suspended, or barred" as a result of misconduct. I had no reason to think that any of the MMCOs that Care Connect works with would terminate its contracts, nor did Care Connect engage in any misconduct that could lead to termination.

5. Today, Care Connect serves approximately 500 CDPAP consumers throughout New York State. Care Connect serves consumers in all five boroughs of New York City, as well as Albany, Erie, Nassau, Niagara, Putnam, Schoharie, Schenectady, Suffolk, and Westchester Counties. Its language competencies include Albanian, Bengali, Chinese, French, Georgian, Hebrew, Hindi, Italian, Korean, Polish, Punjabi, Russian, Slavic, Spanish, Urdu, Ukrainian, Uzbek, and Yiddish. It has never served consumers outside the State of New York.

6. Care Connect has five employees who handle a range of responsibilities from compliance to HR.

7. Care Connect's dedication to its consumers goes above and beyond its statutory obligations. For example, Care Connect facilitates Medicaid certifications by connecting consumers with a third-party company that can assist with that process. Care Connect employees also help consumers find doctors and connect them with experts to assist with translation- and immigration-related needs.

8. Care Connect makes it a priority to monitor potential fraud. Care Connect monitors when the personal assistants begin and end their workday via phone or with a GPS-enabled app that only allows personal assistants to clock in within 100 feet of the patient's address. I personally oversee the process of verifying timesheets.

## The CDPAP Amendment

9. On April 20, 2024, New York Governor Kathy Hochul signed into law the New York State Budget for State Fiscal Year 2024-25, which included an Amendment to CDPAP that will replace the more than 600 fiscal intermediaries with a single, private company (the "Statewide Fiscal Intermediary"). On April 1, 2025, the CDPAP Amendment will nullify the contracts of every fiscal intermediary currently operating in New York by forbidding existing fiscal intermediaries from providing fiscal intermediary services in the State as of that date. The full value of those contracts will be transferred to the Statewide Fiscal Intermediary, which will have full monopoly power over the entire fiscal intermediary industry.

10. The Statewide Fiscal Intermediary was chosen through a procurement process that conditioned eligibility on a bidder having served as a fiscal intermediary on a statewide basis in a state other than the State of New York (among other requirements). Because Care Connect does not have this out-of-state experience, it was prohibited from serving as the Statewide Fiscal Intermediary.

11.  I understand that Public Partnerships LLC ("PPL")—an out-of-state entity with no experience serving New York consumers—was selected for the Statewide Fiscal Intermediary role.

12.  I also understand that PPL will hire subcontractors to facilitate its delivery of services. PPL has not asked or offered Care Connect to serve as a subcontractor, and it has not entered into any subcontractor agreement with PPL. Even if PPL offered Care Connect a subcontractor position and it were able to negotiate an acceptable arrangement with PPL, Care Connect's current contracts with MMCOs would still be terminated, and it would no longer be able to operate independently as a fiscal intermediary. Regardless, as things stand, Care Connect is not a PPL subcontractor and has no path to becoming one.

13.  When the news broke that a single fiscal intermediary would be taking over the entire industry, I was caught off guard. I could not believe that the State would actually go through with such a radical proposal. I came to this country with the dream of starting a business that helped people in my community. Now, the State has decided to steal that dream away from me without any compensation, leaving me without another way to support myself and my family. This business has been the sole source of income for my family since 2018, and I do not know how I am going to pay for basic day-to-day expenses going forward.

### Irreparable Harm to Care Connect

14.  The CDPAP Amendment will cause Care Connect to suffer ruinous, irreparable harm. Once the CDPAP Amendment transition is complete, all of Care Connect's existing contracts with MMCOs will be terminated and the full value of the contracts will be transferred to PPL as the Statewide Fiscal Intermediary.

15. Because Care Connect does not have non-CDPAP lines of business, it will be forced to close its doors once the transition to a Statewide Fiscal Intermediary is completed on April 1, 2025. The State has not offered any compensation or lifelines to our business.

16. The harm to Care Connect will start long before its contracts with MMCOs are formally nullified on April 1, 2025. As soon as the State begins to transition consumers to the Statewide Fiscal Intermediary, which I understand it will begin to do no later than early March 2025, Care Connect will begin to lose revenue. None of that lost revenue will ever be recoverable from the State. Care Connect is also unlikely to be able to recover the lost consumers once they move to a new fiscal intermediary. To prepare for this transition, moreover, the State has mandated that Care Connect bear the unrecoverable cost and burden of transferring its sensitive, proprietary business data—including information about the personal assistants with whom it works—for PPL's use. So we have to help the State put us out of business, and pay the bill for doing so.

17. If the CDPAP Amendment is permitted to go into effect on April 1, 2025, that will spell the end for Care Connect. If that happens, Care Connect will lose all of the investments it made in its business, including significant amounts of money to build the business from the ground up and approximately $100,000 that was used to customize its client-facing software to help make the CDPAP process as seamless as possible. Care Connect's investments in its business and consumers reflects its commitment to the mission of CDPAP and its reasonable expectation that it would be permitted to continue doing business and receiving revenue in New York State under the CDPAP program.

18. The transition also threatens Care Connect's consumers, many of whom depend on the personalized, one-on-one service that they have grown to expect from their local fiscal

intermediaries. In my professional experience, fiscal intermediaries routinely fill gaps in consumer need that the program may not have anticipated. In fact, I give out my personal phone number and tell consumers and personal assistants that they can call or text me with questions at any time—and they do. For example, when a consumer recently complained about needing eye surgery and having trouble finding a doctor who could perform the procedure, the Care Connect team stepped up to help them locate a doctor. Because fiscal intermediaries are the glue that helps hold this program together, I worry about what will happen to our consumers when an out-of-state entity with no experience serving New York takes over.

19. Once Care Connect shuts down and parts ways with its consumers, employees, and personal assistants, it will almost certainly not be able to reopen even if the CDPAP Amendment is later struck down. Its consumers, employees, and personal assistants will likely have already moved on and shifted their allegiances. It would need to renegotiate the business's MMCO contracts and, assuming they are even willing to work at or with the company again, it would need to rehire and retrain staff and convince personal assistants and consumers to come back to the company in large numbers—all within a very uncertain regulatory landscape. In other words, our contracts and business-critical relationships will be gone, and Care Connect would need to start over from scratch. Unfortunately, the company and its owners (my husband and I) won't have the financial means to complete these tasks and get the business up and running again at that point, even if employees, consumers, and personal assistants are willing to return. Thus, any closure will almost certainly be permanent.

Executed this 2nd day of January, 2025 at Brooklyn, New York.

Diana Yakhnis