USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _2/26/2025_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRINCIPLE HOMECARE, LLC, et al.,

                              Plaintiffs,

                    -against-

JAMES V. MCDONALD, in His Official Capacity as
Commissioner of the New York State Department of
Health,

                              Defendant.

24-CV-07071 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

     Plaintiffs Principle Homecare, LLC; Marton Care Inc.; Prompt Home Care LLC; and Care Connect CDPAP, Inc. (collectively, "Plaintiffs") are four small Fiscal Intermediaries ("FIs") that have brought this action against James McDonald, in his official capacity as Commissioner of the New York State Department of Health ("Defendant" or the "State"), challenging the constitutionality of a statutory amendment to New York State's Consumer Directed Personal Assistance Program ("CDPAP").

     CDPAP is a Medicaid program which allows patients who receive home care services to, in certain circumstances, hire family members or friends as their caregivers, with their wages fully paid by Medicaid. Under the program, patients directly employ their caregivers. FIs, such as Plaintiffs, are private entities authorized by the State to assist patients with a range of administrative, financial, and compliance services associated with employing their caregivers under CDPAP. Today, an estimated 280,000 Medicaid beneficiaries in New York receive CDPAP services, and approximately 600 Fiscal Intermediaries assist these consumers. The entire CDPAP program, and indeed the existence of FIs, is a State creation wholly funded by the government through Medicaid.

1

The contested amendment (the "CDPAP Amendment") is a law incorporated into New York's budget for Fiscal Year 2024-2025, effective as of April 20, 2024, that would replace existing FIs with a single Statewide FI (the "Statewide FI") by April 1, 2025.

Defendant has moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiffs are seeking a preliminary injunction enjoining the implementation and enforcement of the CDPAP Amendment, pending the resolution of this action.

The Court is sympathetic to the personal hardship worked on the Plaintiffs by the effects of the CDPAP Amendment.  Nonetheless, after careful consideration of the pleadings, briefs, and the oral arguments, and for the reasons stated herein, the Court has concluded that Plaintiffs have failed to state a claim under any of their constitutional theories.  Accordingly, Defendant's motion to dismiss is GRANTED and Plaintiffs' preliminary injunction motion is DENIED as moot.

## FACTUAL BACKGROUND[1]

### I.    PRE-AMENDMENT STATUTORY AND REGULATORY BACKGROUND

Medicaid is a federal program that subsidizes the provision of medical care to vulnerable populations.  Compl. ¶ 22.  Each state participating in Medicaid operates a state-specific Medicaid program for their citizens that is regulated, overseen, and partially funded by the federal government.  Compl. ¶¶ 22–23.

In 1995, New York established CDPAP, a Medicaid-funded program pursuant to which patients (referred to as "consumers" in the statute) directly hire their care providers (referred to as "personal assistants" in the statute) to provide home care services.  Compl. ¶¶ 21, 25.  The

---

[1] Unless otherwise indicated, the facts that follow are drawn from Plaintiffs' Complaint and are taken as true for purposes of deciding the motion to dismiss.

purpose of CDPAP is "to permit chronically ill and/or physically disabled individuals receiving

home care services . . . greater flexibility and freedom of choice in obtaining such services."

N.Y. Soc. Serv. Law § 365-f(1); Compl. ¶¶ 2, 26.  Under CDPAP, vulnerable individuals are

afforded the opportunity to receive necessary care, such as help with intimate daily activities like

toileting and bathing, in the comfort of their homes from people they already know and trust.

Compl. ¶¶ 27, 33.  In contrast to licensed home care agencies, under CDPAP, friends, non-

spousal family members, and trusted confidants are allowed to be caregivers.  Compl. ¶ 27.

Currently, there are an estimated 280,000 Medicaid beneficiaries in New York who receive

CDPAP services.  Compl. ¶ 31.

While CDPAP empowers consumers to manage their home care needs, consumers are

also responsible for managing the administrative, financial, and compliance tasks associated with

receiving home care under the program and thus having a household employee.  Compl. ¶ 36.

For example, the consumer is responsible for recruiting, hiring, and supervising his or her

personal assistant, as well as setting up and agreeing upon the terms of employment.  Compl.

¶¶ 32, 34.  CDPAP facilitates the compensation of personal assistants by providing consumers

individual budgets, funded by Medicaid, to hire and pay the assistant.  Compl. ¶¶ 2, 26–27.

To assist consumers in managing these responsibilities, the law establishing CDPAP

authorized Fiscal Intermediaries, such as Plaintiffs, who are defined as "entit[ies] that provide[]

fiscal intermediary services and ha[ve] contract[s] for providing such services with the

[D]epartment of [H]ealth and [are] selected through the procurement process described [in this

section]."  N.Y. Soc. Serv. Law § 365-f(4-a)(i); Compl. ¶ 37.  Fiscal intermediary services are

statutorily enumerated services "performed on behalf of the consumer," which involve the back-

end administration of employing personal assistants, including processing wages and benefits;

calculating taxes and wage withholding; ensuring compliance with worker's compensation, disability, and unemployment insurance requirements; and maintaining personnel records.  N.Y. Soc. Serv. Law. § 365-f(4-a)(a)(ii); Compl. ¶ 38.  In addition to these payroll-processing duties, FIs are also responsible for "establishing the amount of each [personal] assistant's wages," 18 N.Y.C.R.R. § 505.28(j)(1)(i); screening potential personal assistants before they provide care services to ensure they comply with certain state health requirements, N.Y. Soc. Serv. Law. § 365-f(4-a)(a)(ii)(E); and monitoring the consumer's ability to continue fulfilling his or her responsibilities under the program.  18 N.Y.C.R.R. § 505.28(j)(1)(v); Compl. ¶ 46.

FIs are paid in one of two ways, depending on whether the consumer is enrolled in Medicaid Managed Care ("MMC") or Fee-For-Service ("FFS") Medicaid.  Under MMC Medicaid, FIs are paid by Medicaid managed care organizations ("MMCOs"), which are companies that contract with states to provide healthcare services to consumers.  Compl. ¶ 49. Under FFS Medicaid, FIs contract with local social services districts and are paid directly by the Department of Health ("DOH").  Compl. ¶¶ 51–52.  Under both MMC and FFS Medicaid, FIs are ultimately reimbursed for the direct costs of care and administrative costs by DOH with Medicaid funds at different rates set by DOH.  Compl. ¶¶ 49–51.  The contracts that each of the four Plaintiffs in this case have are all with private MMCOs.

The contracts FIs enter into with MMCOs and local social services districts are "generally based on the same standard or template and, as relevant here, contain the same material terms."  Compl. ¶ 52.  The contracts have one-year terms that automatically renew absent termination, which has the practical effect of keeping the contracts in effect for extended periods of time.  Compl. ¶ 53; *see generally* Preis MTD Decl. Exs. 2–5.  The contracts are terminable by either party without cause upon a certain notice period, and terminate

automatically if either party is "excluded, suspended, or barred from participating in any government health care program."  Compl. ¶¶ 53–54; *see generally* Preis MTD Decl. Exs. 2–5. DOH is also statutorily permitted to terminate FI contracts or suspend or limit an FI's rights and privileges under the contract, if an FI "failed to comply with the provisions of [the CDPAP statute] or regulations."  Compl. ¶ 54; *see also* N.Y. Soc. Serv. Law § 365-f(4-b)(a).

## II.    THE CDPAP AMENDMENT

On April 20, 2024, the Governor approved the New York State Budget for FY 2024–25, which included the CDPAP Amendment.  Compl. ¶ 59.  The CDPAP Amendment changed the definition of "Fiscal intermediary" to "Statewide fiscal intermediary," N.Y. Soc. Serv. Law § 365-f(4-a)(i), and added a new provision, N.Y. Soc. Serv. Law § 365-f(4-a-1)(a), pursuant to which, as of April 1, 2025, "no entity shall provide, directly or through contract, fiscal intermediary services" as part of the program, "[e]xcept for the [Statewide FI] and its subcontractors."  Compl. ¶ 61.  Essentially, the CDPAP Amendment provides for the creation of a single Statewide FI to administer FI services for all consumers in CDPAP, thereby replacing all other FIs currently operating in the state.

The procurement process for appointing the Statewide FI involved soliciting bids from entities which, in order to be eligible, must "at a minimum . . . [be] capable of performing statewide fiscal intermediary services with demonstrated cultural and language competencies specific to the population of consumers and those of the available workforce, ha[ve] experience serving individuals with disabilities, and as of April [1, 2024] [are] providing services as a fiscal intermediary on a statewide basis with at least one other state."  N.Y. Soc. Serv. Law § 365-f(4-a)(b)(i)(B).  The CDPAP Amendment requires that the entity ultimately appointed as the Statewide FI not only meet the aforementioned criteria, but also "offer[] the best value for providing the services required pursuant to this section and the needs of consumers."  N.Y. Soc.

Serv. Law § 365-f(4-a)(b)(iii).  None of the Plaintiffs satisfied all of these criteria and thus were not eligible to apply to be the Statewide FI.

The Statewide FI is required to subcontract with at least four other pre-existing FIs that meet specified criteria to administer FI services.  N.Y. Soc. Serv. Law § 365-f(4-a)(a)(ii-b) ("The [Statewide FI] shall further subcontract to facilitate the delivery of [FI] services with at least one entity per rate-setting region that has a proven record of delivering services to individuals with disabilities and the senior population, and has been providing [FI] services since January [1, 2012]; provided that such subcontractor shall be required to provide any delegated fiscal intermediary services with cultural and linguistic competency specific to the population of consumers and those of the available workforce, and shall comply with the requirements for registration as a fiscal intermediary set forth in . . . this section.").  At oral argument, the State represented that the Statewide FI is also allowed to contract with additional subcontractors, which need not meet the specified criteria for the aforementioned four FIs.  Tr. 14–15.[2]  Any FI that does not receive a subcontract must cease operations on or before April 1, 2025, and must provide at least 45 days' advance notice to the affected consumers.  *See* N.Y. Soc. Serv. Law § 365-f(4-d).  None of the Plaintiffs were selected as subcontractors by the Statewide FI.

On June 17, 2024, DOH issued Request for Proposals #20524 (the "RFP") to start the procurement process to select the Statewide FI.  Compl. ¶ 90.  On August 7, 2024, DOH issued an amended RFP.  Compl. ¶ 91.  On September 30, 2024, DOH announced that it had selected Public Partnerships LLC to be the Statewide FI.  *See* N.Y. GOVERNOR'S OFF., *Governor Hochul Announces Next Steps in Plans to Strengthen Home Care Services for New Yorkers* (Sept. 30,

---

[2] Citations to the transcript of the February 20, 2025 oral argument shall take the form of "Tr. at [pincite]."

2024), https://www.governor.ny.gov/news/governor-hochul-announces-next-steps-plans-strengthen-home-care-services-new-yorkers.

III.    THE PLAINTIFFS

Plaintiffs are four small FI businesses who have provided FI services in New York State. Compl. ¶ 12. All the Plaintiffs have "longstanding" existing contracts with private MMCOs that, absent the CDPAP Amendment, would have remained in effect beyond April 1, 2025. Compl. ¶¶ 111 (identifying a contract between Principle Homecare and Elderplan Inc. that has been in effect since 2017); 121 (identifying a contract between Marton Care and Centers Plan for Healthy Living, LLC that has been in effect since 2017); 131 (identifying a contract between Prompt Home Care and contract with Centers Plan for Healthy Living, LLC that has been in effect since approximately late 2017); 142 (identifying a contract between Care Connect and Centers Plan for Healthy Living, LLC that has been in effect since 2018). Additionally, none of the Plaintiffs have any non-CDPAP operations, or any operations outside of New York State. Compl. ¶¶ 65, 114, 124, 135, 145.

Founded in 2015, Principle Homecare, LLC ("Principle Homecare") is a minority-owned business that serves over 200 CDPAP consumers—who speak a variety of non-English languages, including Chinese, Haitian-Creole, Korean, and Spanish—throughout New York City and the surrounding counties. Compl. ¶¶ 15, 105–06. Principle Homecare monitors and prevents potential fraud by undertaking several measures, including conducting home visits, conducting daily rollcalls to ensure the consumer and personal assistant are in the same location, clocking personal assistants in and out, and reporting instances of noncompliance. Compl. ¶ 110. Under the expectation that it would continue to perform FI services "for many years to come," Principle Homecare has "spent significant sums" building and investing in its business,

including investing tens of thousands of dollars in software and technology to service its consumers.  Compl. ¶¶ 109, 112.

Founded in 2017 by a former CDPAP personal assistant, Marton Care Inc. ("Marton Care") serves approximately 120 CDPAP consumers in all five boroughs of New York City and the surrounding counties, as well as Albany, Broome, Cattaraugus, Erie, Lewis, Monroe, Niagara, Oneida, Schoharie, and Washington Counties.  Compl. ¶¶ 14, 115–17.  Marton Care monitors the locations from which personal assistants clock in and out and has immediately reported instances of potential fraud.  Compl. ¶ 120.  Under the expectation that it would continue to perform FI services "for many years to come," Marton Care has spent "significant sums" building and investing in its business, including investing tens of thousands of dollars to open a new office in Amherst, New York.  Compl. ¶¶ 119, 122.

Formed in 2017, Prompt Home Care LLC ("Prompt Home Care") serves over 700 CDPAP consumers across New York City and the surrounding counties, with a focus on the Dominican community in the Bronx.  Compl. ¶¶ 15, 125–27.  Nearly all of Prompt Home Care's employees speak Spanish, and virtually all of them are from the Dominican community.  Compl. ¶ 127.  Prompt Home Care has a full-time employee dedicated to guarding against potential fraud by verifying clock-ins, reviewing and cross-checking time sheets, and raising any discrepancies to compliance.  Compl. ¶ 130.  Under the expectation that it would continue to perform FI services "for many years to come," Prompt Home Care has spent "significant sums" building and investing in its business, including investing hundreds of thousands of dollars to open a second storefront location in the Bronx.  Compl. ¶¶ 129, 132.

Care Connect CDPAP, Inc. ("Care Connect") was founded in 2016 by two Ukrainian immigrants and serves approximately 500 consumers across all five boroughs of New York City,

the surrounding counties, as well as Albany, Erie, and Niagara Counties. Compl. ¶¶ 16, 136–38. Care Connect has competencies in a variety of languages, including Albanian, Chinese, Hindu, Punjabi, Russian, Spanish, and Ukrainian. Compl. ¶ 138. Care Connect monitors potential fraud by monitoring clock-ins and clock-outs, and one of its owners verifies timesheets. Compl. ¶ 141. Under the expectation that it would continue to perform FI services "for many years to come," Care Connect has spent "significant sums" building and investing in its business, including investing approximately $100,000 to customize its client-facing software. Compl. ¶¶ 140, 143.

## PROCEDURAL HISTORY

On September 18, 2024, Plaintiffs filed their Complaint. Dkt. No. 1 ("Compl."). In the Complaint, Plaintiffs assert that the CDPAP Amendment (1) violates the Contracts Clause, Compl. ¶¶ 146–61; (2) violates the Takings Clause, Compl. ¶¶ 162–81; (3) violates the Equal Protection Clause, Compl. ¶¶ 182–92; and (4) violates rights protected by substantive due process under the Fourteenth Amendment, Compl. ¶¶ 193–203. Plaintiffs' challenges to the CDPAP Amendment are both facial and as applied.

On November 1, 2024, the State moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 17.[3] On January 3, 2025, Plaintiffs moved for a preliminary injunction. Dkt. No. 32.[4] On February 13, 2025,

---

[3] Defendant's opening brief is Dkt. No. 18 ("MTD Br."). In support of its motion to dismiss, Defendant submitted a declaration from Jessica Preis ("Preis MTD Decl."). The Court will refer to exhibits as they are referenced in the Preis Declaration, *e.g.*, "Ex. 1." Plaintiffs' opposition brief is Dkt. No. 26 ("MTD Opp."), and Defendant's reply brief is Dkt. No. 31 ("MTD Reply").

[4] Plaintiffs' opening brief is Dkt. No. 33 ("PI Br."). In support of their motion for a preliminary injunction, Plaintiffs submitted declarations from Akiva Shapiro ("Shapiro Decl."), Sasha Guillaume ("Guillaume Decl."), Gershon Marton ("Marton Decl."), Eli Rosenthal ("Rosenthal Decl."), and Diana Yakhnis ("Yakhnis Decl."). Defendant's opposition is Dkt. No. 40 ("PI Opp."). In support of its opposition brief, Defendant submitted a declaration from Jessica Preis ("Preis PI Decl."). Plaintiffs' reply brief is Dkt. No. 42 ("PI Reply"). In further support of its motion, Plaintiffs submitted a supplemental declaration from Akiva Shapiro ("Shapiro Supp. Decl.").

Defendant filed a notice of supplemental authority, attaching a recent state court decision denying the petitioner's application for a preliminary injunction which sought to enjoin DOH and Commissioner McDonald from implementing the CDPAP Amendment, in further support of its motion to dismiss and its opposition to Plaintiffs' motion for a preliminary injunction.  Dkt. No. 48 (*Save Our Consumer Directed Home Care, Inc. v. N.Y. Dep't of Health*, Index No. 907872/2024, NYSCEF Doc. No. 67 (Sup. Ct. Albany Cnty. Feb. 7, 2025)).  On February 18, 2025, Plaintiffs filed a letter-response regarding the persuasive weight of the *Save Our Consumer* decision.  Dkt. No. 49.

On February 20, 2025, the Court held oral argument on both motions.

## MOTION TO DISMISS

### I.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts are not required to accept as true legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions [ ] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.*  The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the plaintiff.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents properly considered "integral" to or incorporated by the complaint, *i.e.*, documents as to which the complaint "relies heavily upon [their] terms and effect." *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

## II.    DISCUSSION

### A.    Contracts Clause

The Contracts Clause states: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.  While the language of the Contracts Clause appears absolute, the constitutional protections of the Contracts Clause are balanced against the State's police powers: "[The Contracts Clause] does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected.  This power . . . is paramount to any rights under the contracts between individuals."  *Manigault v. Springs*, 199 U.S. 473, 480 (1905); *see also Home Bldg. & Loan Ass'n v. Blaisdell (Blaisdell)*, 290 U.S. 398, 437 (1934); *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 992–93 (2d Cir. 1997).

In assessing the constitutionality of a state law under the Contracts Clause, courts assess whether the challenged state law (1) substantially impairs an existing contractual obligation; (2) advances a significant and legitimate public purpose; and (3) is drawn in an appropriate and reasonable manner.[5]  *See Melendez v. City of New York*, 16 F.4th 992, 1031 (2d Cir. 2021);

---

[5] As observed by the Second Circuit in *Melendez*, the Supreme Court has articulated this test as a three-step and a two-step test.  *See Melendez v. City of New York*, 16 F.4th 992, 1031 (2d Cir. 2021)

*Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 367 (2d Cir. 2006); *see also Donohue v. Cuomo*, 980 F.3d 53, 78 (2d Cir. 2020) ("Plaintiffs must establish: (1) the existence of the alleged contractual obligation; (2) the State's impairment of that obligation; (3) the substantiality of that impairment; and (4) that the impairment was not a reasonable and necessary means of effectuating a legitimate public purpose.").  In other words, in order to state a Contracts Clause claim, Plaintiffs must plausibly allege that the CDPAP Amendment substantially impairs their existing contractual obligations, and that the CDPAP Amendment was not a reasonable and appropriate means of advancing a legitimate public purpose.  With respect to their facial challenge, Plaintiffs must also plausibly allege that the CDPAP Amendment is unconstitutional in all applications.

For the reasons stated herein, even when viewing the factual allegations and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs fail to state facial and as-applied Contracts Clause claims.

### 1.      There is No "Impairment" Within the Meaning of the Contracts Clause

The primary purpose of the Contracts Clause was to protect bargained-for economic agreements of private parties against state interference that undermined those rights and responsibilities, particularly where that interference privileges one party over the other or unilaterally releases one party from its obligations without the compensation that contractual rights would otherwise provide.  The inclusion of the Contracts Clause in the Constitution "was prompted, in large part, by a post-Revolutionary War economic crisis," in which states sought to

---

(comparing *Energy Rsrvs. Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983) (identifying a three-step test) with *Sveen v. Melin*, 584 U.S. 811 (2018) (identifying a two-step test)).  Whether the test is three or two steps is of no import as "[t]he substance of the inquiry has remained the same."  *Melendez*, 16 F.4th at 1031.

cancel pre-existing debt obligations to assist "beleaguered small debtors . . . thereby bringing credit markets to the brink of collapse." *Melendez*, 16 F.4th at 1017.  In the view of Chief Justice Marshall, the Clause "established a great principle, that contracts should be inviolable." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 206 (1819); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) ("The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts.  Contracts enable individuals to order their personal and business affairs according to their particular needs and interests.  Once arranged, those rights and obligations are binding under law, and the parties are entitled to rely on them.").

Here, Plaintiffs cannot identify a single provision, right, or obligation under their contracts with MMCOs that has been altered or extinguished by the CDPAP Amendment. Indeed, the MMCO contracts contain an express term that they will terminate if either party is "excluded, suspended, or barred" from participation in the Medicaid program or from receiving Medicaid funds.[6]  This is hardly surprising, as the entire existence of the FIs is a creation of New York's Medicaid-funded CDPAP program, and the entire economic relationship between FIs and MMCOs, and FIs and consumers, depends upon the flow of Medicaid reimbursement dollars from the State.

Plaintiffs have tried to argue that this express contractual term only applies to bars, exclusions, or suspensions that derive from misconduct, MTD Opp. at 6, but cannot point to any language in the contracts that limits the term's effects to misconduct or wrongdoing.  And even if

---

[6] In addition, the State points to the contractual provisions that require compliance with state law and regulations, and therefore contemplate compliance with any changes in state law and the Medicaid program, including those that curtail FIs' participation in CDPAP.  The Court need not address these provisions in any depth because of the clarity of the contractual provision discussed above.

a reasonable interpretation of "barred" or "suspended" in these circumstances *could* suggest a limitation to misconduct (and at the pleading stage the Court should accept a reasonable reading that favors the Plaintiffs), the plain meaning of the contractual term taken as a whole ("excluded, suspended, or barred") simply does not support a reading that limits its application to findings of misconduct. Plaintiffs' subjective belief that only misconduct was likely to trigger the application of that term cannot be given any weight where the contractual language is not ambiguous. *See, e.g., Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1164–66 (2d Cir. 2024) (under New York law, "[t]he court is to determine an unambiguous contract's meaning without considering 'extrinsic evidence of the parties' intent, such as their course of dealing" (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 207 (2d Cir. 2005)). Nor would Plaintiffs' suggested limitation make any sense in light of the contracts' purpose to facilitate the provision and reimbursement of FI services. As noted above, the contractual relationship between FIs and MMCOs or CDPAP consumers has no meaning or existence in the absence of Medicaid funds. It makes perfect sense that if either party was deemed ineligible to receive Medicaid funds, for any reason at all, the counterparty would have no right to enforce performance of actions for which no payment would be forthcoming. Plaintiffs thus bargained for and expressly agreed to the termination of their contracts if they, or their counterparties, could no longer participate in the Medicaid program and receive Medicaid funds.[7]

---

[7] The contracts at issue are largely form or template contracts supplied by the State available on the DOH's website. *See* Administrative Agreement for the Provision of Fiscal Intermediary Services for the Consumer Directed Personal Assistance Program, *available at* https://www.health.ny.gov/health_care/medicaid/redesign/docs/cdpas_fi_plan_final_model_agreement.pdf. However, the fact that Plaintiffs did not bargain over specific terms does not change the Contracts Clause analysis. If anything, it highlights that the contracts were intended to be closely tied to, and serve the purpose of, the CDPAP regulations, rather than any private economic bargain that existed outside of a State-created and State-funded program.

14

In other words, it is the operation of the contracts themselves, on their express terms, that has brought about the circumstance Plaintiffs complain of—the impending end of their contractual relationships with MMCOs and consumers. Plaintiffs' failure to identify any contractual provision that is altered or nullified by the CDPAP Amendment is fatal to their Contract Clause claim. *Cf. Melendez*, 16 F.4th at 1034 (City law cancelled personal guaranty provisions of commercial leases, leaving landlords without the benefit of the bargain that had induced the lease agreement and the amount of rent charged); *DoorDash*, 692 F. Supp. 3d at 290(City law capped fees that restaurants paid for delivery services, even where existing contracts contained higher fees); *Allied Structural Steel*, 438 U.S. at 246 (state law imposed retroactive immediate pension funding charges, modifying vesting requirements). Plaintiffs attempt to argue that the CDPAP Amendment also violates the Contract Clause because it eliminates their contractual relationships with MMCOs or renders those business relationships valueless. But not every statute or state action "which affects the value of a contract impair[s] its obligation." *Curtis v. Whitney*, 80 U.S. (13 Wall.) 68, 70 (1871); *see also Donohue*, 980 F.3d at 80–81. Here, Plaintiffs' real complaint is that the State triggered an existing contract provision, by changing the FI program and, as a result, excluding them from receiving Medicaid funds effective April 1, 2025. Plaintiffs may seek to advance other arguments about the propriety of their exclusion from the FI program, *see infra* Sections II(B)–(D), but that exclusion cannot support a Contracts Clause claim because no contractual provision or right has been "impaired," any more than a restaurant that has lost its liquor license could bring a Contracts Clause claim based on their inability to continue doing business with their liquor wholesalers.

##### 2.     Even if There is "Substantial Impairment," the Legislation is Reasonable and Appropriate to Serve a Significant and Legitimate Government Purpose

Even if Plaintiffs had plausibly alleged that the CDPAP Amendment is a "substantial impairment" to their contracts, the Court finds that the CDPAP Amendment is a reasonable and appropriate means to carry out a significant and legitimate government purpose, even considering the standards to be applied at the pleading stage.[8]

---

[8] Although the Court has already found that Plaintiffs have not plausibly alleged "impairment" within the meaning of the Contracts Clause, for purposes of analyzing the second and third steps the Court assumes *arguendo* that if there were "impairment" it would be "substantial" under the caselaw.

The Second Circuit treats the aggrieved party's reasonable expectations as the touchstone of the analysis: "Impairment is greatest where the challenged government legislation was wholly unexpected." *Sanitation*, 107 F.3d at 993. One of the expectations factors courts consider is whether the aggrieved party operates in a "heavily regulated industry." *Sullivan v. Nassau Cnty. Interim Finance Auth.*, 959 F.3d 54, 64 (2d Cir. 2020). For those who contract and do business in heavily regulated industries, "the expected costs of foreseeable future regulation are already presumed to be priced into the contracts formed under the prior regulation." *All. of Auto. Mfrs., Inc. v. Currey*, 984 F. Supp. 2d 32, 55 (D. Conn. 2013); *see also Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 169 (S.D.N.Y. 2020). The State argues here that, given the heavily regulated nature of Medicaid and government healthcare programs generally, Plaintiffs could not reasonably expect that their contracts would renew indefinitely or that future regulatory changes to CDPAP would not bar or exclude them from the program. This regulatory history includes specific events that have limited FIs' participation in CDPAP, including a January 2018 amendment, which required FIs to apply for permission to continue operating within CDPAP, and several amendments from 2020 to 2022 impacting the eligibility of FIs to contract or register with DOH.

In contrast, Plaintiffs argue that their contracted-for expectations were that their business relationships with MMCOs would persist until the parties decided otherwise or a specified termination condition occurred. Plaintiffs further argue that the prior regulations cited by the State are inapposite because (1) these regulations were not in effect at the time that they entered their contracts, and (2) these regulations do not have clear continuity with the CDPAP Amendment. At oral argument, Plaintiffs focused primarily on the 2020 amendment as the only amendment with any "colorable" relationship with the CDPAP Amendment. Tr. 28–29. Under the 2020 amendment, the State established a procurement process whereby an entity could only operate as an FI if it was awarded a contract with DOH. Following the bidding process, only 68 entities were selected in February 2021. *See* MTD Br. at 15 n.8. Indeed, two of these very Plaintiffs were *not* selected in this process and, at least for a time, would not have been eligible to serve as FIs and receive Medicaid funds. MTD Reply at 9.

The proper inquiry is thus whether, given the nature and extent of the regulatory scheme of CDPAP, any given Plaintiff was effectively on notice of the possibility of state action that would render them ineligible to serve as an FI and receive Medicaid funding, as the CDPAP Amendment did, such that the CDPAP Amendment is "presumed to be priced into the contracts formed under the prior regulation." *See All. of Auto. Mfrs., Inc.*, 984 F. Supp. 2d at 55. Again, at this stage, all reasonable inferences regarding Plaintiffs' expectations under their contracts must be drawn in favor of Plaintiffs. Although the

As a threshold matter, the Court must resolve the level of deference it should accord to the State's judgments underlying the enactment of the CDPAP Amendment. The level of deference accorded to legislative judgments regarding the need for and the reasonableness of social and economic legislation varies depending on the nature of the impaired contracts. *See Melendez*, 16 F.4th at 1027. Public contracts, where there is a risk of a state using its police power to engage in self-dealing or unfairly advantage itself as a market participant, must receive a higher level of scrutiny as to the claimed government purpose and the reasonableness of the means employed. *See, e.g., U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 25–26 (1977) ("complete deference to a legislative assessment of reasonableness and necessity [was] not appropriate because the State's self interest [was] at stake."); *Buffalo Tchrs. Fed'n*, 464 F.3d at 369 ("public contracts are examined through a more discerning lens"); *Ass'n of Surrogates and Sup. Ct. Reporters v. New York Surrogates*, 940 F.2d 766, 773 (2d Cir. 1991) (lag payroll scheme for judicial employees "smacks of the political expediency that *U.S. Trust Co.* warned of").

However, despite the reference to some public contracts within the FI scheme, *see* Compl. ¶ 149, Plaintiffs here concede that all of their contracts are private contracts with MMCOs, and acknowledged at oral argument that they were aware of the distinction in the standard of review between public and private contracts and were not asserting that the higher standard applied in this case. *See* Tr. 60–61 ("[W]e didn't take the position that these are public

---

Court views the Plaintiffs' expectations argument as quite thin, especially given the undisputed fact that two of the four Plaintiffs have already experienced exclusion from the FI program due to a prior regulatory change and the CDPAP Amendment incorporate a nearly year-long notice during which period all of the Plaintiffs' contracts were up for renewal, *see* Tr. 11–12, 54; *Sanitation,* 107 F.3d at 993, under the lenient standard at the pleadings stage the State has not established that Plaintiffs' alleged expectations are unreasonable as a matter of law.

contracts.").  When the challenged law only impairs private contracts, courts "must accord substantial deference to the [State's] conclusion that its approach reasonably promotes the public purposes for which [it] was enacted." *Sal Tinnerello & Sons, Inc. v. Town of Stonington*, 141 F.3d 46, 54 (2d Cir. 1998) (citing *Energy Rsrvs. Grp., Inc.*, 459 U.S. at 412–13 (1983)).  The Constitution affords states a wide berth to infringe upon private contractual rights when they do so in the public interest, as a legitimate exercise of their traditional police powers, rather than self-interest. *See U.S. Trust Co.*, 431 U.S. at 16.  Accordingly, even though the Court must view the factual allegations and draw inferences in the light most favorable to Plaintiffs at this stage of the litigation, the Court must also substantially defer to the State's conclusion that the CDPAP Amendment reasonably promotes the public purposes for which it was enacted.  As explained further below, in addition to their failure to demonstrate impairment, Plaintiffs have not plausibly surmounted either the second or third step of the Contracts Clause analysis.

### i.    Significant and Legitimate Government Purpose

A legitimate public purpose is one "aimed at remedying an important general social or economic problem rather than providing a benefit to special interests." *Sanitation*, 107 F.3d at 993.  "[T]he purpose may not be simply the financial benefit of the sovereign." *Buffalo Tchrs. Fed'n*, 464 F.3d at 368.  However, "courts have often held that the legislative interest in addressing a fiscal emergency is a legitimate public interest." *Id.* at 369; *see, e.g.*, *Blaisdell*, 290 U.S. at 444–48 (involving Depression era exigencies); *In re Subway-Surface Supervisors Ass'n v. New York City Transit Auth.*, 44 N.Y.2d 101, 112–14 (1978) (involving a fiscal emergency in New York City).  And courts have frequently held that a state's interest in regulating payments, rates, and costs under Medicaid is a legitimate exercise of the state's traditional police power to provide for the health and welfare of its citizens, and is designed to benefit taxpayers and the public fisc as a whole, rather than the state as a market participant or economic actor. *See, e.g.,*

*Medical Soc. of State of New York v. Cuomo*, 976 F.2d 812, 816 (2d Cir. 1992) (in the context of preemption, "[t]he regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state."); *Home for Aged of Little Sisters of the Poor v. McDonald*, 711 F. Supp. 3d 81, 106 (N.D.N.Y. 2024) (in the context of a Takings claim, "[t]he historic police powers of the State include the regulation of matters of health and safety" (citing *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 506 n.8 (2d Cir. 2014)).

Here, the State's proffered purpose behind the CDPAP Amendment is to reduce waste, fraud, and abuse in the program. *See* Compl. ¶¶ 66, 68–69. In its opening brief, the State primarily argues that "the purpose of the amendment was to save on administrative costs and improve efficiency," by addressing the overhead costs of 600 providers versus 1 provider and a small number of subcontractors and easing the oversight burden on DOH to supervise FIs. MTD Br. at 18. Plaintiffs contend this is a pivot by the State, *post hoc*, arguing that the State did not conduct any economic impact study prior to passing the CDPAP Amendment through the legislative budget process.[9] MTD Opp. at 16.

Before analyzing the significance and legitimacy of the State purpose, the Court must resolve whether the State's FY 2025 Enacted Budget Financial Plan (the "FY 2025 Budget Plan"), drafted by the State's Division of the Budget ("DOB") and issued on behalf of the Governor, as well as any public statements by the legislature or the Governor, may be considered in resolving the motion to dismiss. *See* Preis MTD Decl. Ex. 6; *see also* N.Y. DIV. OF BUDGET, FY2025 ENACTED BUDGET FINANCIAL PLAN at 1 (2024), *available at* https://publications.budget

---

[9] The Court construes anticipated savings on administrative costs as falling under the State's previously announced purpose to reduce "waste," but, even if the State had offered different justifications for the CDPAP Amendment, the statute must be upheld so long as the State has proffered a valid "significant and legitimate" public purpose. *See, e.g.*, *Preseault v. I.C.C.*, 494 U.S. 1, 18 (1990) (in the context of a due process claim, "[t]here is no requirement that a law serve more than one legitimate purpose.").

19

.ny.gov/pubs/archive/fy25/en/fy25fp-en.pdf (last visited Feb. 24, 2025) ("Introduction:  The Financial Plan for Fiscal Year (FY) 2025 . . . summarizes the State of New York . . . official projections for FY 2025 through FY 2028 based on the FY 2025 Enacted Budget.").  Plaintiffs argue that the FY 2025 Budget Plan is not properly before the Court but, to the extent the Court takes judicial notice of it, the Court may not rely on it for the truth of the matters asserted therein.  MTD Opp. at 18 (citing *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020)).  The State does not address this in its reply.  *See* MTD Reply at 7–8.  At oral argument, the State asserted the Court could take judicial notice of the FY 2025 Budget Plan, but it was of no moment that the Court could not rely on it for the truth of the matters asserted therein, given the level of deference owed to the judgment of the State, particularly as expressed through its public statements.  *See* Tr. 18.

In resolving a motion to dismiss, the Court may consider documents attached to the complaint, integral to it, or incorporated in it by reference; or materials in the public record that are subject to judicial notice.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2009); *see, e.g.*, *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 655 (S.D.N.Y. 2011) (referencing DOB's 2010-11 Enacted Budget Financial Plan).  Because the FY 2025 Budget Plan is a document in the public record, the Court takes judicial notice of it as the State's announced justification for the CDPAP Amendment's purpose, but does not rely on it for the truth of the underlying factual claims or assertions therein.  *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  The FY 2025 Budget Plan states that "Medicaid spending in the General Fund is projected to increase due to medical cost increases; enrollment remaining elevated above pre-COVID-19 pandemic levels; expansion of benefits; increases to reimbursement rates; and growing aging and high utilization populations. . . . [So,] [t]o control

rising Medicaid costs, the Enacted Budget includes . . . [s]avings actions total[ing] $768 million in FY 2025[,] and include[s] the transition to a single Statewide Fiscal Intermediary for the CDPAP.").  Preis MTD Decl. Ex. 6 at 23.  The FY 2025 Budget Plan further explains that the transition to a Statewide FI will allow the State "to more cost effectively administer the program," estimating that the State will save about $200 million in the 2025 fiscal year and $504 million in the 2026, 2027, and 2028 fiscal years.  *Id.* at 25, 113.

Although the statements in the FY 2025 Budget Plan regarding the transition to the Statewide FI do not alone dictate the Court's determination as to whether the CDPAP Amendment is reasonably drawn and necessary to advance a significant and legitimate government purpose, nonetheless the Court finds that there is a record basis for the State's plausible assertion that "[the] reduction in costs [effected by the transition to the Statewide FI] will help the long-term viability of CDPAP" and "will allow for greater fiscal accountability, while maintaining the eligibility and care provided to participating consumers."  *See* MTD Br. at 18.  Even when viewing the pleadings record in the light most favorable to Plaintiffs, Plaintiffs have not sufficiently undermined the legitimacy of the State's proffered purpose.

Absent any allegations that the State was acting in bad faith or duplicitously, Plaintiffs have not demonstrated that further development of the factual record is necessary with respect to this issue.  This case is not similar to *DoorDash*, on which Plaintiffs heavily rely in their opposition.  In *DoorDash*, Judge Woods reasoned that the plaintiffs had plausibly alleged that "the motivations of [the] [d]efendant were not in furtherance of a legitimate public purpose," specifically finding the legislative history revealed "a certain hostility" to the plaintiffs and "sympathy for small business owners" who were the plaintiffs' contract counterparties. *DoorDash, Inc. v. City of New York*, 692 F. Supp. 3d 268, 292 (S.D.N.Y. 2023).

21

In the Complaint, Plaintiffs allege the Governor has claimed that the CDPAP Amendment would "save us $500 million every single year, and allow us to start putting controls and guardrails in place for what has historically been a very under regulated program." Compl. ¶ 68. Additionally, during the legislative debate over the CDPAP Amendment, Assemblywoman Weinstein claimed that the CDPAP Amendment would reduce administrative costs associated with the program. Assembly Bill A08807, Chamber Tr. at 85 (N.Y. Apr. 19, 2024). However, Plaintiffs further allege that the Governor's remarks were part of "a full-throated campaign against Fiscal Intermediaries and the CDPAP program, lobbing a series of unsubstantiated claims of fraud, waste, and abuse in the process that appear designed to create and prop up an (unsubstantiated and counterfactual) justification for destroying the existing Fiscal Intermediary industry and replacing it with a State-created monopolist." Compl. ¶ 66. Plaintiffs primarily contest the fraud aspect of the State's proffered purpose—Plaintiffs allege that any claims of fraud within CDPAP are "unfounded," specifically alleging that the CDPAP Amendment "weakens fraud protections by excluding the selection of the Statewide [FI] from State Comptroller review and oversight" and that costs may increase in the transition to the Statewide FI. Compl. ¶¶ 67, 69, 71. Plaintiffs do not, however, explain how the lack of Comptroller involvement in the selection of the Statewide FI, as opposed to the role of the Comptroller in auditing performance under contracts once issued (which appears to be intact), has anything to do with fraud prevention in the operation of CDPAP. Plaintiffs also cite to a 2022 audit by the Office of Medicaid Inspector General which revealed a 99% accuracy in submitted claims as proving that the existing regulatory scheme already has sufficient protections against fraud. Compl. ¶ 70. Once again, Plaintiffs do not explain how a finding of accuracy in submitted

claims in any way undermines the State's proffered purpose of reducing overhead costs and improving DOH's ability to monitor the FI industry by reducing the number of providers.

To the extent Plaintiffs argue that the State's proffered purpose is pretextual, the argument is unsupported, particularly given that a number of Plaintiffs' arguments appear to have been raised on the legislative floor and rejected. *See* Compl. ¶¶ 72–76. At the pleadings stage, the burden is on Plaintiffs to allege sufficient facts to support a reasonable inference that the State did *not* enact the CDPAP Amendment for a significant and legitimate government purpose. Despite efforts to shift that burden to the State, Plaintiffs cannot legitimately claim that the pleadings and public record lacks any support for the State's proffered purpose. And Plaintiffs have not plausibly alleged that the State's asserted purpose for the CDPAP Amendment is illegitimate, insignificant, or otherwise pretextual.

Further, the CDPAP Amendment is not so irrational such that it offends the Constitution, even if, in Plaintiffs' view, it is ill-advised legislation or unwise policy. As Plaintiffs conceded at oral argument, it is not the role of this Court to act as a super-legislature to second-guess the policy judgments of the State. Tr. 38. The lack of fit between a challenged law and the State's purpose could support an argument that the legislation was motivated by an improper purpose. But here, Plaintiffs have offered nothing to support that the State was motivated by an improper purpose. Plaintiffs generally reference the fact that DOH has "virtually unfettered discretion" to appoint the Statewide FI, "for whatever irrational or politically motivated reason it sees fit to do so," and that there is "no conceivable basis for treating similarly situated business different based on [the] arbitrary characteristic [requiring out-of-state statewide experience]." *See* Compl. ¶¶ 85–86, 95. But, even viewing the pleadings record in the light most favorable to Plaintiffs, these generalized allegations are entirely speculative and reflect a policy disagreement with the

State's choices, rather than facts that evidence pretext, malfeasance, or other improper purpose. And while the State's alleged failure to conduct any economic impact studies or the like, Compl. ¶ 7, could tend to show that the CDPAP Amendment was not implemented for a proper public purpose, that alone is insufficient to support Plaintiffs' Contracts Clause claim.  In *DoorDash*, New York City's failure to engage in a meaningful study of the economic effect of the contested legislation "enhance[d]" the plausibility of the plaintiff's contention that the legislation was not implemented for a proper public purpose, but the pleadings record was replete with other indicators that the legislation was motivated by an improper purpose, in contrast with the record here.  *See* 692 F. Supp. 3d at 292–93 (the legislative history indicated hostility to the plaintiffs and sympathy for small business owners who would benefit; timing of statements also directly contradicted claim that legislation was designed to address effects of COVID pandemic).

Thus, the Court finds Plaintiffs have not plausibly alleged that the State was motivated by an improper purpose.  *See Ashcroft*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully" (quoting *Bell Atl. Corp.*, 550 U.S. at 556)).  To the contrary, the State has asserted a significant public purpose underlying the CDPAP Amendment that is legitimate based on permissible records at the pleadings stage.

### ii.    Reasonable and Appropriate Means

At the third and final step in the analysis, the Court must assess whether Plaintiffs have plausibly alleged that the CDPAP Amendment is not reasonably and appropriately drawn in relation to the State's significant and legitimate public purpose.[10]  As previously discussed, the

---

[10] The Second Circuit has, at times, described this third step as an inquiry into appropriateness and necessity.  *Compare Melendez*, 16 F.4th at 1038 (treating the inquiry as into the appropriateness of the contested law) *with Buffalo Tchrs. Fed'n*, 464 F.3d at 369 (treating the inquiry as into the necessity of

Court must substantially defer to the State's judgment regarding the reasonableness and necessity of the CDPAP Amendment.  *See Buffalo Tchrs. Fed'n*, 464 F.3d at 369 ("Unless the state itself is a party to the contract, courts usually defer to a legislature's determination as to whether a particular law was reasonable and necessary.").

Courts consider factors such as the "extent of impairment," the "record basis" that "link[s] purpose and means," and "tailoring" to determine whether the contested law is drawn in an appropriate and reasonable way to advance the State's purpose—the Court's analysis is not strictly formulaic, but is instead inherently fact-intensive and case-specific.  *See, e.g.*, *Melendez*, 16 F.4th at 1038–46.  In *Melendez*, based on the totality of five features of the contested law, the Second Circuit held that the plaintiffs had plausibly alleged that the law was not drawn in an appropriate and reasonable way.  *See id.*  The five factors were as follows: (1) the challenged law was not a "temporary" or "limited" impairment of contract; (2) the pleadings record did not dictate, as a matter of law, that the law was an appropriate means for achieving the City's purpose; (3) a discrete group of private persons bore the "allocation of [the law's] economic burden"; (4) the law's "relief [was] not conditioned on need," and (5) the law did not compensate the aggrieved parties "for damages or losses sustained as a result of their [contracts'] impairment."  *See id.*

While the *Melendez* factors do not squarely or neatly fit the facts of this case, guided by the principles behind the *Melendez* Court's searching inquiry, the Court finds Plaintiffs have not plausibly alleged that the CDPAP Amendment is unreasonable and inappropriate when considering the totality of and principles behind these factors.

---

the contested law).  Whether cast as an inquiry into appropriateness or necessity, the analysis required is a "careful examination."  *See Melendez*, 16 F.4th at 1029.

*First*, although the Court has already determined that the CDPAP Amendment is not an "impairment" of the Plaintiffs' contracts, if it does "impair" for purposes of this analysis, the effect is to "work[s] a severe, permanent, and immediate change" in Plaintiffs' business relationship to MMCOs as well as with the State, by excluding Plaintiffs from continuing to act as FIs. *See Allied Structural Steel*, 438 U.S. at 250; *Melendez*, 16 F.4th at 1038–39. Thus, assuming *arguendo* impairment, the first factor weighs in favor of Plaintiffs.

*Second*, the pleadings record is consistent with a view that the CDPAP Amendment is an appropriate way to reduce waste and administrative costs in the program.[11] *See* MTD Br. at 20; MTD Reply at 7–8. The State estimates significant cost savings, and points to the common-sense observation that over 600 individual businesses (each with their own bookkeeper, office manager, printer contract, etc.) are reasonably likely to, in combination, have higher overhead costs than a single business that can more easily economize on such expenses. *See* MTD Reply at 7 ("The transition [to the Statewide FI] will also reduce the high administrative costs associated with having so many FIs, which have made CDPAP 'prohibitively expensive'—a measure consistent with Medicaid's purpose of providing medical services to the needy." (citing *Corning Council*, Index No. 908147-24, NYSECF No. 59 at 8 (Sup. Ct. Albany Cnty. Sept. 30, 2024))).[12]

In response, Plaintiffs, again, argue that the State's sole basis for its argument is the FY 2025 Budget Plan, which the Court takes judicial notice of but does not rely on for the truth of

---

[11] In its opening brief, the State exclusively focuses its arguments on the reduction in administrative costs effected by the CDPAP Amendment and does not address how the CDPAP Amendment is designed to reduce abuse or fraud. *See* MTD Br. at 19–21.

[12] In *Corning Council*, the state court denied a motion for preliminary injunction, permanent injunction, and an order declaring that the CDPAP Amendment is unconstitutional, facially and as applied, under New York law.

the assertions therein.  MTD Opp. at 18.  Plaintiffs further argue that they have alleged in detail

how the CDPAP Amendment will, in fact, undermine the State's professed goals—Plaintiffs

allege that "eliminating open competition among Fiscal Intermediaries, adding additional layers

of bureaucracy, and arbitrarily limiting the role of [the] Statewide [FI] to a single monopolist

without prior experience with New York's CDPAP program, and without close connections to

the communities it will be serving, the CDPAP Amendment will, in the long-term, increase costs

and reduce efficiency, while also reducing the quality of care consumers receive."  MTD Opp. at

18; *see* Compl. ¶¶ 71, 82–83, 85–86, 154.  In making these arguments, Plaintiffs fail to wrestle

with the economic realities of CDPAP, in which there is only one payor (the State) and FIs do

not compete on costs.  *See* Compl. ¶¶ 49–51 (FIs are reimbursed by DOH at set rates for the

direct cost of care and administrative costs).  Thus the "monopolist" arguments are unavailing, as

are the similarly unsupported claims about the CDPAP Amendment increasing costs or reducing

efficiency.  In addition, there is no support for Plaintiffs' claim that the procurement process of

appointing the Statewide FI is patently arbitrary.  An entity's prior statewide experience is

logically and rationally related to that entity's ability to scale up statewide FI services in New

York.  Such statewide experience necessarily must be out-of-state, as New York has never had a

statewide FI provider.  Additionally, the competitive bidding and procurement process required

DOH to "optimize quality, cost, and efficiency among responsive and responsible bidders."  *See*

MTD Reply at 8 (citing the RFP ¶ 8.1).  In short, Plaintiffs' arguments amount to speculative

disputes with the policy judgment of the State, which does not support a conclusion that the

CDPAP Amendment is unconstitutionally drawn in an unreasonable and inappropriate manner.

Plaintiffs may well be correct that the State's plan will reduce personalization and

perhaps even quality of customer service for patients enrolled in the program.  *But see* N.Y. Soc.

Serv. Law § 365 f(4-a)(a)(ii-b) (The Statewide FI "must subcontract to facilitate the delivery of fiscal intermediary services with at least one entity per rate setting region with a proven record of delivering services to individuals with disabilities and the senior population."; subcontractors "must have been providing fiscal intermediary services since January 1, 2012, and must provide any delegated fiscal intermediary services with cultural and linguistic competency specific to the population of consumers and those of the available workforce.").  But FIs do not provide "care" to Medicaid patients in any reasonable sense of that term—within the design of CDPAP, they provide back-office administrative services that make it easier for consumers to have a household employee (regardless of the "extra" services that the Plaintiffs assert they provide).  It is a reasonable judgment of the State that some loss of personalized service or closeness to the community is a fair tradeoff to substantially reduce administrative costs (which savings can be redirected to patient care) and ease the supervisory burden on DOH employees.  Whether these predictions are in fact realized under the new statutory scheme is not a basis to second guess the State's policy judgment in enacting the CDPAP Amendment.

Accordingly, even viewing the pleadings record and drawing all reasonable inferences in favor of Plaintiffs, the Court finds that the second factor weighs in favor of the State.  Unlike the record in *Melendez* and *DoorDash*, Plaintiffs' allegations do not plausibly raise substantial questions regarding whether the CDPAP Amendment is an appropriate means to reduce costs and waste in the program.

*Third*, and finally, the Court finds that (1) the third and fourth *Melendez* factors are functionally inapplicable here, and therefore do not weigh in favor of either Plaintiffs or the State; and (2) although the fifth factor weighs in favor of Plaintiffs, that, in conjunction with the first factor, does not sufficiently undermine the reasonableness and appropriateness of the

CDPAP Amendment to achieve the goal of reducing the cost inefficiency and waste in the program. While Plaintiffs claim that the rising costs of CDPAP are not solely attributable to the number of FI operating in the program, Plaintiffs concede that the State is not required to prove that the CDPAP Amendment is the best possible option for addressing the high costs of administering the program or that the State explored every possible option for reducing costs. Tr. 65. The State has a sufficient logical basis for the CDPAP Amendment, specifically that high administrative costs are generated by the 600 FIs that exist under the current scheme, all of whom DOH must reimburse and oversee. *See* Compl. ¶¶ 48–51. The burden of any contractual impairment is tailored to the entities, Plaintiffs and other FIs, who are causing the public harm that the State is seeking to mitigate.[13] Indeed, as the State represented at oral argument, New York State is an outlier compared to other states, such as California, Massachusetts, and New Jersey, who operate programs similar to CDPAP and contract with one or two FI-type entities instead of overseeing hundreds. Tr. 5–6.

Accordingly, the Court finds that Plaintiffs have not plausibly pled their Contracts Clause claims, whether facially or as-applied, and the motion to dismiss those claims is granted.

---

[13] Courts have rejected Contracts Clause challenges, even where the contractual impairment at issue is permanent and the State does not provide compensation. *See, e.g.*, *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 504–06 (1987) (rejecting Contracts Clause challenge to a state law overriding damages waivers in mining contracts; although the contract impairment was substantial, it was justified by the state's strong public interest in both deterrence and restoration of the environment); *Sanitation*, 107 F.3d at 994 (pervasive influence of organized crime in commercial carting justified termination of pre-existing contracts). Plaintiffs' attempt to distinguish this case from *Keystone* is unavailing because, for the foregoing reasons, the pleadings record here does show a link between the CDPAP Amendment's purpose and means, which is tailored to the costliness of administering the program under the current regime.

### B. Takings Clause

The Takings Clause of the Fifth Amendment provides that no "private property shall be taken for public use, without just compensation."  U.S. Const. amend. V.  The Takings Clause is incorporated to the states through the Fourteenth Amendment.  *See Kelo v. New London*, 545 U.S. 469 (2005).

The law recognizes two kinds of takings: categorical takings and regulatory takings.  A classical categorical taking occurs when the government physically takes possession of an interest in property for some public purpose, thereby directly appropriating private property for its own use.  *Tahoe–Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 321 (2002).  A regulatory taking occurs when a government regulation "goes too far" and in essence "effects a taking."  *See Buffalo Tchrs. Fed'n*, 464 F.3d at 374 (citing *Meriden Trust & Safe Deposit Co.*, 62 F.3d at 454).

For any Takings Clause claim, the Court must determine whether Plaintiffs have plausibly alleged a protectable property interest.  The State argues that Plaintiffs have failed to allege a protected property interest "in future Medicaid payments or in continued participation as FIs in the Medicaid program," and cites a litany of cases in support.  MTD Br. at 21–22.  In response, Plaintiffs argue that the proper inquiry is, instead, whether property rights exist in their private contracts with MMCOs.  MTD Opp. at 21 (citing *Lynch v. United States*, 292 U.S. 571, 579 (1934) and a litany of cases for the principle that "[v]alid contracts are property").  Plaintiffs, again, cite *DoorDash* as a recent example of a Takings claim based on private contracts which survived a motion to dismiss.  692 F. Supp. 3d at 287.

However, as discussed *supra* Section II(A)(1), Plaintiffs and FIs' existence—indeed CDPAP itself—is entirely a State creation.  *See* N.Y. Soc. Serv. Law § 365-f.  As alleged in the Complaint, Plaintiffs (and all FIs) provide services which are statutorily enumerated, and they

are ultimately compensated for their services with Medicaid funds from DOH at rates set by

DOH.  *See* Compl. ¶¶ 37–39, 48–51.  Under FFS Medicaid, DOH directly reimburses FIs.  *See*

Compl. ¶ 51.  And under MMC Medicaid, DOH indirectly reimburses FIs by way of the

MMCOs with which Plaintiffs contract.  *See* Compl. ¶ 49.  Plaintiffs make much of the fact that

their contracts with MMCOs are private in nature, emphasizing that the MMCOs themselves are

private companies, but Plaintiffs do not, and indeed cannot, contest that they are compensated

entirely via Medicaid funds from the State and their businesses exist only because of a program

created by the State.  *See* Compl. ¶ 49.  So, too, these contracts with MMCOs depend, by their

express terms, on Plaintiffs' continued participation in Medicaid and authorization from the State

to receive Medicaid funds.

        As the State sets forth, it is well settled that there is no valid property interest in future

Medicaid payments or in continued participation as FIs in the Medicaid program.  *See, e.g.*,

*Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91–92 (2d Cir. 2015) (holding

plaintiff-agencies did not have a cognizable property right in future Medicaid reimbursements for

home care services to support a due process claim under the Fourteenth Amendment); *Kelly*

*Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 176 (2d Cir. 1991) (holding a provider of Medicaid-

sponsored home care services did not have a cognizable property right in its contract with a

social services district or the right to continued and uninterrupted participation in the Medicaid

program); *Grossman v. Axelrod*, 646 F.2d 768, 770–71 (2d Cir. 1981) (holding a nursing home

did not have a cognizable property right in prospective Medicaid reimbursements to support

alleged due process and Takings claims).

        Plaintiffs' assertion that courts have previously held that valid contracts are property

sidesteps the fatal fact that these contracts expressly incorporate the statutory scheme established

by CDPAP, a Medicaid program, which provides for Plaintiffs' existence as FIs and for

Plaintiffs' compensation by way of reimbursements using Medicaid funds. The fact that the

CDPAP Amendment will, by its terms, cause the termination of Plaintiffs' existing contracts

does not necessitate a finding that the CDPAP Amendment is an unconstitutional taking.

Plaintiffs entered into the contracts with knowledge that they were contingent on continued

participation in Medicaid, on behalf of both parties. As discussed further *supra* Section II(A)(1),

the essence of Plaintiffs' complaint is their objection to the termination of their status as

authorized FIs under Medicaid. The loss of that status is not an unconstitutional taking.

Accordingly, the Court finds that Plaintiffs have not plausibly pled their Takings claims

and the motion to dismiss those claims is granted.

### C. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment "embodies the general rule

that States must treat like cases alike, but may treat unlike cases accordingly." *Winston v. City of

Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)).

"If a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the

legislative classification so long as it bears a rational relation to some legitimate end." *Romer v.

Evans*, 517 U.S. 620, 631 (1996). For the reasons discussed, *supra* Sections II(A)(2)(ii) and

II(B), the Court finds that Plaintiffs have not plausibly pled their Equal Protection claims, as the

CDPAP Amendment easily passes rational-basis review.

In the Complaint, Plaintiffs allege that "out-of-state experience [is not] any more

probative than in-state experience in ensuring that a potential bidder is prepared to operate on the

scale required to perform statewide [FI] services in New York." Compl. ¶ 86. Plaintiffs argue

that New York's program, with an estimated 280,000 participants, is "more than ten times larger

than similar programs in other states." MTD Opp. at 27 (emphasis removed) (citing Compl. ¶¶

77, 86, 99.  The mere fact that CDPAP is larger than other states' similar programs does not render the prior-statewide-experience requirement wholly irrational.  As the State notes, the prior-statewide-experience requirement is rationally designed to ensure that the appointed Statewide FI has the requisite experience to operate a similar statewide program in New York, including experience working directly with state agencies and regulators.  And such experience must, necessarily, be out-of-state because New York has never had a statewide FI provider for CDPAP.  *See* Compl. ¶ 87.  Plaintiffs have not plausibly pled that the CDPAP Amendment's prior-statewide-experience requirement discriminates against FIs, such as themselves, who have only ever operated within New York, without any rational justification.

Accordingly, the Court finds that Plaintiffs have not plausibly pled their equal protection claims, and the motion to dismiss those claims is granted.

### D.  Substantive Due Process

 "The doctrine of substantive due process protects the individual against certain government actions regardless of the fairness of the procedures used to implement them." *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986) (internal marks omitted).  To establish a substantive due process violation, a plaintiff must show both (1) it has an interest protected by the Fourteenth Amendment; and (2) the contested legislation is not rationally related to a legitimate government interest.  *See Winston*, 887 F.3d at 566.  Where the plaintiffs contend that a state actor infringed on their property rights; to establish a substantive due process violation they must show (1) a valid property interest and (2) that Defendant "infringed on the property right in an arbitrary or irrational manner."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001).  The contested state action must be "arbitrary, conscience-shocking, or oppressive in the constitutional sense, not merely incorrect or ill-advised."  *Ferran v. Town of Nassau*, 471 F.3d 363, 370 (2d Cir. 2006) (internal references omitted); *see also Natale v. Town*

*of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.").

Another district court in this Circuit recently dismissed procedural due process claims asserted by FIs, who are not Plaintiffs in this action but who similarly sought declaratory and injunctive relief to prevent the implementation of the CDPAP Amendment. *See Jeannot v. New York State*, Case No. 24-cv-05896 (HG), 2025 WL 80689 (E.D.N.Y. Jan. 13, 2025). Although the analysis of a procedural due process claim is different than that of a substantive due process claim, both kinds of due process claims, as relevant here, require a deprivation of property. As Judge Gonzalez recognized in *Jeannot*, "a Medicaid provider has no property right to continued enrollment as a qualified provider." *Id.* at *14 (citing *Necula v. Conroy*, 13 F. App'x 24, 26 (2d Cir. 2001)). Judge Gonzalez reasoned that the FI plaintiffs, who "have an even more attenuated relationship to the Medicaid Act than providers of medical assistance," had failed to state a procedural due process claim because "if even entities that provide medical assistance under the Medicaid Act do not have such a property right, it is not apparent to the Court how FIs, which do not provide medical assistance, could possess such a right." *Id.* at *14–15.

So, too, here, the same reasoning applies in full force with respect to Plaintiffs' substantive due process claim. For all the reasons discussed at length above, Plaintiffs have not identified—and indeed cannot plausibly allege—a cognizable property interest in continuing to participate as FIs in CDPAP and receive Medicaid funds, whether expressed in their contracts with MMCOs or otherwise, and so they fail to state a substantive due process claim as a matter of law. The motion to dismiss the substantive due process claims is granted.

## PRELIMINARY INJUNCTION

Having dismissed the entirety of Plaintiffs' complaint for failure to state a claim, the

Court finds Plaintiffs' motion seeking a preliminary injunction must be denied as moot.  Indeed,

it is not possible for Plaintiffs to establish the likelihood of success on the merits necessary to

grant a preliminary injunction where the Court has granted Defendant's motion to dismiss.  *See*

*Jeannot*, 2025 WL 80689, at *15 (collecting cases).

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's motion to dismiss is

GRANTED and Plaintiffs' preliminary injunction motion is DENIED.

Dated:  February 26, 2025
        New York, New York

                                        SO ORDERED.

                                        _____
                                        MARGARET M. GARNETT
                                        United States District Judge